**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

|  |  |  |
|---|---|---|
| MERRILL STEINBERG, Individually and On Behalf of All Others Similarly Situated, | ) ) ) | **CIVIL ACTION NO. 07-CV-9615-RPP** |
| Plaintiff, | ) ) ) | "ECF CASE" |
| vs. | ) ) | |
| ERICSSON LM TELEPHONE CO., CARL-HENRIC SVANBERG and KARL-HENRIK SUNDSTROM, | ) ) ) ) | |
| Defendants. | ) ) ) | |

_____

|  |  |  |
|---|---|---|
| STATE-BOSTON RETIREMENT SYSTEM, Individually and On Behalf of All Others Similarly Situated, | ) ) ) ) | **CIVIL ACTION NO. 07-CV-10659-RPP** |
| Plaintiff, | ) ) ) | "ECF CASE" |
| vs. | ) ) | |
| ERICSSON LM TELEPHONE CO., CARL-HENRIK SVANBER and KARL-HENRIK SUNDSTROM, | ) ) ) ) | |
| Defendants. | ) ) | |

_____

**MEMORANDUM IN OPPOSITION TO THE MOTION OF THE INSTITUTIONAL
INVESTORS GROUP AND IN FURTHER SUPPORT OF
THE MOTION OF JACQUES FURHER TO BE APPOINTED LEAD PLAINTIFF
OF THE CLASS AND FOR APPROVAL OF HIS SELECTION OF LEAD COUNSEL**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................ 1

ARGUMENT ..................................................................................................... 3

POINT I
    AGGREGATION OF LEAD PLAINTIFF MOVANTS IS DISFAVORED IN THIS DISTRICT.............. 3

POINT II
    THE PROPER CLASS PERIOD FOR DETERMINING CLAIMED LOSSES
    IS THAT IN THE FIRST FILED COMPLAINT............................................................. 6

POINT III
    THE INSTITUTIONAL INVESTORS GROUP HAS NOT ESTABLISHED
    A PRIMA FACIE CASE THAT IT CAN ADEQUATELY REPRESENT THE CLASS ........................ 7

POINT IV
    MEMBERS OF THE INSTITUTIONAL INVESTORS GROUP SUFFER
    FROM INSURMOUNTABLE DEFICIENCIES THAT RENDER THEM INADEQUATE ...................... 9

    A.    Deka And Lothian Are Subject To Unique Defenses .................................... 9

    B.    Deka Filed A Deficient And Incomplete Certification ................................. 11

    C.    Fortis Is A Net Seller In The Proper Class Period ....................................... 14

    D.    Boston Has No Transactions In The Proper Class Period........................... 15

POINT V
    MR. FURHER MEETS THE PSLRA'S
    REQUIREMENTS FOR APPONTMENT AS LEAD PLAINTIFF .................................... 15

CONCLUSION ................................................................................................. 16

## TABLE OF AUTHORITIES

**Statutes and Rules**

Fed. R. Civ. P. 23..............................................................................................................*passim*


**Cases**

*A/S D/S Svendborg v. Wansa,*
    2 Lloyd's Rep. 183 (Court Appeals Civ. Div. 1997)................................................. 11

*Bhojwani v. Pistiolis,*
    06-cv-13761(CM)(KNF), (S.D.N.Y. July 31, 207).............................................. 4, 11

*Borochoff v. GlaxoSmithKline PLC,*
    246 F.R.D. 201 (S.D.N.Y. 2007)........................................................................ 10, 11

*Burke v. Ruttenberg,*
    102 F. Supp. 2d 1280 (D. Ala. 2000) ....................................................................... 12

*Capone v. MBIA, Inc.,*
    05 Civ. 3514 (LLS) (S.D.N.Y. July 25, 2005) .......................................................... 14

*Cromer Finance Ltd. v. Berger,*
    205 F.R.D. 113 (S.D. N.Y. 2001)............................................................................. 10

*Goldberger v. PXRE Group, Ltd.,*
    No. 06-CV-3410 (KMK), 2007 WL 980417 (S.D.N.Y. March 30, 2007).................................. 5

*Hively v. Northlake Foods, Inc.,*
    191 F.R.D. 661 (M.D. Fla. 2000) ............................................................................. 14

*In re AIG Advisor Group,*
    No. 06 CV 1625(JG), 2007 WL 1213395 (E.D.N.Y. April 25, 2007) ..................................... 15

*In re Baan Co. Sec. Litig.,*
    186 F.R.D. 214 (D.D.C. 1999) .................................................................................. 6

*In re Cavanaugh*, 306 F.3d 726 (9th Cir. 2002).  ......................................................... 7

*In re Cable & Wireless PLC Sec. Litig.*, 217 F.R.D. 373 (E.D Va. 2003) .............................. 7, 11

*In re Comdisco Sec. Litig.,*

150 F. Supp. 2d 943 (N.D. Ill. 2001) ................................................................... 14

*In re Crawford v. Onyx Software Corp.*,
Civ. No. C01-1346L, 2002 U.S. Dist. LEXIS 1101 (W.D. Wash. Jan. 10, 2002) ..................... 5

*In re Donnkenny Inc. Sec. Litig.*,
171 F.R.D. 156 (S.D.N.Y. 1997).................................................................................4, 8-9

*In re Eaton Vance Corp. Sec. Litig.*,
219 F.R.D. 38 (D. Mass. 2003) ........................................................................... 12

*In re Gibson Greetings Sec. Litig.*,
159 F.R.D. 499 (S.D. Ohio 1994)......................................................................... 14

*In re McKesson HBOC, Inc. Sec. Litig.*,
97 F. Supp. 2d 993 (N.D. Cal. 1999) ..................................................................... 16

*In re MicroStrategy Inc. Secs. Litig.*,
110 F. Supp. 2d 427 (E.D. Va. 2000) ............................................................... 8, 12

*In re Mills Corp.*,
No. Civ. A. 1:06-77, 2006 WL 2035391 (E.D. Va. May 30, 2006).......................................... 14

*In re Network Associates Inc. Sec. Lit.*,
76 F. Supp. 2d 1017 (N.D. Cal. 1999)................................................................... 7, 8

*In re Razorfish, Inc. Sec. Litig.*,
143 F. Supp. 2d 304 (S.D.N.Y. 2001) ..................................................................... 4

*In re Royal Ahold N.V. Sec. & ERISA Litig.*,
219 F.R.D. 343 (D. Md. 2003) ..................................................................... 9, 10, 11

*In re SafeGuard Scientifics*,
216 F.R.D. 577 (E.D. Pa. 2003) ..................................................................... 12, 14

*In re Star Gas Sec. Litig.*,
Civ. No. 04-1766 (JBA), 2005 WL 818617 (D. Conn. April 8, 2005)................................... 5, 6

*In re Tarragon Corp. Sec. Litig.*,
CA No. 07 CIV 7972(PKC), 2007 WL 4302732 (S.D.N.Y. Dec. 6, 2007) .............................. 4

*In re Veeco Instruments, Inc. Sec. Litig.*,
233 F.R.D. 330 (S.D.N.Y. 2005)......................................................................... 4

*In re Vivendi Universal S.A. Sec. Litig.*,
242 F.R.D. 76 (S.D.N.Y. 2007)..................................................................... 9, 10, 11

iii

*In re Warner Commun. Sec. Litig.*,
  618 F.Supp. 735 (S.D.N.Y. 1985) ........................................................................... 15

*In re Williams Sec. Litig.*,
  02-CV-72-H(M) (N.D. Okla. Jul. 8, 2002).............................................................. 12

*In re: E.Spire Communications, Inc., Sec. Litig.*,
  Civ. No. H-00-1140, 2000 U.S. Dist. LEXIS 19517 (D. Md. Aug. 15, 2000) ........................... 6

*Parnes, et al., v. Digital Lightwave, Inc.*,
  No. 99-11293 (11th Cir. Aug. 25, 1999) .................................................................... 8

*Piven v. Sykes Enterprises, Inc.*,
  137 F. Supp. 2d 1295 (M.D. Fla. 2000)...................................................................... 6

*Rozenboom v. Van Der Moolen Holdings, N.V.*,
  No. 03 Civ. 8284 (RWS), 2004 WL 816440 (S.D.N.Y. Apr. 14, 2004) ..................................... 4

## **INTRODUCTION**

Lead Plaintiff movant Jacques Furher respectfully submits this memorandum in opposition to the competing motion filed by the aggregated group of four unrelated entities who have self-styled themselves as the "Institutional Investor Group"[1] and in further support of his motion to be appointed lead plaintiff and for his counsel, Murray, Frank & Sailer LLP ("Murray Frank"), be appointed lead counsel.

Mr. Furher is a sophisticated investor who has previously been appointed lead plaintiff in an action pending in the Northern District of California. He is not an entity of unrelated plaintiffs randomly cobbled together simply to aggregate losses. In stark contrast, the Institutional Investors Group consists of four unrelated entities with no pre-litigation history whose only commonality is sharing the same counsel, Labaton Sucharow LLP – a group created for the sole purpose of being appointed lead plaintiff at the request of their law firm. Rather than being a cohesive group, the Institutional Investor Group actually has a history of being adversaries when moving for lead plaintiff. This attorney driven edifice has no meaningful relationship among its members and has failed to demonstrate that its members can cohesively, and efficiently, work together.

The Institutional Investors Group has failed to make a *prima facie* demonstration that it is an adequate group under the PSLRA. In order to substantialy inflate its losses, the Institutional Investor Group has improperly relied upon an artificially longer class period. While the first filed and first publicly noticed action, *Steinberg v. Ericsson LM Telephone Co.*, CA No. 1:07-cv-9615 (RPP), set forth a Class Period of September 11, 2007 through and including October 15,

---

[1] The Institutional Investor Group is comprised of (i) The City of Edinburgh Council on behalf of The Lothian Pension Fund ("Lothian"); (ii) Fortis Investment Management N.V./S.A. ("Fortis Investments"); (iii) Deka Investment GmbH ("Deka"); and (iv) State-Boston Retirement System ("Boston").

2007, the Institutional Investor Group has relied upon a longer class period of February 2, 2007 through November 20, 2007 set out in an action filed by one of its members, Boston, more than a month later. In fact, it is obvious that Boston's complaint was filed because it had no losses in the initial class period – it had no transactions – and thus no standing. Furthermore, Fortis, another group member, is inadequate to serve as lead plaintiff for the initial class period because it is a net seller of Ericsson securities during that class period and benefited from the fraud that is alleged in this action.

