UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MERRILL STEINBERG, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>ERICSSON LM TELEPHONE CO., CARL-HENRIC SVANBERG and KARL-HENRIK SUNDSTROM,<br><br>Defendants. | Civil Action No. 07-9615<br><br>Judge Robert P. Patterson<br><br>**Oral Argument Requested** |

**DEFENDANTS' MEMORANDUM OF LAW
IN SUPPORT OF THEIR MOTION TO DISMISS
PLAINTIFF'S CONSOLIDATED AMENDED COMPLAINT**

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP

1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: (212) 373-3000
Fax: (212) 373-4020

*Attorneys for Defendants*

# TABLE OF CONTENTS

Page

Table of Authorities ................................................................................................ iii

Preliminary Statement ............................................................................................. 1

Statement of Facts.................................................................................................... 3

    A.    Ericsson............................................................................................ 3

    B.    The Consolidated Complaint ........................................................... 3

Argument ................................................................................................................. 4

I. The Complaint Does Not Adequately Allege That Defendants Violated Section
    10(**b**) ............................................................................................................... 4

    A.    Plaintiff Fails To Allege Any Misleading Statements................................ 4

        1.    Applicable Legal Standard ................................................. 4

        2.    None Of The Statements Cited Are False Or Misleading .............. 5

            a.    Statements Pertaining to Market Share, Data Traffic,
                and Market Growth........................................................ 6

                (1) Paragraph 39 ................................................. 7

                (2) Paragraph 40 ............................................... 10

                (3) Paragraph 41 ............................................... 11

                (4) Paragraph 42 ............................................... 11

            b.    Statements About 3Q07 Performance ...................... 12

                (1) Paragraph 43 ............................................... 12

                (2) Paragraph 44 ............................................... 13

            c.    Statements About AT&T...................................... 14

        2.    Many Of the Challenged Statements Are Not Actionable
            As A Matter Of Law ................................................. 15

            a.    Many Of The Statements Are Non-Actionable Puffery ......... 15

            b.    Many Of The Statements Are Accurate Statements Of
                Historical Fact........................................................ 16

    B.    The Complaint Fails To Allege That Defendants Acted With
        Scienter ................................................................................. 17

Page

1.  Plaintiffs Must Allege Particular Facts Creating A Strong And Compelling Inference Of Scienter .........................................17

2.  The Complaint Does Not Allege That Defendants Had A Motive To Commit Fraud .............................................................18

3.  The Complaint Does Not Allege Strong Circumstantial Evidence Of Conscious Misbehavior Or Recklessness ................18

    a.  Defendants' Access To Adverse Information .........................19

    b.  AT&T's Orders ....................................................................20

    c.  The "50 Contracts" .............................................................21

    d.  Ericsson's Competitors ......................................................21

II.  Plaintiff Fails to Allege a Violation of Section 20(a) ...................................22

III.  This Court Lacks Personal Jurisdiction Over Svanberg And Sundstrom ..................23

    A.  The Applicable Legal Standard ...................................................23

    B.  This Court Does Not Have General Or Specific Jurisdiction Over Svanberg Or Sundstrom.......................................................24

Conclusion .............................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*380544 Canada, Inc. v. Aspen Technology, Inc.*,
   544 F. Supp. 2d 199 (S.D.N.Y. 2008) ........................................................................ 20

*In re Alstom S.A.*,
   406 F. Supp. 2d 346 (S.D.N.Y. 2005) ........................................................................ 24

*In re Apple Computer, Inc.*,
   127 Fed. Appx. 296 (9th Cir. 2005)............................................................................ 21

*ATSI Commc'ns., Inc. v. Shaar Fund Ltd.*,
   493 F.3d 87 (2d Cir. 2007) ............................................................................... 5, 22, 23

*Bell Atlantic v. Twombly*,
   127 S. Ct. 1955 (2007)................................................................................................... 5

*In re Career Educ. Group*,
   No. 03 C 8884, 2007 WL 1029092 (N.D. Ill. Mar. 29, 2007)...................................... 9

*Charas v. Sand Technology Systems Int'l, Inc.*,
   No. 90 Civ. 5638, 1992 WL 296406 (S.D.N.Y. Oct. 7, 1992) ................................... 25

*Chill v. General Electric Co.*,
   101 F.3d 263 (2d Cir. 1996) ....................................................................................... 19

*In re Duane Reade Inc. Sec. Litig.*,
   No. 02 Civ. 6478 (NRB), 2003 WL 22801416 (S.D.N.Y. Nov. 25, 2003),
   *aff'd sub nom. Nadoff v. Duane Reade Inc.*, 107 Fed. Appx. 250 (2d Cir.
   2004)..................................................................................................................... 9, 17

*Dura Pharmaceuticals, Inc. v. Broudo*,
   544 U.S. 336 (2005)....................................................................................................... 4

*Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*,
   No. 06 Civ. 4045 (JGK), 2008 WL 857631 (S.D.N.Y. Mar. 31, 2008) ....................... 5

*Goplen v. 51job, Inc.*,
   453 F. Supp. 2d 759 (S.D.N.Y. 2006) ........................................................................ 20

*Harrison v. Rubenstein*,
   No. 02 Civ. 9356 (DAB), 2007 WL 582955 (S.D.N.Y. Feb. 26, 2007)..................... 23

*In re Intelligroup Sec. Litig.*,
   527 F. Supp. 2d 262 (D.N.J. 2007) ............................................................................... 9

**Page(s)**

*Malin v. XL Capital Ltd.*,
499 F. Supp. 2d 117 (D. Conn. 2007).................................................................. 5, 9

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*,
84 F.3d 560 (2d Cir. 1996) ................................................................................ 23, 25

*In re Nokia Corp. Sec. Litig.*,
No. 96-CV-3752, 1998 WL 150963 (S.D.N.Y. Apr. 1, 1998) .................................. 18

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000) ............................................................................... 18, 19

*In re Rhodia S.A. Sec. Litig.*,
531 F. Supp. 2d 527 (S.D.N.Y. 2007) ................................................................. 23, 24

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004) ............................................................................ 5, 15, 18

*Rothman v. Gregor*,
220 F.3d 81 (2d Cir. 2000) ................................................................................ 17, 18

*San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris
Cos.*,
75 F.3d 801 (2d Cir. 1996) .................................................................................... 5, 19

*SEC v. First Jersey Secs., Inc.*,
101 F.3d 1450 (2d Cir. 1996) ..................................................................................... 22

*In re Sierra Wireless,Inc,. Sec. Litig.*,
482 F. Supp. 2d 365 (S.D.N.Y. 2007) ....................................................................... 16

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
127 S.Ct. 2499 (2007)........................................................................................... 2, 17

*In re Worldcom Sec. Litig.*,
303 F. Supp. 2d 385 (S.D.N.Y. 2004) ....................................................................... 16

## STATUTES

Securities Exchange Act of 1934, 15 U.S.C. § 78u-4(b)........................................... passim

## OTHER AUTHORITIES

Fed. R. Civ. P. 9............................................................................................................ 1, 4

Fed. R. Civ. P. 12.......................................................................................................... 1, 3

Defendants Carl-Henric Svanberg, Karl-Henrik Sundstrom and Ericsson LM Telephone Co. ("Ericsson") respectfully submit this memorandum of law in support of their motion to dismiss Plaintiff's Consolidated Complaint, dated April 15, 2008 (the "Complaint"),[1] pursuant to Rules 9 and 12(b)(2) & (6) of the Federal Rules of Civil Procedure and Section 21D(b)(3) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78u-4(b)(3).

