EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MERRILL STEINBERG, Individually and On Behalf of All Others Similarly Situated, | CIVIL ACTION NO. 07-CV-9615-RPP |
| Plaintiff, | "ECF CASE" |
| vs. | CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934 |
| ERICSSON LM TELEPHONE CO., CARL-HENRIC SVANBERG and KARL-HENRIK SUNDSTROM, | CLASS ACTION |
| Defendants. | JURY TRIAL DEMANDED |

## NATURE OF THE ACTION

1.     This is a securities class action on behalf of all persons who purchased common stock, American Depositary Shares ("ADSs"), or call options or sold put options of Ericsson LM Telephone Co. ("Ericsson" or the "Company") between September 11, 2007 and October 15, 2007 (the "Class Period"), against Ericsson and certain of its officers and/or directors for violations of the Securities Exchange Act of 1934 ("1934 Act") and were injured thereby.

2.     Defendant Ericsson is a Swedish company that offers a portfolio of telecommunication and data communication systems and services covering a range of technologies. Ericsson is headquartered in Stockholm, Sweden, with branch offices in the United States and around the globe. The Company's ADSs are listed on the NASDAQ, its common stock is listed on the Stockholm Stock Exchange and London Stock Exchange, and its options trade in the U.S. and Europe.

3.     During the Class Period, Defendants issued materially false and misleading statements regarding the Company's business and financial results, falsely claiming that the

Company's products had sustainable growth, even while its peers in the market were stating that the market was tightening, and that the Company projected "mid-single digits growth" for 2007, while its peers were retreating from their original forecasts. Indeed, Ericsson falsely claimed to be profiting at its competitors' expense. As a result of Defendants' false statements, Ericsson securities, including ADSs, traded at artificially inflated prices during the Class Period. Ericsson ADSs reached a high of $41.96 per share on October 11, 2007.

4.    In fact, by early September 2007, Defendants had good visibility into the quarterly results, and that visibility improved each day of the Class Period. Defendants, however, until before the market opened on October 16, 2007, the close of the Class Period, concealed their true results from the investing public.

5.    On the morning of October 16, 2007, Ericsson issued a press release entitled "Lower than expected result for Ericsson in third quarter 2007." The press release revealed for the first time that Ericsson's sales and operating income would be well below the Company's previous forecasts and current market expectations. The Company laid the blame for its failure to meet its long-touted expectations, reconfirmed just 45 days before, on an "unfavorable business mix" and a "shortfall in sales in mobile network upgrades." In addition, Ericsson stated that the new networks, the bulk of its sales in the quarter, had relatively low margins. The Company also explained that it had expected a more significant increase in higher margin network sales and upgrades in North America and for the sales of those higher margin products in Western Europe to remain constant. North American sales did not increase as sharply and the Western European sales actually declined.

6.    As a result of Defendants' false statements, Ericsson securities traded at inflated levels during the Class Period. Ericsson's stock collapsed on October 16, 2007, after the disclosure of Ericsson's true financial condition, to close at $31.33 per share, a decline of 24%,

on volume of 42.7 million shares, ten times its normal daily volume.

## JURISDICTION AND VENUE

8.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the 1934 Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

9.    This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the 1934 Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

10.    Venue is proper here pursuant to § 27 of the 1934 Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b). Ericsson ADSs trade on the NASDAQ which is located in this District.

11.    In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities exchanges.

## PARTIES

12.    Lead Plaintiff Jacques Furher purchased Ericsson call options and sold Ericsson put options during the Class Period, as set forth in his certification previously submitted to the Court, and suffered economic losses as a direct result of Defendants' fraudulent conduct alleged herein

13.    Defendant Ericsson is a Swedish company that provides communications networks, related services, and handset technology platforms for mobile and fixed network operators worldwide. The Company operates through three segments, Mobile Networks, Fixed Networks, and Professional Services. Ericsson is headquartered in Stockholm, Sweden.

14.    Defendant Carl-Henric Svanberg is, and at all relevant times was, President, Chief Executive Officer ("CEO") and a director of Ericsson.

15.    Defendant Karl-Henrik Sundstrom was, and at all times during the Class Period, Executive Vice President and Chief Financial Officer ("CFO") of Ericsson until his termination

3

on October 25, 2007.

16.   Defendants Svanberg and Sundstrom (the "Individual Defendants"), because of their positions with the Company, had access to adverse undisclosed information commonly known within the Company about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects. This knowledge was obtained from access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof, and via reports and other information provided to them in connection therewith.

17.   In addition to the above-described involvement, each of the Individual Defendants had knowledge of Ericsson's problems. Defendant Sundstrom, as CFO, was responsible for financial reporting and communications with the market and had full access to the Company's internal non-public reports. Those reports from the Company's internal tracking systems demonstrated that Ericsson's forecasted and actual growth were significantly diverging.

18.   Defendant Svanberg, as CEO and Chairman, was responsible for the financial results and press releases issued by the Company and had full access to the Company's internal non-public reports. Those reports from the Company's internal tracking systems demonstrated that Ericsson's forecasted and actual growth were significantly diverging.

19.   Moreover, Defendants Svanberg and Sundstrom possessed the power and authority to control the contents of Ericsson's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance

4

or cause them to be corrected. Because of their positions with the Company, and their access to material non-public information, defendants Svanberg and Sundstrom knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. Svanberg and Sundstrom are liable for the false statements pleaded herein.

20.    Defendants are liable for: (i) making false statements; and/or (ii) failing to disclose adverse facts known to them about Ericsson. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Ericsson's securities and operated as a fraud or deceit on Class Period purchasers of Ericsson's common stock, ADSs, and call options, and sellers of Ericsson put options, by misrepresenting the Company's operating condition and future business prospects. Defendants achieved this by misstating Ericsson's current business operations and future prospects, as detailed herein. Later, however, when Defendants' misrepresentations were disclosed to the market, the price of Ericsson securities fell precipitously as the artificial inflation came out of the Company's securities price. As a result of their purchases of Ericsson securities and sales of Ericsson put options during the Class Period, Lead Plaintiff and the other members of the Class suffered economic loss, *i.e.*, damages under the federal securities laws when they could not recover this artificial inflation.

