Back to Contents

A discount rate of 35% was used for determining the value of the in−process research and development. This rate is higher than the implied weighted average cost of capital for the acquisition due to inherent uncertainties surrounding the successful development of the purchased in−process technology, the useful life of such technology, the profitability levels of such technology, and the uncertainty of technological advances that were unknown at that time. However, we believe that expenses incurred to date associated with the development and integration of the in−process research and development projects are consistent with our estimates at the time of acquisition.

*Spatial.* We used the purchase method of accounting for Spatial, whereby the excess of cost over the net amounts assigned to assets acquired and liabilities assumed is allocated to goodwill and intangible assets based on their estimated fair values. Such intangible assets identified by us include U.S.$62.5 million allocated to developed technology and know how ("developed technology") and U.S.$14.5 million allocated to in−process research and development.

At the acquisition date, Spatial was selling its distributed mobile switching solution; a centralized call server that manages call/session control for mobile voice and data services, commonly referred to as a "softswitch." In March 2002, Spatial introduced its Atrium (TM) product, the industry's first next−generation mobile core switch that supports 2/2 5/3G GSM and CDMA networks. The allocation of U.S.$62.5 million of the purchase price to the developed technology encompassed the call server technology.

In addition, at the time of acquisition, Spatial was developing new software functionalities that integrate UMTS (Universal Mobile Telecommunications System) and Wi−Fi technology into our wireless softswitch technology platform. It was estimated that this project had incurred approximately U.S.$4 million in costs as of the valuation date. Cost to complete the project was estimated at approximately U.S.$650,000 over four months following the acquisition. Management estimated that the project was approximately 80% complete, in the aggregate, based on development costs.

At the time of the acquisition, we expected estimated total revenues from the acquired developed technology and know how and in−process technology would peak in 2006 and 2008, respectively, and steadily decline thereafter, as other new products and technologies are introduced by Spatial.

The estimated costs of goods sold as well as operating expenses as a percentage of revenues for Spatial were expected to be materially consistent with historical levels, primarily due to the extremely competitive nature of the industry and the need to continue to spend heavily on research and development.

A discount rate of 30% was used for determining the value of the in−process research and development, while a rate of 18% was employed for determining the value of the developed technology and know how. The in−process research and development rate is higher than the implied weighted average cost of capital for the acquisition due to inherent uncertainties surrounding the successful development of the purchased in−process technology, the useful life of such technology, the profitability levels of such technology, and the uncertainty of technological advances that were unknown at that time.

*Lucent.* At the acquisition date, Lucent was conducting design, development, engineering and testing activities associated with the completion of numerous projects aimed at developing next−generation technologies for the telecommunications equipment market. The nature of the additional efforts required to develop these technologies into commercially viable products consists primarily of planning, designing, experimenting, and further testing activities necessary to determine whether the technologies can meet market expectations, including functionality and technical requirements.

The methodology we used to allocate the purchase price to in−process research and development is determined through established valuation techniques. The income approach was the primary valuation method employed; this approach discounts expected future cash flows related to the projects to present value. The discount rates used in the present value calculations are typically based on a weighted−average cost of capital analysis, venture capital surveys and other sources where appropriate. Adjustments were made to reflect the inherent risk of the developmental assets. The cost approach also was employed in selective cases of in−process research and development, which entails estimating the cost to recreate the asset. We consider the pricing models related to the acquisition to be standard within the telecommunications industry.

The key assumptions employed in both approaches consist primarily of an expected completion date for the in−process projects; estimated costs to complete the projects; revenue and expense projections; and discount rates based on the risks associated with the development lifestyle of the in−process technology acquired. We cannot give assurances that the underlying assumptions used to estimate expected project revenues, development costs or profitability, or the events associated with such projects, as described below, will take place as estimated.

The acquisition of Lucent resulted in the allocation of approximately U.S.$581 million of the purchase price to in−process research and development. In−process research and development was expensed under U.S. GAAP upon acquisition because no future alternative uses exist. Under IFRS, an impairment charge of U.S.$123 million was accounted for as restructuring costs in December 2006 in connection with the discontinuance of certain product lines. The development of these technologies remains a significant risk due to the remaining efforts to achieve technological feasibility, rapidly changing customer markets, uncertain standards for new products, and significant competitive threats. Failure to bring these products to market in a timely manner could result in a loss of market share or a lost opportunity to capitalize on emerging markets and could have a material adverse impact on our business and operating results.

*UMTS business of Nortel.* Nortel has spent over U.S.$1.0 billion in the past five years on the development of the UMTS technology assets. The technology is based on current standards and architectures and is designed to allow for future enhancements. Royalty rate data was reviewed for contemporary transactions in the telecommunications transmission technology market and wireless−related protocol market. The relevant range of royalty rate was 4.0% to 6.0%.

Back to Contents

For the analysis performed, a royalty rate of 6.0% was considered appropriate to reflect the specific characteristics of the acquired UMTS technology. Certain of the comparable transactions reviewed involved restricted licenses arrangements (limited geography, markets, etc.) that would underestimate true ownership value. Additionally, our and Nortel's management both considered the Nortel UMTS technology as more mature and superior to our existing products. The majority of our UMTS technology platform going forward will be comprised of Nortel UMTS assets. The acquired UMTS-developed technology was expected to contribute meaningfully to revenue generation for approximately seven years. The technology may contribute to the forthcoming long term evolution (4G) products beyond seven years, but it was unclear at the valuation date what role, if any, the acquired assets will play. The resulting cash flows were discounted to present value using a rate of 18.0% based on the UMTS technology's relative risk profile and position in its technology cycle. The present value associated with UMTS technology assets (including in process research and development) was €127 million.

In order to allocate this aggregate value to developed technology and in-process research and development, the expected contribution to cash flows for the in-process research and development was estimated and used as a factor for allocating its share of the total UMTS value. The remaining value was ascribed to the acquired developed technology and know how. The contribution of in-process research and development was estimated based on the relative research and development costs incurred on the identified projects to the total research and development spent on the overall UMTS platform while in development at Nortel. UA 5.0 and UA 6.0 UMTS projects were identified as in-process at the valuation date. Nortel has spent approximately U.S.$130 million to date on the current research and development projects. The UA 5.0 and UA 6.0 in-process research and development projects have incurred U.S.$24.4 million and U.S.$0.2 million in development expenses, respectively, in 2005. Expenses incurred in 2006 were U.S.$102.7 million and U.S.$2.1 million, respectively.

UMTS development efforts over the last five years can be characterized by a period of three years of development of base UMTS technology, followed by two years of higher value, differentiating product technology (including UA 5.0 and UA 6.0 technologies). As such, UA 5.0 and UA 6.0 development expenses were value-adjusted to reflect their higher contribution to the overall technology platform than the base technology components. The combined value-adjusted research and development spent as of the valuation date was estimated at approximately U.S.$188 million. Given an estimate of U.S.$1.0 billion incurred on the UMTS technology platform since its inception, the in-process research and development represented 18.8% of the total spent. In-process research and development has therefore been valued at U.S.$30.5 million (€24 million).

# Item 6. Directors, Senior Management and Employees

In accordance with French company law governing a *société anonyme*, our business is managed by our board of directors (including its Chairman) and by our Chief Executive Officer.

## Board of Directors

The following table sets forth, as of March 31, 2007, the following information for each of our directors: name, age, year of election to the board, year in which the term on the board expires, principal business activities performed outside of Alcatel-Lucent (including other principal directorships) and the number of our securities owned.

| Name | Age | Year Initially Appointed to board | Year Term Expires | Principal Business Activities Outside of Alcatel-Lucent | Number of Securities Held |
|---|---|---|---|---|---|
| Serge Tchuruk | 69 | 1995* | 2010 | Director of Thales and Total; Director of École Polytechnique, and Member of the Supervisory Board of Alcatel Deutschland GmbH | 236,150 ordinary shares 212 units FCP 2AL(1) |
| Daniel Bernard | 61 | 1997* | 2010 | Director of Cap Gemini; Chairman of Provestis; Deputy Chairman of Kingfisher | 141,125 ordinary shares |
| W. Frank Blount | 68 | 1999* | 2010 | Chairman of JI Ventures Inc. and TTS Management Corp.; Director of Entergy Corporation, Caterpillar Inc., Adtran Inc. and Hanson Plc | 3,668 ADSs |
| Jozef Cornu | 62 | 2000* | 2010 | Chairman of Alcatel Bell NV; Member of the Supervisory Board of Alcatel-Lucent Deutschland AG and of Alcatel Deutschland GmbH; Director of Barco, KBC, Agfa Gevaert, Arinso International and Essensium; Chairman of the Information Society Technologies Advisory Group of the European Commission | 20,500 ordinary shares 1,763 FCP 2AL |
| Linnet F. Deily | 61 | 2006 | 2010 | Director of Chevron Corporation and Honeywell International Inc. | 9,618 ADSs |

