*Employment and Benefit-Related Cases*. Lucent has implemented various actions to address the rising costs of providing retiree health care benefits and the funding of Lucent pension plans. These actions have led to the filing of cases against Lucent and may lead to the filing of additional cases. Purported class action lawsuits have been filed against Lucent in connection with the elimination of the death benefit from its U.S. management pension plan in early 2003. Three such cases have been consolidated into a single action pending in the U.S. District Court in New Jersey, captioned In Re Lucent Death Benefits ERISA Litigation. The elimination of this benefit reduced Lucent future pension obligations by approximately U.S. $400 million. The benefit was paid out of the pension plan assets to certain qualified surviving dependents, such as spouses or dependent children of management retirees. The case alleges that Lucent wrongfully terminated this death benefit and requests that it be reinstated, along with other remedies. This case has been dismissed by the court, but the dismissal has been appealed to a higher court and that appeal is pending. Another such case, Chastain, et al. v. AT&T, was filed in the U.S. District Court in the Western District of Oklahoma. The Chastain case also involves claims related to changes to retiree health care benefits.

In October 2005, a purported class action was filed by Peter A. Raetsch, Geraldine Raetsch and Curtis Shiflett, on behalf of themselves and all others similarly situated, in the U.S. District Court for the District of New Jersey. The plaintiffs in this case allege that Lucent failed to maintain health care benefits for retired management employees as required by the Internal Revenue Code, the Employee Retirement Income Security Act, and the Lucent pension and medical plans. Upon motion by Lucent, the court remanded the claims to Lucent's claims review process. A Special Committee was appointed and reviewed the claims of the plaintiffs and Lucent filed a report with the court on December 28, 2006. The Special Committee denied the plaintiffs' claims and the case has returned to the court, where limited discovery is underway.

The Equal Employment Opportunity Commission (EEOC) filed a purported class action lawsuit against Lucent, EEOC v. Lucent Technologies Inc., in the U.S. District Court in California. The case alleges gender discrimination in connection with the provision of service credit to a class of present and former Lucent employees who were out of work because of maternity prior to 1980 and seeks the restoration of lost service credit prior to April 29, 1979, together with retroactive pension payment adjustments, corrections of service records, back pay and recovery of other damages and attorneys fees and costs. The case is stayed pending the disposition of an appeal raising similar issues in another case before the applicable appellate court.

*Winstar*. Lucent is a defendant in an adversary proceeding originally filed in U.S. Bankruptcy Court in Delaware by Winstar and Winstar Wireless, Inc. in connection with the bankruptcy of Winstar and various related entities. The trial for this matter concluded in June 2005. The trial pertained to breach of contract and other claims against Lucent, for which the trustee for Winstar was seeking compensatory damages of approximately $60 million, as well as costs and expenses associated with litigation. The trustee was also seeking recovery of a payment Winstar made to Lucent in December 2000 of approximately $190 million plus interest. On December 21, 2005, the judge rendered his decision and the verdict resulted in a judgment against Lucent for approximately $244 million, plus statutory interest and other costs. As a result, Lucent recognized a $290 million charge (including related interest and other costs of approximately $46 million) as of December 31, 2006. In addition, $311 million of cash was used to collateralize a letter of credit that was issued during the second quarter of fiscal 2006 in connection with this matter. This judgment is under appeal with the U.S. District Court for the District of Delaware. Additional charges for post-judgment interest will be recognized in subsequent periods until this matter is resolved. Lucent is required to renew the letter of credit in April 2007, which may require a recollateralization.

*Environmental Matters*. Lucent's current and historical operations are subject to a wide range of environmental protection laws. In the U.S., these laws often require parties to fund remedial action regardless of fault. Lucent has remedial and investigatory activities under way at numerous current and former facilities. In addition, Lucent was named a successor to AT&T as a potentially responsible party at numerous Superfund sites pursuant to the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA") or comparable state statutes. Under the Separation and Distribution Agreement among Lucent, NCR and AT&T, Lucent is responsible for all liabilities primarily resulting from or relating to its assets and the operation of its business as conducted at any time prior to or after the separation from AT&T, including related businesses discontinued or disposed of prior to its separation from AT&T. Furthermore, under the Separation and Distribution Agreement, Lucent is required to pay a portion of contingent liabilities in excess of certain amounts paid out by AT&T and NCR, including environmental liabilities. In Lucent's separation agreements with Agere and Avaya, those companies have agreed, subject to certain exceptions, to assume all environmental liabilities related to their respective businesses.

The future impact of environmental matters, including potential liabilities, is often difficult to estimate. Lucent records an environmental reserve when it is probable that a liability has been incurred and the amount of the liability is reasonably estimable. This practice is followed whether the claims are asserted or unasserted. Lucent's management expects that the amounts reserved will be paid out over the periods of remediation for the applicable sites, which typically range from five to 30 years.

*NGC*. On August 8, 2003, NGC filed an action in the U.S. District Court for the Southern District of New York against Lucent, certain former officers and employees, a Lucent subsidiary, Lucent Technologies International Inc., certain unaffiliated individuals and an unaffiliated company, alleging violations of the Racketeer Influenced Corrupt Organizations Act ("RICO") and other improper activities. These allegations relate to activities in Saudi Arabia in connection with certain telecommunications contracts involving Lucent, the Kingdom of Saudi Arabia and other entities. The complaint seeks damages in excess of $63 million, which could be tripled under RICO. The allegations in this complaint appear to arise out of certain contractual disputes between NGC and Lucent that are the subject of a separate case that NGC previously filed against Lucent in U.S. District Court in New Jersey and other related proceedings brought by NGC in Saudi Arabia. On March 1, 2006, the District Court in New York granted Lucent's motion to dismiss the case in its entirety. NGC has filed a notice of appeal. Some of the claims brought by NGC in the New Jersey action have been dismissed, but that case and the other claims in Saudi Arabia are still pending.

*Microsoft*

On February 22, 2007, after a three-week trial in U.S. District Court in San Diego, California, a jury returned a verdict in favor of Lucent against Microsoft in the first of a number of scheduled patent trials. In this first trial involving two of Lucent's "Audio Patents," the jury found all the asserted claims of the patents valid and infringed, and awarded Lucent damages in an amount exceeding U.S.$1.5 billion. The court still must determine certain issues before entering the final judgment. The jury verdict is likely to be subject to various motions and appeals by Microsoft. There can be no assurance that the jury verdict will not be changed or reversed in whole or in part.

FORM 20-F 2006   Alcatel-Lucent – 63

Lucent and Microsoft, Dell and Gateway are involved in a number of patent litigations in various jurisdictions. In the summer of 2003, the Gateway, Dell and Microsoft litigations in San Diego, California, were consolidated in federal court in the Southern District of California. The court scheduled a number of trials for groups of the Lucent patents, including the trial described above. Additional trials in this case against Microsoft, Dell and Gateway are scheduled later in 2007.

**Other matters affecting historical Alcatel and Lucent**

*Intellectual Property Cases.* We are, and Lucent is, a defendant in various cases in which third parties claim infringement of their patents, including certain cases where infringement claims have been made against our or Lucent's customers, as applicable in connection with products we or Lucent have provided to them.

*Asbestos Cases.* Lucent and certain of our other subsidiaries are defendants in various cases in which individuals claim injury from exposure to asbestos.

**Effect of the various investigations and proceedings**

Our policy is to conduct our business with transparency and in compliance with all laws and regulations, both locally and internationally.

Governmental investigations and legal proceedings are subject to uncertainties and the outcomes thereof are difficult to predict. Consequently, we are unable to estimate the ultimate aggregate amount of monetary liability or financial impact with respect to these matters. We believe that our current investigations and cases will not have a material financial impact on us after final decision of the authorities or final disposition. However, because of the uncertainties of government investigations and legal proceedings, one or more of these matters could ultimately result in material monetary payments by us.

Dividend Policy

*General.* Under French law, our board of directors must first propose the distribution of any dividend to a general meeting of all our shareholders. A majority of the holders of our ordinary shares (including our ordinary shares underlying our ADSs) present or represented at the general meeting must approve the distribution. Under French law, the aggregate amount of any dividends paid on our ordinary shares will, for any year, be limited to our distributable amounts (*bénéfice distribuable*) for that year. In any fiscal year, our distributable amounts will equal the sum of the following:

- our profits for the fiscal year, less
- our losses for the fiscal year, less
- any required contribution to our legal reserve fund under French law, plus
- any additional profits that we reported, but did not distribute in our prior fiscal years, less
- any loss carryforward from prior fiscal years, plus
- any reserves available for distribution.