Lothian and Deka are the only Institutional Investor Group members with any claimed losses during the initial class period, but they are subject to a unique Rule 23 *res judicata* defense. Deka has filed an inaccurate and therefore defective plaintiff's certificate; and Deka is also currently a lead plaintiff in three pending class actions and numerous individual actions – it is small wonder that its resources are stretched so thin that it cannot keep track of which cases it has filed.

Because Mr. Furher has the largest financial interest in the litigation, and is the only movant who otherwise satisfies the requirements of Rule 23, and is capable of adequately protecting the interests of the class, his motion should be granted and the motion of the Institutional Investors Group denied. Appointing Mr. Furher Lead Plaintiff further comports with this District's judicial precedent, and will prevent (a) a dilution of control over the prosecution of the litigation and (b) unnecessary costs often encountered with larger sized and artificially structured groups, such as the Institutional Investors Group here.

## ARGUMENT

### POINT I

### AGGREGATION OF LEAD PLAINTIFF MOVANTS IS DISFAVORED IN THIS DISTRICT

The lead plaintiff provision in the PSLRA arose out of Congress's concern that some class actions securities litigation had become a "lawyer-driven" enterprise. In passing the PSLRA, Congress sought to "protect investors who join class actions against lawyer-driven lawsuits by giving control of the litigation to lead plaintiffs with substantial holdings of the securities of the issuer." (Conference Report on Securities Litigation Reform, H.R. Rep. No. 104-369, 32 (1995); accord S.Rep. 19180, 4 (Dec. 22, 1995) (Congress "intended . . . to empower investors so that they – not their lawyers –exercise primary control over private securities litigation), *id.* at 6 ("to transfer primary control of private securities litigation from lawyers to investors"), *id*. at 10 ("[t]he lead plaintiff should actively represent the class. The Committee believes that the lead plaintiff – not lawyers – should drive the litigation.").

The Institutional Investors Group is precisely the type of attorney-generated group of unrelated entities that the PSLRA seeks to eliminate. The four members of the Institutional Investors Group have no association with one another and have presented no evidence of any working relationship between themselves. Furthermore, there is no indication that any of these movants met or conferred before the filing of their joint motion or what process that resulted in their being appointed to serve as a lead plaintiff with previously unrelated, if not unknown, institutions. In essence, the Institutional Investors Group is no more than an attorney-created concoction that presents an artificially created financial interest, usurping the entire purpose of the PSLRA.

3

In this District, aggregation of movants for lead plaintiff motions is met with disfavor. *In re Veeco Instruments, Inc. Sec. Litig.*, 233 F.R.D. 330, 334 (S.D.N.Y. 2005) (McMahon, J.) ("Courts (including this one) view such aggregations of individual shareholders with disapproval."); *see In re Tarragon Corp. Sec. Litig.*, CA No. 07 CIV 7972(PKC), 2007 WL 4302732, at *2 (S.D.N.Y. Dec. 6, 2007) (Castel, J.) (denying motion by unrelated institutional investors); *Rozenboom v. Van Der Moolen Holdings, N.V.*, No. 03 Civ. 8284 (RWS), 2004 WL 816440, at *4 (S.D.N.Y. Apr. 14, 2004) (denying motion by unrelated investors on the "ground that groups of unrelated class members are more likely to abdicate their responsibility to coordinate the litigation to their attorneys, in contravention of the PSLRA's goal to eliminate lawyer driven litigation"); *In re Razorfish, Inc. Sec. Litig.*, 143 F. Supp. 2d 304, 309 (S.D.N.Y. 2001) (Rakoff, J.); *In re Donnkenny Inc. Sec. Litig.*, 171 F.R.D. 156, 157-58 (S.D.N.Y. 1997) (rejecting the appointment of two unrelated institutional investors and four individuals despite the acquiescence by all other named plaintiffs). Judge McMahon has gone so far as to disqualify a lead plaintiff movant who moved as part of a group, even when that movant had the largest single loss of any movant. *Bhojwani v. Pistiolis*, 06-cv-13761(CM)(KNF), Slip op. at 4 (S.D.N.Y. July 31, 2007) (Attached hereto as Exhibit C).

The Court should determine the presumptively most adequate plaintiff by examining the financial interest of each of the four individual unrelated entities comprising the Institutional Investors Group, rather than the aggregated financial interest of the disparate members comprising the group. The PSLRA's underlying philosophy that a party's own financial interest reflects the intensity of interest of that party in representing the best interest of the class further supports considering only the individual financial interests of the unrelated entities comprising the Institutional Investors Group in determining the presumptively most adequate plaintiff. It is

axiomatic that an entity's financial interest is not made greater simply through joinder with other parties such as was done in the creation of the Institutional Investors Group. *See*, *e.g.*, *In re Crawford v. Onyx Software Corp.*, Civ. No. C01-1346L, 2002 U.S. Dist. LEXIS 1101, at *4-5 (W.D. Wash. Jan. 10, 2002) (the court refused to examine the aggregate losses of a group comprised of unrelated individuals, finding that such a "loose group" has "no real cohesiveness" and, therefore, consideration of the aggregate losses of a group is "not convincing in light of the purposes of the PSLRA.").  This determination further avoids the potentially inconsistent outcome whereby the party with the actual largest financial interest, and thus the largest stake in the outcome of the litigation, is not appointed as lead plaintiff merely because that party was not aggregated with a group of unrelated parties that collectively had a larger financial interest. Moreover, this methodology is supportive of this District's efforts to eliminate lawyer-driven litigation and reduce complications caused by the appointment of the aggregation of unrelated movants.

Numerous courts in this Circuit have held that where a group of individuals with no pre-litigation relationship have been aggregated for the purposes of demonstrating their financial interest, the court should determine the movant with the largest financial interest only by examining each movant on an individual, not aggregate, basis.  Judge Karas ruled on this issue in *Goldberger v. PXRE Group, Ltd.*, No. 06-CV-3410 (KMK), 2007 WL 980417, at *5 (S.D.N.Y. March 30, 2007).  In the decision, the court rejected a leaderless group whose members "share[ ] only this lawsuit in common" and suspected the group "of disparate and apparently unrelated plaintiffs" was result of the "type of lawyer-driven action that the PSLRA eschews."  *Id.*  The court instead looked to losses of each potential lead plaintiff individually in determining its choice of lead plaintiff.  *Id.*; *see In re Star Gas Sec. Litig.*, Civ. No. 04-1766 (JBA), 2005 WL

818617, at *4-6 (D. Conn. April 8, 2005) (refusing to consider the aggregate losses of moving groups comprised of parties with no prelitigation relationship, the court instead analyzed each individual's losses, and appointed the three individuals constituting the movants with the three largest individual losses); *see also In re: E.Spire Communications, Inc., Sec. Litig.*, Civ. No. H-00-1140, 2000 U.S. Dist. LEXIS 19517, at *18-24 (D. Md. Aug. 15, 2000) (declining to consider aggregated losses of the group, the court appointed the individual investor who suffered the largest individual loss); *In re Baan Co. Sec. Litig.*, 186 F.R.D. 214, 224 (D.D.C. 1999) (quoting SEC amicus brief: "Each proposed member of a 'group' should be evaluated separately, and the marginal benefit of including another member in the group weighed against the further division of decision making authority and the attendant problems that enlargement of the group entails.").

Because the Institutional Investors Group is composed of unrelated entities with no pre-litigation experience, its alleged losses should not be looked at on an aggregate basis.

## POINT II

### THE PROPER CLASS PERIOD FOR DETERMINING CLAIMED LOSSES IS THAT IN THE FIRST FILED COMPLAINT

As an initial matter, the Court has two competing Class periods before it, the class period set forth in the first filed and publicly noticed case, *Steinberg v. Ericsson LM Telephone Co.*, CA No. 1:07-cv-9615 (RPP) (setting forth a class period of September 11, 2007 through and including October 15, 2007), and a class period of February 2, 2007 through November 20, 2007 set out in the action filed more than a month later by one of the Institutional Investor Group's members, Boston. The law is clear, however, that the "class period for purposes of lead plaintiff motion is defined as that period in the notice published in the first action filed." *Piven v. Sykes Enterprises, Inc.*, 137 F. Supp. 2d 1295, 1303 (M.D. Fla. 2000). This rule eliminates gamesmanship and jockeying by plaintiffs seeking to manipulate the class period for their own

advantage. Thus, the appropriate class period for measuring the claimed losses of the movants is September 11, 2007 through and including October 15, 2007.

When the losses of each of its individual entities are examined, it is clear the only members of the Institutional Investor Group with any losses at all during the proper class period are Lothian and Deka. As discussed in detail below, Fortis, as a net seller of Ericsson securities, is a beneficiary of the fraud and thus inappropriate as a lead plaintiff (*see* Point IV C, *infra*), and Boston had no class period transactions whatsoever in Ericsson securities during the proper class period (*see* Point IV D, *infra*). "A movant's financial interest is just a beginning point, and courts acknowledge that they must also consider the movant's ability and willingness to adequately represent the class." *In re Cable & Wireless PLC Sec. Litig.*, 217 F.R.D. 373, 377 (E.D Va. 2003). Deka and Lothian, as described below, have significant bars to their adequacy as lead plaintiffs in this case.