## PRELIMINARY STATEMENT

In this lawsuit, Plaintiff accuses Ericsson of committing securities fraud based upon little more than the fact that the Company's stock dropped on October 16, 2007, after Ericsson pre-announced financial results for the third quarter of 2007 ("3Q07") that disappointed the market. Unable to point to any public forecasts Defendants made about 3Q07, Plaintiff focuses instead on presentations Defendants made at a technology conference in London on September 11, and attempts to twist those statements into a promise that the Company's 3Q07 results would be strong. Based upon this distortion, Plaintiff charges that Ericsson did not just have a disappointing quarter, but that Defendants committed a fraud. He seeks to assert securities fraud claims on behalf of shareholders who acquired Ericsson's securities in the 45 days between September 11 and October 15, 2007.

Plaintiff's claims are baseless and should be dismissed. This Court is not required to simply accept Plaintiff's aggressive mischaracterization of Defendants' statements. Instead, on this motion to dismiss, the Court may review a transcript of the September 11 conference and, when it does, it will be clear that nothing Defendants said was remotely false or misleading. Contrary to Plaintiff's contentions, Defendants did not make

---

[1] The Complaint is attached to the Declaration of Joshua Kaye, dated June 13, 2008 ("Kaye Decl."), as Ex. A.

encouraging statements about Ericsson's third quarter results. And the statements Defendants did make were fully consistent with what even Plaintiff alleges to have been the true facts. (*See*, Part IA, *infra*.)

Plaintiff also completely fails to allege facts that support a strong, cogent and compelling inference that Defendants acted with an intent to defraud. Plaintiff does not, and cannot, articulate any motive Defendants possibly could have had to mislead investors about Ericsson's financial results on September 11, only to "reveal the truth" a few weeks later in the Company's October 16 press release disclosing its 3Q07 results. Plaintiff also does not, and cannot, identify any facts showing that on September 11 (19 days before the end of the quarter) Defendants knew what the Company's 3Q07 results would be. Instead, the Complaint relies on boilerplate allegations that Defendants had access to unidentified information showing that 3Q07 would be disappointing (allegations that courts uniformly find to be deficient) and on assertions about purported adverse developments in a customer relationship that accounted for a small percentage of Ericsson's revenues and that were, in fact, disclosed. (*See*, Part IB, *infra*.)

Finally, the Complaint does not allege facts establishing that this Court has personal jurisdiction over Defendants Svanberg or Sundstrom. These Defendants are Swedish nationals, working for a Swedish company, who made the challenged statements in London. The Complaint does not allege any U.S.-based conduct that would subject either of these Defendants to suit in the United States. (*See* Part III, *infra*.)

For all of these reasons, and other reasons set forth in this memorandum, Plaintiff has not come close to meeting his burden of pleading a claim of federal securities fraud. The Complaint should be dismissed in its entirety and with prejudice.

STATEMENT OF FACTS

**A. Ericsson.** Ericsson "is a Swedish company that provides communications networks, related services, and handset technology platforms for mobile and fixed network operators worldwide." (Cmplt. ¶13.)  In 2007, Ericsson operated in over 140 countries around the world and had more than 74,000 employees. ( Ericsson's 2007 Form 20-F Annual Report, filed April 21, 2008, attached to Kaye Decl. as Exhibit B, at 4 & 9.). [2]  Carl-Henric Svanberg was and is Ericsson's CEO and Karl-Henrik Sundstrom was Ericsson's CFO at the time of the transactions at issue in the Complaint.  (Cmplt. ¶¶14-15.)

On October 16, 2007, Ericsson announced that it expected sales for the quarter of SEK 43.5 b ($7.25 billion), operating income of SEK 5.6 b ($931 million) and cash flow of SEK -1.6 b (-$266 million).  (*Id.* ¶62.)  Following this announcement, Ericsson's stock price fell.

**B. The Consolidated Complaint.**  On April 15, 2008, Plaintiff filed a Consolidated Complaint, in which he seeks to assert fraud claims against Defendants on behalf of persons who purchased Ericsson stock between September 11, 2007 and October 15, 2007.  (*Id.* ¶1.)  Plaintiff charges that on September 11 Defendants falsely claimed that "the Company's products had sustainable growth, even while its peers in the market were stating the market was tightening... [and] were retreating from their original forecasts" (*id.* ¶3), and that Defendants "concealed their true results from the investing public" until October 16, 2007, when they pre-announced the Company's third quarter results for 2007.  (*Id.* ¶¶4, 68.)  Following that announcement, the Company's stock price fell 24%.  (*Id.* ¶6.)  In Count I, Plaintiff seeks to assert a claim against all Defendants under Section 10(b) of the Exchange

---

[2]  On this motion the Court may consider all "sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 127 S.Ct. 2499, 2509 (2007).

Act, and Rule 10b-5 promulgated thereunder. In Count II, Plaintiff seeks to assert a claim

against Defendants Svanberg and Sundstrom for control person liability under Section 20(a)

of the Exchange Act.

**ARGUMENT**

**I.**

**THE COMPLAINT DOES NOT ADEQUATELY ALLEGE
THAT DEFENDANTS VIOLATED SECTION 10(b)**

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must establish

that each defendant (1) made a misstatement or omission of fact, (2) which was material, (3)

acting with scienter, (4) that plaintiff relied upon, and (5) caused him injury. *Dura*

*Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 341 (2005). As we show below, Plaintiff's

Complaint must be dismissed because it does not properly allege that Defendants made a

material misstatement, or that they acted with scienter.