## CONFIDENTIAL SOURCES

21.    As expressly noted in specific instances, *infra*, Lead Plaintiff relies for certain allegations upon a number of former Ericsson employees.

22.    Confidential Source No. 1 ("CS No. 1") is a former Ericsson manager in the Configuration Management department, which is the department tasked with bridging a customer's purchase proposal to the final contract and ordering. CS No. 1 was employed by

Ericsson for more than 20 years until after the Class Period. CS No. 1 provided corroborated information regarding: (i) Ericsson's declining U.S. market share; and (ii) the diminishing margin for the newer contracts Ericsson was entering, and when they knew about these issues.

23.   Confidential Source No. 2 ("CS No. 2") is a former senior director for delivery control at Ericsson, from March 2002 until March 2007. CS No. 2's responsibilities included ensuring the completion of deployed services to Ericsson's wireless customers and overseeing 200 permanent and temporary employees. CS No. 2 reported to Rick Shanker, Vice President for Infrastructure Delivery, who in turn reported to Ann Louis, who in turn reported directly to the President and CEO of Ericsson North America, Angel Ruiz, who reported to the Individual Defendants. CS No. 2 provided corroborated information regarding: (i) Ericsson's declining U.S. market; (ii) the diminishing margin for the newer contracts Ericsson was entering; and that (iii) Ericsson's "in-between technologies" product was not attracting new customers.

24.   Confidential Source No. 3 ("CS No. 3") is a former Ericsson Senior Director and Head of Managed Services and reported to the Ericsson North America's Vice President of Operations and the Vice President of Multimedia, who, in turn, reported to CEO of Ericsson North America Angel Ruiz, who reported to the Individual Defendants. CS No. 3 was employed by Ericsson from 1999 throughout the Class Period. CS No. 3 described the significant decline in purchases under Ericsson North America's contract with AT&T/Cingular, the Company's largest U.S. contractor, and the little value that the 50 new contracts were adding. In addition, CS No. 3 stated that his concerns were raised with the senior executives.

## SUBSTANTIVE ALLEGATIONS

### ERICSSON CONDITIONS THE MARKET PRIOR TO THE CLASS PERIOD

25.   Ericsson provides communications networks, related services, and handset technology platforms for mobile and fixed network operators worldwide. The Company

operates through three segments, Mobile Networks, Fixed Networks, and Professional Services. The Mobile Networks segment provides mobile systems solutions to network operators, including radio base stations, base station and radio network controllers, mobile switching centers, and application nodes. The Fixed Networks segment supplies broadband communications equipment and services to fixed network operators in Latin America and Europe. The fixed network operators are moving from single-service networks toward broadband packet-switched multi-service networks that handle multiple services, such as voice, data, and images.   The Professional Services segment provides consulting, education, systems integration, and managed services, as well as customer support services to the telecommunications industry.[1]

26.  Beginning in February 2007, Ericsson and the Individual Defendants issued glowing projections for revenue growth in the coming year.  For example, on February 2, 2007, Ericsson issued a press release stating: "For 2007 we believe that the GSM/WCDMA track within the global mobile systems market, measured in USD, will continue to show mid-single digit growth."

27.  On February 12, 2007, Defendant Svanberg, while participating in the 3GSM World Congress Conference, as reported by BLOOMBERG NEWS, stated:

> We outpaced the market quite a lot last year, and we'll outpace the market this year as well.  [In 2006], smaller and weaker players lost sales more than we thought.  Our own role was stable.  We see the same conditions for 2007.

28.  While Defendants continued to issue positive statements regarding its primary business, its chief competitors Alcatel-Lucent, Nokia, Corp. ("Nokia"), and Nortel Networks

---

[1]  As part of its core operations, Ericsson provides voice and data network solutions.  As part of its current package of services, the Company provides third generation ("3G") or advanced second generation Global System for Mobile Communications ("GSM").  Ericsson also provides certain 3G network technology for enhanced data services including Universal Mobile Telecommunications System ("UMTS"), Wideband Code Division Multiple Access ("WCDMA") which uses the UTMS network system to provide high speed data transmission protocol, and High Speed Packet Access ("HSPA") which is used with WCDMA to extend and

Corporation ("Nortel") were issuing warnings regarding the tightening of the network market and downgrading their previous revenue projections. For example, on April 19, 2007, Nokia issued its first quarter 2007 results over the PR NEWSWIRE stating that it expected "very slight market growth for the mobile and fixed infrastructure and related services market in euro terms in 2007." In a conference call with analysts, Nokia's President and CEO stated that "there are more challenging times ahead" for the network and infrastructure market.

29.    Similarly, on April 24, 2007, Alcatel-Lucent disclosed in an ASSOCIATED PRESS article that it expected a first quarter 2007 loss because of "lower volumes in traditional wireless and core networks at a time when considerable investments were made in the next generation of these technologies" in the U.S. and Western Europe and "lower volumes especially in 2G in some emerging markets."

30.    The Company issued a press release on April 26, 2007, which stated:

> For 2007 we believe that the GSM/WCDMA track within the global mobile systems market, measured in USD, will continue to show mid-single digit growth. The addressable market for professional services is expected to show good growth in 2007.  With our technology leadership and global presence we are well positioned to take advantage of these market opportunities.

31.    As reported by THE FINANCIAL TIMES OF LONDON on April 27, 2007, "[u]nlike Nokia-Siemens and Alcatel-Lucent, Ericsson has maintained its market forecast, predicting continued mid-single digit annual growth for both the mobile and fixed markets."

32.    On May 3, 2007, in a conference call with analysts, Nortel reconfirmed its guidance for the year that revenue for 2007 would be flat to slightly down compared to 2006.

33.    Despite the negative outlook regarding the network market made by Alcatel-Lucent, Nortel, and Nokia in April and May 2007, on May 9, 2007, Ericsson continued to project mid-single digit growth. Ericsson's positive forecasts stood out in a market in which its peers and

---

improve the performance of existing UMTS network technology.

primary competitors were complaining of tightening markets and slowing growth for GSM/WCDMA.