Back to Contents

| Name | Age | Year Initially Appointed to board | Year Term Expires | Principal Business Activities Outside of Alcatel-Lucent | Number of Securities Held |
|---|---|---|---|---|---|
| Robert E. Denham | 61 | 2006 | 2010 | Director of Chevron Corporation, Wesco Financial Corporation, Fomento Economico Mexicano SA de CV; Vice Chairman of Good Samaritan Hospital of Los Angeles; Chairman of Financial Accounting Foundation; Partner of Munger, Tolles & Olson LLP; Director of New School University, Russell Sage Foundation and John D. and Catherine T. MacArthur Foundation: Member of the Board of the United States Trust Company and its wholly-owned banking subsidiary United States Trust Company N.A. | 43,840 ADSs |
| Edward E. Hagenlocker | 67 | 2006 | 2010 | Director of Air Products and Chemicals, American Standard Companies, Inc. and AmeriSource Bergen Corporation | 20,585 ADSs |
| Jean-Pierre Halbron | 70 | 1999* | 2010 | Director of Électro Banque | 28,670 ordinary shares 2,002 units FCP 2AL (1) |
| Sylvia Jay** | 60 | 2006 | 2009 | Director of Saint Gobain; Vice Chairman of L'Oréal UK Ltd.; Chairman of Food For Britain; Director of Lazard Limited; Chairman of the Pilgrim Trust; Trustee of the Prison Reform Trust and of the Entente Cordiale Scholarships Scheme | 500 ordinary shares |
| Karl J. Krapek | 58 | 2006 | 2010 | Director of Delta Airlines, Inc., Visteon Corporation, The Connecticut Bank and Trust Company and Prudential Financial Inc. | 36,570 ADSs |
| Daniel Lebègue | 63 | 2003* | 2010 | Director of Crédit Agricole SA, SCOR and Technip; Chairman of the Institut Français des Administrateurs, Transparency International and the Institut d'Études Politiques (Lyon): Director of SCOR US | 500 ordinary shares |
| Patricia F. Russo | 54 | 2006 | 2010 | Director of Schering-Plough Corp. | 539,329 ADSs |
| Henry B. Schacht | 72 | 2006 | 2010 | Director of ALCOA Inc.; Trustee of the Metropolitan Museum of Art | 225,589 ADSs |
| Jean-Cyril Spinetta** | 63 | 2006 | 2009 | President and CEO of Air France-KLM and Société Air France; Director of Saint Gobain and Unilever; Permanent Representative of Air France-KLM to the Board of Directors of Le Monde des Entreprises | 2,500 ordinary shares |
| Thierry De Loppinot*** | 63 | 1997* | 2008 | Chairman of the Supervisory Board of Actionnariat Alcatel-Lucent mutual fund (FCP 2AL) | 7,094 ordinary shares 5,490 units FCP 2AL (1) |
| Jean-Pierre Desbois*** | 53 | 2006 | 2008 | Member of the Supervisory Board of Actionnariat Alcatel Lucent mutual fund (FCP 2AL) | 1,511 units FCP 2AL (1) |

* *Refers to year of appointment to the historical Alcatel board.*

***At the November 30, 2006 meeting of our board, Sylvia Jay and Jean-Cyril Spinetta were appointed as directors; this appointment is subject to ratification at our ordinary general meeting of shareholders to be held on June 1, 2007.*

****Mr. De Loppinot and Mr. Desbois are censeurs (i.e. board observers with similar rights as the other directors, except for the right to vote).*

*(1) FCP 2AL is the unit trust of our employees governed by Article 20 of French law dated December 23, 1988. Our articles of association and bylaws require that two members of our board be employed by us, and that they participate in a FCP at the time of their appointment to our board and during their terms in office as directors.*

The following tables set forth the amount of compensation paid by us or, where indicated by footnote (1), by Lucent, during 2006 to each of the individuals who were, during 2006, members of the board of directors of historical Alcatel or Alcatel-Lucent, in connection with such person's service as a director and, if applicable, an executive of historical Alcatel or Alcatel-Lucent.

| *Historical Alcatel (Directors no longer on the Board as of November 30, 2006)* **Director** | **Amount** |
|---|---|
| Philippe Bissara | €56,328 |
| David Johnston | 41,553 |
| Pierre-Louis Lions | 47,250 |
| Peter Mihatsch | 28,517 |
| Bruno Vaillant | 47,250 |
| Marc Viénot | 58,227 |

Back to Contents

*Alcatel–Lucent (Members of the Board as of November 30, 2006)*

| Director | Amount |
|---|---|
| Daniel Bernard | €70,684 |
| W. Frank Blount | 50,631 |
| Jozef Cornu | 45,352 |
| Linnet F. Deily | 131,411[(1)] |
| Robert E. Denham | 151,322[(1)] |
| Edward E. Hagenlocker | 143,358[(1)] |
| Jean–Pierre Halbron | 47,250[(2)] |
| Sylvia Jay | 0 |
| Karl J. Krapek | 135,393[(1)] |
| Daniel Lebègue | 59,708 |
| Henry B. Schacht | 131,411[(1)] |
| Jean–Cyril Spinetta | 0 |
| Jean–Pierre Desbois (censeur – board observer) | 0 |
| Thierry De Loppinot (censeur – board observer) | 47,250 |
| Patricia Russo | 1,894,546[(3)] |
| Serge Tchuruk | 8,187,464[(4)] |

*(1) Compensation paid by Lucent. Attendance fees allocated to directors of Lucent were paid in cash or in shares, at the election of the director, but in any event at least 50% in shares.*
*(2) In addition, Mr. Halbron received €3,118 in directors fees from our subsidiary, Electro Banque.*
*(3) Compensation paid by Lucent. Please see "Compensation — Patricia Russo" below for an explanation of this amount.*
*(4) Please see "Compensation — Serge Tchuruk" below for an explanation of this amount.*

## Attendance Fees

The total annual attendance fees allocated to directors was set at €600,000, which amount was approved at our shareholders' meeting held on May 16, 2000. The allocation of attendance fees, as approved by the board, is set forth in the internal rules of the board. As determined by our board on November 30, 2006, the Chairman is entitled to receive twice the amount of attendance fees paid to other members of our board, taking into account the remuneration attributed to the two employee representatives *("censeurs")* on our board who serve on our board as required under French law and in accordance with Article 14 of our bylaws.

The following provisions regarding the board attendance fees remain unchanged:

- the attendance fees are divided into two equal parts, a fixed portion equally shared among the members of the board and a variable part depending on their attendance at board meetings and meetings of the committees on which they serve; and
- payments are made in two installments: after the annual general meeting of our shareholders and at the end of the year.

The total amount of attendance fees paid out in 2006 was €600,000. From January 1 until November 30, 2006, the Chairman and Chief Executive Officer (both titles were held by Serge Tchuruk) was not entitled to attendance fees. Beginning December 1, 2006, only our Chief Executive Officer is not entitled to attendance fees.

At a meeting held on November 30, 2006, our board of directors evaluated the independence of its members and determined that 11 of its members (representing more than half of the members of the board) are independent under the independence criteria set by the board and those set by The New York Stock Exchange. These members are Daniel Bernard, W. Frank Blount, Linnet F. Deily, Robert E. Denham, Dr. Edward E. Hagenlocker, Jean–Pierre Halbron, Lady Sylvia Jay, Karl J. Krapek, Daniel Lebègue, Henry B. Schacht and Jean–Cyril Spinetta.

## Senior Management

As a result of the business combination with Lucent, we formed a Management Committee that is responsible for implementing our board of directors' strategic policies, deciding and coordinating our management policies and our policies for allocating resources to our various operating segments. The table below sets forth, as of March 30, 2007, certain information for our senior executives who are members of this committee.

Back to Contents

| Name | Age | Current Position and Year Appointed to Management Committee |
|---|---|---|
| Patricia Russo | 54 | Chief Executive Officer (2006) |
| Jean-Pascal Beaufret | 56 | Chief Financial Officer (2006) |
| Frank D'Amelio | 49 | Chief Administrative Officer and Senior Executive Vice President of Integration (2006) |
| Étienne Fouques | 58 | President of the Carrier Business Group (2006) |
| Claire Pedini | 41 | Senior Vice President, Corporate Human Resources and Communications (2006) |
| Michael Quigley | 54 | President, Science, Technology and Strategy (2006) |

There are no family relationships between any of our directors or senior executives. No director or senior executive was elected or appointed as a result of any arrangement or understanding with any third party. However, in connection with the business combination with Lucent, historical Alcatel and Lucent agreed that our board of directors would be comprised of 14 members: (i) five members from historical Alcatel's board of directors, (ii) five members from Lucent's board of directors, (iii) Serge Tchuruk (who was the Chairman of the Board of Directors and Chief Executive Officer of historical Alcatel), (iv) Patricia Russo (who was the Chairman of the Board of Directors and Chief Executive Officer of Lucent), and (v) two Europeans (one of whom is French), who historical Alcatel and Lucent would agree upon, who qualify as independent directors. In addition to these members, there are two employee representatives ("*censeurs*"), who serve on our board as non-voting observers at the meetings of our board of directors. As of December 31, 2006, none of our senior executives owned more than one percent of the total outstanding number of our ordinary shares.

## Compensation

*Senior Management.* The information provided in this section describes compensation received in 2006 by the following persons: (i) Serge Tchuruk, as Chairman and Chief Executive Officer of historical Alcatel until November 30, 2006 and as Chairman of Alcatel-Lucent beginning December 1, 2006; (ii) Patricia Russo, as our Chief Executive Officer beginning December 1, 2006; (iii) members of historical Alcatel's executive committee from January 1, 2006 until November 30, 2006 and (iv) members of our management committee from December 1, 2006 until December 31, 2006. This group is comprised of 15 individuals and we refer to this group as the "Current and Historical Senior Executive Group." From January 1, 2006 until November 30, 2006 (unless otherwise indicated), the members of the executive committee of historical Alcatel were: Serge Tchuruk, Michael Quigley, Jean-Pascal Beaufret, Hubert de Pesquidoux [(1)], Etienne Fouques, Olivier Houssin, Claire Pedini, Olivier Picard [(1)], Michel Rahier [(1)], Christian Reinaudo, Marc Rouanne [(1)], and (from January 1 to April 2, 2006) Jacques Dunogué and also (from April 27, 2006 to November 30, 2006) Frédéric Rose. The individuals whose names are followed by the notation "[(1)]" were members from April 2, 2006 to November 30, 2006).