In the future, we may offer our shareholders the option to receive any dividends in shares instead of cash.

Historical Alcatel announced a dividend of €0.16 per ordinary share and ADS for 2005. The dividend, which applied to all ordinary shares (including ordinary shares underlying ADSs) issued on or before December 31, 2005, was paid on September 11, 2006 to holders of ordinary shares who held such shares as of September 8, 2006, and in the case of ADSs, to Société Générale, as custodian for the Bank of New York, the depositary for our ADSs as of September 8, 2006. For the year ended December 31, 2006, we announced a dividend of €0.16 per share on the 2,390,679,141 shares comprising of our capital on December 31, 2006. In addition, pursuant to the merger agreement between historical Alcatel and Lucent, dividends will be paid on any shares issued between January 1, 2007 and the date the 2006 dividend is paid upon exercise of options that had been granted under a Lucent option plan or upon conversion of any of Lucent's convertible securities.

See "Item 10 – Additional Information – Taxation" for a summary of certain U.S. federal and French tax consequences to holders of our shares or ADSs. Holders of our shares or ADSs should consult their own tax advisors with respect to the tax consequences of an investment in our shares or ADSs. Dividends paid to holders of our ADSs will be subject to a charge by the Depositary for any expenses incurred by the Depositary in the conversion of euro to U.S. dollars. You should refer to Item 10 – "Additional Information – Description of ADSs" for a further discussion of the payment of dividends on the ADSs.

# Item 9. The Offer and the Listing

### General

All of our shares and bonds are traded on Eurolist by Euronet, which also serves as the principal trading market for our ordinary shares. Our ordinary shares have been traded on the Euronext Paris SA since June 3, 1987. In addition to Eurolist, our ordinary shares are also listed on Euronext Amsterdam, Antwerp, Basle, Euronext Brussels, Frankfurt, Geneva, Tokyo and Zurich exchanges and are quoted on SEAQ International in London. Our ADSs have been listed on The New York Stock Exchange since May 1992.

The following table sets forth, for the periods indicated, the high and low prices on the Euronext Paris SA for our ordinary shares:

|  | Price per share | |
|---|---|---|
|  | High | Low |
| 2002 | €21.62 | €2.05 |
| 2003 | 11.89 | 4.16 |
| 2004 | 14.82 | 8.77 |
| 2005 | 11.70 | 8.14 |
| First Quarter | 11.70 | 9.35 |
| Second Quarter | 9.69 | 8.14 |
| Third Quarter | 11.12 | 8.47 |
| Fourth Quarter | 11.35 | 9.45 |
| 2006 | 13.82 | 8.27 |
| First Quarter | 13.49 | 10.38 |
| Second Quarter | 13.82 | 9.07 |
| Third Quarter | 10.10 | 8.27 |
| Fourth Quarter | 11.06 | 9.30 |
| 2006 | | |
| October | 10.47 | 9.30 |
| November | 10.68 | 9.80 |
| December | 11.06 | 9.73 |
| 2007 | | |
| First Quarter | 11.86 | 8.51 |
| 2007 | | |
| January | 11.86 | 9.60 |
| February | 10.58 | 9.54 |
| March | 9.67 | 8.51 |

## Trading in the United States

The Bank of New York serves as the depositary with respect to the ADSs which are traded on The New York Stock Exchange. Each ADS represents one ordinary share.

The following table sets forth, for the periods indicated, the high and low prices on The New York Stock Exchange for the ADSs:

|  | Price per ADS | |
|---|---|---|
|  | High | Low |
| 2002 | $19.14 | $2.02 |
| 2003 | 13.68 | 4.60 |
| 2004 | 18.32 | 10.76 |
| 2005 | 15.75 | 10.44 |
| First Quarter | 15.75 | 12.06 |
| Second Quarter | 12.22 | 10.45 |
| Third Quarter | 13.42 | 10.44 |
| Fourth Quarter | 13.51 | 11.50 |
| 2005 | | |
| September | 13.42 | 11.91 |
| October | 13.51 | 11.51 |
| November | 12.49 | 11.50 |
| December | 13.09 | 12.17 |
| 2006 | 16.51 | 10.63 |
| First Quarter | 16.12 | 12.68 |
| Second Quarter | 16.51 | 11.56 |
| Third Quarter | 12.91 | 10.63 |
| Fourth Quarter | 14.49 | 11.64 |
| 2006 | | |
| October | 13.06 | 11.64 |
| November | 13.64 | 12.37 |
| December | 14.49 | 12.98 |
| 2007 | | |
| First Quarter | 15.43 | 11.41 |
| 2007 | | |
| January | 15.43 | 12.71 |
| February | 13.71 | 12.61 |
| March | 12.54 | 11.41 |

# Item 10. Additional Information

## Memorandum and articles of association

*Our purpose.* Our corporate purpose can be found in Article 2 of our articles of association and bylaws. Generally, our purpose in all countries is to take any and all types of actions relating to domestic, industrial, civilian or military applications and other applications related to electricity, telecommunications, data processing, electronics, space industry, nuclear power, metallurgy and generally to all means of production and transmission of power or communications (cables, etc.) and all possible activities related to operations and services in connection with these means. In addition, we may create companies regardless of activity, own stock in other companies and manage shares and securities.

## Information Concerning Directors

*General.* Our articles of association and bylaws (*statuts*) stipulate that our directors shall be elected by our shareholders and that our board of directors shall consist of no fewer than six and no more than 14 directors. Our board of directors presently consists of 14 directors. Pursuant to the articles of association and by-laws that we adopted effective as of the closing date of the business combination with Lucent, our board of directors is comprised of the former Chief Executive Officer of each of historical Alcatel and Lucent prior to the Lucent transaction, five former historical Alcatel directors, five former Lucent directors and two European directors who qualify as independent directors. Two representatives of our employees or employees of our subsidiaries and participants in a mutual fund for our employees that hold shares (an "FCP") serve as *censeurs*, non-voting observers on the board of directors. The board of directors determines our business strategies and ensures their implementation.

Directors are elected for terms of up to four years, which term can only be renewed by the vote of our shareholders. However, Directors may be elected to multiple and consecutive terms. Until November 30, 2007 (the first anniversary of the Lucent transaction), the appointment of a replacement director, in the event of a vacancy by reason of death or resignation, would require the affirmative vote of the majority of the directors present or represented.

The board of directors decides whether management of our company will be performed by the Chairman of the Board or by the Chief Executive Officer. Until November 30, 2009, the Chief Executive Officer will act as our highest ranking executive officer, unless the board of directors determines, by the affirmative vote of at least two-thirds of the directors then in office, that the management of our company will be performed by the Chairman of the Board. Our board of directors appoints, and has the power to remove, the Chairman of the Board and the Chief Executive Officer. Until November 30, 2009, at least a two-thirds vote of the board of directors then in office will be required to remove the Chairman of the Board or the Chief Executive Officer and to decide upon a replacement.

Directors can be individuals or entities, including corporations. If an entity is a director, it must appoint an individual to act as its permanent representative.

*Shareholdings.* Each director must own at least 500 of our shares.

*Retirement.* Generally, the maximum age for holding a directorship is 70. However, this age limit does not apply if less than one-third, rounded up to the nearest whole number, of serving directors has reached the age of 70. No director over 70 may be appointed if, as a result of the appointment, more than one-third of the directors would be over 70. When the roles of the chairman and the chief executive officer are held by separate persons, the age limit applicable to the chairman of the board of directors shall be that applied to all of our directors.

If for any reason more than one-third of the number of serving directors are over 70, then the oldest director shall be deemed to have retired at the ordinary shareholders' meeting called to approve our accounts for the fiscal year in which the one-third threshold was exceeded, unless the board proportion is reestablished prior to the meeting.

If a company or other legal entity has the right to appoint a director and that director reaches 70, the company or legal entity must replace the director by the date of the ordinary shareholders' meeting called to approve our accounts for the fiscal year in which such director reached 70.

The retirement age for our Chief Executive Officer is 68.