### POINT III

#### THE INSTITUTIONAL INVESTORS GROUP HAS NOT ESTABLISHED A PRIMA FACIE CASE THAT IT CAN ADEQUATELY REPRESENT THE CLASS

Under the PSLRA, if a court finds that a movant has the largest financial interest in the litigation, the court may still find that the movant has not made a *prima facie* showing of adequacy and typicality. *See In re Cavanaugh*, 306 F.3d 726 (9th Cir. 2002). The Institutional Investors Group has failed to make a *prima facie* demonstration that it is an adequate group under the PSLRA and can adequately represent the class. Even where courts have considered appointing a group as lead plaintiff, they have required a heightened showing by the group of the value of the additional lead plaintiff parties and how the group will effectively and efficiently manage the litigation. *See In re Network Associates Inc. Sec. Lit.*, 76 F. Supp. 2d 1017, 1026 (N.D. Cal. 1999) (in determining the adequacy of a group to be lead plaintiff the group must

7

"explain and justify its composition and structure to the court's satisfaction" (quoting Amicus Brief of the Securities Exchange Commission filed in *Parnes, et al., v. Digital Lightwave, Inc.,* No. 99-11293 (11th Cir. Aug. 25, 1999))); *In re MicroStrategy Inc. Secs. Litig.,* 110 F. Supp. 2d 427, 434-35 (E.D. Va. 2000)  (considering factors of the group including "descriptions of [the group's] members, including any pre-existing relationships among them; an explanation of how its members would function collectively; and a description of the mechanism that its members and the proposed lead counsel have established to communicate with one another about the litigation.").  The Institutional Investors Group has not provided any information that would allow this Court to conclude that it is an adequate lead plaintiff.  The Institutional Investors Group's submissions are based solely on perfunctory certification forms, which lack any information about the background or preexisting relationships between its group members, information as to how it will cohesively act to effectively and efficiently serve as an aggregated lead plaintiff, or a justification for its extended leadership structure.  Indeed, the Institutional Investor Group's motion fails to disclose and discuss the adversarial relationship between Deka and Fortis in their battle to be lead plaintiff in the General Motors securities litigation.  *See* Docket Entries 18-20; 22-24; 28-30; 31-34; 36-37; 59-65 of *In re General Motors Sec. Litig.,* Civ. No. 1:05-cv-08088(JES) (S.D.N.Y.).  Therefore, the Institutional Investor Group should not be appointed lead plaintiff as it is unable to fairly and adequately protect the interest of the class. *See* 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II); *In re MicroStrategy Inc. Secs. Litig.*, 110 F. Supp. 2d at 435 (rejecting group as a lead plaintiff for failing to demonstrate it was cohesive or able to function as a unified entity); *In re Donnkenny Inc. Sec. Litig.*, 171 F.R.D. at 157-58 (in rejecting the appointment of an aggregated group of unrelated movants, the court noted that counsel "have

8

not offered any reason for appointing an aggregation of unrelated institutional and individual investors as lead plaintiffs").

In addition to the Institutional Investors Group failure to make a *prima facie* demonstration of its adequacy, certain members of the Institutional Investors Group suffer fatal deficiencies that prevent their appointment as lead plaintiff individually, let alone as a group. These fatal deficiencies, as shown in Point IV, *infra,* cast further doubt on the interest and vigorousness with which certain members of the Institutional Investors Group can adequately protect the interest of the class.

**POINT IV**

**MEMBERS OF THE INSTITUTIONAL INVESTORS GROUP SUFFER FROM INSURMOUNTABLE DEFICIENCIES THAT RENDER THEM INADEQUATE**

**A.**    **Deka And Lothian Are Subject To Unique Defenses**

There is no issue regarding this Court's subject matter jurisdiction over this action. Courts, nevertheless, remain unwilling to appoint lead plaintiffs where there are uncertainties regarding whether a foreign court would later give *res judicata* effect of a judgment in favor of defendants. *See See Borochoff v. GlaxoSmithKline PLC*, 246 F.R.D. 201, 205 (S.D.N.Y. 2007) (Stanton, J.) (holding that "possibility that foreign courts will not enforce a decision in favor of" defendant, raised significant concerns and "prudence cautions that the arguments for its exclusion are substantial, and in light of that risk it would be improvident to appoint the German Institutional Investor Group [including Deka] as lead plaintiff"); *In re Vivendi Universal S.A. Sec. Litig.*, 242 F.R.D. 76, 105 (S.D.N.Y. 2007) (Holwell, J.) (refusing to certify a similarly situated German investor under Rule 23, reasoning "plaintiffs have not shown a probability that German courts will give *res judicata* effect to a judgment in this case"); *In re Royal Ahold N.V.*

9

*Sec. & ERISA Litig.*, 219 F.R.D. 343 (D. Md. 2003) (refusing to appoint German lead plaintiff in a case against a foreign corporation).

> In *Ahold*, the court refused to appoint a German investor as lead plaintiff, finding that:

> Adding to the concerns about subject matter jurisdiction over Union's claims is the question of the *res judicata* effect of a judgment in favor of Royal Ahold in this class action. Foreign courts might not recognize or enforce such a decision from an American court, which would allow foreign plaintiffs in the class to file suit against the defendant again in those foreign courts. This factor must be considered in determining whether a class action is the superior method of litigating a particular case, although it is not determinative. *Cromer Finance Ltd. v. Berger*, 205 F.R.D. 113, 134-35 (S.D. N.Y. 2001). A strong possibility or near certainty that a foreign court will not recognize a judgment in favor of the defendant as a bar to the action of its own citizens may be the basis for eliminating foreign purchasers from the class. *Bersch*, 519 F.2d at 996. No specific evidence has been produced thus far regarding which foreign courts may or may not recognize a decision of this court. It is possible, however, that Union and other foreign purchasers might be eliminated from the class at the certification stage because a judgment would not be enforceable. *See id.* at 996-97.

219 F.R.D. at 352. Addressing the very issue that troubled the court in *Ahold*, but with the benefit of "specific evidence," Judge Holwell recently refused to certify a German plaintiff that bought a foreign company's stock, reasoning:

> Taking the parties' expert affidavits as a whole, the Court is left with the distinct impression that the formalities of German law may well preclude the recognition of a judgment in the instant case. Indeed, plaintiffs' expert concludes only that "one cannot rule out a U.S. class action settlement or judgment . . . will be recognized or enforced in German." This candid opinion is insufficient on its face and leads the Court to conclude that plaintiffs have not shown a probability that German courts will give res judicata effect to a judgment in this case.

*Vivendi*, 242 F.R.D. at 105. The Court should avoid appointing a lead plaintiff like Deka when it may later find that it is uncertifiable under Rule 23.

Lothian faces a similar hurdle in connection with the *res judicata* effect of an American judgment on absent class members in the United Kingdom. Despite the decisions of the Courts in *Vivendi* and *GlaxoSmithKline* regarding the British courts, at least one British court has held

that United States judgments would not be preclusive on citizens of the United Kingdom.  *A/S D/S Svendborg v. Wansa*, 2 Lloyd's Rep. 183 (Court Appeals Civ. Div. 1997) (Attached hereto as Exhibit D).  Even if Lothian were not subject to the *res judicata* defence, it is inadequate as lead plaintiff because it moved as part of a group.  *See Bhojwani*, 06-cv-13761, Slip op. at 4 (Ex. C).

Indeed, Deka is fully aware of this issue as it was denied a lead plaintiff position on this very issue.  *GlaxoSmithKline,* 246 F.R.D. at 205 (finding that the issues regarding the ability of Deka to obtain a res judicata effect against the defendant, although a matter of class certification, raised substantial prudential issues to bar naming Deka a lead plaintiff).  Deka and Lothian cannot satisfy the requirements of Rule 23 and their motion should be therefore denied. *See Vivendi*, 242 F.R.D. at 104-03; *Ahold*, 219 F.R.D. at 352; *Cable & Wireless*, 217 F.R.D. at 377.

## B. Deka Filed A Deficient And Incomplete Certification

In addition to the *res judicata* issues, Deka submitted a deficient and incomplete certification, wrongly stating that it was not appointed lead plaintiff in a case it was so appointed and omitting a case in which it was appointed lead plaintiff.  The shortcomings of this certification, standing alone, suggests a failure on the Deka's representatives to employ the most basic level of care expected of a fiduciary.  This indicates that Deka lacks even the most minimal interest in this litigation, thereby abrogating its fiduciary responsibilities as a prospective lead plaintiff, or are not aware of its fiduciary responsibilities in other actions for which it has been given the responsibility to serve as a lead plaintiff.[2]  These serious shortcomings are indicative of

---

[2] It is in part due to extensive fiduciary duties required by serving as a lead plaintiff and concerns over the likelihood that one may become stretched too thin as a lead plaintiff, resulting in the ultimate failure to fulfill their duties, that Congress implemented a discretionary bar that prohibits a party from serving as a lead plaintiff in no more than 5 securities class actions during any 3-year period. *See* 15 U.S.C. § 78u-4(a)(3)(B)(vi).  The certification defects described herein

a movant who is unlikely to enact control over their counsel and the litigation and demonstrate that at least one of the members of the Institutional Investors Group, Deka, is unable to stay abreast of the numerous actions for which it already serves as lead plaintiff.

Critical to any consideration of an application to the court is that the court be provided evidence by affidavit or sworn statement demonstrating certain factual contentions relevant to their consideration for appointment as lead plaintiff. As stated by the court in *Burke v. Ruttenberg*, "[c]ertification requires a plaintiff seeking to serve in a representative capacity to put forward with his, her or its motion such information from which the district court can evaluate the adequacy of that plaintiff against competitors under subsection 21D(a)(3)(B)(iii)(I)." 102 F. Supp. 2d 1280, 1320 (D. Ala. 2000). The court in *In re Eaton Vance Corp. Sec. Litig.* commented upon the rationale underlying certifications, stating that "[t]he purpose of the certification is "to ensure more effective representation of investors in securities . . . class actions by transferring control of the litigation from the attorneys to the investors." 219 F.R.D. at 42. The significance of a certification is evident – it often comprises the only evidence that would permit a court to determine the adequacy, and true interest, of a movant to serve as a lead plaintiff.

For these reasons, courts have found that defective certifications, standing alone, is grounds for finding a lead plaintiff movant inadequate. *See id.* at 38; *In re SafeGuard Scientifics*, 216 F.R.D. 577, 582 n.4 (E.D. Pa. 2003); *In re Olsten Corp. Sec. Litig.*, 3 F. Supp. 2d 286, 295 (E.D.N.Y. 1998); *In re Williams Sec. Litig.*, 02-CV-72-H(M) (N.D. Okla. Jul. 8, 2002); *In re Microstrategy Inc. Sec. Litig.*, 110 F. Supp. at 436; *Burke*, 102 F. Supp. 2d at 1320.

_____

are indicative of parties whose resources dedicated to serving as a lead plaintiff are already too spread out.

The certification submitted by Deka and signed on December 21, 2007, by two officers of the company "under penalty of perjury . . . of the laws of the United States of America" is defective because it wrongly states that Deka was not appointed lead plaintiff in the Harley-Davidson case pending in the Eastern District of Wisconsin and it fails to acknowledge its appointment as lead plaintiff in an active matter before the District Court for District of New Jersey, both within the last three years. *See* Exhibit B of the Declaration of Allan I. Ellman in Support of the Motion of the Ericsson Institutional Investors Group.

Specifically, Deka was appointed to serve as a lead plaintiff in *In re Harley-Davidson Sec. Litig.*, CA No. 05-C-1123, on February 15, 2006 and was appointed to serve as Lead Plaintiff in *Lodish v. Able Laboratories, Inc.*, CA. No. 05-2681 (JAG) (D.N.J. 2006) on March 17, 2006 (the orders are respectively attached as Exhibits A & B hereto). Deka certified that it had not been appointed as lead plaintiff in *Harley-Davidson* and did not include the *Able Laboratories* case at all. Both cases are currently being actively litigated.