**A.    Plaintiff Fails To Allege Any Misleading Statements**

**1. Applicable Legal Standard.** In a securities fraud case such as this, which

is subject to Fed. R. Civ. P. 9(b) and the heightened pleading requirements of the Private

Securities Litigation Reform Act ("PSLRA"), plaintiffs must "specify each statement alleged

to have been misleading," identify "the reason or reasons why the statement is misleading,"

and "state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-

4(b)(1). Plaintiffs must do more than allege that statements were materially misleading:

"they must demonstrate with specificity why and how that is so." *Rombach v. Chang*, 355

F.3d 164, 174 (2d Cir. 2004). The complaint must contain allegations "plausibly suggesting

(not merely consistent with)" liability. *Bell Atlantic v. Twombly*, 127 S. Ct. 1955, 1959 (2007).[3]

In the present case, where Plaintiff quotes extensively from Defendants' statements, the Court is entitled to consider the statements in full. *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 808-809 (2d Cir. 1996).[4] And where, as here, those statements fail to support Plaintiff's characterization of them, the complaint must be dismissed. *E.g., Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*, No. 06 Civ. 4045 (JGK), 2008 WL 857631, at *6-*8 (S.D.N.Y. Mar. 31, 2008).

**2. None Of The Statements Cited Are False Or Misleading.** The *only* statements Plaintiff alleges are misleading are those made at the September 11 Strategy and Technology Summit in London.[5] (Cmplt. ¶¶ 39-46.) While the substantive allegations of the Complaint begin with 13 paragraphs of earlier statements and projections by Ericsson and by several of its competitors from February to August 2007 (Cmplt. ¶¶ 26-38, 58 & 60), Plaintiff asserts no claims with respect to any statements during that period, and the putative class period begins on September 11.

Plaintiff claims that at the London conference, 19 days before the end of the third quarter, Svanberg and Sundstrom provided investors with strong "projected quarterly and annual results." (Cmplt. ¶¶ 65, *see also* ¶39.) As the discussion that follows

---

[3]   The requirements of *Twombly*, an antitrust case, apply in securities law cases. *ATSI Commc'n., Inc. v. Shaar Fund Ltd.*, 493 F.3d 87, 98 & n.2 (2d Cir. 2007).

[4]   Consequently, Defendants attach the full transcript of the September 11, 2007 presentation, and the accompanying slides used by Svanberg and Sundstrom, as Exhibits C, D, and E to the Kaye Declaration. *See Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 131 (D. Conn. 2007) (court may consider transcript on motion to dismiss where plaintiff has quoted from it in complaint).

[5]   Although the Complaint refers to Ericsson "forecasts" or "projections," Plaintiff does not, and cannot, point to a forecast or projection Ericsson ever made regarding its financial performance for 3Q07 until it made its announcement on October 16, 2007.

demonstrates, Defendants did not make the projections Plaintiff alleges. Their discussion was almost entirely directed at long-term trends and strategy, and non-U.S. operations. Defendants made virtually no mention of anticipated third quarter results; and in fact they *did* note that the Company's U.S. business – which comprised less than 9% of Ericsson's overall business – was down.

### a.  Statements Pertaining to Market Share, Data Traffic, and Market Growth.

The statements Plaintiff quotes – consistent with the focus of the London conference – are predominantly about Ericsson's progress and future expectations in increasing its market share, primarily in non-U.S. markets. Plaintiff seeks to recharacterize them as statements about 3Q07 financial results. Whether read as a whole or as the series of excerpts Plaintiff has chosen, they do not support that characterization.

Svanberg spoke first at the conference. (Ex. C, at 3-8.) He addressed efforts to increase the scale of Ericsson's business (*id.* at 3) and discussed market enthusiasm for mobile broadband (HSPA) services and Ericsson's plans to roll out these systems, focusing on Latin America, Russia and India (*id.* at 4). He then spoke of system upgrades underway in South Africa, Sweden and Malaysia (*id.* at 5). He discussed how the business models might evolve as demand for data services increased (*id.*), and the Company's progress in increasing its market share and its efforts to gain advantages of scale (*id.* at 5-7). He spoke of new start-up contracts, but cautioned that this strong growth came with "initial costs" (*id.* at 7). He turned briefly to Ericsson's multimedia business, launched at the beginning of the year, which he described as "a little bit bumpy" in its initial phase (*id.*). He reviewed the results of operations in Ericsson's five regions[6] during the first half of 2007, describing the U.S. market

---

[6]    The regions are Western Europe; Central and Eastern Europe, Middle East and Africa ("CEMA"); Asia-Pacific ("APAC"); Latin America; and North America.

as "a bit of a rollercoaster" and using a slide showing that Ericsson's North American revenues had declined by 31% during the first half of 2007. (*Id.* at 8; *see also* Slides Accompanying Carl-Henric Svanberg's Presentation at the London Conference, attached to Kaye Decl. as Ex. D, at slide 19.) He concluded by describing Ericsson's objectives of operational excellence and improved cash flow.

Sundstrom then briefly summarized Ericsson's previously-disclosed financial results for the first half of 2007. (Ex.C, at 8-9.) He described substantial growth in the Asia-Pacific and the Central and Europe, Middle East and Africa regions, and the financial impact of payment practices in those regions (*id.* at 9). He noted in particular the prevalence of turnkey projects in those regions, which adversely affect working capital and cash flow, but which over time would lead to capacity expansions, which are more advantageous in these respects. (*Id.* at 9-10.)

Neither Svanberg nor Sundstrom focused on short-term results, or made any promises or predictions regarding 3Q07 performance. Svanberg spoke of long-term strategic objectives, and Sundstrom spoke of prior-period financial results.

Notwithstanding the clear focus of these presentations, Plaintiff has cherry-picked numerous snippets of the presentations and attempts to portray them as promises of strong 3Q07 results. Those snippets (alleged principally in paragraphs 39-42) do not support Plaintiff's recharacterization.

**(1) *Paragraph 39.*** In this paragraph, Plaintiff attempts to contrast what he describes as "grim forecasts for the third quarter and beyond" by Ericsson's competitors with statements by Defendant Svanberg describing new customers in Latin America, Russia and India, along with an increase in data traffic in Western Europe and Asia. Plaintiff quotes the following statement:

7

> A lot of HSPA [High Speed Packet Access, a form of high-speed broadband service] roll outs in the pipeline.  Actually more than 50 operators are now being added to the list, will be added to the list as in the near future.  Lots of countries that you see there and this goes beyond just the developing markets, developed markets.  And here we talk about rollouts throughout Latin America and Russia and India as part of, for example, the DS&L contract – although licenses and frequencies are not yet awarded, but it will come rather quickly in India as well.

(Cmplt. ¶39; *see also* Ex. C, at 4.)  Plaintiff faults this statement because, according to his Confidential Sources ("CS") 1 and 3, these 50 new contracts would generate only limited third-quarter revenue.  (Cmplt. ¶¶50, 75, 79.)