34.    On July 31, 2007, Alcatel-Lucent disclosed in a press release and conference call with analysts, reported by BLOOMBERG NEWS, that "the margins [for mobile networks] are very much under pressure and there's no visibility" thus it would be unable to provide revenue or margin projections on its network business until 2008.

35.    Shortly after Alcatel-Lucent's announcement, Nokia issued its second quarter 2007 results over the PR NEWSWIRE on August 2, 2007. In the press release Nokia stated that it only expected "very slight market growth for the mobile and fixed infrastructure" in the remainder of 2007 and that it no longer targeted "a double digit operating margin" for the year.

36.    On the same day, Nokia's chief financial officer, Richard Simonson, informed analysts during a conference call that its profits from the sales of handsets was partially offset by its network sales. According to Mr. Simonson:

> Clearly, this was a weak first quarter of operations for NSN. The reasons for the poor results can be summed up in two ways, issues related to competition, and issues related to the start of operations. We're in an extremely competitive environment today, especially in the wireless infrastructure market. Specifically, we have recently been seeing very aggressive and we believe unsustainable pricing behavior in the industry, with some competitors looking to capitalize on the Nokia Siemens Networks integration. NSN has simply not participated in many of these deals because of the overall bad financial terms.

37.    Similarly, on August 2, 2007, BLOOMBERG NEWS reported that Nortel announced losses in its Network unit (the primary competitor with Ericsson) and announced a 500 million euro cost cutting plan. On a conference call with analysts, Nortel's president and CEO stated: "We are reconfirming our prior year total year guidance for revenues of being flat to slightly down for the year."

38.    In a THESTREET.COM article entitled "Nokia Delivers a Margin Miracle," published on August 2, 2007, just after the Nokia and Nortel announcements, one market analyst stated:

9

"Taken together with Nortel's (NT) scary report, the message is clear Ericsson (ERIC) is trying

to crush its smaller rivals Nokia Siemens, Nortel and Alcatel-Lucent (ALU) like a trio of June

bugs."

### MATERIALLY FALSE AND MISLEADING
### STATEMENTS ISSUED DURING THE CLASS PERIOD

39. On September 11, 2007, the beginning of the Class period, there were 19 days left

in Ericsson's third quarter of fiscal 2007, only thirteen of which were business days. That day

the Company held its Strategy and Technology Summit Conference in London for analysts and

investors (the "September 11 Conference"). As Ericsson's competitors were announcing grim

forecasts for the third quarter and beyond, Ericsson's top management went to the podium in

London to assure investors that Ericsson was not suffering the same fate as its competitors and

was profiting at their expense. During the conference, Defendant Svanberg discussed specific

examples of network growth:

> **A lot of HSPA roll outs in the pipeline. Actually more than 50 operators are**
> **now being added to the list, will be added to the list as in the near future.**
> Lots of countries that you see there **and this goes beyond just the developing**
> **markets, developed markets.** And here we talk about roll outs throughout Latin
> America and Russia and India as part of, for example, the DS&L contract —
> although licenses and frequencies are not yet awarded, but it will come rather
> quickly in India as well.
>
> * * * *
>
> This is a picture that – what came up there was the added information. The rest
> was before last time we met. **You can see – and these are three examples that**
> **we follow, two in Western Europe, one in Asia Pacific where we're just**
> **seeing what is happening to data traffic in HSPA networks. And after six**
> **months, there was a doubling and now after an additional three months,**
> **we're 300% up in these networks. And it really happens quite quickly.**
> [Emphasis added.]

40. Defendant Svanberg then specifically detailed the anticipated growth in mobile

networks for the third quarter of 2007:

If we then talk about the regained scale advantage, this is pretty important. We

10

are almost today, we just saw a recent report, an external report, on market shares and we are -- we're not quoting much of our own estimates by the weighting of external reports on market shares, but there was a report recently that said that we were over 45% now in both GSM and HSPA.

**Now that's pretty encouraging. Because if you go back three or four years, we were at 35 and we had a pretty good leverage over our nearest competitors, but through the mergers, others [crept] much closer. And now we've sort of extended it, so we are — we're basically back where we were in scale advantage before the consolidation took place.**

* * * *

If we look at the margins, we have only tracked them now with you for six quarters. But you can see that — where they are. And obviously there is always a bit of a boost in the fourth quarter. **Again, as we say, well over 40% market share, it could be over 45. Great 2007 for GSM. That's interesting because back in 2003, lots of people said that GSM would be dead by 2005. This is a peak year and it will just continue.**

**HSPA is boosting. We have repositioned ourselves in IP-based networks, as I said, through a number of acquisitions there.** Lots of key wins, maybe the ones to mention here, it could be BSNL was just a few days ago, that contract, as you saw, was smaller than we had anticipated, but it was because it was covering shorter time. It was the same, basically the same ambition for the next year, but it was basically covering more years than two years.

The same thing with Bharti, you're well aware of that, we — AT&T U.S. for example, for broadband roll outs, fiber-to-the-home was important here. Professional services, I think this is an area that you're very familiar with. Our strategy there is to make sure that we work where we have scale. How were we on scale?

**Which means that focus is always on where we have a fair share of owned products because that's where all our strength starts. And obviously to make sure that we leverage our capabilities and services there. If we look at the margins, you can see that what we [found is that they're] around 15% there. You can also see that in Q3 '06, we actually got a -- quite a lot of start-ups with new contracts that, managed services contracts, that we [wrote in] and there's always initial costs.**

**We may have a bit of that also in Q3 this year because you know that we took 11 deals only in Q2, and we had deals in Q1 that is also starting up in Q3. But growth will obviously be strong in Q3 for us here.** Well you probably recognize the down-left picture there, but it's pretty amazing what we are today in managed services and services around the world. Lots of people, lots of engineers, lots of business and a clear leadership. [Emphasis added.]