For the year ended December 31, 2006, the aggregate amount of compensation and benefits (such as extension bonuses, expatriate allowances and housing allowances), excluding exceptional items, that we paid to the Current and Historical Senior Executive Group, for services in all capacities, was €12.1 million (compared with €14 million in 2005). These amounts are computed pro rata to take into account the length of the individual's participation on the aforementioned committees. The exceptional items for the Current and Historical Senior Executive Group, which was comprised of severance payments resulting from contractual commitments during 2006, amounted to €7.5 million for 2006, as compared to €5.3 million in 2005.

The compensation for the Current and Historical Senior Executive Group (excluding Ms. Russo and Mr. D'Amelio for 2006) consists of both a base salary and a bonus, which is determined based partly on our performance and partly on the executive's performance, pursuant to criteria reviewed by the nomination and compensation committee of our board of directors prior to November 30, 2006 and, following such date, by the compensation committee.

During 2006, the bonuses for the members of the Current and Historical Senior Executive Group (excluding Ms. Russo and Mr. D'Amelio) were based on our net income and our working capital needs for 2005. Of the total compensation paid to the Current and Historical Senior Executive Group in 2006, €6.6 million was paid in base salary and €5.5 million was paid in bonus, which bonus represents 45.5% of their total salary. The criteria applicable by Lucent for 2006 to Ms. Russo, Mr. D'Amelio and many other employees of Lucent were based on Lucent's operating income and revenue performance and the individual's performance.

The bonus to be paid in 2007 with respect to 2006 will be based on whether the Company's revenue, net profit after minority interests and net change in free cash flow met certain targeted levels.

Directors' fees that members of the Current and Historical Senior Executive Group received from various companies as a result of their employment with us are deducted from their salary. Our directors and the Current and Historical Senior Executive Group did not exercise any stock options of historical Alcatel or of Alcatel-Lucent in 2006.

*Serge Tchuruk.* The aggregate remuneration (fixed and variable) paid to Mr. Tchuruk in 2006 with respect to his positions as our Chairman and Chief Executive Officer was €2,502,704, excluding exceptional items (compared to €2,839,363 in 2005). The pro rata portion of Mr. Tchuruk's fixed annual compensation, until November 30, 2006, was €1,397,449. Mr. Tchuruk's variable compensation (indexed to net profit, excluding amortization of goodwill and after deducting minority interests) paid in 2006 with respect to 2005 was €1,105,255.

Back to Contents

The amount of variable remuneration to be paid in 2007 in respect of Mr. Tchuruk's position as Chairman and Chief Executive Officer in 2006 was €244,554. This amount was determined by applying the same criteria as those applicable to all of historical Alcatel's senior executives for 2006, namely 30% of such variable remuneration was based on the Company's obtaining a targeted level of revenues, 40% was based on the Company's obtaining a targeted level of net profit after minority interests and 30% was based on the Company's obtaining a targeted level of net change in free cash flow, each measured on a proforma basis without giving effect to the business combination with Lucent or the transfer of certain businesses to Thales.

Upon Mr. Tchuruk's appointment in 1995 as our Chairman and Chief Executive Officer, we agreed to pay Mr. Tchuruk, upon termination of his employment as our Chief Executive Officer, an amount equal to two times the average of his highest remuneration during two out of five years immediately preceding the termination of his employment as Chief Executive Officer. On November 30, 2006, when Mr. Tchuruk ceased to be our Chief Executive Officer, the nomination and compensation committee determined that such amount aggregated €5,675,540. Due to the benefits Mr. Tchuruk accrued pursuant to a supplementary pension plan for our executives, as well as the benefits he accrued prior to his employment with the Group, we will not need to make any payments pursuant to a guarantee that our board of directors gave Mr. Tchuruk that his retirement benefits would equal, on an annual basis, 40% of the average of his two highest total annual remunerations during the five years preceding his ceasing to be our Chairman and Chief Executive Officer.

As Chairman, Mr. Tchuruk will not receive any compensation, except for director's attendance fees earned as Chairman and as a member of certain board committees. At a board meeting held on November 30, 2006, our board authorized Mr. Tchuruk to receive twice the amount of attendance fees as those earned by other members of the board, taking into account remuneration attributed to the two censeurs in accordance with Article 14 of our bylaws. No attendance fees were paid to him for December 2006. He also is entitled to a company car, a driver and a secretary and, consistent with the policy applicable to all historical Alcatel retiring employees the options granted to him during the course of his employment with the Company will continue to vest in accordance with the terms thereof.

*Patricia Russo.* Ms. Russo was appointed by our board as Chief Executive Officer on November 30, 2006. Beginning January 1, 2007, Ms. Russo's fixed annual compensation is €1.2 million. The variable component of her compensation depends upon the achievement of certain performance objectives. At a meeting held on March 28, 2007, the board set the same criteria for her variable compensation as are applicable to all of our senior executives and to many of our executives for 2007, namely 50% of such variable remuneration is based on the Company's obtaining a targeted level of revenues, 25% is based on the Company's obtaining a targeted level of net profit after minority interests and 25% is based on the Company's obtaining a targeted level of net change in free cash flow.

Ms. Russo will also receive a housing allowance for her Paris residence, a company car and a driver. She will not receive any directors' attendance fees for attending meetings of our board or committees thereof.

In 2006, Ms. Russo received €1,894,546 in total compensation from Lucent pursuant to the terms of Ms. Russo's employment agreement with Lucent.

For 2006, as Chairman and Chief Executive Officer of Lucent, Ms. Russo's remuneration consisted of a fixed component, a variable component, participation in a profit-sharing plan and stock options. The fixed portion of Ms. Russo's compensation for 2006 (including December, the month in which she became our Chief Executive Officer) was €955,718. For the period between October 1, 2005 and September 30, 2006, Ms. Russo received variable compensation totaling €527,238 representing 37% of the target bonus for that period. The criteria for awarding the variable portion of Ms. Russo's compensation were based on Lucent's operating income and revenue and her individual performance. The three-month period of October 1 through December 31, 2006 included two months of Lucent's 2007 fiscal year (October and November) before the merger closed and one month of Alcatel-Lucent's calendar year (December) after the merger closed. In view of the difficulty of accessing performance during this transition period and since annual compensation increases that periodically had been awarded in October would not take place, the Lucent Leadership Development and Compensation Committee approved a bonus pool in an amount equal to 100% of the target amount, pro rated for the three-month period. This bonus pool was then allocated to some employees based on their individual performance, particularly with respect to their contribution to the consummation of the merger. In accordance with the Committee's determination for Ms. Russo, she was awarded €375,916 (representing approximately 26% of Ms. Russo's annual target), which will be paid in July 2007.

Lucent's long-term incentive programs for approximatly 1,000 of its employees, including Lucent's Chief Executive Officer, were terminated as of the closing date of our business combination. In accordance with agreements governing these programs, based on the original timetable and the terms and conditions applicable to such bonuses, Lucent accrued the earnings-based bonuses in full in respect of Lucent's full fiscal years ended prior to the closing of the business combination on November 30, 2006, and pro-rata for the period between October 1, 2006 (the commencement of Lucent's fiscal year) and November 30, 2006, based on the target performance levels for fiscal 2007. In addition, Lucent awarded its employees a special stock option grant to partially address the lost opportunity arising from the early termination of the plans.

Accordingly, Ms. Russo received in 2006 the following amounts:

(i) in respect of Lucent's 2004–2006 performance cycles, a payment of €371,668; (ii) in respect of Lucent's 2005–2007 and 2006–2008 performance cycles the grant of 135,353 restricted stock units vesting over two years or less; and (iii) the grant of options to purchase 390,400 ordinary shares at an exercise price of €9.349 per share which shall vest 25% per year over four years.

Back to Contents

Cash compensation paid to Ms. Patricia Russo by Lucent

| *In euros* * | 2006 | 2005** | 2004 ** |
|---|---|---|---|
| Fixed remuneration | 955,718 | 955,718 | 955,718 |
| Variable remuneration | 527,238 | 1,553,042 | 2,349,474 |
| Long-Term incentive plan *** | 371,668 | 2,266,114 | - |
| Other remuneration | 25,327 | 41,904 | 36,441 |
| Benefits in kind | 14,595 | 60,389 | 25,393 |

** Conversion rate: € 1.00 = U.S.$ 1.2556.*
*** Lucent 's fiscal year was from October 1st to September 30th.*
**** Amounts reflect cash payment for the three-year performance cycles that ended in 2005 and in 2006; a portion of the incentive payment for each of these performance cycles was paid to Ms. Russo in the form of restricted stock units.*

*Severance pay.* Our board, at its meeting held on November 30, 2006, acknowledged the renewal by us of the Lucent Officer Severance Policy governing severance pay awarded to Ms. Russo if she ceases to be Chief Executive Officer.In this context, she will be entitled to the benefits established for dismissal of certain of Lucent's corporate officers as set out in the Lucent Officer Severance Policy, amounting to payment of two years of total annual remuneration (including fixed and variable pay) which applies in the event of dismissal without cause, following a change of control, or resignation for cause. The policy stipulates that remuneration will continue to be paid for a two-year period known as the continuation period, as well as payment of a bonus based on achievement of annual objectives, such bonus to be paid in each December during the continuation period. Furthermore, this continuation period and the corresponding remuneration are included in the calculation of age, length of service and remuneration on which pension benefits are based. Ms Russo's severance pay package will be presented to our shareholders for approval at our annual shareholders meeting to be held on June 1, 2007. The various social and pension benefits and benefits in kind will also continue during the continuation period.