## Description of Ordinary Shares

*Form of shares.* Under French company law, ownership of ordinary shares is not represented by share certificates. Bearer shares are recorded in the books of an accredited financial intermediary in an account opened in the name of the shareholder at EUROCLEAR France (formerly Sicovam SA) (an accredited financial intermediary is a French broker, bank or authorized financial institution registered as such in France). Upon our request, EUROCLEAR France will disclose to us the name, nationality, address and number of shares held by each shareholder who holds them in bearer form. This information may only be requested by us and may not be communicated to third parties.

Ordinary shares that are fully paid-up may be held in registered or bearer form at the option of the holder, subject to the next paragraph. Ownership of ordinary shares in registered form is recorded in books maintained by us or our appointed agent. A holder of ordinary shares in registered form may manage its own ordinary shares or appoint an accredited financial intermediary. Ordinary shares held in bearer form by a person who is not a resident of France may, at the request of such holder, be physically delivered in the form of bearer certificates representing such ordinary shares, provided that the ordinary shares are held and traded outside France. In determining whether or not to issue physical certificates in these circumstances, the accredited financial intermediary considers certification practices in foreign markets and may consult with us.

*Registration of shares.* Any holder owning 3% of the total number of ordinary shares (including ADSs) must request, within five trading days of reaching that ownership level, registration of the shares in non-transferable form. In addition, this registration requirement will apply to all ordinary shares (including ADSs) that the holder may subsequently acquire each time a holder of 3% or more of the total number of shares increases its holding by 1%, up to and including 50%. The holder is required to notify us of any such subsequent acquisition within two weeks and such notice shall set forth the number of shares held, the acquisition date and a certification that all shares owned by such holder are reported. Compliance with this requirement is deemed to be in compliance with the notification requirements described below under "Holdings exceeding certain percentages." Failure to comply with this requirement may, upon petition of one or more shareholders representing 3% or more of our share capital, result in the loss of the voting rights attached to the shares in excess of the relevant threshold.

*Transfer of shares.* Ordinary shares held in registered form are transferred by means of an entry recorded in the transfer account maintained by us or on our behalf for this purpose. In order for ordinary shares in registered form to be traded on a stock exchange in France, the shares must first be converted into bearer form by a financial intermediary upon receipt of a selling order from the holder. Upon completion of the trade, the new holder is required to register the shares in its name within five trading days, only if such trade causes the holder to cross the 3% threshold specified by our articles of association and bylaws. Bearer shares are held and recorded in the securities account of the holder and may be traded without any further requirement. Ordinary shares held in bearer form by a person who is not a resident of France are transferable outside France by delivery of the bearer certificates representing the ordinary shares.

*Holdings exceeding certain percentages.* Under French law, any individual or entity, acting alone or in concert with others, who becomes the owner of more than 5%, 10%, 15%, 20%, 25%, 33 1/3%, 50%, 66 2/3%, 90% or 95% of our outstanding share capital or voting rights (including through ADSs), or whose holding subsequently falls below any of these thresholds, must notify us of the number of ordinary shares it holds within five trading days of the date the relevant threshold was crossed. The individual or entity must also notify the French stock exchange and securities regulator *(Autorité des marchés financiers)* within five trading days of the date the threshold was crossed.

In addition, our articles of association and bylaws provide that any individual or entity which at any time owns, directly or indirectly, a number of shares equal to or more than 2% of our issued share capital, or whose holding falls below any of these thresholds, must within five days of exceeding this threshold, notify us by letter, fax or telex of the total number of each class of shares owned. When this threshold is reached, every further increase of 1% must be reported. Failure to provide timely written notice to us may, upon petition of one or more shareholders representing 3% or more of our share capital, result in the loss of the voting rights attached to the shares in excess of the relevant threshold.

French company law and the regulations of the French stock exchange and securities regulator impose additional reporting requirements on any person or persons acting alone or in concert who acquire more than 10% or 20% of our share capital or voting rights. An acquiror exceeding those thresholds must file a statement with us, the French securities regulator and stock exchange regulator. The notice must specify the acquirer's intentions for the 12-month period following the acquisition of its 10% or 20% stake, including whether or not it intends to (1) increase its stake, (2) acquire a controlling interest in us or (3) seek the election of nominees to our Board of Directors. The statement must be filed within 10 trading days after the date either of these thresholds was crossed. The statement is published by the French stock exchange and securities regulator. Similar reporting requirements must be complied with if the acquiror's intentions have changed due to material events.

In addition, under French law and the regulations of the French stock exchange and securities regulator, any person or persons, acting alone or in concert, who enter into an agreement containing provisions granting preferential treatment, with respect to the sale of shares, voting rights, or otherwise, for shares representing 0.5% or more of our share capital or voting rights must file such provisions with the French stock exchange and securities regulator.

Under French law and the regulations of the French stock exchange and securities regulator, and subject to limited exemptions granted by it, any person or persons, acting alone or in concert, who acquires shares representing one-third or more of our share capital or voting rights must initiate a public tender offer for the balance of our share capital and all other outstanding securities (such as convertible bonds) that are convertible into or exchangeable for our share capital.

If a shareholder (including a holder of ADSs) fails to comply with these notification requirements, the shareholder will be deprived of voting rights attached to the shares it holds in excess of the relevant threshold. The shareholder will be deprived of its voting rights at all shareholders' Meetings held until the end of a two-year period following the date on which the shareholder has complied with the notification requirements. Furthermore, any shareholder who fails to comply with these requirements, including the notification requirements of our articles of association and bylaws, may have all or part of its voting rights (and not only with respect to the shares in excess of the relevant threshold) suspended for up to five years by court decree at the request of our Chairman, any of our shareholders or the French stock exchange and securities regulator. Such shareholder may also be subject to criminal penalties.

In order to permit shareholders to give the notice required by law and our articles of association and bylaws, we are obligated to publish each month on the AMF website and our website information with respect to the total number of votes available as of the date of the Meeting.

*Shareholder Meetings.* Annual ordinary and extraordinary meetings of our shareholders are convened and held in accordance with French law. Any shareholder may attend a properly convened meeting of shareholders in person or by proxy upon presentation of proof of identity and upon proof of registration of shareholding in the company no later than midnight (Paris time) on the third business day prior to the shareholders' meeting.

*Voting rights.* Each ordinary share entitles a holder to one vote at all Meetings of our shareholders subject to the provisions concerning double voting rights described below. For each ordinary share fully paid and registered in the name of the same person for at least three years, the holder will be entitled to double voting rights with respect to such ordinary share at any of our Meetings, whether ordinary or extraordinary. The double voting right will automatically terminate for any share which has been subject to conversion into a bearer share or for which ownership has been transferred. Any transfer of shares as a result of inheritance, division of community property by spouses or donation to a spouse or heir shall not affect a share's double voting rights.

Regardless of the number of ordinary shares held, the total voting rights per shareholder cannot exceed 8% of the total voting rights present or represented at any meeting of shareholders (16% if double voting rights apply). This limit applies whether or not the shares are voted directly or by proxy. However, this limit does not apply if a shareholder, acting alone or in concert, owns at least 66 2/3% or more of our outstanding shares as a result of a public tender offer or exchange offer for all our shares. In addition, this limit does not apply to the votes cast by the Chairman of the Meeting pursuant to a blank proxy.

*Preemptive rights.* Under French law, shareholders will have preemptive rights to subscribe on a pro rata basis for additional shares of any equity securities or other securities giving a right, directly or indirectly, to equity securities issued by us for cash. During the subscription period relating to a particular offering of shares, shareholders may transfer preferential subscription rights that they have not previously waived. In order to issue additional ordinary shares without preemptive rights, beyond issuances already approved, we must obtain the approval of two-thirds of the voting rights present or represented by proxy at an extraordinary meeting of our shareholders, voting together as a single class.

*Liquidation.* Upon our liquidation, after payment of all prior claims, holders of ordinary shares will be entitled to receive a pro rata amount of all our net assets. The pro rata amount will be calculated, first to repay the paid-up and non-liquidated capital and any surplus will be divided among all shareholders, subject to any applicable rights arising from the different classes of shares.

*Dividends.* You should refer to Item 8 — "Dividend Policy" for a description of how dividends are calculated and paid on our ordinary shares.

## Changes in Share Capital

*Capital increases.* In accordance with French law and subject to the exceptions discussed below, our share capital may be increased only with the approval of a two-thirds vote of the shareholders present or represented by proxy voting together as a single class at an extraordinary Meeting. The shareholders may delegate to our Board of Directors, which in turn may delegate to the Chairman of the Board of Directors, the power required to effect, in one or more phases, certain increases in share capital previously approved by our shareholders.