The defective certification submitted by Deka evidences its to adequately protect the interests of the class. Deka's failure to stay abreast of the actions in which it is ***currently serving as a lead plaintiff*** strongly suggests its overextended and will be unable to control and oversee an additional action, even were it to be a single lead plaintiff, let alone coordinate control of the litigation with three other independent entities. The errors further suggest that it is counsel for the Institutional Investors Group, and not the movant itself, who is controlling the litigation.[3]

Deficiencies such as those found in the certification submitted by Deka is troubling and raise serious questions about the Institutional Investors Group's adequacy to serve as lead

---

[3] Deka has also engaged in a practice of consistently replacing or adding counsel in the actions in which it is lead plaintiff – further suggesting that its cases are lawyer driven. In the General Motors case, it employed three firms at different times as Lead Counsel – all before the motion to dismiss was decided. *See* Docket entries 10, 11, 77, 78, 82 in *In re General Motors Sec. Litig.*, MDL 1749 (E.D. Mich.)

plaintiff in this action.  *See In re Safeguard Scientifics*, 216 F.R.D. at 582 & n.4 (credibility issues render "impose an unnecessary disadvantage on the class"); *Hively v. Northlake Foods, Inc.*, 191 F.R.D. 661, 668-70 (M.D. Fla. 2000) (plaintiff making "inconsistent statements" is an inadequate class representative); *In re Gibson Greetings Sec. Litig.*, 159 F.R.D. 499, 501 (S.D. Ohio 1994) (plaintiff "vulnerable to attacks on his credibility" is an inadequate class representative).

**C.      Fortis Is A Net Seller In The Proper Class Period**

Fortis is inadequate and/or atypical under Rule 23 because it is a net seller of Ericsson securities during the appropriate class period. Specifically, during the appropriate class period, Fortis was a net seller of 86,000 Ericsson shares, having purchased 92,184 shares and sold 178,509 shares.  As courts in this district and across the country have repeatedly held, a net seller who sells more shares that it purchased during a class period is inadequate to represent a putative class of purchasers because the net seller arguably benefits from the fraud.  *See Capone v. MBIA, Inc.*, 05 Civ. 3514 (LLS), slip op. at 4 (S.D.N.Y. July 25, 2005) (Stanton, J.) (attached as Exhibit E); *see also In re Mills Corp.*, No. Civ. A. 1:06-77, 2006 WL 2035391, at *3 (E.D. Va. May 30, 2006) ("Courts generally reject a party's motion for lead plaintiff if the party is a net seller of shares during the class period."); *In re Comdisco Sec. Litig.*, 150 F. Supp. 2d 943, 945-46 (N.D. Ill. 2001) (net seller is "totally out of the running for designation as lead plaintiff"); *In re McKesson HBOC, Inc. Sec. Litig.*, 97 F. Supp. 2d 993, 997 (N.D. Cal. 1999) (noting that "a net seller has arguably profited more from the fraud than it has been injured") (emphasis in original).

D.    **Boston Has No Transactions In The Proper Class Period**

It is black letter law that in order to be securities fraud plaintiff, let alone lead plaintiff, a party must have standing.  "Only a purchaser or seller of securities who is misled has standing to sue." *In re Warner Commun. Sec. Litig.*, 618 F.Supp. 735, 754 (S.D.N.Y. 1985); *see also In re AIG Advisor Group,* No. 06 CV 1625(JG), 2007 WL 1213395, at *4 (E.D.N.Y. April 25, 2007) ("In this securities fraud case, the named plaintiffs can allege no injury from the purchase or sale of funds they never invested in . . . . They therefore have no standing to ask me to remedy injuries related to those funds.").  During the appropriate class period, Boston neither purchased nor sold Ericsson securities and as such lacks standing to be even a class member in this action let alone a lead plaintiff.

**POINT V**

**MR. FURHER MEETS THE PSRLA'S
REQUIREMENTS FOR APPOINTMENT AS LEAD PLAINTIFF**

The claims of Mr. Furher, on the other hand, are typical of the claims of the rest of the class because, just like all other class members, he:  (1) purchased Ericsson securities shares during the Class Period; (2) purchased Ericsson securities in reliance upon the allegedly materially false and misleading statements issued by defendants; and (3) suffered damages thereby.  Thus, Mr. Furher's claim is typical of those of the other class members because their claim and the claims of the other class members arise out of the same course of events.

Mr. Furher is also an adequate representative of the class.  As evidenced by the injuries he has suffered by purchasing Ericsson securities at prices artificially inflated by defendants' materially false and misleading statements, the interests of Mr. Furher are clearly aligned with the interests of the members of the class, and there is no evidence of any antagonism between Mr. Furher and the other members of the class.  Thus, Mr. Furher *prima facie* satisfies the

15

commonality, typicality, and adequacy requirement of Rule 23 for the purposes of this motion. Unlike Deka, which was recently rejected as a lead plaintiff in this District, Mr. Furher has never been rejected as a lead plaintiff and is actively overseeing the *Oracle* securities litigation pending in the Northern District of California.

## <u>CONCLUSION</u>

The Institutional Investor Group suffers from numerous deficiencies, including using an inappropriate class period manipulated to provide a favorable damages calculation, aggregating the damages of four entities in an impermissible group, filing a defective certification, and moving with parties with no standing or losses. The Institutional Investor Group's motion should be denied and Mr. Furher should be appointed Lead Plaintiff and his selection of Murray, Frank & Sailer LLP as Lead Counsel for the Class should be approved by the Court.

Dated:  January 17, 2008
      New York, New York

**MURRAY, FRANK & SAILER LLP**

By:         /s/
      Brian Murray (BM 9954)
Lawrence D. McCabe (LM 1846)
Brian Brooks (BB 7442)
275 Madison Avenue, 8th Floor
New York, New York 10016
Telephone: (212) 682-1818
Facsimile: (212) 682-1892

**Proposed Lead Counsel for the Class**

16

# EXHBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------x
LEON D. BOROCHOFF, Individually and On
Behalf of All Others Similarly
Situated,

               Plaintiff,                  07 Civ. 5574 (LLS)

      vs.                          OPINION and
                                        ORDER OF APPOINTMENT

GLAXOSMITHKLINE PLC, DR. JEAN-PIERRE
GARNIER, and JULIAN HESLOP,

               Defendants.
--------------------------------------x

     This motion involves competing claims for appointment as lead plaintiff and lead counsel in a securities fraud class action against Glaxosmithkline PLC ("GSK", a corporation headquartered in the United Kingdom), its Chief Executive Officer, and its Chief Financial Officer. The complaint alleges that GSK made "numerous positive statements regarding Avandia, GSK's popular diabetes drug," but never disclosed that it could increase the risk of a user's heart attack. Cmplt. ¶ 3. By separate motions, (1) Deka Investment GmbH, Metzler Investment GmbH, Internationale Kapitalanlagegesellschaft mbH, and INDEXCHANGE Investment AG (a German subsidiary of Barclay's Bank) (collectively the "German Institutional Investor Group"), (2) Avon Pension Fund administered by Bath & North East Somerset Council ("Avon") and North Yorkshire County Council

administering authority for the North Yorkshire Pension Fund ("North Yorkshire") (collectively the "U.K. Pension Funds"), and (3) the City of Tallahassee Pension Plan ("Tallahassee") seek appointment of themselves as lead plaintiff, and their respective counsel as lead counsel.

## Appointment of Lead Plaintiff

The Private Securities Litigation Reform Act ("PLSRA") provides that the court shall appoint the "most adequate plaintiff" as lead plaintiff. 15 U.S.C. § 78u-4(a)(3)(B)(i). The most adequate plaintiff is the person or group of persons that—

> (aa) has either filed the complaint or made a motion in response to a notice under subparagraph (A)(i);
> (bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and
> (cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

15 U.S.C. § 78u-4(a)(3)(B)(iii). Each of the three motions was made in response to a notice, satisfying the first requirement.

The German Institutional Investor Group, which suffered a loss of over $28 million, has the largest financial interest in the relief sought by the class. It otherwise satisfies the requirements of Fed. R. Civ. P. 23. Accordingly, it is entitled to the presumption that it is the most adequate plaintiff.

That presumption can be rebutted by proof that the Group "is subject to unique defenses that render such plaintiff incapable of adequately representing the class."  15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)(bb).

The most serious argument against the German Institutional Investor Group in this respect[1] is that all those who purchased in Germany may have to be excluded from the class, because any judgment in this action (whether favoring plaintiffs or defendants) may be refused enforcement by a German court.  If this Court's judgment on the merits neither protects a prevailing defendant against relitigation in Germany, nor grants a prevailing German plaintiff an enforceable damage judgment, then for those litigants a class action is not "superior to other available methods for the fair and efficient adjudication of the controversy."  Fed. R. Civ. P. 23(b)(3).  Rather, it is a waste, and their presence in the class (with its associated problems of notice-giving in Germany) may inflict burdens on the administration of the action.

In In re Vivendi Universal, S.A., 242 F.R.D. 76 (S.D.N.Y. 2007), the court analyzed German procedural law to appraise

---

[1]  Tallahassee argues that the anti-fraud provisions of the securities laws do not apply to purchases by foreigners of a foreign corporation's securities on a foreign exchange.  Those laws do apply when the activities within the United States were not "merely preparatory" but "directly caused" the claimed losses.  Itoba Ltd. v. LEP Group PLC, 54 F.3d 118, 122 (2d Cir. 1995).  That seems to be the case here.

whether a foreign judgment would be recognized in Germany. In
that case, experts agreed "that there is no decision by a German
court as to whether a judgment in a U.S. class action would be
recognized" under the German procedures, which provide (Vivendi,
242 F.R.D. at 104):

> for the recognition of foreign judgments if five
> conditions are met:
>     (1) if the foreign court was competent for
> deciding on the claims based on the German provisions
> on jurisdiction, (2) if the defendant was properly
> served (in the legal relationships of the United
> States and Germany according to the Hague Service
> Convention) in a timely manner enabling defendant to
> defend itself properly, (3) if the judgment is not
> inconsistent with an earlier German or foreign
> judgment which would be itself recognised in Germany,
> (4) if the contents of the judgment do not infringe
> the German ordre public, i.e. the indispensable
> provisions of German law and (5) if reciprocity is
> guaranteed, i.e. if the foreign court would recognise
> a corresponding German judgment.