Plaintiff's objection is baseless.  *First*, Svanberg was not discussing revenue, and did not cite the contracts as a source of substantial short-term revenue.  Rather, as the preceding paragraph of the transcript demonstrates, he was addressing future subscriber growth potential.  (Ex. C, at 4.)  *Second*, the very statement Plaintiff quotes makes clear that Svanberg was not promising substantial revenue growth from these new contracts in the near future:  he stated explicitly that "the licenses and frequencies are not yet awarded" with respect to some of them.  And *third*, as the accompanying slide showed, the new contracts Svanberg was addressing were primarily in emerging market countries – "Brazil, Kenya, Macau, Mexico, Nigeria, Russia, Thailand, Ukraine and Uruguay" (Ex. D, at slide 5) – countries with respect to which CS 1 and 3 do not claim to have any role or information.[7] Because the CS's are not alleged to have direct knowledge of the particular matters relevant to

---

[7]  CS 1 and 3 are alleged to have information about U.S. matters.  (Cmplt. ¶¶22, 24.)  The Complaint alleges that CS 1 had knowledge of the 50 new contracts, but speaks only of one such contract – with Cincinnati Bell.  (Cmplt. ¶50.)  CS 3 apparently believes Svanberg's reference was to contracts with "'tiny' regional telephone companies in companies [sic] in small markets such as Texarkana, Arkansas and Biloxi, Mississippi." (*Id.* at ¶56.)  It does not appear from the materials before the Court that these CSs are even talking about the contracts that were addressed in the presentation, because the presentation slide pointing to the new contracts referred only to non-U.S. contracts.  Moreover, the allegation that these contracts might not lead to revenues until after 3Q07 (*id.* at ¶50) is entirely consistent with Svanberg's statement, which promised no such revenues.

the statements at issue – non-U.S. contracts – they provide no support for the claims here.

*See, e.g., In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 360-61 (D.N.J. 2007) (rejecting

confidential witness allegations lacking an adequate basis for inferring first-hand

knowledge).[8]

   Plaintiff next quotes a passage addressing growth in data traffic in certain non-

U.S. markets:

> This is a picture that – what came up there was the added information. The
> rest was before last time we met. You can see – and these are three examples
> that we follow, two in Western Europe, one in Asia Pacific, where we're just
> seeing what is happening to data traffic in HSPA networks. And after six
> months, there was a doubling and now after an additional three months, we're
> 300% up in these networks. And it really happens quite quickly.

(Cmplt. ¶39; *see also* Ex. C, at 4-5.) While the Complaint does not specify what was

allegedly false about this statement, one thing is clear: the statement did not, as the

Complaint suggests, address Ericsson's financial results in the third quarter. The slide that

accompanied the statement demonstrates that Plaintiff's theory is mistaken in two respects:

*first*, Svanberg was talking about overall data traffic at multiple non-U.S. operators as a means

of demonstrating customer demand, and not about Ericsson's financial results for the quarter;

and *second,* the accompanying slide explicitly noted that it was a summary of "data traffic

growth, ending June '07." (Ex. D, at slide 6.) It was thus solely historical information,

clearly so labeled, and not a projection of 3Q07 results. "Defendants may not be held liable

under the securities laws for accurate reports of past successes, even if present circumstances

are less rosy." *In re Duane Reade Inc. Sec. Litig.*, No. 02 Civ. 6478 (NRB), 2003 WL

22801416, at *6 (S.D.N.Y. Nov. 25, 2003), *aff'd sub nom. Nadoff v. Duane Reade Inc.*, 107

---

[8] *See also Malin v. XL Capital Ltd.*, *supra*, 499 F. Supp. 2d at 131 (rejecting CS allegations
where witnesses lacked personal involvement in calculations at issue); *In re Career Educ.
Group*, No. 03 C 8884, 2007 WL 1029092, at *4 (N.D. Ill. Mar. 29, 2007) (rejecting CS
allegations where "[p]laintiffs have not shown that the witnesses have any basis for their
knowledge").

Fed. Appx. 250, 252 (2d Cir. 2004) ("Accurate statements about past performance are self-evidently not actionable under the securities laws...").

(2) *Paragraph 40.*  The Complaint turns in paragraph 40 to what it characterizes as "anticipated growth in mobile networks for the third quarter of 2007."  The lengthy quotation, however, is directed at market share – not revenues or profits.  Svanberg begins the quoted passage by explaining, "we just saw a recent report, an external report, on market shares and we are – we're not quoting much of our own estimates by the weighting of external reports on market shares, but there was a report recently that said we were over 45% now in both GSM and HSPA."  (Cmplt. ¶40; *see also* Ex. C, at 6.)  The Complaint does not dispute the accuracy of these figures.

The principal highlighted allegation in paragraph 40 with respect to Svanberg's statements entirely misportrays them.  Svanberg stated:

> Professional services, I think this is an area that you're very familiar with.  Our strategy there is to make sure that we work where we have scale.  How were we on scale?
>
> Which means that focus is always on where we have a fair share of owned products because that's where all our strength starts.  And obviously to make sure that we leverage our capabilities and services there.  If we look at the margins, you can see that what we [found is that they're] around 15% there.  You can also see that in Q3 '06, we actually got a – quite a lot of start-ups with new contracts that, managed services contracts, that we [wrote in] and there's always initial costs.
>
> We may have a bit of that also in Q3 this year because you know that we took 11 deals only in Q2, and we had deals in Q1 that is also starting up in Q3.  But growth will obviously be strong in Q3 for us here.

(Cmplt. ¶40, Ex. C, at 7 (bracketed insertions in original).)  While Plaintiff seeks to portray this as falsely promising increased revenues or profits in the third quarter, it is quite the opposite.  *First,* Svanberg was speaking of professional services, not network growth; and by Plaintiff's own allegations, professional services proved to be an area of "strong growth and

stable margins" in the third quarter.  (Cmplt. ¶62 (quoting Ericsson's disclosure in which "the

truth is revealed").)  *Second,* read in context, Svanberg clearly was *not* promising revenue or

profit gains in the third quarter.  To the contrary, he was cautioning that Ericsson's growth of

market share would lead to increased initial costs in the third quarter – just the opposite of

what Plaintiff attempts to portray.[9]  And *third*, Svanberg warned that "there are large projects

and big roll outs and there can be swings in quarters."  (Ex. C, at 7.)

> (3) *Paragraph 41.*  In paragraph 41, the Complaint again takes a quotation

from Svanberg's statement and misconstrues its import.  It quotes him saying that "[w]e are in

Western Europe so far, 5% up," and concluding that "[w]e are in a good position and we

expect to do – continue to gain share, continue to outperform competition."  (Cmplt. ¶41; *see*

*also* Ex. C, at 8.)  As the accompanying slide demonstrates, Svanberg was providing historical

information (through June 2007) with respect to sales growth in that and other regions.  (Ex.

D, at slide 19.)  He made no projection as to changes in market share in 3Q07, much less

financial results in that quarter.

> (4) *Paragraph 42.*  Finally, in paragraph 42, the Complaint focuses on

Defendant Sundstrom's statements about the importance of large, turnkey projects:

> Large projects are for the third year in a row our biggest growth engine.  Most
> of the sales in networks are actually turnkey today.  And I will come back to
> that, coming back to the regional pictures.  Large projects are very good for
> Ericsson.  We have unique capabilities, we get premium priced, but more
> importantly, we are getting an installed base where we can leverage expansion
> and capacity enhancement in the installed base later on.