11

41. Defendant Svanberg reiterated Ericsson's strong financial positions and his expectations for future growth:

> We are in Western Europe so far, 5% up, but it's interesting to see that it's actually 15 compounded over four years, so sometimes we, I think, we have a bit of a too pessimistic view and it hasn't helped when we were so slow in the second quarter with the standstill in two main markets for us. But anyway, it's been pretty strong there, of course, a lot driven by services.

> The [CEMA region] 18%, we are at 8 right now and as we said, larger projects create a bit of swing there, lots of activities in that region although a bit slower in Russia this year. APAC, 30% up, 30, compounded 30, everything. You know – you're well aware of the strength in there. Latin America has been 7% up with minus one after having actually a slower year last year, and then we were negative numbers in the first quarter and I think it was 7% or 8% in the first quarter. So we're sort of back on the line, but it's clear that there is a recovery in Latin America. Quite a lot of excitement there.

> * * * *

> We are in a good position and we expect to do — continue to gain share, continue to outperform competition. The competitive environment is a bit – or the competitors, as you know, are involved in the mergers and so on, so it's a little bit of a special -- maybe, period. But we continue to expect to do well in all of the -- our key areas. [Emphasis added.]

42. The conference then turned to Defendant Sundstrom, who explained the significance of large projects to Ericsson growth:

> Large projects are for the third year in a row our biggest growth engine. Most of the sales in networks are actually turnkey today. And I will come back to that, coming back to the regional pictures. Large projects are very good for Ericsson. We have unique capabilities, we get premium priced, but more importantly, we are getting an installed base where we can leverage expansion and capacity enhancement in the installed base later on. [Emphasis added.]

43. The conference returned to Defendant Svanberg, who discussed how large projects would provide growth for the second half of 2007:

> Yes, we are expecting a seasonal third quarter. And we also said that, as we did last year, that there is – we have a bigger proportion of larger projects now. And larger projects tend to sort of be started more in the beginning of the year and finished at the end of the year. So like last year we had a little bit of a more back-loaded second half, and I think that's still the comment we make. [Emphasis added.]

12

44.   Defendant Svanberg then issued the Company's projections for 2007:

Well if you look at the mobile infrastructure as we see it, and that is the figure
you're after, **mobile infrastructure market we see growing now in mid-single
digits in U.S. dollars and all of that.** [Emphasis added.]

45.   In responding to an analyst's question regarding the Company's expected revenues

from the AT&T/Cingular contract, Defendant Svanberg stated:

Coming back to your question on AT&T and T-Mobile, **when it comes to AT&T
first, we've done the initial roll out.  There is still more roll out and capacity
build out that is needed.  They have been a bit slower this year** and if you talk
to them they will probably even say publicly that they've been so focused on all
the mergers and so on, so they haven't been too much into expanding networks.

They see that need that is there and they have fairly recently also stated that they
are adding US$1 billion to what they had otherwise planned in 2008 for additional
investments.  Remember that is CapEx in total with everything that comes to it,
everything doesn't translate to telecom equipment.  And it's in total for AT&T, but
a lot of that is focused on the mobile side.

46.   Defendant Svanberg's statement that Ericsson was expecting a "seasonal third

quarter" was particularly telling.  In the prior two years, the Company's third quarter financial

results were strong.  For example, on October 19, 2006, the Company announced strong financial

results for the third quarter of 2006.  According to the Company's October 2006 release, net

income climbed 17% in the third quarter of 2006 to 6.23 billion kronor ($839 million) from 5.31

billion kronor a year earlier, and sales rose 12%.  Similarly, on October 21, 2005, the Company

announced that 2005 third quarter net income rose 22% to 5.31 billion kronor ($675 million)

from 4.35 billion kronor a year earlier, and net sales increased by 13.8%.

47.   The market reacted immediately to Ericsson's bullish statements in the waning days

of the third quarter.  On September 10, 2007, Ericsson's ADS had closed at $36.25.  On

September 11, 2007, after the Strategy and Technology Summit, the ADS rose to a closing price

of $38.26, an increase of 5.25%.  The stock price continued to rise on the following day to a

close of $39.23 on September 12, 2007, a total increase of 7.59% from September 10, 2007.

48.    In the wake of Defendants Svanberg's and Sundstrom's statements during the

September 11 Conference, on September 11, 2007, BLOOMBERG NEWS reported:

> **Ericsson AB, the world's largest maker of wireless network equipment, climbed the most in more than a year in Stockholm trading after predicting "strong" industry growth in the third quarter as data traffic increases.**
>
> **Ericsson shares rose 5.4 percent.** The company said its main network market will grow about 5 percent in 2007, reiterating an earlier target.
>
> "We have good reason over time to reach our old levels," Chief Executive Officer Carl-Henric Svanberg said at an event for investors in London today. "We expect to continue to do well in all our areas."
>
> Demand for networks that let users download music, view street maps on handheld devices or share files is "beyond any expectation," Svanberg said. **Stockholm-based Ericsson is upgrading networks for more than 50 phone companies,** with about 6 million customers signing up for faster mobile access each month globally, Ericsson said in documents distributed today. Ericsson said mobile subscribers globally will exceed 5 billion by 2012.
>
> \* \* \* \*
>
> Ericsson shares rose 1.32 kronor to 25.80 kronor in Stockholm, the biggest gain since July 2006. Before today, the stock was up 2.4 percent in a year, trailing the 15 percent increase in Sweden's OMX Index.
>
> #### Multimedia Push
>
> The Swedish company has sought to capitalize on rising demand for wireless media applications by creating a multimedia division, partly with the help of acquisitions including Tandberg Television ASA. The performance of the multimedia division will remain "bumpy" because the unit is still in a start-up phase, Svanberg said, reiterating comments made in July. [Emphasis added.]
>
> "We all can see that mobile broadband will be a mass market," Svanberg said. "Data will take over."

49.    The statements of current fact referenced above in ¶¶ 39-48 were each materially

false and misleading when made as Defendants knew or recklessly disregarded the following

material adverse facts set forth in ¶¶ 50-57 below; and in the case of forward-looking statements

in ¶¶ 39-48 each statement was materially false and misleading when made as Defendants knew

of facts or had access to information demonstrating that the statements were false.