*Other benefits.* Our board also acknowledged that our Chief Executive Officer will be entitled to the same benefits as all employees of Lucent calculated on the basis of her fixed and annual variable pay from the Group. Such benefits include Lucent's pension plan and disability plans. See "Share Ownership" for a discussion of the options granted to Ms. Russo in 2007. During 2008, the board may grant bonus shares (subject to such grants being authorized at our shareholders' meeting), on the basis of performance targets to be determined by the compensation committee.

As a result of Ms. Russo's 2002 hiring agreement with Lucent, she has a vested pension of the greater of U.S.$740,000 per year or the amounts calculated under the Lucent Retirement Income Plan covering U.S. salaried employees generally. Under that pension plan, benefits are equal to 1.4% of the sum of a participant's (a) average annual pay for the five years ended December 31, 1998 (excluding the variable pay award paid in December 1997) multiplied by the number of years of service through that date, (b) pay after 1998, and (c) variable pay award paid in December 1997. Average annual pay includes fixed and variable pay which, for Ms. Russo, includes all such payments from the Group.Ms. Russo also has company-provided life insurance coverage.

#### *Pension and retirement accruals*

The aggregate amount of the benefit obligation related to pension, retirement, or similar benefits for our directors listed in the first table under the heading "Board of Directors" above and our senior executives listed in the table under the heading "Senior Management" above, as a group, as of December 31, 2006, was approximately €53.1 million. The corresponding amount of pension reserve accounted for, taking into account plan assets and unrecognized actuarial loss/gain amounted to €30.5 million as of December 31, 2006.

### Committees of the Board

During the November 30, 2006 meeting of our new board of directors, the board adopted new internal rules for the board, which established four committees of the board and outlined each committee's powers, duties, responsibilities and operating methods.

#### *Audit and Finance Committee*

Prior to the business combination with Lucent, historical Alcatel's board of directors had an audit committee. This committee consisted of three members: Daniel Lebègue, chairman of the committee, Marc Viénot and Daniel Bernard. After the Lucent transaction, our new board of directors established the audit and finance committee, which consists of four members: Robert E. Denham, chairman of the committee, Jean-Pierre Halbron, Daniel Lebègue, and Karl J. Krapek. Our board has determined that each of the members of the audit committee is "independent" under the applicable rules promulgated by the Securities and Exchange Commission and by The New York Stock Exchange. Similar to historical Alcatel's audit committee, our audit and finance committee reviews our accounting standards and methods, internal control procedures for collecting and controlling financial information, significant risks, off-balance sheet obligations, as well as any other financial or accounting matter that is submitted to the committee by our Chief Executive Officer or Chief Financial Officer. It selects our auditors and determines which engagements, in addition to auditing our accounts, will be undertaken by such auditors. The committee regularly examines the operation and organization of our Internal Audit Group, including the scheduling of its audits and its main reports. It also assesses the risks to which our company may be exposed. For more information regarding the audit and finance committee's policies and procedures for the appointment of outside auditors, see Item 16C. — "Principal Accounting Fees and Services."

Back to Contents

***Corporate Governance and Nominating Committee***

Prior to the business combination with Lucent, historical Alcatel's board of directors had a nomination and compensation committee. This committee consisted of three members: Daniel Bernard, chairman of the committee, Philippe Bissara and W. Frank Blount. After the Lucent transaction, our new board of directors established the corporate governance and nominating committee, which has responsibility for a portion of the responsibilities of the prior nomination and compensation committee. The corporate governance and nominating committee consists of five members: Daniel Bernard, chairman of the committee, Linnet Deily, Frank Blount, Henry Schacht and Jean-Cyril Spinetta. Our board of directors has determined that each of the members of the corporate governance and nominating committee is "independent" as such term is defined under the applicable rules of The New York Stock Exchange. The corporate governance and nominating committee studies issues relating to the composition, organization and operation of our board of directors and its committees to identify and make proposals to the board regarding individuals qualified to serve as our directors and on committees of our board of directors. It also defines the corporate nomination and compensation principles applicable to our company, and examines the succession plans for our Chief Executive Officer as well as our other senior executives.

***Compensation Committee***

As discussed above in "Corporate Governance and nominating Committee," prior to the business combination with Lucent, historical Alcatel's board of directors had a nomination and compensation committee. After the Lucent transaction, our new board of directors established a compensation committee, which currently consists of four members: Dr. Hagenlocker, chairman of the committee, Linnet Deily, Lady Jay and Jean-Pierre Halbron. Our board of directors has determined that each of the members of this committee are "independent" as such term is defined under the applicable rules of The New York Stock Exchange. The compensation committee is responsible for determining the compensation of our company's main senior executives and officers. It also establishes our policy on allotting stock options and granting bonus shares and capital increases reserved for employees.

***Strategic and Investments Committee***

Prior to the business combination with Lucent, historical Alcatel's board of directors had a strategic committee. This committee consisted of three members: Serge Tchuruk, chairman of the committee, Pierre-Louis Lions and Peter Mihatsch. After the Lucent transaction, our new board of directors established a strategic and investments committee that currently consists of four members: Serge Tchuruk, chairman of the committee, Jozef Cornu, Dr. Hagenlocker and Henry Schacht. Our board of directors has determined that Dr. Hagenlocker and Mr. Schacht are "independent" as such term is defined under the applicable rules of The New York Stock Exchange. The strategic and investment planning committee examines our strategic orientations and investments. It examines associated internal reorganization plans and investments/divestments. The committee also monitors the integration of historical Alcatel and Lucent.

## Statement of Business Principles, Ethics Committee, Code of Ethics and Chief Compliance Officer

Our Statement on Business Practices, adopted in 1997 and revised and renamed "Statement of Business Principles" in December 2006 following the Lucent business combination, is a code of conduct that defines our vision of appropriate business behavior. It covers many areas, from business ethics and corporate governance to human rights and environmental concerns. Our Statement of Business Principles provides that our policy is to conduct our worldwide operations in accordance with the highest business ethical standards, to comply with the laws of the countries in which we operate and to be a good corporate citizen.

We established an Ethics Committee to ensure our compliance with the Statement. The committee was comprised of members of our management and was chaired by a member of the board of directors. The Ethics Committee reported directly to the Chairman and Chief Executive Officer, was empowered to call an internal audit and was in place until November 30, 2006.

In addition, in 2004, our board of directors adopted a code of ethics that applies to our Chief Executive Officer, President, Chief Operating Officer, Chief Financial Officer and Corporate Controller.

In early 2006, we appointed a Chief Compliance Officer, reporting directly to the Chairman and Chief Executive Officer (and after December 1, 2006, to the Chief Executive Officer). The Chief Compliance Officer is charged with overseeing regulatory compliance according to international laws and standards and our corporate governance and business practices.

After the business combination with Lucent, the major part of the work of the Ethics Committee was taken over by a newly formed Compliance Council comprised of nine senior members of our management. A new Chief Compliance Officer was appointed, and she is assisted by a team of full-time employees.

## Employees

At December 31, 2006, we employed 89,370 people worldwide compared with 57,699 at December 31, 2005 and 55,718 at December 31, 2004. The tables below show the geographic locations and the business segments in which our employees worked (i) at December 31, 2006 based on the business segments that we instituted on December 1, 2006 and (ii) at December 31, 2005 and 2004, based upon historical Alcatel's business segments prior to December 1, 2006 (after taking into account the discontinuance in 2004 of our optical fiber, mobile phones and electrical power systems businesses). Employees related to the businesses to be transferred to Thales are included in the tables below, as these business were not yet transferred as of December 31, 2006. As we continue to implement our integration plan during 2007, some of our employees listed in the tables for 2006 may be reallocated between segments.

Back to Contents

Total number of employees and the breakdown of this number by business segments is determined by taking into account all of the employees at year–end who worked for fully consolidated companies and a percentage of those employees at year–end who worked for subsidiaries consolidated using proportionate consolidation based on the percentage of interest in such companies (see Note 36 to our consolidated financial statements included elsewhere herein).

| | Fixed Communications | Mobile Communications | Private Communications | Other | Total Group |
|---|---|---|---|---|---|
| 2004 | 18,446 | 15,350 | 21,367 | 555 | 55,718 |
| 2005 | 17,311 | 17,700 | 22,138 | 550 | 57,699 |
| | **Carrier** | **Enterprise** | **Services** | **Other** | **Total Group** |
| 2006 | 45,444 | 6,026 | 28,080 | 9,819 | 89,370[(1)] |

*(1) Including 1,631 employees from Nortel in connection with the acquisition of Nortel's UMTS technologies as of December 29, 2006, 29,861 employees from Lucent in connection with the business combination of Lucent as of December 1, 2006 and 8,862 employees that are part of the businesses to be transferred to Thales as described in Note 3 of our consolidated financial statements.*

The breakdown by geographical areas gives the headcount of employees who worked for fully consolidated companies and companies in which we own 50% or more of the equity. The impact of taking into account the headcount of subsidiaries consolidated using proportionate consolidation only for the percentage of interests in these entities is isolated in the "proportionate consolidation impact" column. The impact is related to the joint ventures with Finmeccanica in the space business, which will be contributed or transferred to Thales as explained in Note 3 to our 2006 consolidated financial statements included elsewhere in this annual report.

| | France | Other Western Europe | Rest of Europe | Asia Pacific | USA | Rest of World | Proportionate Consolidation Impact | Total Group |
|---|---|---|---|---|---|---|---|---|
| 2004 | 16,161 | 16,190 | 1,517 | 8,338 | 6,026 | 7,486 | --- | 55,718 |
| 2005 | 16,037 | 17,114 | 2,037 | 9,109 | 6,181 | 9,167 | (1,946) [(1)] | 57,699 |
| 2006 | 17,071 | 20,632 | 3,108 | 14,589 | 23,647 | 12,219 | (1,896)[(2)] | 89,370 |

*(1) This consolidation impact is a reduction of 1,362 in our employee headcount in France and a reduction of 584 in the rest of Europe.*
*(2) This consolidation impact is a reduction of 1,411 in our employee headcount in France and a reduction of 485 in the rest of Europe.*

Membership of our employees in trade unions varies from country to country. Although differing from country to country, we believe that relations with our employees are satisfactory. The average number of temporary workers during 2006 was approximately 1,855.