Our share capital may be increased by the issuance of additional shares or by an increase in the nominal value of our existing shares. Our share capital may also be increased through the capitalization of existing reserves, profits or premium, in which case we must obtain the approval of a majority of the shareholders present or represented by proxy voting together as a single class at an extraordinary Meeting of our shareholders. In case of an increase in our share capital by capitalization of reserves, profits or premium, shares attributed to a shareholder will be allocated pro rata based on the respective total nominal value of the ordinary shares held by such shareholder. The shares received by a shareholder will be of the same class as those owned by such shareholder.

Share dividends may be approved by the shareholders, in lieu of payment of cash dividends, at an ordinary Meeting.

Additional ordinary shares may be issued:

- for cash;

- in satisfaction of or set off against liabilities, including indebtedness;

- for assets contributed to us in kind; or

- upon the conversion, exchange or redemption of securities or upon exercise of warrants to purchase ordinary shares.

FORM 20-F 2006   Alcatel-Lucent – 69

*Capital decreases.* Our share capital may generally only be decreased with the approval of two-thirds of the shareholders present or represented by proxy voting together as a single class at an extraordinary Meeting. Reductions in share capital may be made either by decreasing the nominal value of the shares or reducing the number of shares. The number of shares may be reduced if we either exchange or repurchase and cancel shares. As a general matter, reductions of capital occur pro rata among all shareholders, except (1) in the case of a share buyback program, or a public tender offer to repurchase shares *(offre publique de rachat d'actions (OPRA))*, where such a reduction occurs pro rata only among tendering shareholders; and (2) in the case where all shareholders unanimously consent to an unequal reduction.

*Cross shareholdings and holding of our shares by our subsidiaries.* French law prohibits a company from holding our shares if we hold more than 10% of that company's share capital. French law also prohibits us from owning any interest in a French company holding more than 10% of our share capital. In the event of a cross-shareholding that violates this rule, the company owning the smaller percentage of shares in the other company must sell its interest. Until sold, these shares are not entitled to voting rights. Failure by the Officers or Directors of a company to sell these shares is a criminal offense. In the event that one of our subsidiaries holds our shares, these shares are not entitled to voting rights. However, French law does not require the subsidiary to sell the shares.

## Description of ADSs

The following is a summary of certain provisions of the deposit agreement for the ADSs and is qualified in its entirety by reference to the deposit agreement among Alcatel, The Bank of New York, as depositary, and the holders from time to time of ADSs. The form of the deposit agreement and the form of American depositary receipt (ADR) that represents ADSs have been filed as exhibits to the registration statement on Form F-6 that we filed with the Securities and Exchange Commission on November 16, 2006. Additional copies of the deposit agreement are also available for inspection at the principal office of The Bank of New York, which is located at 101 Barclay Street, New York, New York 10286, and at the principal office of the custodian, Société Générale, located at 32, rue du Champ de Tir, 44312 Nantes, France.

*American depositary shares.* Each ADS represents one ordinary share. The ordinary shares underlying the ADSs are deposited with the custodian or any successor custodian. Under French law and our articles of association and bylaws, shareholders must disclose the amount of their shareholding under certain circumstances.

## Dividends, Other Distributions and Rights

The Bank of New York is responsible for making sure that it or the custodian, as the case may be, receives all dividends and distributions in respect of deposited ordinary shares.

Amounts distributed to ADS holders will be reduced by any taxes or other governmental charges required to be withheld by the custodian or The Bank of New York. If The Bank of New York determines that any distribution in cash or property is subject to any tax or governmental charges that The Bank of New York or the custodian is obligated to withhold, The Bank of New York may use the cash or sell or otherwise dispose of all or a portion of that property to pay the taxes or governmental charges. The Bank of New York will then distribute the balance of the cash and/or property to the ADS holders entitled to the distribution, in proportion to their holdings.

*Cash dividends and cash distributions.* The Bank of New York will convert into dollars all cash dividends and other cash distributions that it or the custodian receives in a foreign currency. The Bank of New York will distribute to the ADS holders the amount it receives, after deducting any currency conversion expenses. If The Bank of New York determines that any foreign currency it receives cannot be converted and transferred on a reasonable basis, it may distribute the foreign currency (or an appropriate document evidencing the right to receive the currency), or hold that foreign currency uninvested, without liability for interest, for the accounts of the ADS holders entitled to receive it.

*Distributions of ordinary shares.* If we distribute ordinary shares as a dividend or free distribution, The Bank of New York may, with our approval, and will, at our request, distribute to ADS holders new ADSs representing the ordinary shares. The Bank of New York will distribute only whole ADSs. It will sell the ordinary shares that would have required it to use fractional ADSs and then distribute the proceeds in the same way it distributes cash. If The Bank of New York deposits the ordinary shares but does not distribute additional ADSs, the existing ADSs will also represent the new ordinary shares.

If holders of ordinary shares have the option of receiving a dividend in cash or in ordinary shares, we may also grant that option to ADS holders.

*Other distributions.* If The Bank of New York or the custodian receives a distribution of anything other than cash or ordinary shares, The Bank of New York will distribute the property or securities to the ADS holder, in proportion to such holder's holdings. If The Bank of New York determines that it cannot distribute the property or securities in this manner or that it is not feasible to do so, then, after consultation with us, it may distribute the property or securities by any means it thinks is fair and practical, or it may sell the property or securities and distribute the net proceeds of the sale to the ADS holders.

*Rights to subscribe for additional ordinary shares and other rights.* If we offer our holders of shares any rights to subscribe for additional ordinary shares or any other rights, The Bank of New York will, if requested by us:

- make the rights available to all or certain holders of ADSs, by means of warrants or otherwise, if lawful and feasible; or
- if it is not lawful or feasible to make the rights available, attempt to sell those rights or warrants or other instruments.

In that case, The Bank of New York will allocate the net proceeds of the sales to the account of the ADS holders entitled to the rights. The allocation will be made on an averaged or other practicable basis without regard to any distinctions among holders.

If registration under the Securities Act of 1933, as amended, is required in order to offer or sell to the ADS holders the securities represented by any rights, The Bank of New York will not make the rights available to ADS holders unless a registration statement is in effect or such securities are exempt from registration. We do not, however, have any obligation to file a registration statement or to have a registration statement declared effective. If The Bank of New York cannot make any rights available to ADS holders and cannot dispose of the rights and make the net proceeds available to ADS holders, then it will allow the rights to lapse, and the ADS holders will not receive any value for them.

*Voting of the underlying ordinary shares.* Under the deposit agreement, an ADS holder is entitled, subject to any applicable provisions of French law, our articles of association and bylaws and the deposited securities, to exercise voting rights pertaining to the ordinary shares represented by its ADSs. The Bank of New York will send to ADS holders English-language summaries of any materials or documents provided by us for the purpose of exercising voting rights. The Bank of New York will also send to ADS holders directions as to how to give it voting instructions, as well as a statement as to how the underlying ordinary shares will be voted if it receives blank or improperly completed voting instructions.

The voting rights per holder of ADSs cannot exceed 8% of the total number of voting rights present or represented at a meeting of shareholders (16% if double voting rights apply). ADSs will represent ordinary shares in bearer form unless the ADS holder notifies The Bank of New York that it would like the ordinary shares to be held in registered form.

*Changes affecting deposited securities.* If there is any change in nominal value or any split-up, consolidation, cancellation or other reclassification of deposited securities, or any recapitalization, reorganization, merger or consolidation or sale of assets involving us, then any securities that The Bank of New York receives in respect of deposited securities will become new deposited securities. Each ADS will automatically represent its share of the new deposited securities, unless The Bank of New York delivers new ADSs as described in the following sentence. The Bank of New York may, with our approval, and will, at our request, distribute new ADSs or ask ADS holders to surrender their outstanding ADRs in exchange for new ADRs describing the new deposited securities.

*Amendment of the deposit agreement.* The Bank of New York and we may agree to amend the form of the ADRs and the deposit agreement at any time, without the consent of the ADS holders. If the amendment adds or increases any fees or charges (other than taxes or other governmental charges) or prejudices an important right of ADS holders, it will not take effect as to outstanding ADSs until three months after The Bank of New York has sent the ADS holders a notice of the amendment. At the expiration of that three-month period, each ADS holder will be considered by continuing to hold its ADSs to agree to the amendment and to be bound by the deposit agreement as so amended. The Bank of New York and we may not amend the deposit agreement or the form of ADRs to impair the ADS holder's right to surrender its ADSs and receive the ordinary shares and any other property represented by the ADRs, except to comply with mandatory provisions of applicable law.