The Vivendi court found that although German notice
requirements could be satisfied by measures reasonably
calculated to give actual notice to class members of their
rights, it seemed that "a U.S. judgment would not be enforced
against a class member who did not in fact receive actual notice
despite plaintiffs' efforts to broadly disseminate notice."
Ibid.  The court continued (ibid.):

> Leaving aside the question of whether the Hague
> Service Convention is the exclusive means for
> notifying the absent class members, can it be said
> that the use of a collective action is so contrary to
> German public policy that a U.S. class action judgment
> will not be recognized under any circumstance?  In

-4-

this regard the Court notes that, in contrast to France and England, collective actions remain unknown in Germany.

On this point, the Vivendi court concluded (id. at 105):

> Taking the parties' expert affidavits as a whole, the Court is left with the distinct impression that the formalities of German law may well preclude the recognition of a judgment in the instant case. Indeed, plaintiffs' expert concludes only that "one cannot rule out a U.S. class action settlement or judgment ... will be recognized or enforced in German [sic]." This candid opinion is insufficient on its face and leads the Court to conclude that plaintiffs have not shown a probability that German courts will give res judicata effect to a judgment in this case.

Under the circumstances, the Vivendi Court elected (id. at 107) ". . . to proceed with caution and limit the class to foreign shareholders whose courts, in the unlikely event of successive litigations, are likely to give res judicata effect to any judgment herein", and excluded the German purchasers from the class.

In Bersch v. Drexel Firestone Inc., 519 F.2d 974, 996-97 (2d Cir. 1975), the Court of Appeals for the Second Circuit stated

> The management of a class action with many thousands of class members imposes tremendous burdens on overtaxed district courts, even when the class members are mostly in the United States and still more so when they are abroad. Also, while an American court need not abstain from entering judgment simply because of a possibility that a foreign court may not recognize or enforce it, the case stands differently when this is a near certainty. This point must be considered not simply in the halcyon context of a large recovery which plaintiff visualizes but in those of a judgment

for the defendants or a plaintiffs' judgment or a settlement deemed to be inadequate. As Judge Frankel stated in his order permitting the case to proceed as a class action:

> if defendants prevail against a class they are entitled to a victory no less broad than a defeat would have been.

Here the record contains uncontradicted affidavits that England, the Federal Republic of Germany, Switzerland, Italy, and France would not recognize a United States judgment in favor of the defendant as a bar to an action by their own citizens, even assuming that the citizens had in fact received notice that they would be bound unless they affirmatively opted out of the plaintiff class . . .

>     . . . .

> We therefore direct that the district court eliminate from the class action all purchasers other than persons who were residents or citizens of the United States. (footnote omitted)

Those concerns led the court in <u>In re Royal Ahold N.V. Securities and ERISA Litig.</u>, 219 F.R.D. 343, 352-53 (D. Md. 2003) to deny a foreign corporation appointment as lead plaintiff, stating that:

> Foreign courts might not recognize or enforce such a decision from an American court, which would allow foreign plaintiffs in the class to file suit against the defendant again in those foreign courts. This factor must be considered in determining whether a class action is the superior method of litigating a particular case, although it is not determinative. <u>Cromer Finance Ltd. v. Berger</u>, 205 F.R.D. 113, 134-135 (S.D.N.Y. 2001). A strong possibility or near certainty that a foreign court will not recognize a judgment in favor of the defendant as a bar to the action of its own citizens may be the basis for eliminating foreign purchasers from the class. <u>Bersch</u>, 519 F.2d at 996.

. . . .

In light of the above considerations — particularly the possible absence of subject matter jurisdiction over Union's claims[2] and the possibility that foreign courts will not enforce a decision in favor of Royal Ahold against foreign plaintiffs in the class — the court finds that Union/Detroit General's status as presumptive lead plaintiff is rebutted.

This is not the proper occasion to determine whether the German Institutional Investor Group will be in the class. That will come later, but prudence cautions that the arguments for its exclusion are substantial[3], and in light of that risk it would be improvident to appoint the German Institutional Investor Group as lead plaintiff at this point.

That leaves as the presumptive most adequate plaintiff the movant with the next largest financial interest, which is the U.K. Pension Funds. However, North Yorkshire purchased 854,938 shares of GSK on the London Stock Exchange and sold 1,190,984 shares during the class period. See August 10, 2007 Affidavit of David Rosenfeld, Ex. A. Thus, North Yorkshire is a net seller and although it nevertheless may have sustained a small loss (or, depending on the accounting method chosen, a gain) it does not adequately represent the proposed class of purchasers.

---

[2] In Royal Ahold considerable fraudulent activity occurred outside the United States.

[3] The Declaration of Professor Hess, who concedes that the binding effect of a U.S. class action judgment is disputed in German legal literature and undecided by a German court, does not persuade me that the probabilities favor its acceptance.

Avon, however, is a net purchaser with a loss of $2.69 million. It meets the requirements of Rule 23. It is not subject to the same res judicata defense which disqualifies the German Institutional Investor Group. See Vivendi, 242 F.R.D. at 103: "English courts, when ultimately presented with the issue, are more likely than not to find that U.S. courts are competent to adjudicate with finality the claims of absent class members and, therefore, would recognize a judgment or settlement in this action."

Therefore, Avon is the most adequate plaintiff and shall serve as lead plaintiff.

## Appointment of Lead Counsel

Pursuant to 15 U.S.C. § 78u-4(a)(3)(B)(v), "The most adequate plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class." Avon selected Coughlin Stoia Geller Rudman & Robbins LLP, a firm which is well qualified and has successfully served as lead counsel or co-lead counsel in numerous complex securities class actions. Accordingly, Coughlin Stoia Geller Rudman & Robbins LLP is appointed lead counsel.

## Conclusion

The U.K. Pension Funds' motion is granted to the extent that Avon shall serve as lead plaintiff and Coughlin Stoia Geller Rudman & Robbins LLP as lead counsel. The German Institutional Investor Group's and Tallahassee's motions are denied.

So ordered.

Dated: October 5, 2007
       New York, New York

Louis L. Stanton
Louis L. Stanton
U.S.D.J.

# EXHBIT B

Westlaw.

[1997] C.L.C. 985                                                                                                          Page 1
1997 WL 1105865 (CA (Civ Div)), [1997] C.L.C. 985, [1997] 2 Lloyd's Rep. 183
**(Cite as: [1997] C.L.C. 985)**

**\*985** A/S D/S Svendborg & Anor v. Wansa

Court of Appeal (Civil Division)

CA (Civ Div)

Staughton, Waite & Aldous L JJ

Judgment delivered 16 April 1997

Anti-suit injunctions Stay of proceedings--Shipowner sought to restrain cargo claims by W in Sierra Leone--W sought stay of English proceedings--Relevant bills of lading provided for English, and Estonian jurisdiction Shipowners submitted to jurisdiction in Sierra Leone to set aside default judgments-- Materiality of evidence of 'claims industry' in Sierra Leone.

These were appeals by 'W' against prior restraint orders made by Clarke J in January 1996 and injunctions ordering W not to continue proceedings which he had commenced against the plaintiff shipowners in Sierra Leone.

W made cargo claims against the shipowners in Sierra Leone. In one case the relevant bill of lading conferred jurisdiction on the English courts, in the other on the courts of Estonia. The Sierra Leone proceedings were begun in May 1993 and October 1994 respectively. The shipowners had submitted to the jurisdiction of the Sierra Leone courts in both cases; they had allowed judgment in default to be entered and had had to submit to the jurisdiction if it was to be set aside.

Clarke J held that there was a strong case for the discharge of the injunctions but that there were special circumstances consisting of the evidence of 'G', an English solicitor, relating to what G called a 'claims industry' in Sierra Leone. G produced evidence that W and others had made fraudulent claims for loss and damage to cargo, in these and other cases. Clarke J regarded G's evidence, that it would not be safe for him to attend a trial in Sierra Leone and that W had boasted that he could manipulate the legal system in Sierra Leone, as sufficient reason for his orders restraining W from

dealing with his assets, and from continuing the proceedings in Sierra Leone, and for refusing an order staying the English actions.

*Held*, dismissing Was appeal:

**1** The evidence of fraud could have been brought in the Sierra Leone proceedings, but it had not been. Seeing that no criticism was made of the Sierra Leone judges, it required more than mere evidence that the claims were fraudulent to justify restraining proceedings in Sierra Leone and allowing the English actions to proceed. The case for taking that course depended on whether there was a real impediment to justice in Sierra Leone. On that issue, the court would not interfere with the judge's carefully considered conclusion. There could be no proper criticism of the way that he exercised his discretion.

**2** If W discontinued the Sierra Leone proceedings there would be a case for reducing the amount of the prior restraint injunctions. There would be liberty to apply to a judge of the Commercial Court in that event.

**The following cases were referred to in the judgment of Staughton LJ:**

Aratra Potato Co Lid v Egyptian Navigation Co ('The El Amria') [1981] 2 Ll Rep 119.

Sohio Supply Co v Gatoil USA) Inc [1989] I Ll Rep 588.

**Representation**

Kenneth Rokison QC and Vernon Flynn (instructed by Ince & Co) for the appellant.

Michael Thomas QC and Graham Dunning (instructed by Stephenson Harwood) for the respondents.

**JUDGMENT**

Staughton LJ:

These proceedings are brought by two shipowning

concerns against Mr Mohamed Kamel Wansa. In the first action the plaintiffs are Maersk Line, which is the **986** trading name of two Danish companies, and the defendant is Mr Wansa trading as Melborne Enterprises. That I will call the Melborne action. In the second, called the Estonian action, the plaintiffs are Estonian Shipping Co Ltd and the defendant is Mr Wansa trading as D & M Impex. Mr Wansa is now the appellant in both appeals, and the shipowners are the respondents.

On 12 January 1996 Clarke J made prior restraint orders against Mr Wansa in respect of his assets worldwide up to a total of $671,581 in the Melborne action and $1,271,723 in the Estonian action. He also granted injunctions ordering Mr Wansa not to continue proceedings which he had commenced against both shipowners in Sierra Leone. There was a third action with which the judge was also concerned, but that does not feature before us.

Mr Wansa was in England on 12 January 1996, and was personally served with the writs and the orders of Clarke J in all three actions. An application was made in February on his behalf to Clarke J for an order that the English proceedings be set aside or stayed and the injunctions and prior restraint orders also set aside. The application was refused in both cases; and Mr Wansa appeals to this court against those orders.