(Cmplt. ¶42; *see also* Ex. C, at 9.)  Once again, Plaintiff mistakes the import of the statement,

ignoring the two paragraphs that preceded the one he selected for inclusion in the Complaint.

*First,* Sundstrom prefaced his discussion by making clear he was discussing historical data

---

[9]     The slide Svanberg used with respect to professional services (Ex. D, at slide 17), showed
a dip in both net sales and operating margin in the third quarter of 2006.  It did not project
results for the third quarter of 2007.

from the first half of 2007. (*Id.* at 8.) *Second,* Sundstrom cautioned the audience that "turnkey projects continue to grow faster than the group average and it's temporarily affecting the working capital and the cash flow" – that is, that although the projects are good business, they reduce working capital and cash flow in the short run (by requiring early investment). (Ex. C, at 9.) *Third,* Svanberg later made clear that margins for turnkey projects are less favorable in their early years: "one must remember that initial roll outs where you have often more tougher negotiations, which then gives way for many years of expansions, is tougher margins." (*Id.* at 26.)

Thus, the statements by the Ericsson executives regarding market share did not address short term profitability or give guidance with respect to third quarter results. Rather, they were descriptions of historical growth of market share – the accuracy of which is not in dispute – and hopes for future growth, with cautionary indications that these increases in market share would not translate into short-term revenue or profit growth.

**b. Statements About 3Q07 Performance.** Plaintiff attempts to read two statements (in paragraphs 43 and 44 of the Complaint) as providing optimistic projections for 3Q07. Neither of those statements supports Plaintiff's reading.

**(1) *Paragraph 43.*** In paragraph 43, the Complaint quotes Svanberg's statement that Ericsson is "expecting a seasonal third quarter," interpreting it as promising strong results in that quarter and finding that "particularly telling." (Cmplt. ¶¶43, 46.) This interpretation is precisely backwards – as a review of the question from an analyst to which Svanberg was responding demonstrates:

> Matt Hoffman – Cowen and Company – Analyst:
>
> *Seasonally, the third quarter is a little bit weaker* for the networks business, historically, but in— again, in your comments you commented earlier on the professional services maybe being a little bit better here in the third quarter.

> *Could the overall corporate top line bump that trend, or are we expecting still a seasonal type of third quarter here*? Thanks.

> Carl-Henric Svanberg – Ericsson – President and CEO:

> *Yes, we are expecting a seasonal third quarter*. And also said that, as we did last year, that there is— we have a bigger proportion of larger projects now. And larger projects tend to sort of be started more in the beginning of the year and finished at the end of the year. So like last year we had a little bit of a more back-loaded second half, and I think that's still the comment we make.

(Ex. C, at 11.) Far from predicting a strong third quarter, Svanberg was in fact agreeing that the third quarter would be *weaker* – that strength in the professional services business would not outweigh seasonal weakness in the networks business.[10] Plaintiff has misportrayed this answer to mean the opposite of what it in fact conveyed.

(2) *Paragraph 44.* In paragraph 44, the Complaint cites what it characterizes as "the Company's projection for 2007":

> Well if you look at the mobile infrastructure as we see it, and that is the figure you're after, mobile infrastructure market we see growing now in mid-single digits in U.S. dollars and all of that.

(Cmplt. ¶44; *see also* Ex. C, at 13.) This statement, read in the context of the allegations of the Complaint, was a reiteration of earlier guidance of "mid-single digit growth" in revenues. (Cmplt. ¶¶26, 30.) Plaintiff alleges that CS 3 complained to his superiors of "Defendants' revenue projections of mid-single digit growth," viewing them as unrealistic in light of what he knew of U.S. operations. (*Id.* ¶57.)

The inherent flaw in Plaintiff's theory is that, by his own allegations, Ericsson's 3Q07 revenues did in fact show mid-single-digit growth over the prior year. The Complaint alleges that Ericsson's earnings release, in which "the truth is revealed," reported

---

[10] The Complaint also misconstrues the meaning of the word "seasonal." In paragraph 46, the Complaint attempts to give meaning to "seasonal" by comparing third quarter results with those of the third quarter of prior years. That is not a relevant comparison. The term "seasonal" refers to a comparison between different "seasons," or in this case different

that "[t]he year-over-year sales increase of 6% consisted of organic growth of 4%." (Cmplt. ¶62.) While earnings were disappointing, revenue growth – the metric Plaintiff claims Defendants were overstating – was as expected, according to his own allegations.

      **c.  Statements About AT&T.**  Plaintiff asserts that Defendant Svanberg misled the market by failing to disclose, or to take into account in his statements about revenue growth, that Ericsson's largest U.S. customer had reduced its business in 2007. (Cmplt. ¶¶45, 51-52.)  This claim is flatly contradicted by the transcript itself.

      The Complaint alleges that, "in responding to an analyst's question regarding the Company's expected revenues from the AT&T/Cingular contract," Defendant Svanberg stated that

> when it comes to AT&T first, we've done the initial roll out. There is still more roll out and capacity build out that is needed. *They have been a bit slower this year and if you talk to them they will probably even say publicly that they've been so focused on all the mergers and so on, so they haven't been too much into expanding networks.*
>
> They see that need that is there and they have fairly recently also stated that they are adding US$1 billion to what they had otherwise planned in 2008 for additional investments. Remember that is CapEx in total with everything that comes to it, everything doesn't translate to telecom equipment. And it's in total for AT&T, but a lot of that is focused on the mobile side.

(Cmplt. ¶45 (emphasis added); *see also* Ex. C, at 28.)[11]

      Plaintiff's claim is difficult to fathom because the statement explicitly says just what he claims the facts to have been – that AT&T's business was slower in 2007, and AT&T had not been expanding its networks.  Indeed, the slide Svanberg used with his presentation to show performance in the various regions showed North America with a decline in sales of 31% for the first half of 2007.  (Ex. D, at slide 19.)

---

quarters of the same year.  As the slides Svanberg used showed, sales had dipped in the third quarter of the two preceding years, 2005 and 2006.  (*See* Ex. D, at slide 19.)

Plaintiff's CSs – all of them former U.S. employees – appear to have provided information about the slowdown in the AT&T business and about certain smaller U.S. contracts. (Cmplt. ¶¶50-57.) This information, however, does not contradict the statements of the Ericsson executives at the London conference, where they said very little about the U.S. business. Nor is this surprising because, as the Svanberg chart showed, *total* U.S. sales in the first half of 2007 amounted to only 6 billion Swedish kroner ("SEK") out of Ericsson's total worldwide sales of approximately SEK 90 billion – less than 7%. (Ex. D, at slide 19.) The CSs, even if purportedly knowledgeable about particular U.S. contracts, are in no position to shed light on the much larger, global picture that the Ericsson executives were addressing.