50.    According to CS No. 1, the Company's projections could not be supported by any internal facts or figures.  For example, CS No. 1 stated that the 50 new contracts touted by Svanberg at the September 11 Conference were actually with very small companies from which the Company could not, even in the most positive circumstances, obtain any immediate profits. CS No. 1 identified one of the new contracts as U.S.-based Cincinnati Bell, which like the other small companies that made up the 50 new contracts, needed time to do build outs.  Indeed, according to CS No. 1, it was well known that these smaller companies often delayed payment, or paid in small increments over extended periods of time.  Even if the companies signed agreements with Ericsson in September 2007, the projections for the third quarter 2007 and year end 2007 could not be met because many, if not all, of the companies would have clauses providing that they not initiate payment until the first or second quarters of 2008.  Further, the profit margin from a smaller customer differed from large customers, such as AT&T/Cingular. CS No. 1 estimated that Ericsson's profit margin from the AT&T/Cingular agreement was about 30%, but that the profit margins from the smaller companies, such as Cincinnati Bell, were as low as 15%.

51.    In addition to the low margin, low/delayed payout of the touted new contracts, CS No. 1 also stated that the September 11 Conference projections failed to consider, and Defendants knew or were reckless in not knowing, that AT&T/Cingular had significantly reduced its business with Ericsson in 2007 and knew of facts or had access to information demonstrating that trend was not going to change.  According to CS No. 1, AT&T/Cingular made up approximately 60% of Ericsson's business in the United States.  Beginning in late 2006, AT&T/Cingular had been ordering less and less from Ericsson in order to "clean their own house."

52.    CS No. 1's statements regarding the decline in sales to AT&T/Cingular are

15

corroborated by CS No. 2. According to CS No. 2, by 2006, as a result of the AT&T/Cingular merger, AT&T/Cingular was significantly reducing their orders with Ericsson in an effort to cut down AT&T/Cingular's costs. CS No. 2 stated that: "They [AT&T/Cingular] were wildly over budget." CS No. 2 also noted that although AT&T/Cingular signed a Master Purchasing Agreement and Sales Contract with Ericsson in 2007, making Ericsson an exclusive supplier, AT&T/Cingular did not commit to any volume of sales. Without a commitment concerning the amount of sales, and in light of the declining sales, the AT&T/Cingular contract did not provide a reasonable basis for projections.

53. In addition to the declining sales to AT&T/Cingular, CS No. 2 also stated that Ericsson's sales to T-Mobile (another major U.S. customer) were in serious decline. The decline in sales was caused, CS No. 2 stated, by the fact that Ericsson was selling "in-between technologies" which the customers did not buy because they could just wait until the next system came out.

54. CS No. 3, who left the Company in part because of the issues surrounding the revenue projection miss, provided further corroboration on the decline in sales to AT&T/Cingular. As an initial matter, CS No. 3 stated that it was well-known within the Company that the September 11 Conference projection "was an astonishing, astronomical figure." CS No. 3 further stated that the available intra-company results and projections for revenue and margin demonstrated that as of September 11, the targets set by Svanberg and Sundstrom were objectively unobtainable – "They just weren't realistic figures."

55. In particular, CS No. 3 stated that Svanberg's and Sundstrom's projections included revenue from AT&T/Cingular of approximately $2.3 billion, representing an incremental increase from the Company's revenues of $2.2 billion from the contract in 2006 and revenues of $2.1 billion in 2005. According to CS No. 3, AT&T/Cingular's previous purchases and current

16

orders could not be projected to be $2.3 billion because at the end of 2006, AT&T/Cingular warned Ericsson that it was placing its purchase orders on "hiatus" to review current inventory. CS No. 3 stated that AT&T/Cingular's review showed that it had purchased too much from Ericsson in 2005 and 2006 and was carrying excess inventory in 2007. According to CS No. 3, it was "very clear" to Ericsson that AT&T/Cingular would not be placing orders comparable to those made in 2005 and 2006. CS No. 3 stated that internal Company reports and the Company's internal tracking system demonstrated that revenues from AT&T/Cingular would be closer to $1.5 billion to $1.8 billion.

56. CS No. 3 also stated that the 50 new contracts touted by Defendants during the September 11 Conference could not make up the lost revenues from the AT&T/Cingular shortfall. CS No. 3 stated that the contracts were with "one-off" companies buying services, not equipment, i.e. that they only provided one-time sales and would not generate the future upgrade purchases that Ericsson depended upon. Moreover, the contracts were for small amounts with "tiny" regional telephone companies in companies in small markets such as Texarkana, Arkansas and Biloxi, Mississippi. For example, the largest of the new contracts was with Cincinnati Bell, which would provide revenues of less than $5 million. More typical of the contracts, according to CS No. 3, were with Cellular South ($750,000 in revenues), Pocket Wireless and Quickit (revenues in the range of $500,000 to $750,000).

57. After each of Defendants' revenue projections of mid-single digit growth in July, August, and September 2007, CS No. 3 complained to his direct superiors during staff meetings regarding the projection. Noting the projections' reliance upon the AT&T/Cingular contract revenues, CS No. 3 would say: "Does anyone believe this?" According to CS No. 3, the Vice President of Operations and the Vice President of Multimedia did not agree with the accuracy of the projections, nor did President and CEO of Ericsson North America Angel Ruiz.

17

58. On September 13, 2007, only two days after Ericsson and the Individual Defendants touted the Company's strength in the U.S. market, Alcatel-Lucent, a company that Ericsson had identified as a key competitor in its Annual Reports filed on Form 20-F with the Securities and Exchange Commission ("SEC"), announced that it was reducing its full-year revenue outlook from revenue growth in the mid-single digits to "flat to slightly up." Alcatel-Lucent stated that it needed to reduce its revenue projections because of:

> the most recent and updated discussions with some wireless customers in North America. Alcatel-Lucent is now seeing a change in capital spending with those customers in 2007, compared to what it had anticipated. As a result, the company is not seeing the projected volume changes that would have mitigated the ongoing pricing pressures it is experiencing.