## Share Ownership

***Directors and Senior Executives***

Our articles of association and bylaws provide that each of our directors must own at least 500 of our ordinary shares. As of December 31, 2006, none of our directors or members of our management committee beneficially owned, or held options to purchase, 1% or more of our ordinary shares. During 2006, no options to purchase our ordinary shares or ADSs were exercised by our directors or senior executives.

*Shares.* As of December 31, 2006, our directors, including directors who were also members of our management committee, and the other members of our management committee, as a group, beneficially held an aggregate of 1,411,457 ordinary shares (including ADSs) and 15,034 FCP 2AL interests.

*Options.* As of December 31, 2006, our directors listed in the table under the heading "Board of Directors" above and our senior executives listed in the table under the heading "Senior Management" above, as a group, beneficially owned the following options (granted by historical Alcatel or Alcatel–Lucent (excluding options granted under Lucent's option plans):

- for 775,000 ordinary shares granted pursuant to a share subscription plan approved by our board in March 2000 at an exercise price of €48 per share expiring on December 31, 2005 or 2007, depending on whether the beneficiary is an employee of a company with a registered office in France;
- for 15,000 ordinary shares granted pursuant to a share subscription plan approved by our board in December 2000 at an exercise price of €65 per share expiring on December 31, 2005 or 2007, depending on whether the beneficiary is an employee of a company with a registered office in France;
- for 784,900 ordinary shares granted pursuant to a share subscription plan approved by our board in March 2001 at an exercise price of €50 per share expiring on March 6, 2009;

Back to Contents

- for 884,300 ordinary shares granted pursuant to a share subscription plan approved by our board in December 2001 at an exercise price of €20.80 per share expiring on December 18, 2009;
- for 150 ordinary shares granted to those persons who participated in our March 2000 and March 2001 capital increases, pursuant to a share subscription plan approved by our board in December 2001 at an exercise price of €20.80 per share expiring on December 31, 2005 or 2006, depending on whether the beneficiary is an employee of a company with a registered office in France;
- for 776,200 ordinary shares granted pursuant to share subscription plans approved by our board in March 2003 at an exercise price of €6.70 per share expiring on or prior to March 6, 2011;
- for 56 ordinary shares granted to those persons who participated in our March 2000 and March 2001 capital increases, pursuant to a share subscription plan approved by our board in March 2003, at an exercise price of €6.70 per share expiring on June 30, 2007 or 2008, depending on whether the beneficiary is an employee of a company with a registered office in France;
- for 50,000 ordinary shares granted pursuant to a share subscription plan approved by our Chief Executive Officer in September 1, 2003 at an exercise price of €9.30 per share expiring on August 31, 2011;
- for 781,000 ordinary shares granted pursuant to share subscription plans approved by our board in March 2004 at an exercise price of €13.20 per share expiring on or prior to March 9, 2012;
- for 291,000 ordinary shares granted pursuant to share subscription plans approved by our board in March 2005 at an exercise price of €10 per share expiring on or prior to March 9, 2013; and
- for 305,000 ordinary shares granted pursuant to share subscription plans approved by our board in March 2006 at an exercise price of €11.70 per share expiring on or prior to March 7, 2014.

As a result of a grant by our board at its meeting on March 28, 2007, members of the management committee received an aggregate of 1,940,000 stock options, representing 4.8% of the total stock options granted by the board at this meeting. These stock options are exercisable at an exercise price of €9.10 and meet the general terms and vesting schedule of the 2007 stock option plan outlined below under "2007 Stock Option Plan."

As of December 31, 2006, Patricia Russo owned options to purchase 3,810,997 ordinary shares. These options arose from grants of options by Lucent between January 20, 1997 and November 1, 2006 to purchase Lucent common stock. As a result of the Lucent business combination, these options were converted into options to purchase our ordinary shares, as discussed below in "Option plans for Lucent." Of these options, 1,061,400 were unvested with an average exercise price of €11.4063 per share, and 2,749,577 were vested with an average exercise price of €43.5226 per share.

***Employee stock options***

At December 31, 2006, there were 119,690,279 options outstanding pursuant to existing share subscription plans (excluding options granted under Lucent-derived plans), each option giving a right to acquire one ordinary share.

Our board of directors and our Chief Executive Officer have granted stock options to specialists, high-potential employees and future executives as well as members of senior management pursuant to the share subscription plans and share purchase plans listed below. In order to maintain in all circumstances the stability of the activities of our Group and the personnel that is key to our development, our board of directors has the ability to render outstanding options under our share subscription plans immediately exercisable in the event of a merger pursuant to which Alcatel-Lucent is merged into another company, a tender offer for our shares or a withdrawal of our shares from public listing (a "going private" transaction), regardless of any delay in the vesting of such options provided for in the initial terms of the plans. However, any such acceleration would not apply to stock options held by any member of our board of directors, our Chief Executive Officer or any deputy executive officer, that is, by a *"mandataire social,"* as such term is defined in French law, who was a *"mandataire social"* either at the date of the grant of the option or at the date of the decision of the board of directors to accelerate vesting.

*Share Subscription Plans.* At our shareholders' meeting held on May 20, 2005, our shareholders authorized our board of directors to grant options to our employees and executives to subscribe for a number of new shares not to exceed 6% of the total number of shares comprising the capital of the company. Based on this authorization, the Board of Directors had committed itself to ensure that the total number of existing options not yet exercised does not confer a right to subscribe to a number of new shares exceeding 12% of the total number of shares of the company.

Back to Contents

The following table sets forth information as at December 31, 2006 with respect to historical Alcatel's share subscription plans approved by our board of directors:

| Date of approval of plan | Number of options authorized at grant date | Number of options outstanding | Number of recipients at grant date | Exercise period | | Exercise price |
|---|---|---|---|---|---|---|
| | | | | From | To | |
| 03/29/2000 | 15,239,250 | 7,628,805 | 3,887 | 04/01/2005(2) | 12/31/2007(2) | €48.00 |
| 12/13/2000 | 1,235,500 | 545,850 | 478 | 12/13/2005(2) | 12/31/2007(2) | €65.00 |
| 12/13/2000 | 306,700 | 196,000 | 340 | 12/13/2001(3) 12/13/2004(2)(3) | 12/12/2008 | €64.00 |
| 03/07/2001 | 37,668,588 | 26,498,305 | 30,790 | 03/07/2002(3) 03/07/2005(2)(3) | 03/06/2009 | €50.00 |
| 12/19/2001 | 27,871,925 | 15,377,015 | 25,192 | 12/19/2002(3) 12/19/2005(2)(3) | 12/18/2009 | €20.80 |
| 12/19/2001 | 565,800 | 109,101 | 521 | 12/19/2002(3) 12/19/2005(2)(3) | 12/18/2009 | €9.30 |
| 12/19/2001 | 935,660(4) | 371,280 | 45,575 | 01/01/2006(2) | 12/31/2006(2) | €20.80 |
| 03/07/2003 | 25,626,865 | 17,167,094 | 23,650 | 03/07/2004(1)(3) 03/07/2007(2)(3) | 03/06/2011(1) | €6.70 |
| 03/07/2003 | 827,348(4) | 793,822 | 31,600 | 07/01/2006(1) 07/01/2007(2) | 06/30/2007(1) 06/30/2008(2) | €6.70 |
| 03/10/2004 | 18,094,315 | 15,220,613 | 14,810 | 03/10/2005(1) 03/10/2008(2) | 03/09/2012(1) | €13.20 |
| 03/10/2005 | 16,756,690 | 15,236,514 | 9,470 | 03/10/2006(1) 03/10/2009(2) | 03/09/2013(1) | €10.00 |
| 03/08/2006 | 17,009,320 | 16,527,190 | 8,001 | 03/08/2007(1) 03/08/2010(2) | 03/07/2014(1) | €11.70 |

*(1) Options granted to employees of any of our subsidiaries with a registered office outside France.*
*(2) Options granted to employees of any of our subsidiaries with a registered office in France are not exercisable during the first four years after grant.*
*(3) One quarter of these options vest upon the first anniversary of the grant date and the remaining options vest thereafter at a monthly rate of 1/48th of the total number of options initially granted.*
*(4) Options granted to recipients who subscribed to the capital increases of March 2000 and March 2001, and who remain our employees.*

From 2001 through 2006, our Chairman and Chief Executive Officer approved certain share subscription plans pursuant to authority delegated by our board of directors. Pursuant to this delegation of authority to the Chief Executive Officer, which was renewed by the board on November 30, 2006, our Chief Executive Officer may grant stock options to our or to our affiliates', new employees or, under exceptional circumstances, to our or to our affiliates' existing employees.