*Termination of the deposit agreement.* The Bank of New York will terminate the deposit agreement if we ask it to do so and will notify the ADS holders at least 30 days before the date of termination. The Bank of New York may also terminate the deposit agreement if it resigns and a successor depositary has not been appointed by us and accepted its appointment within 90 days after The Bank of New York has given us notice of its resignation. After termination of the deposit agreement, The Bank of New York will no longer register transfers of ADSs, distribute dividends to the ADS holders, accept deposits of ordinary shares, give any notices, or perform any other acts under the deposit agreement whatsoever, except that The Bank of New York will continue to:

- collect dividends and other distributions pertaining to deposited securities;
- sell rights as described under the heading "— Dividends, other distributions and rights — Rights to subscribe for additional ordinary shares and other rights" above; and
- deliver deposited securities, together with any dividends or other distributions received with respect thereto and the net proceeds of the sale of any rights or other property, in exchange for surrendered ADRs.

One year after termination, The Bank of New York may sell the deposited securities and hold the proceeds of the sale, together with any other cash then held by it, for the pro rata benefit of ADS holders that have not surrendered their ADSs. The Bank of New York will not have liability for interest on the sale proceeds or any cash it holds.

FORM 20-F 2006    Alcatel-Lucent – 71

## Ownership of shares by non-French persons

Under French law and our articles of association and bylaws, no limitation exists on the right of non-French residents or non-French shareholders to own or vote our securities.

Both E.U. and non-E.U. residents must file an administrative notice ("déclaration administrative") with French authorities in connection with the acquisition of a controlling interest in any French company. Under existing administrative rulings, ownership of 20% or more of a listed company's share capital or voting rights is regarded as a controlling interest; however, a lower percentage may be held to be a controlling interest in certain circumstances depending upon such factors as the acquiring party's intentions, its ability to elect Directors or financial reliance by the French company on the acquiring party.

The payment of all dividends to foreign shareholders must be effected through an accredited intermediary. All registered banks and credit establishments in France are accredited intermediaries.

You should refer to "Description of Ordinary Shares" above for a description of the filings required based on shareholdings.

## Material contracts

**Thales Agreements**

*Overview.* On December 4, 2006, we signed an agreement with Thales for the transfer of our transportation, security and space assets to Thales and on the future industrial cooperation of the two groups. This agreement follows the execution in 2006 of an agreement among Thales, Finmeccanica S.p.A., an Italian aerospace and defense company and us, in which Finmeccanica agreed to the transfer to Thales of our 67% interest in Alcatel Alenia Space and our 33% interest in Telespazio Holding, our two joint ventures with Finmeccanica.

At the extraordinary general shareholders' meeting held on January 5, 2007, Thales' shareholders approved the resolutions relative to the contribution of our transportation and security activities to Thales. On January 5, 2007, the two activities were transferred to Thales and we received 25 million new Thales shares and a cash payment of €50 million including purchase price adjustments. The sale of our space activities to Thales for cash should be finalized during the first half of 2007.

*Cooperation Agreement.* In connection with the Thales transaction, we entered into a cooperation agreement on December 1, 2006 with Thales and the French government (the "French State") governing the relationship between Thales and us after completion of the Thales transaction. The cooperation agreement requires that Thales give preference to the equipment developed by us, in consideration for our agreement not to submit offers to military clients in certain countries, subject to certain exceptions protecting, in particular, the continuation of Lucent's current business with U.S. defense agencies. The agreement also includes non compete commitments by us with respect to our businesses being contributed to Thales, and by Thales with respect to our other businesses, in each case, subject to limited exceptions. The cooperation agreement also provides that Thales cooperate in certain matters relating to research and development.

In connection with the Thales transaction, we entered into an amended shareholders agreement on December 28, 2006 with TSA, a French company wholly owned by the French State, which governs the relationship of the shareholders in Thales and provides as set forth below.

*Board of Directors of Thales.* The Thales board of directors will be comprised of 16 persons and will include (i) five directors, proposed by the French State, represented by TSA; (ii) four directors proposed by us, each of whom will be a citizen of the European Union, unless otherwise agreed by the French State; (iii) two Thales employee representatives; (iv) one representative of the employee shareholders of Thales; and (v) four independent directors. The French State and we will consult with each other on the appointment of independent directors. At least one director appointed by the French State and one director appointed by us will sit on each of the board committees.

The French State and we will each have the right to replace members of the Thales board of directors, such that the number of directors appointed by each of the French State and us is equal to the greater of:

- the total number of directors (excluding employee representatives and independent directors), multiplied by a fraction, the numerator of which is the percentage of shares held by the French State or us as the case may be, and the denominator of which is the total shares held by the French State and us; and

- the number of employee representatives and representatives of employee shareholders on the Thales board of directors.

*Joint Decision-Making.* The following decisions of the Thales board of directors will require the approval of a majority of the directors appointed by us:

- the election and dismissal of the chairman/chief executive officer of Thales (or of the chairman and of the chief executive officer, if the functions are split) and the splitting of the functions of the chairman/chief executive officer;

- the adoption of the annual budget and strategic plan of Thales;

- any decision threatening the cooperation between us and Thales; and

- significant acquisitions and sales of shares or assets (with any transaction representing €150 million in revenues or commitments deemed significant).

If the French State and we disagree on (i) major strategic decisions deemed by the French State to negatively affect its strategic interests or (ii) the nomination of a chairman/chief executive officer in which we exercised our veto power, the French State and we will consult in an effort to resolve the disagreement. If the parties cannot reach a joint agreement within 12 months (reduced to three months in the case of a veto exercised on the nomination of the chairman/chief executive officer), either the French State or we may unilaterally terminate the shareholders agreement.

*Shareholding in Thales.* We will lose our rights under the shareholders agreement unless we hold at least 15% of the capital and voting rights of Thales. The shareholders agreement provides that the participation of the French State in Thales will not exceed 49.9% of the share capital and voting rights of Thales, including the French State's golden share in Thales (described below under "Agreement Regarding the Strategic Interests of the French State").

*Duration of Shareholders Agreement.* The amended shareholders agreement took effect on January 5, 2007 and will remain in force until December 31, 2011. The agreement provides that, unless one of the parties makes a non-renewal request at least six months before the expiration date, the agreement will be automatically renewed for five years. If the French State's or our equity ownership drops below 15% of the then outstanding share capital of Thales, the following provisions will apply:

The party whose ownership decreases below 15% of Thales' share capital will, one year following the date on which such shareholding falls below 15%, no longer have rights under the shareholders agreement unless such party has acquired during that one-year period Thales shares so that it again owns in excess of 15% of the Thales share capital. If a party's ownership decreases below 15%, the party will take the necessary actions to cause the resignation of the board members it has appointed so that their number reflects the proportion of Thales' share capital and voting rights that such party maintains.

- The party whose shareholding has not decreased below the 15% threshold will have a right of first refusal to acquire any shares the other party offers for sale to a third party in excess of 1% of the then outstanding share capital of Thales.

*Breach of Our Obligations.* In. the case of a material breach by us of our obligations under the agreement relating to the strategic interests of the French State, which is defined as a breach that the French State determines may jeopardize substantially the protection of its strategic interests, the French State will have the power to enjoin us to cure the breach immediately. If we do not promptly cure the breach or if the French State determines that foreign rules of extra territorial application that are applicable to us impose constraints on Thales likely to substantially jeopardize the strategic interests of the French State, the French State will be entitled to exercise its termination remedies as described below.

If any natural person's or entity's equity ownership of us increases above the 20%; 33.33%, 40% or 50% thresholds, in capital or voting rights, we and the French State will consult as to the consequences of this event and the appropriateness of the agreement respecting the strategic interests of the French State to the new situation. If, after a period of six months following the crossing of the threshold, the French State determines that the share ownership of us is no longer compatible with its strategic interests and that the situation cannot be remedied through an amendment to the shareholders agreement, the French State will be entitled to exercise its termination remedies as described below.