**The primary facts:**

**(1) The Melborne case**

In February 1992 a container loaded with bales of textiles was loaded on the Esther Schulte at Banjul in the Gambia for carriage to Freetown in Sierra Leone. Maersk Line were the contractual carriers; their bill of lading contained this clause:
    'Wherever the Carriage of Goods by Sea Act 1936 (COGSA) of the United States of America applies ... this contract is to be governed by United States law and the United States Federal Court Southern District of New York is to have exclusive jurisdiction to hear all disputes hereunder. In all other cases, this Bill of Lading is subject to English law and jurisdiction.'

Mr Wansa claims to have bought the goods from the shippers, and that there was a shortage of 82 bales of textiles when the container was opened at Freetown. The shortage is disputed. On 11 May 1993 Mr Wansa issued a writ against Maersk Line and others

claiming damages in the sum of $111,529.95, together with interest at 36 per cent per annum.

**(2) The Estonian case**

In March and April 1993 cement in bags was shipped at Tallin for carriage to Freetown on board the Parila and the Paldiski, both vessels owned by Estonian Shipping Co Ltd. The bills of lading each contained this clause:

'3. Jurisdiction

    Any dispute arising under this Bill of Lading shall be decided in the country where the carrier has his principal place of business, and the law of such country shall apply except as provided elsewhere herein.'

Claims for shortage and damage were presented on behalf of the government of Sierra Leone to Sun Alliance, insurers of the cargo for the voyage. Those claims were settled for £8,161.02 in one case and $2,587.46 in the other. Subrogation forms were executed by the Crown agents on behalf of the government of Sierra Leone, which presumably were designed to transfer the government's rights against the carrier (if any) to the insurers; and Sun Alliance presented claims under the bills of lading to the shipowners.

Then what appeared to be a different version of the same claim was made by Mr Wansa. He issued a writ against Estonian Shipping Co Ltd in Sierra Leone. The claim was for 24,714 bags lost or damaged on the Parila (two fifths of the cargo) and 23,941 bags (nearly the same proportion), on the Paldiski. The claim was based on an alleged **987** market value of $7.10 per bag, as opposed to the figure of $4.10 per bag for which the cargo was insured, and amounted to $348,479.44. It is disputed.

**The jurisdiction clauses**

In the Melborne case, there is an issue as to whether the clause in the bill of lading conferred exclusive jurisdiction on the English courts, and whether the commencement of an action in Sierra Leone was a breach of contract. It can be argued that the express mention of exclusive jurisdiction in the first part of the clause excludes any implication that the second part provides for exclusive jurisdiction. On the other

[1997] C.L.C. 985                                                                    Page 3
1997 WL 1105865 (CA (Civ Div)), [1997] C.L.C. 985, [1997] 2 Lloyd's Rep. 183
**(Cite as: [1997] C.L.C. 985)**

hand it can be argued that the author wished to provide for exclusive jurisdiction throughout, and did not think it necessary to repeat the word 'exclusive' in the second part. It was conceded in the court below that it was 'at least strongly arguable' that the clause conferred exclusive jurisdiction on the English courts.

Mr Rokison, for Mr Wansa, urged us to decide the point, and not to be content with what is strongly arguable. I am prepared to accept the invitation, although that does not help Mr Rokison. I conclude that the clause does confer exclusive jurisdiction on the English courts. My reasons are in substance, first those which I stated in Sohio Supply Co v Gatoil (USA) Inc [1989] 1 Ll Rep 588 at pp. 591-592, and in particular that I could think of no reason why businessmen should choose to go to the trouble of saying that the English courts should have non-exclusive jurisdiction. My second reason is that the parties in the second part of the clause were plainly saying that English law was to be mandatory if the American Carriage of Goods by Sea Act did not apply; it seems to me that they must have intended *English jurisdiction* likewise to be mandatory in that event.

The Estonian bills of lading do not provide for English jurisdiction; in effect they say that any dispute arising under them shall be decided in the courts of Estonia. It follows that there was a breach of contract by Mr Wansa in commencing proceedings in Sierra Leone. But he contends that the shipowners are also in breach, because they have started an action in England. Against that it is argued for the shipowners that their English action is not a dispute 'under the bill of lading'. I do not find that argument at all plausible, in view of the wide meaning that has been given to such words, for example in arbitration cases. So I am prepared to assume that the shipowners were in breach of contract, by commencing proceedings against Mr Wansa in England. But that does not mean that we are obliged to stay the Estonian action. The English courts, like those of many other countries, do not regard themselves as bound in all circumstances to comply with a private contract which seeks to deprive them of jurisdiction: see for example The El Amria [1981] 2 Ll Rep 119.

**The Sierra Leone proceedings:**

**(1) The Melborne case**

A full history of these proceedings is set out in the judgment of Clarke J [1996] 2 Ll Rep 559 at pp. 570-571. What follows is an abridged version.

The writ, as I have said, was issued in Sierra Leone on 11 May 1993. On 24 June Maersk Line entered an appearance under protest, and on 5 July they issued a notice of motion seeking a stay in reliance on the English jurisdiction clause. There was an exchange of affidavits, in which Mr Wansa's shortage claim was disputed by Mr Ghirardani, an English solicitor acting for Maersk Line. He did not assert at that stage that there was a history of fraudulent cargo claims being made in Sierra Leone. Indeed he did not, as Mr Rokison pointed out on several occasions, say in terms that the claim in question was fraudulent.

On 25 April 1994 Ademosu J, directing himself in accordance with The El Amria, refused a stay. On 3 May Maersk Line filed a notice of motion seeking leave to appeal and a stay of the action. This, it seems, was not served. On 11 May the lawyer acting for **988** Mr Wansa searched the registry for a defence; none had been filed, and he entered judgment for the resale value of the goods damaged or short delivered, to be assessed, and interest on that amount at the rate of 36 per cent per annum.

Some further attempts by Maersk Line to obtain leave to appeal and a stay followed. Then at the beginning of June or thereabouts they changed their legal advisers in Sierra Leone. What happened next was described by Clarke J as follows:
'Once Mr Macauley came on the scene no further attempts were made to seek leave to appeal from the Judge's refusal of a stay of the action. Instead the plaintiffs filed a notice of motion dated June 4, in which they sought to set aside the judgment on the grounds, inter alia, that the defendant was not entitled to sign judgment for 36 per cent per annum interest, and that the plaintiffs had a defence on the merits. An affidavit was sworn in support, exhibiting a draft proposed defence. Paragraph 8 of the affidavit includes the statement that the plaintiffs,
"have advised themselves to apply for leave to defend the claim on the merits."
The reason given for not serving a defence earlier was that a challenge to the jurisdiction was being made.
Nothing more was heard of the application for leave to appeal, and the only reasonable inference is that at that time it was decided to seek to defend the

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

[1997] C.L.C. 985                                                                                                    Page 4
1997 WL 1105865 (CA (Civ Div)), [1997] C.L.C. 985, [1997] 2 Lloyd's Rep. 183
**(Cite as: [1997] C.L.C. 985)**

claim on the merits.'

Once again Maersk Line did not seek to rely on any history of fraudulent cargo claims, or assert in plain terms that the claim in question was fraudulent. It would of course have been open to them, if they obtained leave to defend, to call evidence showing that the alleged short delivery was fictitious; but like Clarke JI am surprised that they did not say so in an affidavit at this stage. There may have been a tactical reason for such reticence.

On 17 October 1994 Ademosu J refused to set aside the judgment on the ground that a general denial in the proposed defence was not enough. He did, however, remove the award of interest at 36 per cent per annum, and instead ordered interest to be assessed. On 9 December he granted leave to appeal but refused a stay. However a stay was granted by the Court of Appeal on 3 February 1995.

### (2) The Estonian case

Mr Wansa's writ was issued on 10 October 1994. On 24 November judgment in default of appearance was entered on his behalf. On the same day Estonian Shipping entered an appearance under protest, but on 2 December they voluntarily submitted to the jurisdiction by serving a notice of motion to set aside the default judgment. On 10 January 1995 J set aside the judgment, and gave Estonian Shipping leave to serve a defence.

They did so on 19 January, and later joined the port authority as a third party. The trial began on 13 June 1995.

Then there was an objection to the admissibility of a survey report by Lloyd's agents. On 20 June the judge held that it was admissible, but on 13 July he gave leave to appeal against that decision. Mr Rokison told us that the appeal was dismissed on 30 November 1995; and Mr Thomas, for the shipowners, said that he had no reason to disagree with that.

### The English actions

Thus far, there is much to be said for the view that the shipowners ought not to be allowed now to proceed against Mr Wansa in England, as they did on 12 January 1996. They had taken no steps here since the Sierra Leone proceedings were begun in May 1993 and October 1994 respectively. They had

submitted to the jurisdiction of the Sierra Leone courts in both cases, although if any question of discretion arises it can be said in their **\*989** favour that they had mistakenly allowed judgment in default to be entered; there was a need to submit to the jurisdiction if it was to be set aside. Whilst there was exclusive English jurisdiction in the Melbourne case, the exclusive jurisdiction in the Estonian case was Estonian.

Mr Thomas argued that the English actions are wider than those in Sierra Leone. In some senses this is true. They include a cause of action in deceit, a claim for a negative declaration (that they are not liable for any loss or damage to cargo), and breach of the jurisdiction clauses in the bills of lading. But in essence they cover the same ground, as it seems to me, with the possible exception of breach of the jurisdiction clauses. What is likely to be different, if the English actions proceed, is the evidence. As will shortly appear, the shipowners have substantial material which they say should be considered in an action here, and which has not been put forward in Sierra Leone.

There has been a hint, and perhaps more than a hint, in the evidence that the courts of Sierra Leone are likely to be partial, favouring Mr Wansa father than the shipowners. That was expressly disclaimed by Mr Boyd, who appeared for the shipowners before Clarke J, and has not been renewed in this court. There is still some criticism of the procedure in Sierra Leone courts; and to judge from one example of which we have evidence they may take "a more leisurely course than we do in this country. It is said that their procedure is defective because discovery is wholly or partly absent. But I would not regard discovery as in all cases a necessary attribute of an enlightened jurisdiction; it is often the cause of much unnecessary expenditure, a view which Lord Woolf appears to share. What I do find alarming is that the Sierra Leone courts entertain claims for an award of interest at 36 per cent per annum on US dollar claims. Mr Rokison, in a fine attempt to defend the indefensible, tried to persuade us that there were facts which would justify such an award. I cannot agree. However, the English courts are in no position to proclaim their innocence on this point. Until recently the Judgments Act rate (applied after judgment but not" before) was 15 per cent, whether the currency of the judgment was US dollars, Swiss francs or Brazilian cruzeiros. The going rate for US dollars at the time was six per cent.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

[1997] C.L.C. 985                                                            Page 5
1997 WL 1105865 (CA (Civ Div)), [1997] C.L.C. 985, [1997] 2 Lloyd's Rep. 183
**(Cite as: [1997] C.L.C. 985)**

Two further, arguments why the English actions should not proceed were advanced by Mr Rokison. First it was said that the question whether the jurisdiction clauses in the bills of lading should be enforced was submitted to the Sierra Leone court, and the shipowners were bound by the decision.