### 2.    Many Of the Challenged Statements Are Not Actionable As A Matter Of Law

**a.  Many Of The Statements Are Non-Actionable Puffery.** It is well-settled that general statements of optimism – referred to by courts as "puffery" – made by management cannot give rise to liability under the securities laws. As the Second Circuit has repeatedly held, "[p]eople in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage." *Rombach*, 355 F.3d at 174.

Many of the alleged misstatements Plaintiff highlights in his Complaint are simply expressions of optimism of the sort that have been consistently held to be permissible, including: (a) "there was a report recently that said that we were over 45% now in both GSM and HSPA. Now that's pretty encouraging" (Cmplt. ¶40); (b) "it's pretty amazing what we are today in managed services and services around the world" (*id.*); (c) "We are in a good

---

[11]  Svanberg also noted in his remarks that the "U.S. has been a bit of a rollercoaster with this large Cingular contract. Right now, we're sort of a little bit in the middle – little bit between bigger contracts . . ." (Ex. C, at 8.)

position and we expect to do—continue to gain share, continue to outperform competition"
(*id.* ¶41); and (d) "we continue to expect to do well in all of the—our key areas." (*Id.*).   Such
statements have consistently been held to be non-actionable corporate puffery.  *See, e.g., In re
Sierra Wireless, Inc. Sec. Litig.*, 482 F. Supp. 2d 365, 373 (S.D.N.Y. 2007) (holding that
defendants' "broadly optimistic pronouncements on the future of [the company's] business...
are considered 'expressions of puffery and corporate optimism [which] do not give rise to
securities violations.'") (internal citations omitted).

      **b.  Many Of The Statements Are Accurate Statements Of Historical Fact.**

Finally, many of the statements Plaintiff alleges are false or misleading are simply non-
actionable statements of historical fact.  *In re Worldcom Sec. Litig.*, 303 F. Supp. 2d 385, 389-
90 (S.D.N.Y. 2004) (dismissing complaint on the basis that a company's "disclosure of
accurate historical data" is not actionable under federal securities law).

      As the slides that accompanied the London presentation expressly stated, the
results they described were historical.  (*See* Ex. D, at 14-19.)  For example, Defendants stated
that (a) "after six months, there was a doubling [of data traffic in Western Europe and Asia
Pacific among various operators] and now after an additional three months, we're 300% up in
these networks" (Cmplt. ¶39); (b) "We are in Western Europe so far, 5% up, but it's
interesting to see that it's actually 15 compounded over four years" (*id.* ¶41); and (c) "If we
look at the margins, you can see that what we [found is that they're] around 15% there. You
can also [see] that in Q3 '06, we actually got a – quite a lot of start-ups with new contracts
that, managed services contracts, that we [wrote in] and there's always initial costs."  (*Id.*
¶40).

      Plaintiff raises no claim that any of this historical information was inaccurate.
At most, Plaintiff alleges that Ericsson's performance in 3Q07 declined relative to its

16

performance in late 2006 and early 2007. It is well-settled that this is insufficient to state a

claim under the federal securities laws. *In re Duane Reade*, 2003 WL 22801416, at *6

("Defendants may not be held liable under the securities laws for accurate reports of past

successes, even if present circumstances are less rosy. Plaintiffs do not allege, nor is there

any evidence that the statements are false, and contrary to plaintiffs' suggestions, disclosure of

accurate historical data does not become misleading even if less favorable results might be

predictable by the company in the future.").

> **B.      The Complaint Fails To Allege That Defendants Acted With Scienter**

In the absence of false or misleading statements, Plaintiff cannot allege an

intent to defraud. In any event, he has failed to adequately allege scienter.

> **1.      Plaintiffs Must Allege Particular Facts Creating A Strong And Compelling Inference Of Scienter**

Plaintiff faces a high hurdle in pleading a claim under Section 10(b). As the

Supreme Court recently confirmed, the PSLRA was intended as a "check against abusive

litigation by private parties" and "unequivocally raise[d] the bar for pleading scienter" in

securities fraud cases. *Tellabs,* 127 S.Ct. at 2504 & 2509. The PSLRA does this by requiring

that plaintiffs state with particularity facts giving rise to a strong inference that the defendant

acted with an intent to deceive. *Id.* at 2508.

The Second Circuit has held that a plaintiff may attempt to allege scienter in

one of two ways, either (a) by showing that defendants had "both a motive and opportunity to

commit fraud," or (b) by alleging facts "that constitute strong circumstantial evidence of

conscious misbehavior or recklessness." *Rothman v. Gregor*, 220 F.3d 81, 90 (2d Cir. 2000).

As the Supreme Court explained, "Congress required plaintiffs to plead with particularity

facts giving rise to a 'strong' – i.e., a powerful or cogent – inference" of scienter. It "must be

more than merely 'reasonable' or 'permissible' – it must be cogent and compelling". *Tellabs*, 127 S. Ct. at 2510.

### 2.    The Complaint Does Not Allege That Defendants Had A Motive To Commit Fraud

Motive is established by alleging "concrete benefits" that defendants could realize by the allegedly false statements. *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000). In this case, Plaintiff does not suggest any possible reason that would have led Defendants to deceive shareholders in September about financial results the Company would be disclosing in October. He alleges no insider sales of stock during this interim period, nor any other motive to mislead. Indeed, the fact that Defendants "pre-announced" the third quarter results – voluntarily disclosed Ericsson's financial results earlier than was required (Cmplt. ¶62) – significantly undermines Plaintiff's claim of scienter. *See, e.g., Rombach*, 355 F.3d at 176-77 ("The allegation that defendants behaved recklessly is weakened by their disclosure of certain financial problems prior to the deadline to file its financial statements."); *In re Nokia Corp. Sec. Litig.*, No. 96-CV-3752, 1998 WL 150963, at *13 (S.D.N.Y. Apr. 1, 1998) ("[i]f anything the fact that [defendant] voluntarily chose to issue a press release earlier than its standard year-end reporting ... undercuts the allegation that defendants were acting recklessly").

### 3.    The Complaint Does Not Allege Strong Circumstantial Evidence Of Conscious Misbehavior Or Recklessness

Where, as here, Plaintiff does not allege that Defendants had a motive to commit fraud, he must satisfy a higher threshold to establish scienter, by pleading with particularity facts "that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Rothman*, 220 F.3d at 90. Recklessness sufficient to establish scienter involves not merely simple, or even inexcusable, negligence, but conduct that is "highly

18

unreasonable and . . . represents an extreme departure from the standards of ordinary care."