59. Alcatel's statement reduction of its revenue outlook did not shock the market because it had adequately alerted investors to the market tightening in July 2007.

60. On September 21, 2007, Adtran, Inc. ("Adtran"), another of Ericsson's market peers, announced over BUSINESS WIRE that "revenues and fully diluted earnings per share for the third quarter [of 2007] are anticipated to be flat." The press release quoted Adtran's chief executive as stating: "The normal seasonal increase in business that is typical in the third quarter has not materialized."

61. On October 15, 2007, Ericsson's shares closed at $40.93 per share.

**THE TRUTH IS REVEALED**

62. On October 16, 2007, before the market opened, Ericsson issued a press release entitled "Lower than expected result for Ericsson in third quarter 2007." The press release stated in part:

> Ericsson expects sales of SEK 43.5 b., an operating income of SEK 5.6 b. and a cash flow of SEK -1.6 b. for the third quarter 2007. This is below the company's own as well as current market expectations and primarily a result of an unexpected shift in the business mix.
>
> "The unexpected development in the quarter is mainly due to a shortfall in sales in

18

mobile network upgrades and expansions which resulted in an unfavorable business mix that also negatively affected Group margins," said Carl-Henric Svanberg, President and CEO of Ericsson. "All other businesses performed as expected. The effect of market dynamics is always a matter of judgment. This quarter we have underestimated the effects."

Ericsson's networks business continues to develop most rapidly in regions where new network rollouts and break-in contracts are predominant. This is where competition is intense as it builds footprint for long-term profitable growth. So far the margin pressures from these business activities have been offset by higher margin sales such as network expansions and upgrades. Such expansions and upgrades have a short sales cycle and builds during the quarter. This quarter, sales of these higher margin offerings did not materialize as much as in previous quarters. High margin software sales are also lower than normal.

The Professional Services segment continues to show strong growth and stable margins. The Multimedia segment is expected to also show a strong growth with operating income slightly above breakeven level, reflecting the continued investments in new business areas.

"In infrastructure scale is critical for success. Our strategy to regain scale advantage through increased mobile systems market shares has been effective. The present market dynamics are however working to our disadvantage from a short-term in financial perspective. Now that we have reestablished our scale advantage from the pre-industry consolidation we will shift our focus slightly and capitalize on our market share gains," said Carl-Henric Svanberg.

The year-over-year sales increase of 6% consisted of organic growth of 4%. The USD has continued to weaken during the quarter and affected reported sales growth negatively.

The decline in gross margin is mainly due to an unfavorable business mix consisting of a high proportion of new network rollouts and lower software sales. In addition to the good growth in network rollout, sales of transmission systems, with a lower margin, showed strong growth, also negatively affecting Group gross margins.

Operating income amounted to SEK 5.6 (8.8) b. in the quarter and SEK 23.0 (23.6) b. year-to-date. In the Networks business mix, new network rollouts are now dominating and in combination with lower sales of software this caused the group operating margins to decline significantly during the quarter. Sony Ericsson's pre-tax profit contributed 4% to Group operating margin in the quarter.

Cash flow from operating activities is estimated to be SEK -1.6 (4.8) b. in the quarter and SEK 7.2 (7.5) b. year-to-date.

Networks

Sales in Networks declined mainly due to lower sales of expansions and upgrades

19

of mobile networks with its related high software content. Sales of lower margin network rollouts and break-ins currently represent the majority of the networks business. It is this shift in business mix that is negatively affecting group margins rather than a change in the underlying margins.

* * * *

**North American sales increased slightly year-over-year, however Ericsson had expected a more significant increase driven by mobile network expansions and upgrades of the installed base which so far has not materialized. In Western Europe Ericsson was also expecting similar sales which did not occur due to ongoing operator consolidation in several major markets.**

Sales development in Asia-Pacific was flattish due to lower mobile systems sales in China. The underlying business activity is ongoing at a healthy level but invoicing varies quarter by quarter due to the nature of the Chinese market. Sales in Australia were down as a result of the completion of the initial HSPA network rollout. Excluding China and Australia sales growth was 17% in the region. All other regions developed as expected.

PLANNING ASSUMPTIONS

For the fourth quarter of 2007 our planning assumption is Group sales of SEK 53-60 b. and operating margins in the mid-teens, including Sony Ericsson.

For the market in 2008, our early expectation is that the current conditions will prevail.

63. On October 16, 2007, the Company held a conference call with analysts where Defendant Svanberg discussed the revelations in the press release. Noticeably absent from the call was Defendant Sundstrom.

64. On October 16, 2007, Ericsson's stock collapsed to close at $31.33 per share, a decline of 24% from the prior day's close of $40.93, on volume of 42.7 million shares compared to average daily volume of 4.15 million shares during the Class Period. As a result of Defendants' false statements, Ericsson securities traded at inflated levels during the Class Period. After the truth above was revealed, the Company's securities were hammered by massive sales, sending them down more than 24% from their Class Period highs.

65. By September 11, 2007, Defendants knew of facts or had access to information

20

demonstrating that their projected quarterly and annual results were materially false.    This

knowledge became more certain each day of the Class Period, but Defendants concealed, until

October 16, 2007, the true facts from the investing public.

66.    On October 17, 2007, Merrill Lynch issued an analyst report entitled "Razor Blades

Business Draws Blood." As explained by Merrill Lynch analysts covering Ericsson:

> **Questions, questions. What is happening at Ericsson? Where was the CFO
> on the conference call? Why did it take Ericsson management two weeks to
> spot a problem that appears to be a multi-quarter trend not a one-off?**
>
> \* \* \* \*
>
> Mix issues linger
>
> This at first looked [] like a fairly straightforward mix issue.    The pre-
> announcement, which we described in our report yesterday, was driven by
> Ericsson's mix being more low-margin new network roll out driven, rather than
> higher margin "razor blades" upgrade business.  In particular the upgrade markets
> in China, W Europe, and the US were weaker.  [Emphasis added.]