Back to Contents

The following table sets forth information as at December 31, 2006 with respect to share subscription plans approved by our Chief Executive Officer:

| Date of approval of plan | Number of options authorized at grant date | Number of options outstanding | Number of recipients at grant date | Exercise period From | To | Exercise Price |
|---|---|---|---|---|---|---|
| 04/02/2001 | 48,850 | 12,250 | 13 | 04/02/2002(1) | 04/01/2009 | €41.00 |
| 04/02/2001 | 2,500 | 2,500 | 1 | 04/02/2002(1) | 04/01/2009 | €39.00 |
| 06/15/2001 | 977,410 | 745,050 | 627 | 06/15/2002(1) 06/15/2005(1)(2) | 06/14/2009 | €32.00 |
| 09/03/2001 | 138,200 | 95,800 | 58 | 09/03/2002(1) 09/03/2005(1)(2) | 09/02/2009 | €19.00 |
| 11/15/2001 | 162,000 | 82,000 | 16 | 11/15/2002(1) | 11/14/2009 | €9.00 |
| 02/15/2002 | 123,620 | 54,580 | 37 | 02/15/2003(1) 02/15/2006(1)(2) | 02/14/2010 | €17.20 |
| 04/02 2002 | 55,750 | 27,250 | 24 | 04/02/2003(1) | 04/01/2010 | €16.90 |
| 05/13/2002 | 54,300 | 37,300 | 23 | 05/13/2003(1) 05/13/2006(1)(2) | 05/12/2010 | €14.40 |
| 06/03/2002 | 281,000 | 227,500 | 176 | 06/03/2003(1) 06/03/2006(1)(2) | 06/02/2010 | €13.30 |
| 09/02/2002 | 1,181,050 | 246,322 | 226 | 09/02/2003(1) | 09/01/2010 | €5.20 |
| 10/07/2002 | 30,500 | 8,559 | 16 | 10/07/2003(1) | 10/06/2010 | €3.20 |
| 11/14/2002 | 111,750 | 26,732 | 26 | 11/14/2003(1) | 11/13/2010 | €4.60 |
| 12/02/2002 | 54,050 | 11,155 | 16 | 12/02/2003(1) | 12/01/2010 | €5.40 |
| 06/18/2003 | 338,200 | 249,741 | 193 | 06/18/2004(1) 06/18/2007(1)(2) | 06/17/2011 | €7.60 |
| 07/01/2003 | 53,950 | 12,095 | 19 | 07/01/2004(1)(2) | 06/30/2011 | €8.10 |
| 09/01/2003 | 149,400 | 128,226 | 77 | 09/01/2004(1) 09/01/2007(1)(2) | 08/31/2011 | €9.30 |
| 10/01/2003 | 101,350 | 56,183 | 37 | 10/01/2004(1) 10/01/2007(1)(2) | 09/30/2011 | €10.90 |
| 11/14/2003 | 63,600 | 10,600 | 9 | 11/14/2004(1) 11/14/2007(1)(2) | 11/13/2011 | €11.20 |
| 12/01/2003 | 201,850 | 92,211 | 64 | 12/01/2004(1) 12/01/2007(1)(2) | 11/30/2011 | €11.10 |
| 04/01/2004 | 48,100 | 25,991 | 19 | 04/01/2005(1) 04/01/2008(1)(2) | 03/31/2012 | €13.10 |
| 05/17/2004 | 65,100 | 52,750 | 26 | 05/17/2005(1) 05/17/2008(1)(2) | 05/16/2012 | €12.80 |
| 07/01/2004 | 313,450 | 264,463 | 187 | 07/01/2005(1) 07/01/2008(1)(2) | 06/30/2012 | €11.70 |
| 09/01/2004 | 38,450 | 30,550 | 21 | 09/01/2005(1) | 08/31/2012 | €9.90 |
| 10/01/2004 | 221,300 | 137,673 | 85 | 10/01/2005(1) 10/01/2008(1)(2) | 09/30/2012 | €9.80 |
| 11/12/2004 | 69,600 | 62,700 | 20 | 11/12/2005(1) 11/12/2008(1)(2) | 11/11/2012 | €11.20 |

Back to Contents

| Date of approval of plan | Number of options authorized at grant date | Number of options outstanding | Number of recipients at grant date | Exercise period | | Exercise Price |
|---|---|---|---|---|---|---|
| | | | | From | To | |
| 12/01/2004 | 42,900 | 35,962 | 11 | 12/01/2005(1)<br>12/01/2008(1)(2) | 11/30/2012 | €11.90 |
| 01/03/2005 | 497,500 | 411,455 | 183 | 01/03/2006(1) | 01/02/2013 | €11.41 |
| 06/01/2005 | 223,900 | 186,892 | 96 | 06/01/2006(1)<br>06/01/2009(1)(2) | 05/31/2013 | €8.80 |
| 09/01/2005 | 72,150 | 65,050 | 39 | 09/01/2006(1)<br>09/01/2009(1)(2) | 08/31/2013 | €9.80 |
| 11/14/2005 | 54,700 | 45,100 | 23 | 11/14/2006(1)<br>11/14/2009(1)(2) | 11/13/2013 | €10.20 |
| 05/15/2006 | 122,850 | 115,750 | 53 | 05/15/2007(1)<br>05/15/2010(1)(2) | 05/14/2014 | €12.00 |
| 08/16/2006 | 337,200 | 337,200 | 217 | 08/16/2007(1)<br>08/16/2010(1)(2) | 08/15/2014 | €9.30 |
| 11/08/2006 | 121,100 | 121,100 | 26 | 11/08/2007(1)<br>11/08/2010(1)(2) | 11/07/2014 | €10.40 |

*(1) One quarter of these options vests upon the first anniversary of the grant date and the remaining options vest thereafter at a monthly rate of 1/48th of the total number of options initially granted.*
*(2) Options granted to employees of any of our subsidiaries with a registered office in France are not exercisable during the first four years after grant.*

Under certain of the share subscription plans described above, options granted to employees of our companies with a registered office in Belgium may become exercisable or vest, as applicable, over a longer period than in France.

*2007 Stock Option Plan.* At a meeting held on March 28, 2007, our board decided to grant 40,078,421 stock options to 15,779 of our employees and senior management. These options, together with the 119,690,279 options previously outstanding, represent an aggregate of 159,768,700 outstanding options, or 6.5% of our outstanding ordinary shares (assuming exercise of all such outstanding options) as of December 31, 2006. These options entitle the recipients to purchase new ordinary shares at an exercise price of €9.10 per share, which corresponds to the average closing price of our ordinary shares for the 20 trading days immediately preceding the board meeting. These stock options will vest according to a vesting schedule that varies according to the location of the registered office of the entity employing the option holder (four years for option holders employed by an entity with its registered office in France), up to March 27, 2015.

Members of our management committee received a grant of 1,940,000 stock options (of which 800,000 were granted to Ms. Russo) on March 28, 2007, representing 4.8% of the total number of stock options authorized under the 2007 plan. These stock options are subject to the general terms of the 2007 plan and have an exercise price of €9.10.

As part of the 2007 stock option plan and in connection with new French law requirements, our board of directors set a new requirement that our Chief Executive Officer hold a portion of the shares acquired upon exercise of the options awarded under this plan in a restricted account until she no longer holds the position of Chief Executive Officer. The number of shares to be held in this restricted account will be equal to 40% of the capital gains recognized upon exercise of the options, net of tax, any other mandatory deductions and the value of any shares used in a cashless exercice of such options. However, if the value of all of the shares of Alcatel-Lucent (including those issued upon exercise of the granted options pursuant to the 2007 plan) held by our Chief Executive Officer exceeds her fixed and variable annual remuneration (assuming 100% of the target for the year preceding the exercise), this obligation to hold shares in a restricted account will be suspended.

Back to Contents

***Option plans for Lucent***

As provided in the merger agreement between historical Alcatel and Lucent, each outstanding option to purchase shares granted under Lucent's compensation or benefit plans or agreements pursuant to which shares may be issued (excluding the Lucent 2001 employee stock purchase plan), whether vested or not vested, was converted into a right to acquire the number of our ordinary shares determined by applying the exchange ratio used in the transaction (0.1952) and the euro exchange rate of € 1.22. The following table sets forth information as at December 31, 2006 (therefore, post-conversion) with respect to outstanding options pursuant to Lucent's option plans:

| Number of options outstanding | Exercise period | | Exercise price |
|---|---|---|---|
| | From | To | |
| 6,015,453 | 11/01/2007 | 10/31/2013 | €9.35 |
| 4,554,345 | 12/01/2006 | 11/30/2012 | €10.89 |
| 7,990,774 | 12/01/2006 | 11/30/2011 | €15.28 |
| 7,645,968 | 12/01/2006 | 11/30/2010 | €12.40 |
| 5,320,875 | 12/01/2006 | 12/15/2009 | €5.49 |
| 9,191,365 | 12/01/2006 | 11/24/2008 | €6.88 |
| 1,484,527 | 12/01/2006 | 12/25/2010 | €61.93 |
| 1,260,460 | 12/01/2006 | 05/31/2010 | €224.93 |
| 1,387,253 | 12/01/2006 | 10/05/2007 | €76.64 |
| 949,001 | 12/01/2006 | 01/19/2007 | €46.69 |
| 907,192 | 12/01/2006 | 05/03/2014 | €0.28 to 10.00 |
| 1,108,891 | 12/01/2006 | 12/01/2014 | €10.01 to 20.00 |
| 10,711,692 | 12/01/2006 | 01/05/2012 | €20.01 and more |

Moreover, each unvested restricted stock unit granted under Lucent's compensation or benefit plans or agreements was converted into the number of our ordinary shares determined by applying the exchange ratio used in the transaction (0.1952) and the Euro exchange rate of €1.22. At December 31, 2006, there were 1,662,696 unvested restricted stock units outstanding.