*Termination Remedies.* Upon a breach of our obligations described above or if a third party acquires significant ownership in us as described above and an amendment to the shareholders agreement will not remedy the concerns of the French State, the French State may:

- terminate the shareholders agreement immediately;

- if the French State deems necessary, require us to immediately suspend the exercise of our voting rights that exceed 10% of the total voting rights in Thales; or

- if the French State deems necessary, require us to reduce our shareholding in Thales below 10% of the total share capital of Thales by selling our shares of Thales in the marketplace. If, after a period of six months, we have not reduced our shareholding, the French State may force us to sell all of our Thales shares to the French State or a third party chosen by the French State.

*Agreement Regarding the Strategic Interests of the French State.* On December 28, 2006, we entered into a revised agreement with the French State in order to strengthen the protection of the strategic interests of the French State in Thales. The terms of this agreement include, either as an amendment to, or as a separate agreement supplementing, the shareholders agreement, the following:

- will maintain our executive offices in France;

- Thales board members appointed by us must be citizens of the European Union, unless otherwise agreed by the French State, and one of our executives or board members who is a French citizen will be the principal liaison between us and Thales;

- access to classified or sensitive information with respect to Thales will be limited to our executives who are citizens of the European Union, and we are required to maintain procedures (including the maintenance of a list of all individuals having access to such information) to ensure appropriate limitations to such access;

- normal business and financial information with respect to Thales will be available to our executives and Directors (regardless of nationality);

- the French State will continue to hold a golden share in Thales, giving it veto rights over certain transactions that might otherwise be approved by the Thales Board of Directors, including permitting a third party to own more than a specified percentage of the shares of certain subsidiaries or affiliates holding certain sensitive assets of Thales, and preventing Thales from disposing of certain sensitive assets;

- the French State will have the ability to restrict access to the research and development operations of Thales, and to other sensitive information; and

- will use our best efforts to avoid any intervention or influence of foreign state interests in the governance or activities of Thales.

National Security Agreement and Specialty Security Agreement

On November 17, 2006, the Committee on Foreign Investment in the United States ("CFIUS"), approved our business combination with Lucent. In the final phase of the approval process CFIUS recommended to the President of the United States that he not suspend or prohibit our business combination with Lucent, provided that we execute a National Security Agreement ("NSA") and Specialty Security Agreement ("SSA") with certain U.S. Government agencies within a specified time period. As part of the CFIUS approval process, we entered into a NSA with the Department of Justice, the Department of Homeland Security, the Department of Defense and the Department of Commerce (collectively, the "USG Parties") effective on November 30, 2006. The NSA provides for, among other things, certain undertakings with respect to our U.S. businesses relating to the work done by Bell Labs and to the communications infrastructure in the United States. Under the NSA, in the event that we materially fail to comply with any of its terms, and the failure to comply threatens to impair the national security of the United States, the parties to the NSA have agreed that CFIUS, at the request of the USG Parties at the cabinet level and the Chairman of CFIUS, may reopen review of the business combination with Lucent and revise any recommendations submitted to the President. In addition, we agreed to establish a separate subsidiary to perform certain work for the U.S. government, and hold government contracts and certain sensitive assets associated with Bell Labs. This separate subsidiary has a board of directors including at least three independent directors who are resident citizens of the United States who have or are eligible to possess personnel security clearances from the Department of Defense. These directors are former U.S. Secretary of Defense William Perry, former Director of the Central Intelligence Agency R. James Woolsey, former National Security Agency Director Lt. Gen. Kenneth A. Minihan, USAF (Ret.) and former Assistant Secretary of the U.S Navy Dr. H. Lee Buchanan. The SSA, effective December 20, 2006, that governs this subsidiary contains provisions with respect to the separation of certain employees, operations and facilities, as well as limitations on control and influence by the parent company and restrictions on the flow of certain information.

The provisions contained in both the NSA and the SSA are not expected to impact the projected synergies to be realized from the business transaction with Lucent or materially impact the integration of the businesses of historical Alcatel and Lucent.

## Exchange controls

Under current French exchange control regulations, no limits exist on the amount of payments that we may remit to residents of the United States. Laws and regulations concerning foreign exchange controls do require, however, that an accredited intermediary handle all payments or transfer of funds made by a French resident to a non-resident.

## Taxation

The following is a general summary of the material U.S. federal income tax and French tax consequences to you if you acquire, hold and dispose of our ordinary shares or ADSs. It does not address all aspects of U.S. and French tax laws that may be relevant to you in light of your particular situation. It is based on the applicable tax laws, regulations and judicial decisions as of the date of this annual report, and on the Convention between the United States of America and the Republic of France for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with respect to Taxes on Income and Capital dated as of August 31, 1994 (the "Treaty") entered into force on December 30, 1995, and the 2004 Protocol amending the Treaty which entered into force on December 21, 2006, all of which are subject to change, possibly with retroactive effect, or different interpretations.

This summary may only be relevant to you if all of the following five points apply to you:

- You own, directly or indirectly, less than 10% of our capital;

- You are any one of (a), (b), (c) or (d) below:
  (a) an individual who is a citizen or resident of the United States for U.S. federal income tax purposes,
  (b) a corporation, or other entity taxable as a corporation that is created in or organized under the laws of the United States or any political subdivision thereof,
  (c) an estate, the income of which is subject to U.S. federal income tax regardless of its source, or
  (d) a trust, if a court within the United States is able to exercise a primary supervision over its administration and one or more U.S. persons have the authority to control all of the substantial decisions of such trust;

- You are entitled to the benefits of the Treaty under the "limitations on benefits" article contained in the Treaty;

- You hold our ordinary shares or ADSs as capital assets; and

- Your functional currency is the U.S. dollar.

You generally will not be eligible for the reduced withholding tax rates under the Treaty if you hold our ordinary shares in connection with the conduct of business through a permanent establishment or the performance of services through a fixed base in France, or you are a nonresident in the United States for U.S. tax purposes.

The following description of tax consequences should be considered only as a summary and does not purport to be a complete analysis of all potential tax effects of the purchase or ownership of our ordinary shares or ADSs. Special rules may apply to U.S. expatriates, insurance companies, tax-exempt organizations, financial institutions, persons subject to the alternative minimum tax, securities broker-dealers, traders in securities that elect to use a mark-to-market method of accounting for the securities' holdings, and persons holding their ordinary shares or ADSs as part of a hedging, straddle, conversion transaction or other integrated investment, among others. Those special rules are not discussed in this annual report. This summary does not address all potential tax implications that may be relevant to you as a holder, in light of your particular circumstances. You should consult your tax advisor concerning the overall U.S. federal, state and local tax consequences, as well as the French tax consequences, of your ownership of our ordinary shares or ADRs and ADSs represented thereby.

For purposes of the Treaty and the U.S. Internal Revenue Code of 1986, as amended (the "Code"), if you own ADSs evidenced by ADRs, you will be treated as the owner of the ordinary shares represented by such ADSs.

## Taxation of Dividends

**Withholding Tax and Tax Credit.** In France, companies may only pay dividends out of income remaining after tax has been paid. When shareholders resident in France receive dividends from French companies, they historically were entitled to a tax credit, known as the avoir fiscal tax credit. However, the French Finance Law of 2004 eliminated the avoir fiscal and the related précompte with respect to dividends paid after January 1, 2004 to corporate shareholders and after January 1, 2005 to individual shareholders.

To compensate for the abolition of the avoir fiscal, for dividends paid as from January 1, 2006, French resident individuals will be subject to taxation on only 60 percent of the dividends received by them from both French and foreign companies. This exemption will apply to any dividend distributed by a company that is subject to corporation tax or an equivalent tax and that is located in an EU member state or a country that has signed a tax treaty with France.

In addition, French resident individuals will receive a tax credit equal to 50 percent of the dividends (which we refer to as the Tax Credit), capped at €115 for single individuals or married persons subject to separate taxation and €230 for married couples and members of a union agreement subject to joint taxation.

French companies normally must deduct a 25% French withholding tax from dividends paid to nonresidents of France. Under the Treaty, this withholding tax is reduced to 15% if your ownership of our ordinary shares or ADSs is not effectively connected with a permanent establishment or a fixed base that you have in France.

If your ownership of the ordinary shares or ADSs is not effectively connected with a permanent establishment or a fixed base that you have in France, we will withhold tax from your dividend at the reduced rate of 15%, provided that you (i) complete the French Treasury Form entitled "Certificate of Residence" which establishes that you are a resident of the U.S. under the Treaty, (ii) have it certified either by the Internal Revenue Service or the financial institution that is in charge of the administration of the ordinary shares or ADSs, and (iii) send it to us before the date of payment of the dividend.