It is true that Ademosu J was asked to decide that question and did decide it on 25 April 1994 in the Melbrone case. There was no appeal from his decision. But that episode was part of the Maersk Line's protest against the jurisdiction. I do not see that such a protest can be treated as a submission to the jurisdiction of the foreign court to decide the issue of jurisdiction. (At one time English law took the contrary view on that point, but see now *Dicey & Morris on the Conflict of Laws* (12th edn), p. 48.0.) The decision may well have been binding on Mr Wansa, but not on Maersk Line.

The position on that point cannot be any different in the Estonian case, where there has been no decision of the Sierra Leone court on the enforceability of the jurisdiction clause in the bill of lading.

It was also, I think, argued that the judgment on liability in the Melborne case gave rise to an estoppel against Maersk Line, as they had submitted to the jurisdiction of the Sierra Leone courts. Mr Thomas answers that point by saying that a foreign judgment can always be contested in this country on the ground that it was obtained by fraud: *Dicey & Morris*, pp. 501,505. Nevertheless Clarke J took the view in both cases that, but for the evidence which I have yet to mention, he would not have favoured some or all of the shipowners' submissions in the English actions. Thus in the Melborne case he said: **\*990**

'There is no doubt that the plaintiffs submitted to the jurisdiction of the High Court in Sierra Leone on June 4, 1994. Mr Collins submits that in those circumstances, and having regard to the lapse of time since then, no injunction should now be granted. There is considerable force in that submission. In ordinary circumstances it would almost certainly succeed. The question is, however, whether there are any circumstances in this case which lead to any other conclusion. Mr Boyd submits that there are.'
And in the Estonian case:

'If the Estonian Shipping case is looked at in isolation, the defendant has a strong case for the discharge of the injunction restraining the further prosecution of the claims. The plaintiffs took no steps

to obtain an injunction at the outset. On the contrary, they submitted to the jurisdiction, brought in a third party and participated in the trial on the merits. If this case stood alone I would discharge the injunction. However, it does not.'

## Mr Ghirardani's evidence

Mr Ghirardani is a solicitor, and a partner in the firm of Stephenson Harwood who act for the shipowners in these two actions. He has in the past nine years conducted an extensive investigation into cargo claims made at West African ports, particularly in Sierra Leone, Guinea and the Gambia. He has sworn lengthy affidavits in each of these cases. In the nature of things much of his evidence is hearsay, but not on that account to be rejected out of hand on an interlocutory application; and I do not doubt that he can to some extent give first hand evidence.

Mr Ghirardani speaks of what he calls a claims industry in Sierra Leone, that is to say a continuing series of cargo claims over many years which cannot have been justified. He relates how, at first, claims were made against cargo underwriters. But these in course of time were disputed, and were difficult and expensive to pursue in foreign courts. It was easier to sue the shipowners in Sierra Leone, with both jurisdiction and enforcement available from the presence of their vessels. Eventually, international pressure was put on the government of Sierra Leone, and the procedure for arresting ships was changed; the prior approval of the Attorney General was required. The result was that claims were still pursued in Freetown, without security, with the possibility of enforcement against a defendant's visiting ship thereafter.

The evidence produced by Mr Ghirardani that Mr Wansa and others have made fraudulent claims for loss and damage to cargo, in these and other cases, is impressive. Clarke J said in his judgment:
'Nevertheless, there is, I think force in Mr Boyd's submission that the evidence amounts to a strong prima facie case that the defendant has advanced fraudulent claims in the Melborne Enterprises and Estonian Shipping cases. Whether he has in fact done so can only be determined at a trial.'
Evidence of fraud would, as I have said, be admissible in enforcement proceedings brought in England. But is one to suppose that enforcement will take place in this country? The shipowners are exposed to such proceedings wherever their vessels

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

[1997] C.L.C. 985                                                                    Page 6
1997 WL 1105865 (CA (Civ Div)), [1997] C.L.C. 985, [1997] 2 Lloyd's Rep. 183
**(Cite as: [1997] C.L.C. 985)**

(150 of them, in the case of Maersk Line) roam the seas.

The evidence of fraud could, of course, have been brought in the Sierra Leone proceedings, but it has not been. Seeing that no criticism in now made of the Sierra Leone judges, it would require more than mere evidence that the claims are fraudulent to justify restraining proceedings in Sierra Leone and allowing the English actions to proceed. The case for taking that course depends on whether there is a real impediment to justice in Sierra Leone.

**\*991** The evidence is considered at length in the judgment of Clarke J. The principal point, perhaps, is Mr Ghirardani's assertion that it would not be safe for him to return to Sierra Leone for any prolonged period of time. A death threat has been made against him and against the Maersk Line's former senior representative in West Africa. It is said for Mr Wansa that there will be no need for Mr Ghirardani to go to Sierra Leone. But in my judgment there is very likely to be a significant amount of first-hand evidence which he can give; and in any event, as a solicitor who has masterminded the investigation he could reasonably be required to be present at the trial. I see no reason to doubt the credibility of Mr Ghirardani's evidence at this stage, particularly when it is challenged (if at all) by Mr Wansa whose claims are for the present considerably discredited.

It is also Mr Ghirardani's evidence that Mr Wansa has regularly boasted that he can in effect manipulate the legal system in Sierra Leone. That too may lack credibility, since it is accepted that there are no grounds for criticism of the Sierra Leone judiciary; but it scarcely lies in Mr Wansa's mouth to say that his own assertions should be altogether disregarded. And the shipowners may feel that justice is not seen to be done with such assertions from their opponent.

This evidence, from a respectable solicitor, to my mind changes the situation entirely. Clarke J regarded it as sufficient reason for his orders restraining Mr Wansa from dealing with his assets, and from continuing the proceedings in Sierra Leone, and for refusing an order staying the English actions. All that was within the judge's discretion, and it seems to me that there can be no proper criticism of the way that he exercised it. This court should not in my judgment interfere with the carefully considered conclusion of a judge with great experience in this field.

**The amount restrained**

In the Melborne action Mr Wansa is restrained from dealing with his assets up to a total of $671,581.54, and in the Estonian action up to a total of $1,271,723.50. Those figures are derived from the affidavits of Mr Ghirardani. They comprise the estimated costs of the shipowners' English and Sierra Leone lawyers to the date of the judge's order, which are large enough in all conscience, and the damages and costs which will fall upon the shipowners if the Sierra Leone proceedings are continued (in breach of the injunctions) and result in judgment for Mr Wansa. The 'best estimate' is that, included in the latter part of the calculation, there will be interest at 36 per cent per annum for a period of six years.

There is a good deal of doubt inherent in those calculations. We have little guidance from authority as to how we should treat, for the purposes of a prior restraint injunction, an assertion that breaches of contract (and of an order of this court) will continue in the future for a period of six years, that in consequence a foreign court will reach a wrong conclusion on liability, and that the damages will be grotesque. Presumably we must require a good arguable case as to what is likely to happen; Mr Ghirardani says in his affidavit:

'The figures are the best estimates that we can provide, and are based on my and [the local lawyer's] previous experiences.'

The solution adopted by Clarke J was to wait and see whether Mr Wansa discontinued the Sierra Leone proceedings. If he did, and instead counterclaimed in England, the amounts covered by the prior restraint injunctions could be reduced by a very substantial amount. If not, the shipowners' claim for a restraint in the amounts claimed would be all the stronger.

The two cases came back before Clarke J on 21 March 1996. At that time it was Mr Wansa's case that he would not discontinue the Sierra Leone proceedings until there had been an appeal in the English actions.

**\*992** There now has been an appeal. Once again, if Mr Wansa discontinues the Sierra Leone proceedings there will be a case for reducing the amount of the prior restraint injunctions. I would give liberty to apply to a judge of the Commercial Court in that

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

[1997] C.L.C. 985
1997 WL 1105865 (CA (Civ Div)), [1997] C.L.C. 985, [1997] 2 Lloyd's Rep. 183
**(Cite as: [1997] C.L.C. 985)**

event. For the present, I would dismiss both appeals. During the hearing there appeared to be some doubt as to whether the injunctions still subsisted, or had expired without renewal. Perhaps that has now been clarified.

Waite LJ:

 I agree.

Aldous LJ: I

 also agree.

(Appeals dismissed with costs. Leave to appeal refused)

       (c) Sweet & Maxwell Limited

END OF DOCUMENT

# EXHBIT C

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

---

SCOTT RAY, Derivatively On Behalf
of Harley-Davidson, Inc.,

                  Plaintiff,

            v.                         Case No. 05-C-1123

JAMES L. ZIEMER,
JEFFREY L. BLEUSTEIN,
W. KENNETH SUTTON, JR.,
GAIL A. LIONE,
JOHN A. HEVEY,
JON R. FLICKINGER,
JAMES M. BROSTOWITZ,
JAMES A MCCASLIN,
DONNA F. ZARCONE,
RONALD M. HUTCHINSON,
BARRY K. ALLEN,
JUDSON C. GREEN,
SARA L. LEVINSON,
JAMES A NORLING,
RICHARD I. BEATTIE,
GEORGE H. CONRADES,
DONALD A JAMES,
GEORGE L. MILES, JR.,

                  Defendants.
     and

HARLEY-DAVIDSON, INC.,

                  Nominal Defendant.

---

LISA BOSMAN, On Behalf of Herself
and All Others Similarly Situated,

                  Plaintiff,

            v.                         Case No.  05-C-0912

HARLEY-DAVIDSON, INC.,
ADMINISTRATIVE COMMITTEE OF
HARLEY-DAVIDSON, INC.,
HAROLD A. SCOTT,
JAMES M. BROSTOWITZ,
JAMES L. ZIEMER,
GAIL A LIONE,
BARRY K. ALLEN,
RICHARD I. BEATTIE,
JEFFREY L. BLEUSTEIN,
GEORGE H. CONRADES,
JUDSON C. GREEN,
DONALD A. JAMES,
SARA L. LEVINSION,
GEORGE L. MILES, JR.,
JAMES A. NORLING,

Defendants.