*Chill v. General Electric Co.,* 101 F.3d 263, 269 (2d Cir. 1996). The allegations must

approximate an actual intent to aid in a fraud. *Id.*

      **a. Defendants' Access To Adverse Information.** Plaintiffs in Section 10(b)

actions must "specifically allege[] defendants' knowledge of facts or access to information

contradicting their public statements." *Novak,* 216 F.3d at 308-09. "Where plaintiffs contend

defendants had access to contrary facts, they must specifically identify the reports or

statements containing this information." *Id.*

      Plaintiff makes no effort to identify any reports Defendants Svanberg or

Sundstrom saw, or any conversations in which they were provided information inconsistent in

any way with their statements. Indeed, Plaintiff's CSs were lower level managers in the U.S.

who claim no contacts or communications with Svanberg or Sundstrom, or even with

Ericsson's European corporate headquarters. Instead, the Complaint relies on conclusory

boilerplate allegations that Svanberg and Sundstrom, "because of their positions with the

Company, had access to adverse undisclosed information" about the Company and its

customer contracts, and had unspecified "conversations and connections with other corporate

officers and employees." (Cmplt. ¶¶16, 73-76.) The Complaint does not identify this

"adverse undisclosed information" other than stating, generically, that it was contained in

unidentified "internal corporate documents" such as "operating plans, budgets and forecasts

and reports of actual operations" and could be gleaned from "the Company's internal non-

public reports" and "internal tracking systems." (Cmplt. ¶¶16-18, 73.) The courts have

repeatedly rejected such boilerplate allegations as a basis for alleging scienter.[12]

---

[12]   *San Leandro Emergency Med. Group,* 75 F.3d at 812-13; *Goplen* v. *51job, Inc.*, 453 F.
Supp. 2d 759, 773 (S.D.N.Y. 2006) ("bare assertions [that defendants, due to their high-
level positions in the Company, had access to adverse undisclosed financial information
through internal corporate documents, meetings, and reports], without any further facts or

**b. AT&T's Orders.** The Complaint alleges as a basis for scienter that it was "well known within the Company that AT&T/Cingular, Ericsson's largest U.S. customer, was scaling back its Ericsson purchases for 2007." (Cmplt. ¶74.) The most obvious defect with this allegation as a basis for scienter is that Svanberg stated this very fact at the September 11 conference: "They [AT&T] have been a bit slower this year and if you talk to them they will probably even say publicly that they've been so focused on all the mergers and so on, so they haven't been too much into expanding networks." (Ex. C, at 28; *see also* Cmplt. ¶45.) Sundstrom further highlighted in a slide that revenues in North America for the first half of 2007 had declined by 31%. (Slides Accompanying Karl-Henrik Sundstrom's Presentation at the London Conference, attached to Kaye Decl. as Ex. E, at slide 7; *see also* Ex. D, at slide 19.)

Plaintiff's reliance on the downturn in AT&T purchases as a showing of scienter is insufficient for the additional reasons that he does not allege (a) that this downturn particularly affected 3Q07, apart from the already-disclosed decline in purchases, or (b) that the downturn rose to a level of materiality such that Defendants would have had it in mind in connection with their reports. While Plaintiff harps on the fact that AT&T was Ericsson's largest U.S. customer (Cmplt. ¶¶ 51, 74), he overlooks the fact that the entirety of Ericsson's U.S. operations accounted for only a modest portion of its global operations: SEK 6.1 billion out of total revenues of SEK 90 billion. (Ex. D at 19.)[13] *See, e.g., 380544 Canada, Inc. v.*

---

details, do not adequately demonstrate defendants' knowledge of facts or access to information contradicting their public statements").

[13] Plaintiff alleges that revenues from AT&T in 2007 were likely to be in the range of $1.5 billion to $1.8 billion, below internal projections of $2.3 billion – a $.5 to $.8 billion shortfall. By comparison, Ericsson's total revenues in 2007 were $28.1 billion, of which the alleged shortfall constituted 2 to 3%. (Ex. B, at 4.) Moreover, Defendant Svanberg reported at the September 11 conference that North American revenues during the first half of 2007 alone, at SEK 6.1 billion, were down by 31% – some $.5 billion dollars.

*Aspen Tech., Inc.*, 544 F. Supp. 2d. 199, 225-26 (S.D.N.Y., 2008) (rejecting argument that corporate officers should have known of transactions that caused a restatement of operating income by 33% in one year and 5.8% in another year); *see also In re Apple Computer, Inc.*, 127 Fed. Appx. 296, 300 (9th Cir. 2005) (scienter requirement cannot be satisfied by allegations that defendants must have known "facts critical to a business' core operations").

    **c.   The "50 Contracts"**   The CSs also attack Defendants' statement at the September 11 conference that "more than 50 operators are now being added to the list, will be added to the list as in the near future." (Cmplt ¶ 39.)   None of the CSs contend that the statement was incorrect; quite the contrary, they confirm that there were "50 new contracts," but CS 1 and 3 state they were "with very small companies from which the Company could not, even in the most positive circumstances, obtain any immediate profits." (Cmplt ¶¶ 50, 56.)   This is a red herring.   As we note in Part IA, *supra*, Defendants never connected the new contracts to Ericsson's 3Q07 performance, and explained that the new contracts would not be expected to result in "immediate profits."

    **d.   Ericsson's Competitors.**   Finally, the Complaint notes that "Ericsson's chief competitors, Alcatel-Lucent, Nokia, Nortel and Adtran each disclosed to their investors that the market for network systems was 'tightening' and warned their investors that earlier revenue projections would be reduced."[14] (Cmplt. ¶¶81-83.)   Plaintiff speculates that these announcements put Defendants on notice before September 11 that their revenue projections should likewise be reduced.

---

[14]   In fact, the statements by these competitors about their expected revenue growth were not substantially different from Ericsson's statement.   Whereas Ericsson stated that it expected – and achieved – "mid-single digit growth" in revenue (Cmplt. ¶¶ 26, 30, 33, 57, 62), Alcatel-Lucent reported on September 13, 2007 that it expected revenue would be "flat to slightly up" (*id.* ¶ 58), AdTran anticipated on September 21, 2007 that revenue would be "flat" (*id.* ¶60), and Nortel predicted on August 2, 2007 that revenue would be "flat to slightly down". (*Id.* ¶ 37.)

Plaintiff cites no basis for his assumption that one company's decline in revenues should lead its competitors to expect – much less disclose – a similar decline in revenues; this is particularly the case where the companies are competing for market share, and one company's decline may reflect the competitor's increase.[15] More importantly, the undisputed fact is that Ericsson's guidance with respect to revenues – that it expected a single-digit increase (Cmplt. ¶¶ 26, 33, 44) – proved accurate: by Plaintiff's own allegations, "[t]he year-over-year sales increase of 6% consisted of organic growth of 4%." (Cmplt. ¶ 62 ("The Truth Is Revealed").)