67.    On October 25, 2007, Ericsson issued two press releases before the opening of

trading.  The first press release announced the termination of Defendant Sundstrom.  The second

press release confirmed the October 16, 2007 announcement that the Company was facing an

earnings shortfall for the third quarter of 2007 as well as for the year.  Once again, Ericsson

attributed declining profitability to the slow down in sales of network upgrades and expansions.

For the first time however, the Company stated that for the nine months ending September 30,

2007, sales in North America were down 24%, sales were flat in Latin America, sales were up

only 4% in Western Europe, but sales had jumped 21% in Asia.  The Company also disclosed

that its sales were up in Central and Eastern Europe, the Middle East and Africa, but those sales

were in regions that brought low margins.

68.    On the same day, Merrill Lynch issued an analyst report entitled "Q3 results – first

take" stating:

The unexpected pre-announcement

**On October 16th Ericsson unexpectedly pre-announced much lower profitability than expected: Net income came in almost 40% lower than we expected.** Ericsson blamed a mix shift away from higher margin upgrade business and cited a substantial fall in China revenues and weakness in Western Europe and North America. Today's results shed more light on the numbers but do not explain what went wrong. We retain our neutral rating for now, noting that on our previous long-term assumptions the stock looks cheap.

CFO resigns, replaced by services head Hans Vestberg

The resignation of a senior board member is not entirely unexpected **given the fact that Ericsson should have been aware of the short-term structural changes in profitability driven by its move to gain share of new initially lower margin business.** [Emphasis added.]

69. On November 20, 2007, BLOOMBERG NEWS reported that Ericsson had issued another earnings warning stating that lower customer demand more generally had caused the disappointing earnings outlook, citing a slump in orders in Europe and North America. The Company finally joined the ranks of its peers in admitting that markets in the United States and Europe were "tightening."

70. On November 21, 2007, THE WALL STREET JOURNAL also reported that Ericsson now expected sales for the quarter ending December 31, 2007 to be between 53 billion and 60 billion kroner, and for lower sales to continue into 2008:

**Late last month, Ericsson issued a profit warning, citing a slackening in demand in wireless networking equipment, similar to many of its peers. Prior to the warning, Ericsson had been widely believed not to be suffering from these issues.** Ericsson had said the root of the problem was higher sales in less profitable new network rollouts and lower sales of lucrative software. A week after the warning, Ericsson reported a sharp fall in its third quarter net profit, and said it had appointed a new chief financial officer. The company yesterday said it continues to see problems in its network business, with the European and U.S. markets tightening. [Emphasis added.]

71. In an odd admission of guilt, the Board of Directors of Ericsson voted at its annual meeting on April 9, 2008, to clear the company of any wrongdoing in connection with the projections at issue here, without investigation or any real consideration.

22

## SCIENTER

72. As alleged herein, Defendants acted with scienter in that they knew, or were reckless in not knowing, that the statements they publicly issued were materially false and misleading.

### INTERNAL INFORMATION AND REPORTS DEMONSTRATE SCIENTER

73. Defendants, by virtue of their receipt of material non-public information reflecting the true facts from the Company's internal sales reporting systems, knew or were reckless in not knowing that such statements were materially false and misleading. According to CS No. 3, by September 11, 2007, intra-company results and projections for revenues available to Defendants, were significantly below the projections issued by Defendants at the September 11 Conference.

74. Moreover, according to all the Confidential Sources, it was well-known within the Company that AT&T/Cingular, Ericsson's largest U.S. customer, was scaling back its Ericsson purchases for 2007 until it cleared excess Ericsson inventory from its books. Indeed, according to CS No. 3, AT&T/Cingular had informed the Company that it was taking a purchasing hiatus until it "cleaned house."

75. In connection with the 50 new HSPA contracts that Defendants touted at the September 11 Conference, the agreements and terms were readily available to Defendants, and if reviewed would have demonstrated, according CS No. 3, that these new agreements did not amount to more than $35 million in revenues, with the largest providing approximately $5 million, while most were in the $700-$800 thousand range. This is a minimal amount for Ericsson.

76. The agreements and terms of the 50 new HSPA contracts were available to Defendants, who chose to highlight the contracts at the September 11 Conference, and thus knew or recklessly disregarded their terms and conditions when they failed to disclose the limited

23

revenues they would provide the Company.

### THE CONTRACTS AND PRODUCTS AT ISSUE WERE PART OF THE COMPANY'S CORE OPERATIONS

77.   Defendants, as key officers of Ericsson, have a duty to familiarize themselves with the facts relevant to the core operations of the Company before addressing the public on these issues.  The core operations of the Company were its sales of communications networks, related services, and handset technology platforms for mobile and fixed networks worldwide. Moreover, AT&T/Cingular was the Company's largest U.S. customer providing over $5 billion in revenues from 2005 through the first half of 2007.

78.   Defendants knew of facts or had access to information regarding the declining sales to AT&T/Cingular from (i) the internal reports and tracking systems of the Company, and (ii) the statement by AT&T/Cingular to the Company that it intended to significantly limit its purchases in 2007. This information contradicted Defendants' public statements.

79.   Defendants knew of facts or had access to information regarding the *de minimus* increase in revenues that the Company would receive from the 50 new HSPA contracts.  The terms and conditions of the agreements were part of the Company's books and records. Moreover, Defendants chose to highlight the 50 new agreements without disclosing the revenue information to shareholders.

80.   Defendants chose to make statements concerning the Company's financial condition and future business prospects while they either knew or ignored the reasonably available data, discussed above, which indicated that their statements were materially false or misleading.

### DEFENDANTS IGNORED "RED FLAGS" REGARDING THE MARKET FOR NETWORK SYSTEMS AND INFRASTRUCTURE

81.   Defendants also turned a blind eye to financial realities, and deliberately chose to

ignore "red flags" regarding the market for network systems and infrastructure even though they would be clearly evident to anyone in Defendants' position.