***Option plans for acquired companies other than Lucent***

Option plans of companies that we acquired now provide for the issuance of ordinary shares or ADSs upon exercise of options granted under such plans, in lieu of the issuance of shares of the acquired companies. Except in the case of Astral Point, Telera, Imagic TV, TiMetra and Spatial, we will not issue new ordinary shares (or ADSs) to satisfy these options, but rather will use outstanding ADSs held by us. In addition, Alcatel USA, Inc. has also adopted share purchase plans for executives and employees of our U.S. and Canadian subsidiaries. In total, options to purchase up to 8,833,487 ADSs or ordinary shares were outstanding as of December 31, 2006 under the assumed stock option plans and the share purchase plans of Alcatel USA, Inc. The following table sets forth information as of December 31, 2006 with respect to option plans of companies acquired by us and the share purchase plans of Alcatel USA, Inc.

Back to Contents

| Company | Exercise price (giving right to one ordinary share or ADS) | Outstanding Options Number outstanding at 12/31/2006 | Weighted remaining exercise period (years) | Weighted average exercise price | Exercisable Options Amount exercisable at 12/31/2006 | Weighted average exercise price |
|---|---|---|---|---|---|---|
| Packet Engines | 0.29–0.86 USD | 7,372 | 1.42 | 0.71 | 7,372 | 0.71 |
| Xylan | 0.05–18.14 USD | 977,283 | 1.50 | 9.57 | 977,283 | 9.57 |
| Internet Devices Inc. | 0.26–1.17 USD | 23,980 | 1.88 | 0.92 | 23,980 | 0.92 |
| DSC | 16.57–44.02 USD | 24,550 | 0.63 | 23.69 | 24,550 | 23.69 |
| Genesys | 0.01–41.16 USD | 2,638,367 | 2.38 | 21.90 | 2,638,367 | 21.90 |
| Astral Point | 0.29–58.71 EUR | 37,634 | 4.45 | 22.64 | 37,634 | 22.64 |
| Telera | 0.43–6.36 EUR | 122,958 | 3.86 | 5.08 | 122,958 | 5.08 |
| Imagic TV | 2.84–64.68 EUR | 55,405 | 0.88 | 20.48 | 55,405 | 20.48 |
| TiMetra | 0.53–7.97 EUR | 1,356,659 | 4.17 | 6.43 | 1,154,662 | 6.17 |
| Spatial Wireless | 0.24–9.1 EUR | 463,536 | 7.26 | 3.78 | 274,232 | 3.49 |
| Alcatel USA Inc | 21.40–84.88 USD | 8,833,487 | 3.42 | 54.28 | 8,833,487 | 54.28 |
| **TOTAL NUMBER OF OPTIONS** | | **14,541,231** | | | **14,149,930** | |

# Item 7. Major Shareholders and Related Party Transactions

## Major Shareholders

At December 31, 2006, to our knowledge, the only shareholders holding more than 5% of our share capital were Brandes Investment Partners LP, Fidelity Management and Research Corporation and Fidelity International Limited (together with Fidelity Management Research Corporation "Fidelity").

The table below lists our principal shareholders as of December 31, 2006:

| Principal Shareholders | Capital | Voting Rights |
|---|---|---|
| Brandes Investment Partners L.P. | 9.75% | 9.86% |
| Fidelity | 5.22% | 5.27% |
| Crédit Agricole Asset Management | 2.74% | 2.77% |
| Caisse des Dépôts et Consignations | 2.08% | 2.11% |
| Employee Investment Fund (FCP 2AL) | 1.23% | 2.34% |
| BNP PARIBAS Asset Management | 0.44% | 0.44% |
| Platinium Asset Management | 0.39% | 0.39% |
| Treasury Stock | 1.10% | – |
| Shares held by subsidiaries | 1.45% | – |
| Public | 75.60% | 76.82% |
| **TOTAL** | **100%** | **100%** |

*(1) On February 14, 2007 Fidelity filed a Schedule 13G with the SEC, asserting that it and Fidelity International Limited ("FIL") owned a combined total of 120,454,579 of our shares, representing 5.216% of our share capital. However, these shares are not jointly owned by Fidelity and FIL.*

Back to Contents

Each fully paid ordinary share that is held in registered form by the same holder for at least three years entitles the holder to double voting rights at any of our shareholder meetings. The double voting right will automatically terminate for any share which has been subject to conversion into a bearer share or for which ownership has been transferred. Regardless of the number of ordinary shares held, the total voting rights per shareholder cannot exceed 8% of the total voting rights present or represented at any of our shareholder meetings (16% if double voting rights apply). For further details about voting rights of our shares please refer to Item 10 — "Additional Information — Description of Ordinary Shares."

According to Schedule 13G filed with the SEC on February 14, 2007, Brandes Investment Partners, L.P. was, as of December 31, 2006, the beneficial owner of 115,638,616 ADRs and 109,614,137 ordinary shares, representing 9.75% of our outstanding shares as of December 31, 2006. Brandes Investment Partners, L.P. is an investment adviser registered under the Investment Advisers Act of 1940.

According to Schedule 13G filed with the SEC on February 14, 2007, Fidelity was, as of December 31, 2006, the beneficial owner of 120,454,579 ordinary shares, representing 5.216% of our outstanding shares as of December 31, 2006.

As of December 31, 2006, 912,797,577 ADSs were outstanding in the United States, representing approximately 39.5% of the total outstanding ordinary shares. At such date, the number of registered ADS holders in the United States was 525,943.

As of December 31, 2006, members of our board and management committee as a whole held 1,411,457 shares (including ADSs) and 15,034 portions of FCP 2AL, i.e. 0.06% of our outstanding shares as of December 31, 2006and voting rights.

We are not directly or indirectly owned or controlled by another corporation, by any foreign government or by any other natural or legal person. We are not aware of any arrangements that may result in a change of control of Alcatel-Lucent.

## Related Party Transactions

*Agreement signed with Thales in 2006.* On November 30, 2006, our board approved the execution of five agreements relating to our strategic shareholding in Thales. These new agreements signed on December 28, 2006, and effective from January 5, 2007, include: (i) a binding protocol with the Industrial Group Marcel Dassault, TSA and Thales that ends the 1998 and 1999 shareholders' agreements, (ii) a new shareholders' agreement with TSA, (iii) an agreement with the French State on the protection of the national strategic interest in Thales, (iv) a cooperation agreement with Thales and TSA and (v) a Master Agreement with Thales relating to the transfer of our assets in space activities, railway signals and security systems to Thales. For a further description of these contracts, see "Material Contracts."

*Assistance provided to subsidiaries.* Our board authorized some of our companies to contribute to research and development and industrial property costs. The sums due are paid in full to us, and we are responsible for distributing them among our subsidiaries according to their financial needs. For fiscal year 2006, the revenue recorded by us amounted to €735,638,690, and the amounts owed by us to our subsidiaries amounted to €763,351,623. We recognize that our assistance to our subsidiaries does not constitute a related party agreement within the meaning of Article L.225-38 of the French Commercial Code.

# Item 8. Financial Information

## Consolidated statements and other financial information

See our consolidated financial statements elsewhere in this annual report.

## Legal matters

In addition to legal proceedings incidental to the conduct of our business which our management believes are adequately reserved against in our financial statements or will not result in any significant costs to us, we are involved in the following legal proceedings:

***Historical Alcatel matters***

*France Telecom.* Since 1993, a legal investigation has been ongoing concerning "overbillings" which are alleged to have been committed at Alcatel CIT, a French subsidiary of historical Alcatel ("Alcatel CIT") to the detriment of its principal client, France Telecom, based on an audit of production costs conducted in 1989 in the transmission division and in 1992 in the switching division (which are now the part of the Carrier business segment).

We entered into two settlement agreements with France Telecom, one in 1993, in relation to the transmission division, and the other in May 2004, in relation to the switching activity and the financial impact of which had been fully reserved in our December 31, 2004 financial statements. In the context of the latter settlement, France Telecom acknowledged that the parties' dispute on pricing did not involve fraud by Alcatel CIT.

In April 1999, we learned that the criminal investigation had been extended to determine whether our corporate funds as well as those of Alcatel CIT had been misused. As a consequence, both Alcatel CIT and we filed civil complaints to preserve our respective rights with respect to this investigation.

Back to Contents

The investigating magistrate closed his judicial inquiry in early 2006. Pursuant to his ruling of May 16, 2006, an ex-employee of Alcatel CIT and two of his supervisors, each of whom left our group several years ago, will be brought before the criminal court of Evry for the overbilling that allegedly occurred in the transmission division. On the other hand, the judge ruled that there are no grounds for the prosecution of all other suspects (three in the transmission division and seven in the switching division), which include Alcatel CIT. Alcatel CIT remains a party to the procedure as a plaintiff pursuant to its civil complaint. With respect to the procedure regarding a potential misappropriation of corporate funds at Alcatel CIT and at our company, the judge issued an order to dismiss on November 16, 2006, and this case is now over, since neither the Prosecutor nor any party appealed such order.

*Class A and Class O Shareholders.* Several purported class action lawsuits were filed in the United States District Court for the Southern District of New York since May 2002 against us and certain of our officers and directors, asserting various claims under the federal securities laws. These actions have been consolidated. The consolidated action challenges the accuracy of certain public disclosures that were made in the prospectus for the initial public offering for Class O shares and other public statements regarding Alcatel, and in particular, our former Optronics division.

The complaint purports to bring claims on behalf of the lead plaintiffs and a class of persons consisting of persons who (i) acquired Class O shares in or traceable to the initial public offering of ADSs conducted by us in October 2000, (ii) purchased Class A or Class O shares in the form of ADSs between October 20, 2000 and May 29, 2001, and (iii) purchased Class A shares in the form of ADSs between May 1, 2000 and May 29, 2001. The amount of damages sought has yet not been specified.