If you have not completed and sent the "Certificate of Residence" before the dividend payment date, we will deduct French withholding tax at the rate of 25%. In that case, you may claim a refund from the French tax authorities of any excess withholding tax in accordance with the following procedures.

1. If you are an "eligible" U.S. holder as defined below, you must complete French Treasury Form RF1 A EU-No. 5052, entitled "Application for Refund of French Taxes on Dividends Entitled to the Tax Credit," and send it to us early enough to enable us to file it with the French tax authorities before December 31st of the year following the year during which the dividend is paid.

2. If you are not an "eligible" U.S. holder but nonetheless qualify as a resident of the United States under the Treaty, you must complete French Treasury Form RF1 B EU-No. 5053, entitled "Application for Refund of French Taxes on Dividends where the Recipient is not Entitled to the Tax Credit," and send it to us early enough to enable us to file it with the French tax authorities before December 31st of the year following the year during which the dividend is paid.

You are an "eligible" U.S. holder if any one of the following four points applies to you:

1. You are an individual or other noncorporate holder that is a resident of the United States for purposes of the Treaty;

2. You are a U.S. corporation, other than a regulated investment company;

3. You are a U.S. corporation which is a regulated investment company, provided that less than 20% of your ordinary shares or ADSs are beneficially owned by persons who are neither citizens nor residents of the United States; or

4. You are a partnership or trust that is a resident of the U.S. for purposes of the Treaty, but only to the extent that your partners, beneficiaries or grantors would qualify as "eligible" under point 1 or point 2 above.

Back to Contents

You can obtain the Certificate of Residence, the forms and their respective instructions from the Depositary, the Internal Revenue Service or the French Centre des Impôts des non-résidents the address of which is 10 rue du Centre, 93465 Noisy-Le-Grand, France.

Any French withholding tax refund is generally expected to be paid within 12 months after you file the relevant French Treasury Form. However, it will not be paid before January 15, following the end of the calendar year in which the related dividend is paid.

Prior to the French tax reform described above, an "eligible" U.S. individual holder could also claim the avoir fiscal tax credit (net of applicable withholding tax) in addition to the reduced rate of withholding tax. Instead, qualifying nonresident individuals who were previously entitled to a refund of the avoir fiscal tax credit may benefit, under the same conditions as for the avoir fiscal tax credit, from a refund of the Tax Credit (net of any applicable withholding tax). Thus, if you are an "eligible" U.S. individual holder, you may be entitled to a refund of the Tax Credit (less a 15% withholding tax), provided that you are subject to U.S. federal income tax on the Tax Credit and the related dividend. The refund of the Tax Credit, like the refund to the French withholding tax discussed above, is not likely to be paid before January 15, following the end of the calendar year in which the dividend is paid.

U.S. holders that are legal entities, pension funds or other tax-exempt holders are no longer entitled to tax credit payments from the French Treasury.

For U.S. federal income tax purposes, the gross amount of any distribution (including any related Tax Credit) will be included in your gross income as dividend income to the extent paid or deemed paid out of our current or accumulated earnings and profits as calculated for U.S. federal income tax purposes. You must include this amount in income in the year payment is received by you, which, if you hold ADSs, will be the year payment is received by the Depositary. Dividends paid by us will not give rise to any dividends-received deduction allowed to a U.S. corporation under Section 243 of the Code. They will generally constitute foreign source "passive category" income for foreign tax credit purposes or, for some holders, "general category" income. For tax years beginning before January 1, 2007, however, such dividends generally will constitute "passive" income, or for some holders, "financial services" income.

For tax years beginning before January 1, 2011, a maximum U.S. federal income tax rate of 15% will apply to dividend income received by an individual (as well as certain trusts and estates) from a U.S. corporation or from a "qualified foreign corporation" provided certain holding period requirements are met. A non-U.S. corporation (other than a passive foreign investment company) generally will be considered to be a qualified foreign corporation if (i) the shares of the non-U.S. corporation are readily tradable on an established securities market in the United States, or (ii) the non-U.S. corporation is eligible for the benefits of a comprehensive U.S. income tax treaty determined to be satisfactory to the United States Department of the Treasury. The United States Department of the Treasury and the Internal Revenue Service have determined that the Treaty is satisfactory for this purpose. In addition, the United States Department of the Treasury and the Internal Revenue Service have determined that ordinary shares, or an ADR in respect of such shares (which would include the ADSs), are considered readily tradable on an established securities market if they are listed on an established securities market in the United States such as The New York Stock Exchange. Information returns reporting dividends paid to U.S. persons will identify the amount of dividends eligible for the reduced tax rates.

Also, for U.S. federal income tax purposes, the amount of any dividend paid in a foreign currency such as euros, including any French withholding taxes, will be equal to the U.S. dollar value of the euros on the date the dividend is included in income, regardless of whether you convert the payment into U.S. dollars. If you hold ADSs, this date will be the date the payment is received by the Depositary. You will generally be required to recognize U.S. source ordinary income or loss when you sell or dispose of the euros. You may also be required to recognize foreign currency gain or loss if you receive a refund of tax withheld from a dividend in excess of the 15% rate provided for under the Treaty. This foreign currency gain or loss will generally be U.S. source ordinary income or loss.

To the extent that any dividends paid exceed our current and accumulated earnings and profits as calculated for U.S. federal income tax purposes, the distribution will be treated as follows:

- First, as a tax-free return of capital to the extent of your basis in your ordinary shares or ADSs, which will reduce the adjusted basis of your ordinary shares or ADSs. This adjustment will increase the amount of gain, or decrease the amount of loss, which you will recognize if you later dispose of those ordinary shares or ADSs.

- Second, the balance of the distribution in excess of the adjusted basis will be taxed as capital gain.

French withholding tax imposed on the dividends you receive on your ordinary shares or ADSs at 15% under the Treaty is treated as payment of a foreign income tax eligible for credit against your federal income tax liability. Under the Code, the limitation on foreign taxes eligible for credit is not calculated with respect to all worldwide income, but instead is calculated separately with respect to specific classes of income. For this purpose, the dividends you receive on your ordinary shares or ADSs generally will constitute "passive" income, or, for some holders, "general category" income. For tax years beginning before January 1, 2007, however, such dividends generally will constitute "passive" income, or, for some holders, "financial services" income. Foreign tax credits allowable with respect to each class of income cannot exceed the U.S. federal income tax otherwise payable with respect to such class of income. The consequences of the separate limitation calculation will depend in general on the nature and sources of your income and deductions. Alternatively, you may claim all foreign taxes paid as an itemized deduction in lieu of claiming a foreign tax credit. A deduction does not reduce U.S. tax on a dollar-for-dollar basis like a tax credit. The deduction, however, is not subject to the limitations described above.

## Taxation of Capital Gains

If you are a resident of the United States for purposes of the Treaty, you will not be subject to French tax on any gain if you sell your ordinary shares or ADSs unless you have a permanent establishment or fixed base in France and such ordinary shares or ADSs were part of the business property of that permanent establishment or fixed base. Special rules apply to individuals who are residents of more than one country.

In general, for U.S. federal income tax purposes, you will recognize capital gain or loss if you sell or otherwise dispose of your ordinary shares or ADSs based on the difference between the amount realized on the disposition and your tax basis in the ordinary shares or ADSs. Any gain or loss will generally be U.S. source gain or loss. If you are a noncorporate holder, any capital gain will generally be subject to U.S. federal income tax at preferential rates if you meet certain minimum holding periods. Long-term capital gains realized upon a sale or other disposition of the ordinary shares or ADSs before the end of a taxable year which begins before January 1, 2011 generally will be subject to a maximum U.S. federal income tax rate of 15%.

## Transfer Tax on Sale of Ordinary Shares or ADSs

A 1.10% transfer tax capped at €4,000 per transfer applies to certain transfers of ordinary shares or ADSs in French corporations. The transfer tax does not apply to transfers of ordinary shares or ADSs in French publicly-traded companies that are not evidenced by a written agreement, or where that agreement is executed outside France. Therefore, you should not be liable to pay the transfer tax on the sale or disposition of your ordinary shares or ADSs provided such sale or disposition is not evidenced by a written agreement or such agreement is not executed in France.