---

## ORDER CONSOLIDATING CASES FOR ADMINISTRATIVE PURPOSES

In the summer of 2005, several securities class actions were filed against Harley-Davidson, Inc.  Additionally, plaintiff Scott Ray has filed a derivative action on behalf of Harley-Davidson, Inc., against members of its board of directors, and plaintiff Lisa Bosman filed an E.R.I.S.A. class action against Harley-Davidson, Inc., and members of its board of directors.  While the ultimate issues in these cases are not closely related, many of the document requests, depositions, and other discovery demands will be common to some or all of the cases.  Thus, to conserve resources and to avoid duplicate depositions and document productions, the above-captioned cases are consolidated for administrative purposes pursuant to Fed. R. Civ. P. 42(a).

Therefore,

IT IS ORDERED that:

2

1.   The above-entitled cases are consolidated with Case No. 05-C-547, for administrative purposes only, pursuant to Fed. R. Civ. P. 42(a).

2.   Every pleading filed in these actions shall have the following caption:

_____
                                )
IN RE HARLEY-DAVIDSON, INC.     )     Case No. 05-C-00547-CNC
SECURITIES LITIGATION           )
                                )
_____ )

3.   When a pleading is intended to apply to all actions governed by this order, the words "All Actions" shall appear immediately after the words "This Document Relates To:" in the caption set out above.  When a pleading is intended to apply only to some, but not all of the Consolidated Actions, this court's docket number for each individual action to which the paper is intended to be applicable and the last name of the first-named plaintiff in said action shall appear immediately after the words "This Document Relates To:" in the caption described above (e.g., "No. 2:04-C-00547," (Kadagian)).

Dated at Milwaukee, Wisconsin, this 15th day of February, 2006.

BY THE COURT

s/ C. N. CLEVERT, JR._____
C. N. CLEVERT, JR.
U. S. District Judge

3

# EXHBIT D

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

_____

                                         :

                                         :             Civil Action No. 05-2681 (JAG)

IN RE ABLE LABORATORIES SECURITIES  :

 LITIGATION                                  :                  **ORDER**

                                         :

_____  :

**GREENAWAY, JR., U.S.D.J.**

      This matter comes before this Court on the motions of the Denver Employees Retirement

Plan ("DERP") (Docket Entry No. 14) , Deka International (Ireland) Limited ("Deka") (Docket

Entry No. 13), Richard Upham ("Upham") (Docket Entry No. 17), Floyd Webster, Kent Webster,

Keith Webster and Helen Darrah (the "Webster Family") (Docket Entry No. 7), the

Communications Workers of America Plan for Employees' Pensions and Death Benefits

("CWA") with Daniel Levy (Docket Entry No. 11), Genesee County Employees Retirement

System with Julian M. Warren ("Genesee and Warren") (Docket Entry No. 6), Edward Howlette

(Docket Entry No. 12), and Charles M. Gillis (Docket Entry No. 16) for appointment as lead

plaintiff and appointment of their respective attorney as lead counsel.  Following the filing of the

individual motions seeking appointment as lead plaintiff, Deka and DERP proposed combining

to form the Institutional Investor Group ("IIG"), and the court having reviewed the submissions

of the parties, as well a the oral arguments presented on January 23, 2006; and for the reasons set

forth in the Court's opinion,

      IT IS on this  17th  day of March, 2006,

      ORDERED that the motions of Deka and DERP are GRANTED, and Deka and DERP

shall combine to form the Institutional Investor Group; and

IT IS FURTHER ORDERED that the Institutional Investor Group is appointed as the lead

plaintiff; and

IT IS FURTHER ORDERED that Grant & Eisenhofer P.A. and Murray, Frank and Sailer

LLP are appointed as co-lead counsel; and

IT IS FURTHER ORDERED that the motion of the Webster Family is withdrawn; and

IT IS FURTHER ORDERED that all other motions for appointment as lead plaintiff are

DENIED; and

IT IS FURTHER ORDERED that a copy of this Order be served on all parties within

seven (7) days of the date of this Order.

         S/Joseph A. Greenaway, Jr.
         JOSEPH A. GREENAWAY, JR., U.S.D.J.

# EXHIBIT E

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7/26/05

ANTHONY CAPONE, Individually and On    :
Behalf of All Others Similarly
Situated,                              :

          Plaintiff,    : 05 Civ. 3514 (LLS)

     vs.                              : ORDER OF CONSOLIDATION
                              AND APPOINTMENT
MBIA INC., NEIL G. BUDNICK, GARY       :
DUNTON, JOSEPH W. BROWN, DOUGLAS
C. HAMILTON and NICHOLAS FERRERI,      :

          Defendants.    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
TODD SIMON, Individually and On        :
Behalf of All Others Similarly
Situated,                              :

          Plaintiff,    : 05 Civ. 3636 (LLS)

     vs.                              :

MBIA INC., NEIL G. BUDNICK, GARY       :
DUNTON, JOSEPH W. BROWN, DOUGLAS
C. HAMILTON and NICHOLAS FERRERI,      :

          Defendants.    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
MARISS PARTNERS, LLP, Individually     :
and On Behalf of All Others
Similarly Situated,                    :

          Plaintiff,    : 05 Civ. 3709 (LLS)

     vs.                              :

MBIA INC., NEIL G. BUDNICK, GARY       :
DUNTON, JOSEPH W. BROWN, DOUGLAS
C. HAMILTON and NICHOLAS FERRERI,      :

          Defendants.    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

```
------------------------------------x
THOMAS CASSADY, and On Behalf of      :
Himself and All Others Similarly
Situated,                             :

            Plaintiff,                :  05 Civ. 3730 (LLS)

    vs.                               :

MBIA INC., NEIL G. BUDNICK, GARY      :
DUNTON, JOSEPH W. BROWN, DOUGLAS
C. HAMILTON and NICHOLAS FERRERI,     :

            Defendants.               :
------------------------------------x
ALAN D. SADOWSKY and BARBARA S.       :
KATZIN, Individually and On Behalf
of All Others Similarly Situated,     :

            Plaintiffs,               :  05 Civ. 4150 (LLS)

    vs.                               :

MBIA INC., JOSEPH W. BROWN, GARY C.   :
DUNTON, NICHOLAS FERRERI, NEIL G.
BUDNICK, and DOUGLAS C. HAMILTON,     :

            Defendants.               :
------------------------------------x
```

Two separate groups of plaintiff class members who are
institutional investors, the first a combination of Southwest
Carpenters Pension Trust and the City of Pontiac General
Employees' Retirement System, and the second a combination of
United Food Commercial Workers Local 1262 Pension Fund and
Activest Investmentgesellschaft mbH, each seek consolidation of
these securities class actions for all purposes, and appointment

of themselves as lead plaintiff, and their counsel as lead
counsel.

Recently, the two separate groups formed together and
stipulated to co-prosecute the case, with their respective
counsel to serve as lead counsel jointly, without duplication of
effort. After consideration of the submissions of counsel and
the factors listed in 15 U.S.C. § 78u-4(a)(3)(B) and Fed. R.
Civ. P. 23 and 42, it is ORDERED that:

## 1. Consolidation

The five cases above are consolidated for all purposes into
one action under the caption:

------------------------------------x

In re MBIA INC. SECURITIES LITIGATION : 05 Civ. 3514 (LLS)

------------------------------------x

Further papers in any of the five actions shall be filed in and
maintained thereunder.

## 2. Lead Plaintiff and Lead Counsel

While the court has entire confidence that the parties and
their attorneys would make every effort to avoid any duplication
of effort, it remains inevitable that with fewer entities there
is less duplication. One group of institutional investors and

-3-

one law firm will suffice for adequate representation of the class.

Netting the dollar amounts of purchases and sales made by each group during the class period, and then appraising any stock bought during the period and held after its close at the mean trading price during the post-close 90 days (15 U.S.C. § 78u-4(e)), Southwest and City of Pontiac had losses of $205,620.55; UFCW Local 1262 Pension Fund is a net seller, and thus not an adequate representative of a class of purchasers; and Activest lost $70,832.32. Thus, Southwest and City of Pontiac as a group has the largest financial loss and is the group "most capable of adequately representing the interests of the class members." Even viewing Southwest as a "professional plaintiff" under 15 U.S.C. § 78u-4(a)(3)(B)(vi), its participation will be permitted with its co-lead plaintiff which has served as lead plaintiff in only two other cases in the last three years.

Accordingly, institutional investors Southwest Carpenters Pension Trust and City of Pontiac General Employees' Retirement System shall serve as lead plaintiff and their firm of choice, Lerach Coughlin Stoia Geller Rudman & Robbins LLP, are appointed

-4-

as lead counsel for the class.

So ordered.

Dated: July 25, 2005
     New York, New York

_____
     Louis L. Stanton
     U.S.D.J.

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

_____

MERRILL STEINBERG, Individually and On
Behalf of All Others Similarly Situated,

                    Plaintiff,

vs.

ERICSSON LM TELEPHONE CO., CARL-
HENRIC SVANBERG and KARL-HENRIK
SUNDSTROM,

                    Defendants.

_____

**CIVIL ACTION NO. 07-CV-9615-RPP**

"ECF CASE"

STATE-BOSTON RETIREMENT SYSTEM,
    Individually and On Behalf of All Others
    Similarly Situated,

                    Plaintiff,

           vs.

ERICSSON LM TELEPHONE CO., CARL-
    HENRIK SVANBER and KARL-HENRIK
    SUNDSTROM,

                    Defendants.

_____

**CIVIL ACTION NO. 07-CV-10659-RPP**

"ECF CASE"

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 17, 2008, I caused to be electronically filed the foregoing MEMORANDUM IN OPPOSITION TO THE MOTION OF THE INSTITUTIONAL INVESTORS GROUP AND IN FURTHER SUPPORT OF THE MOTION OF JACQUES FURHER TO BE APPOINTED LEAD PLAINTIFF OF THE CLASS AND FOR APPROVAL OF ITS SELECTION OF LEAD COUNSEL with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to counsel of record.

I FURTHER CERTIFY that I caused the foregoing document and the notice of electronic filing by first-class mail to the following non-CM/ECF participants:

N/A

**MURRAY, FRANK & SAILER LLP**

By: _____/s/_____
       Brian Murray (BM 9954)
Lawrence D. McCabe (LM 1846)
Brian Brooks
275 Madison Avenue, 8th Floor
New York, New York 10016
Telephone: (212) 682-1818
Facsimile: (212) 682-1892

**Proposed Lead Counsel for the Class**