Plaintiff has therefore wholly failed to satisfy his burden of pleading facts giving rise to a strong inference of scienter.

## II.

### PLAINTIFF FAILS TO ALLEGE A VIOLATION OF SECTION 20(a)

To state a claim under Section 20(a), a plaintiff must plead (i) a primary violation of the Exchange Act, (ii) that the defendant was a "controlling person," and (iii) that the defendant was "in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person." *SEC v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1472 (2d Cir. 1996); *see also ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.,* 493 F.3d 87, 108 (2d Cir. 2007).

---

[15] For example, Alcatel-Lucent announced that the merger of Alcatel and Lucent created "uncertainty that impacted our results," including "uncertainty about which products and services the combined company would maintain and which would be phased out or delayed." (Alcatel-Lucent's 2007 Form 20-F Annual Report, filed April 6, 2007, at 27, Ex. F.) An article from the FINANCIAL TIMES on October 5, 2007, [which plaintiff cited at paragraph 41 of his original Complaint], makes this plain, as it noted that "Ericsson is capitalizing on Alcatel-Lucent's severe difficulties to strengthen its leading position in mobile phone infrastructure deals." (*Alcatel in Danger of Losing AT&T Role*, FIN. TIMES (LONDON), Oct. 5, 2007, at 1, attached to Kaye Decl. as Ex. G). Similarly, the Complaint quotes one analyst as stating in August 2007 that Ericsson "is trying to crush its smaller rivals Nokia Siemens, Nortel and Alcatel-Lucent (ALU) like a trio of June bugs." (Cmplt. ¶ 38.)

As we show in Part I, *supra*, the Complaint does not properly allege a primary violation of the Exchange Act. Consequently, there is no predicate for a claim for control person liability. *See, e.g., ATSI Commc'ns*, 493 F.3d 87 at 108.

Plaintiff also has not alleged facts showing that either Svanberg or Sundstrom acted with scienter regarding any of the allegedly fraudulent acts. Accordingly, the Section 20(a) claim must be dismissed because the Complaint does not adequately allege that these Defendants culpably participated in the alleged fraud. *See, e.g., Harrison v. Rubenstein*, No. 02 Civ. 9356 (DAB), 2007 WL 582955, at *19 (S.D.N.Y. Feb. 26, 2007) ("Where a complaint contains no detailed allegations regarding the state of mind of the 'control person,' a Section 20(a) claim must be dismissed for failure to allege culpable participation.").

## III.

### THIS COURT LACKS PERSONAL JURISDICTION OVER SVANBERG AND SUNDSTROM

### A.     The Applicable Legal Standard

In cases brought under the Exchange Act, plaintiffs can establish jurisdiction over defendants only where they show that: (1) the defendants have "minimum contacts" with the United States as a whole, and (2) the exercise of jurisdiction over the defendant is "reasonable" such that the exercise of jurisdiction does not offend "traditional notions of justice and fair play." *See Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567-68 (2d Cir. 1996).

Two types of jurisdiction are implicated in the minimum contacts analysis: general jurisdiction and specific jurisdiction. General jurisdiction exists if defendants' general business contacts in the U.S. have been "continuous and systematic," even though they are unrelated to the lawsuit. *Id.* at 567-568. Specific jurisdiction exists when the

defendant has purposefully directed his activities toward the forum, and the litigation arises out of or is related to the defendant's contacts with the forum. *Id.*

Plaintiff bears the burden of showing personal jurisdiction over all defendants. *Id.* at 566-67. Where, as here, the complaint fails to make "good faith allegations which would establish a prima facie showing of personal jurisdiction," the complaint will be dismissed. *In re Rhodia S.A. Sec. Litig.*, 531 F. Supp. 2d 527, 542 (S.D.N.Y. 2007).

**B.     This Court Does Not Have General Or Specific Jurisdiction Over Svanberg Or Sundstrom**

In this case, Plaintiff has not alleged that Svanberg or Sundstrom had any contact with the U.S., much less "continuous and systemic" contacts required for general jurisdiction. Indeed, Plaintiff cannot make these allegations as both Svanberg and Sundstrom are domiciled in Sweden, hold Swedish drivers licenses, are registered to vote in Sweden and pay taxes in Sweden. Neither has ever owned any property in the U.S., ever paid taxes in the U.S., ever conducted any business in the U.S. in a personal capacity, or ever appointed an agent in the U.S. to transact business on his behalf. (*See* Affidavits of Carl-Henric Svanberg and Karl-Henrik Sundstrom, to be submitted to the Court the week of June 16, 2008.)

Plaintiff also has not alleged facts showing specific jurisdiction, because the Complaint does not contain any factual allegations tying these non-resident defendants to the United States. Instead, Plaintiff alleges that Svanberg and Sundstrom were officers in a Swedish company (Cmplt. ¶¶14-15), who made the statements that are the subject of this lawsuit during a conference in London (*id.* ¶39). The fact that Ericsson does business in the United States is not sufficient to base jurisdiction in the United States over its officers. *See, e.g., In re Rhodia S.A.*, 531 F. Supp. 2d at 541-42.[16] Because neither Svanberg nor Sundstrom

---

[16]   *See also In re Alstom S.A.*, 406 F. Supp. 346, 399 (S.D.N.Y. 2005) ("[Defendant]'s status as a Board Member in itself, even if he in some respect oversaw ATI's execution of the NJT contract, is too tenuous a connection to plausibly claim that this status alone

24

has "contacts, ties, or relations" to this forum, it would not comport with "traditional notions

of fair play and substantial justice" to exercise personal jurisdiction over them.  *Metro. Life*

*Ins. Co.*, 84 F.3d at 568.

CONCLUSION

For the reasons set forth above, Defendants respectfully request that the Court

dismiss the Complaint, in its entirety and with prejudice.

Dated:   New York, New York
         June 13, 2008

                              PAUL WEISS, RIFKIND, WHARTON
                              & GARRISON LLP

                              By: /s/Daniel J. Kramer

                              Susanna M. Buergel
                              Charles E. Davidow
                              Brad S. Karp
                              Daniel J. Kramer
                              Richard A. Rosen

                              1285 Avenue of the Americas
                              New York, NY 10019
                              Telephone: (212) 373-3000
                              Fax: (212) 373-4020
                              *dkramer@paulweiss.com*

                              *Attorneys for Defendants*

---

directly and foreseeably gave rise to the effects complained of by the plaintiffs."); *Charas v. Sand Tech. Sys. Int'l, Inc.*, No. 90 Civ. 5638, 1992 WL 296406, at *5 (S.D.N.Y. Oct. 7, 1992) ("Jurisdiction over the representatives of a corporation 'may not be predicated on jurisdiction over the corporation itself, and jurisdiction over the individual officers and directors must be based on their individual contacts with the forum state.'")(internal citations omitted).