82.    In the months proceeding the Class Period, and in the early days of the Class Period, Ericsson's chief competitors, Alcatel-Lucent, Nokia, Nortel, and Adtran each disclosed to their investors that the market for network systems was "tightening" and warned their investors that earlier revenue projections would be reduced.    Indeed Nortel noted that a number of network transactions were being made at significant disadvantageous terms.

83.    Defendants turned a blind eye to these market realities, and either were reckless and deliberately chose to ignore such "red flags" or intentionally made materially false statements.

### LOSS CAUSATION/ECONOMIC LOSS

84.    By misrepresenting Ericsson's financial outlook, Defendants presented a misleading picture of the Company's business and prospects.    Thus, instead of truthfully disclosing during the Class Period that Ericsson's business was not as healthy as represented, Ericsson falsely represented that its business was growing.

85.    These claims of profitability caused and maintained the artificial inflation in Ericsson's share price throughout the Class Period and until the truth about its future earnings was revealed to the market.

86.    Defendants' false and misleading statements had the intended effect and caused Ericsson shares to trade at artificially inflated levels throughout the Class Period, reaching as high as $41.96 per share.

87.    On October 16, 2007, with the end the third quarter closing in, Defendants were forced to publicly disclose that Ericsson had not achieved even close to the results forecasted for it by the Defendants, causing its share price to drop to $31.33 on October 17, 2007.

88.    As a direct result of Defendants' admissions and the public revelations regarding

25

the truth about Ericsson's profitability and its actual business prospects going forward, Ericsson's share price plummeted 24%, falling from $40.93 per share on October 15, 2007 to $31.33 per share the following day, a one day decline of $9.60 per share. This drop removed the inflation from Ericsson's share price, causing real economic loss to investors who had purchased the securities during the Class Period.

## COUNT I

### For Violation of § 10(b) of the 1934 Act and Rule 10b-5
### <u>Against All Defendants</u>

89.  Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

90.  During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

91.  Defendants violated § 10(b) of the 1934 Act and Rule 10b-5 in that they:

a.  employed devices, schemes and artifices to defraud;

b.  made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

c.  engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Ericsson common stock, ADSs, and call options, and sellers of Ericsson put options during the Class Period.

92.  Plaintiff and the Class have suffered damages in that, in reliance on the integrity of

the market, they paid artificially inflated prices for Ericsson publicly traded securities. Plaintiff and the Class would not have purchased Ericsson publicly traded securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements. Moreover, at the end of the Class Period, when the inflation of the securities was removed by the disclosure of the fraud, the Class suffered damages because they did not recover the inflation.

## COUNT II

### Pursuant to § 20(a) of the 1934 Act
### Against The Individual Defendants

93. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

94. Defendants Svanberg and Sundstrom acted as controlling persons of Ericsson within the meaning of Section 20(a) of the 1934 Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Defendants Svanberg and Sundstrom had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Lead Plaintiff contends are false and misleading. Defendants Svanberg and Sundstrom were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

95. In particular, Defendants Svanberg and Sundstrom had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have

had the power to control or influence the particular statements giving rise to the securities violations as alleged herein, and exercised the same.

96.   Furthermore, by engaging in the conduct alleged above, Defendants Svanberg and Sundstrom culpably participated in the fraud alleged above, directly and/or indirectly causing the investors' losses.

97.   By virtue of their positions as controlling persons, Defendants Svanberg and Sundstrom are liable pursuant to Section 20(a) of the 1934 Act jointly and severally with Ericsson for Ericsson's violation of Section 10(b) and Rule 10b-5.  As a direct and proximate result of Defendants Svanberg and Sundstrom's wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**CLASS ACTION ALLEGATIONS**

98.   Plaintiff brings this action as a class action pursuant to Fed.R.Civ.P. 23 on behalf of all persons purchased common stock, ADSs, or call options or sold puts options of Ericsson during the Class Period (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

99.   The members of the Class are so numerous that joinder of all members is impracticable.  Ericsson has over 1.59 billion shares of stock outstanding, owned by hundreds if not thousands of persons.  Throughout the Class Period, Ericsson's ADSs were actively traded on the NASDAQ, a well-developed and efficient market.  Throughout the Class Period, Ericsson's common stock was traded on the Stockholm, London, and Frankfurt stock exchanges, well-developed and efficient markets.  Throughout the Class Period, Ericsson's options were

28

traded on the American Stock Exchange, Chicago Option Exchange, International Stock Exchange, Philadelphia Stock Exchange, as well as certain European exchanges, all well-developed and efficient markets. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Ericsson or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

100. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

      a.    whether the 1934 Act was violated by Defendants;

      b.    whether Defendants omitted and/or misrepresented material facts;

      c.    whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

      d.    whether Defendants knew or deliberately disregarded that their statements were false and misleading;

      e.    whether the prices of Ericsson's publicly traded securities were artificially inflated; and

      f.    the extent of damage sustained by Class members and the appropriate measure of damages.

101. Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

102. Lead Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

103. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.   Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.   Awarding Lead Plaintiff and the other members of the Class damages, including interest;

C.   Awarding Lead Plaintiff's and the other members of the Class reasonable costs and attorneys' fees; and

D.   Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated:  April 15, 2008

MURRAY, FRANK & SAILER LLP

By: _____
      Brian P. Murray (BM 9954)
Lawrence D. McCabe (LM 1846)
275 Madison Avenue, 8th Floor
New York, New York 10016
Telephone: (212) 682-1818
Facsimile:  (212) 682-1892

*Lead Counsel*

Of Counsel:

Randall Steinmeyer

31

## CERTIFICATE OF SERVICE

I hereby certify, under penalty of perjury, that on this 15th day of April, 2008, I caused a true and correct copy of the foregoing CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT to be served on the person listed below, who is accepting service for defendants, by causing a true copy thereof to be delivered by e-mail to:

**Daniel Jonathan Kramer**
Paul, Weiss, Rifkind, Wharton &
Garrison LLP (NY)
1285 Avenue of the Americas
New York, NY 10019
(212)-373-3020
Fax: (212)-492-0020
Email: dkramer@paulweiss.com
*LEAD ATTORNEY*

Lawrence D. McCabe