We are defending this action vigorously and deny any liability or wrongdoing with respect to this litigation. We filed a motion to dismiss this action on January 31, 2003, and a decision on the motion was rendered on March 4, 2005. The judge rejected a certain number of the plaintiffs' demands with prejudice. He also rejected all the remaining claims under the federal securities laws for lack of specificity in the pleadings, but with leave to file a further amended complaint. This was filed, and fully briefed as of August 5, 2005. The parties are waiting for the judge's decision.

*Costa Rica.* Beginning in early October 2004, we learned that investigations had been launched in Costa Rica by the Costa Rican Prosecutors'Office and the National Congress regarding payments alleged to have been made by consultants on behalf of Alcatel CIT or other of our subsidiaries to various public officials in Costa Rica, two political parties in Costa Rica and representatives of ICE, the state owned telephone company, in connection with the procurement by Alcatel CIT of several contracts for network equipment and services from ICE. Upon learning of these allegations, we immediately commenced an investigation into this matter, which is ongoing.

In Costa Rica and other countries, our subsidiaries retain consultants to assist us with our local operations and contracts. Our contracts with persons through whom we deal locally strictly prohibit the provision of any pecuniary or other advantage in contravention of applicable laws. In addition, we have a strict Statement of Business Principles (a copy of which is available on our web site, www.alcatel.com, under the heading "Business Ethics and Compliance") that imposes the highest standards of legal and ethical conduct on our employees. We rigorously enforce this Statement of Business Principles across the entire company and, when violations occur, we take prompt and appropriate action against the persons involved.

We terminated the employment of the president of Alcatel de Costa Rica and of a vice president-Latin America of CIT. We are also pursuing criminal actions in France against the latter, and in Costa Rica against these two ex-employees and certain local consultants, based on our suspicion of their complicity in an improper payment scheme and misappropriation of funds. The contracts with the local consultants were limited to the specific projects involved and are no longer in effect or have been terminated, and any payments due under those contracts have been suspended.

We contacted the United States Securities and Exchange Commission (the "SEC") and the United States DOJ (the "DOJ") and informed them that we would cooperate fully in any inquiry or investigation into these matters. The SEC and the DOJ are conducting an investigation into possible violations of the Foreign Corrupt Practices Act (FCPA) and the Federal Securities Laws. If the DOJ or the SEC determines that violations of law have occurred, it could seek civil or, in the case of the DOJ, criminal sanctions, including monetary penalties against us.

In connection with these allegations, on December 19, 2006, the DOJ indicted the former Alcatel CIT employee on charges of violations of the FCPA, money laundering and conspiracy and on March 20, 2007, a grand jury returned a superseding indictment based on the same allegations as those contained in the previous indictment and indicting also the ex-President of Alcatel de Costa Rica. The case is currently set for trial on July 9, 2007, in the Southern District of Florida.

Neither the DOJ nor the SEC has informed us what action, if any, it will take against us.

Several investigations have been launched in Costa Rica concerning this matter by both the Costa Rican Prosecutors' Office and ICE. On November 25, 2004, the Costa Rican Attorney General's Office commenced a civil lawsuit against Alcatel CIT to seek compensation for the pecuniary damage caused by the alleged payments described above to the people and the Treasury of Costa Rica, and for the loss of prestige suffered by the Nation of Costa Rica. On February 1, 2005, ICE commenced a lawsuit against Alcatel CIT to seek compensation for the pecuniary damage caused by the alleged payments described above to ICE and its customers, and for the harm to the reputation of ICE resulting from these events. On August 31, 2006, the Costa Rican Prosecutor's Office filed an amended complaint seeking compensation in the amount of $17.8 million for pecuniary damage caused generally to the Costa Rican people ("daño social"). Such amount is claimed on a "provisional and prudential basis," and it may therefore be modified in the future. The amount of damages sought by the lawsuit filed by ICE has not yet been specified. We intend to defend these actions vigorously and deny any liability or wrongdoing with respect to these litigations.

We are unable to predict the outcome of these investigations and civil lawsuit and their effect on our business. If the Costa Rican authorities conclude criminal violations have occurred, we may be banned from participating in government procurement contracts in Costa Rica for a certain period and fines or penalties may be imposed on us in an amount which we are not able to determine at this time. We expect to generate approximately € 16 million in revenue from Costa Rican contracts in 2007. Based on the amount of revenue received from these contracts, we do not believe a loss of business in Costa Rica would have a material adverse effect on us as a whole. However, these events may have a negative impact on the image of our company in Latin America.

Back to Contents

*Taiwan.* Certain employees of Taisel, a Taiwanese subsidiary of Alcatel, and Siemens Taiwan, along with a few suppliers and a legislative aide, have been the subject of an investigation by the Taipei Investigator's Office of the Ministry of Justice relating to an axle counter supply contract awarded to Taisel by Taiwan Railways in 2003. It has been alleged that persons in Taisel, one of our German subsidiaries involved in the Taiwan Railway contract and Siemens Taiwan, and subcontractors hired by them were involved in a bid rigging and illicit payment arrangement for the Taiwan Railways contract.

Upon learning of these allegations, we commenced and are continuing an investigation into this matter. We terminated the former president of Taisel. A director of international sales and marketing development of the German subsidiary resigned.

On February 21, 2005, the former president of Taisel, Taisel and others were indicted in Taiwan for violation of the Taiwanese Government Procurement Act.

On November 15, 2005, the Taipei criminal district court found Taisel not guilty of the alleged violation of the Government Procurement Act. The former President of Taisel was not judged because he was not present or represented at the proceedings. The court found two Taiwanese businessmen involved in the matter guilty of violations of the Business Accounting Act.

The prosecutor has filed an appeal with the Taipei court of appeal. Should the higher court find Taisel guilty of the bid-rigging allegations in the indictment, Taisel may be banned from participating in government procurement contracts within Taiwan for a certain period and fines or penalties may be imposed on us, in an amount not to exceed € 25,000.

Other allegations made in connection with this matter may still be under ongoing investigation by the Taiwanese authorities.

The SEC and the DOJ are also looking into these allegations in conjunction with their investigation relating to the allegations in Costa Rica.

We expect to generate approximately € 148 million of revenue from Taiwanese contracts in 2007, of which only a part will be from governmental contracts. Based on the amount of revenue expected from these contracts, we do not believe a loss of business in Taiwan would have a material adverse effect on our group as a whole.

*Kenya.* As part of their investigation regarding Costa Rica, the SEC and the DOJ have asked us to look into payments made by Alcatel CIT to a consultant arising out of a supply contract between Alcatel CIT and a privately-owned company in Kenya. We are cooperating with the U.S. authorities and are looking into those payments as requested.

***Historical Lucent matters***

*Securities cases.* On April 3, 2006, a putative class action entitled Resnick v. Lucent Technologies Inc., et al was filed against Lucent and members of Lucent's board of directors in the Superior Court of New Jersey, Law Division, Union County. The named plaintiffs proposed to represent a class of Lucent shareowners and claimed that, among other things, the proposed merger with Alcatel was the product of breaches of duty by Lucent's board of directors in that they allegedly failed to maximize shareowner value in the transaction. On May 12, 2006, a second putative class action entitled AR Maley Trust v. Lucent Technologies Inc., et al was filed against Lucent and members of Lucent's board of directors in the United States District Court for the Southern District of New York. The named plaintiff proposed to represent a class of Lucent's shareowners and claimed that, among other things, Lucent and the directors breached their fiduciary duties by allegedly failing to maximize shareowner value in the transaction. Along with other relief, both the Resnick and AR Maley Trust complaints sought an injunction against the closing of the proposed merger. On September 6, 2006, Lucent reached a tentative settlement of these actions. The settlement does not require any payment to class members but requires a payment of U.S.$250,000 tp plaintiffs' counsel. On February 26, 2007, the court approved the settlement of these actions.

*Governmental Investigations.* In August 2003, the DOJ and the SEC informed Lucent that they had each commenced an investigation into possible violations of the FCPA with respect to Lucent's operations in Saudi Arabia. These investigations followed allegations made by National Group for Communications and Computers Ltd. (NGC) in an action filed against Lucent on August 8, 2003, which is described below. In April 2004, Lucent reported to the DOJ and the SEC that an internal FCPA compliance audit and an outside counsel investigation found incidents and internal control deficiencies in Lucent's operations in China that potentially involve FCPA violations. Lucent is cooperating with those agencies. Lucent believes these incidents and deficiencies did not have a material effect on its results of operations. However, Lucent cannot determine whether this continuing investigation will affect its future business operations in China. The investigation is continuing with respect to both China and Saudi Arabia.

During September 2006, Lucent received a Wells notice relating to this investigation of its operations in China under the FCPA. Lucent responded to the Wells notice via a written submission to the SEC staff and is continuing discussions with the SEC staff in an effort to resolve the matter.

In May 2005, Lucent received subpoenas on two different matters, requesting specific documents and records. One of the subpoenas relates to a DOJ investigation of potential antitrust and other violations by various participants in connection with the United States government's E-Rate program. The subpoena requires Lucent to produce documents before a grand jury of the U.S. District Court in Georgia. The second subpoena was from the Office of Inspector General, U.S. General Services Administration and relates to a federal investigation into certain sales to the federal government of telecommunications equipment and related maintenance services. During April 2006, the California DOJ served Lucent with discovery requests related to sales to California governmental agencies of telecommunications equipment and related maintenance services. It is too early for us to determine whether any of these matters will have a material effect on our business, financial position, results of operations or cash flows.