## French Estate and Gift Taxes

Under "The Convention Between the United States of America and the French Republic for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Estates, Inheritance and Gifts of November 24, 1978," and the 2004 Protocol amending this 1978 Convention which entered into force on December 21, 2006, if you transfer your ordinary shares or ADSs by gift, or if they are transferred by reason of your death, that transfer will be subject to French gift or inheritance tax only if one of the following applies:

- you are domiciled in France at the time of making the gift, or at the time of your death, or
- you used the ordinary shares or ADSs in conducting a business through a permanent establishment or fixed base in France, or you held the ordinary shares or ADS for that use.

The French gift or inheritance tax may be credited against the U.S. gift or inheritance tax. This tax credit is limited, however, to the amount of the U.S. gift or inheritance tax due on the shares.

## French Wealth Tax

The French wealth tax generally does not apply to you if you are a "resident" of the United States for purposes of the Treaty.

## U.S. Information Reporting and Backup Withholding

In general, if you are a non-corporate U.S. holder of our ordinary shares or ADSs (or do not come within certain other exempt categories), information reporting requirements will apply to distributions paid to you and proceeds from the sale, exchange, redemption or disposal of your ordinary shares or ADSs. U.S. holders that are corporations generally are excluded from these information reporting and backup withholding tax rules.

Additionally, if you are a non-corporate U.S. holder of our ordinary shares or ADSs (or do not come within certain other exempt categories) you may be subject to backup withholding at a current rate of 28% (increased to 31% for taxable years 2011 and thereafter) with respect to such payments, unless you provide a correct taxpayer identification number (your social security number or employer identification number), and with respect to dividend payments, certify that you are not subject to backup withholding and otherwise comply with applicable requirements of the backup withholding rules. Generally, you will be required to provide such certification on Internal Revenue Service Form W-9 ("Request for Taxpayer Identification Number and Certification") or a substitute Form W-9.

If you do not provide your correct taxpayer identification number, you may be subject to penalties imposed by the Internal Revenue Service, as well as backup withholding. However, any amount withheld under the backup withholding rules should be allowable as a credit against your U.S. federal income tax liability (which might entitle you to a refund), provided that you furnish the required information to the Internal Revenue Service.

## U.S. State and Local Taxes

In addition to U.S. federal income tax, you may be subject to U.S. state and local taxes with respect to your ordinary shares or ADSs. You should consult your own tax advisor concerning the U.S. state and local tax consequences of holding your ordinary shares or ADSs.

## U.S. Reportable Transactions

A U.S. holder that participates in any "reportable transaction" (as defined in U.S. Treasury regulations) must attach to its U.S. federal income tax return a disclosure statement on Internal Revenue Service Form 8886. U.S. holders are urged to consult their own tax advisers as to the possible obligation to file Internal Revenue Service Form 8886 with respect to the sale, exchange or other disposition of any non-U.S. currency received as a dividend on, or as proceeds from the sale of, our shares.

## Documents on display

We file reports with the Securities and Exchange Commission that contain financial information about us and our results or operations. You may read or copy any document that we file with the Securities and Exchange Commission at the Securities and Exchange Commission's Public Reference Room at 100 F Street, N.E., Washington, D.C. 20549. You may obtain information about the Public Reference Room by calling the Securities and Exchange Commission at 1-800-SEC-0330. All of our Securities and Exchange Commission filings made after February 4, 2002 are available to the public at the SEC web site at http://www.sec.gov. Our web site at http://www.alcatel-lucent.com includes information about our business and also includes some of our Securities and Exchange Commission filings prior to February 4, 2002. The contents of our website are not incorporated by reference into this Form 20-F.

Back to Contents

## Item 11. Quantitative and Qualitative Disclosures About Market Risk

See Item 5 under "Qualitative and Quantitative Disclosures About Market Risk."

## Item 12. Description of Securities Other than Equity Securities

Not applicable.

# Part 2

## Item 13. Defaults, Dividend Arrearages and Delinquencies

Not applicable.

## Item 14. Material Modifications to the Rights of Security Holders

Not applicable.

## Item 15. Controls and Procedures

(a) *Disclosure Controls and Procedures*. We performed an evaluation of the effectiveness of our disclosure controls and procedures that are designed to ensure that the material financial and non-financial information required to be disclosed by us in reports that we file with or submit to the Securities and Exchange Commission under the Securities Exchange Act of 1934, as amended, is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms. Based on our evaluation, our management, including our Chief Executive Officer and Chief Financial Officer, has concluded that our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as amended) as of the end of the period covered by this report are effective. Notwithstanding the foregoing, there can be no assurance that our disclosure controls and procedures will detect or uncover all failures of persons within Alcatel-Lucent to disclose material information otherwise required to be set forth in our reports, although our management, including our Chief Executive Officer and Chief Financial Officer, has concluded that, as of the end of the period covered by this report, our disclosure controls and procedures provide reasonable assurance of achieving these objectives.

(b) *Management's Annual Report on Internal Control Over Financial Reporting*. We are responsible for establishing and maintaining adequate internal control over financial reporting for Alcatel-Lucent. Internal control over financial reporting is defined in Rule 13a-15(f) and 15d-15(f) under the Securities Exchange Act of 1934, as amended, as a process designed by, or under the supervision of, our principal executive and principal financial officers and effected by our Board of Directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of consolidated financial statements in accordance with generally accepted accounting principles.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements and even when determined to be effective can only provide reasonable assurance with respect to financial statements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

We assessed the effectiveness of our internal control over financial reporting as of December 31, 2006, and concluded that our internal control over financial reporting is effective. In making this assessment, we used the criteria established in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on our assessment under these criteria, we concluded that, as of December 31, 2006, our internal control over financial reporting is effective. The current assessment does not include the internal controls of Lucent Technologies Inc. and certain assets acquired from Nortel Networks Corporation that are included in our 2006 consolidated financial statements and that constituted €22.1 billion, or 53.4%, of our total assets as of December 31, 2006 and €651 million, or 5.3%, of our total revenues for the year then ended. Following the current guidance provided by the SEC, we will defer for a 12-month period the assessment of the internal control over financial reporting of these businesses, which were acquired in November 2006 (Lucent) and December 2006 (certain assets from Nortel).

Our assessment of the effectiveness of our internal control over financial reporting has been audited by Deloitte & Associés and Ernst & Young et Autres, our independent registered public accounting firms, as stated in their report, which is included herein.

(c) Attestation Report of Independent Registered Public Accounting Firms.

To the Shareholders and the Board of Directors of Alcatel-Lucent

We have audited management's assessment, included in the accompanying Management's Annual Report on Internal Control Over Financial Reporting (Item 15(b)) that Alcatel-Lucent and subsidiaries maintained effective internal control over financial reporting as of December 31, 2006, based on criteria established in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. Alcatel-Lucent's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting. Our responsibility is to express an opinion on management's assessment and an opinion on the effectiveness of Alcatel-Lucent's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, evaluating management's assessment, testing and evaluating the design and operating effectiveness of internal control, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that : (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the company's assets that could have a material effect on the financial statements.

Because of inherent limitations internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that the controls may become inadequate because of changes in conditions or that the degree of compliance with the policies or procedures may deteriorate.

As described in "Management's Annual Report on Internal Control over Financial Reporting" (Item 15(b)), management's assessment of and conclusion on the effectiveness of internal control over financial reporting did not include the internal controls of Lucent Technologies Inc. and certain assets acquired from Nortel Networks Corporation that are included in the 2006 consolidated financial statements of Alcatel-Lucent and that constituted €22.1 billion, or 53.4%, of total assets at December 31, 2006 and €651 million, or 5.3%, of total revenues for the year then ended. Our audit of internal control over financial reporting of Alcatel-Lucent also did not include an evaluation of the internal controls over financial reporting of Lucent Technologies Inc. and those assets acquired from Nortel Networks Corporation.

In our opinion, management's assessment that Alcatel-Lucent maintained effective internal control over financial reporting, as of December 31, 2006, is fairly stated, in all material respects, based on the criteria established in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. Also in our opinion, Alcatel-Lucent maintained, in all material respects, effective internal control over financial reporting as of December 31, 2006 based on the criteria established in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated financial statements of Alcatel-Lucent as of and for the year ended December 31, 2006 and our report dated April 6, 2007 expressed an unqualified opinion thereon.

/s/ Deloitte & Associés

/s/ Ernst & Young et Autres
Represented by Jean-Yves Jegourel

Neuilly-sur-Seine, France
April 6, 2007