**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____
                                                                  )
MERRILL STEINBERG, Individually And On      )
Behalf Of All Others Similarly Situated,               )      **CIVIL ACTION NO. 07-CV-9615-RPP**
                                                                  )
                                Plaintiff,                      )      "ECF CASE"
                                                                  )
                v.                                              )
                                                                  )      **Oral Argument Requested**
ERICSSON LM TELEPHONE CO., CARL-        )
HENRIC SVANBERG and KARL-HENRIK          )
SUNDSTROM,                                             )
                                                                  )
                                Defendants.                 )
_____ )

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED COMPLAINT**

**Murray, Frank & Sailer LLP**
**275 Madison Avenue, Suite 801**
**New York, New York 10016**
**Tel: (212) 682-1818**
**Fax: (212) 682-1892**

**Lead Counsel for the Class**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................... 1

FACTS ....................................................................................................................... 2

   A.    Background ................................................................................................ 2

   B.    Defendants' September 11, 2007 Call.................................................... 3

     1.   AT&T/Cingular And T-Mobile Contracts ........................................... 3

     2.   50 New Contracts/Large Projects ....................................................... 5

     3.   Seasonal Third Quarter....................................................................... 6

   C.    October 16, 2007 Bombshell.................................................................. 8

   D.    Material Market Impact........................................................................... 9

ANALYSIS
      LEGAL STANDARD ON MOTION TO DISMISS........................................... 9

POINT I
      THE COMPLAINT IS PLED WITH THE REQUISITE PARTICULARITY ......................... 10

   A.    The Complaint Properly Sets Forth Defendants'
       Materially False And Misleading Statements ...................................... 10

     1.   Falsity ................................................................................................. 10

      a. The 50 Projects Would Never Produce Significant Revenue ......................... 102

      b. Plaintiff's Confidential Sources Are Knowledgeable ....................................... 10

      c. Subscriber Growth Equals Revenue And Earnings .......................................... 10

      d. The Third Quarter Of 2007 Was Not "Seasonal" ............................................ 10

     2.   Materiality .......................................................................................... 15

   B.    Defendants' Misstatements Are Not Mere Puffery ............................. 17

POINT II

    SCIENTER HAS BEEN ADEQUATELY PLED..............................................................18

  A.    Defendants Had Knowledge Of The Falsity Of Their Statements.....................19

  B.    The False Statements Concerned Core Operations ...........................................19

  C.    The Magnitude Of The Earnings Miss
       Supports An Inference Of Scienter ...................................................................20

  D.    Defendants Did Not Disclose The Expected
       Revenue Decrease In The September 11 Call....................................................21

  E.    Corroboration Of Confidential Sources ...........................................................22

  F.    The Inference Of Scienter Is Bolstered By The Short Time Involved .............22

POINT III

    THE COURT HAS PERSONAL JURISDICTION OVER
    DEFENDANTS SVANBERG AND SUNDSTROM .........................................................23

POINT IV

    CONTROL PERSON LIABILITY IS ADEQUATELY PLED .............................................25

CONCLUSION.................................................................................................................25

## TABLE OF AUTHORITIES

### Statutes and Rules

Fed. R. Civ. P. 12(b)(6).................................................................................................. 9, 16

Fed. R. Civ. P. 9(b) ...................................................................................................... 10

Securities Exchange Act of 1934, Section 10(b) ..................................................... *passim*

Securities Exchange Act of 1934, Section 20(a) ........................................................... 25

### Cases

*380544 Canada, Inc. v. Aspen Tech., Inc.,*
  544 F. Supp. 2d 199 (S.D.N.Y. 2008)........................................................................... 21

*Azrielli v. Cohen Law Offices,*
  21 F.3d 512 (2d Cir. 1994).......................................................................................... 15

*Basic Inc. v. Levinson,*
  485 U.S. 224 (1988).................................................................................................... 15

*Bell Atl. Corp. v. Twombly,*
  127 S. Ct. 1955 (2007) ............................................................................................... 10

*Brumbaugh v. Wave Sys. Corp.,*
  416 F. Supp. 2d 239 (D. Mass. 2006) ......................................................................... 17

*Caiola v. Citibank, N.A.,*
  295 F.3d 312 (2d Cir. 2002)........................................................................................... 9

*City of Sterling Heights Police and Fire Ret. Sys. v. Abbey Nat'l, PLC,*
  423 F. Supp. 2d 348 (S.D.N.Y. 2006).................................................................... 17, 20

*Cosmas v. Hassett,*
  886 F.2d 8 (2d Cir. 1989)............................................................................................ 19

*Dura Pharms., Inc. v. Broudo,*
  544 U.S. 336 (2005).................................................................................................... 10

*EED Holdings v. Palmer Johnson Acquisition Corp.,*
  387 F. Supp. 2d 265 (S.D.N.Y. 2004)......................................................................... 17

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.,*
  343 F.3d 189 (2d Cir. 2003)................................................................................... 16-17

iii

*Ganino v. Citizens Utils. Co.*,
    228 F.3d 154 (2d Cir. 2000)........................................................................... 15

*Greebel v. FTP Software, Inc.*,
    194 F.3d 185 (1st Cir. 1999)......................................................................... 19

*In re Alstom, S.A.*,
    406 F. Supp. 2d 346 (S.D.N.Y. 2005).......................................................... 23

*In re Ashanti Goldfields Sec. Litig.*,
    CV 00-0717(DGT), 2004 WL 626810 (E.D.N.Y. Mar. 30, 2004).............. 10

*In re Atlas Air Worldwide Hldgs., Inc. Sec. Litig.*,
    324 F. Supp. 2d 474 (S.D.N.Y. 2004)..................................................... 20, 22

*In re AXIS Capital Holdings Ltd. Sec. Litig.*,
    456 F. Supp. 2d 576 (S.D.N.Y. 2006).......................................................... 11

*In re Bristol-Meyers Squibb Sec. Litig.*,
    No. Civ. A. 00-1990(SRC), 2005 WL 2007004, (D.N.J. Aug. 17, 2005) .... 10

*In re Career Educ. Group*,
    No. 03 C. 8884, 2007 WL 1029092 (N.D. Ill. Mar. 29, 2007) .................... 13

*In re Daimler Chrysler AG Sec. Litig.*,
    247 F. Supp. 2d 579 (D. Del. 2003)) ............................................................ 23

*In re Duane Reade Inc. Securities Litigation*,
    No. 02 civ. 6478(NRB), 2003 WL 22801416 (S.D.N.Y. Nov. 25, 2003) .... 18

*In re Home Health Corp. of Am., Inc. Sec. Litig.*,
    No. Civ. A. 98-834, 1999 WL 79057 (E.D. Pa. Jan. 29, 1999) ................... 16

*In re Initial Pub. Offering Sec. Litig.*,
    241 F. Supp. 2d 281 (S.D.N.Y. 2003).......................................................... 11

*In re Int'l Bus. Machines Corp. Sec. Litig.*,
    163 F.3d 102 (2d Cir. 1998).......................................................................... 12

*In re Intelligroup Sec. Litig.*,
    527 F. Supp. 2d 262 (D.N.J. 2007) ............................................................... 13

*In re Marsh & McLennan Cos. Inc. Sec. Litig.*,
    501 F. Supp. 2d 452 (S.D.N.Y. 2006).......................................................... 11

iv

*In re Prudential Sec. Inc. P'ships Litig.*,
   930 F. Supp. 68 (S.D.N.Y. 1996) ................................................................. 15

*In re Recoton Corp. Sec. Litig.*,
   358 F. Supp. 2d 1130 (M.D. Fla. 2005) ....................................................... 16

*In re Rhodia S.A. Sec. Litig.*,
   531 F. Supp. 2d. 527 (S.D.N.Y. 2007)......................................................... 23

*In re Sierra Wireless, Inc. Sec. Litig*,
   482 F. Supp. 2d 365 (S.D.N.Y. 2007).......................................................... 14

*Kramer v. Time Warner Inc.*,
   937 F.2d 767 (2d Cir. 1991)......................................................................... 7

*Leasco Data Processing Equip. Corp. v. Maxwell*,
   468 F.2d 1326 (2d Cir. 1972)....................................................................... 24

*Malin v. XL Capital Ltd.*,
   499 F. Supp. 2d 117 (D. Conn. 2007) .......................................................... 13

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*,
   84 F.3d 560 (2d Cir. 1996)..................................................................... 23, 24

*Mississippi Pub. Employees Ret. Sys. v. Boston Scientific Corp.*,
   523 F.3d 75 (1st Cir. 2008)......................................................................... 22

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000)................................................................... 10-11

*Oran v. Stafford*,
   226 F.3d 275 (3d Cir. 2000)........................................................................ 16

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004)................................................................... 11, 14

*Serabian v. Amoskeag Bank Shares, Inc.*,
   24 F.3d 357 (1st Cir. 1994)......................................................................... 19

*Shaw v. Digital Equip. Corp.*,
   82 F.3d 1194 (1st Cir. 1996) ....................................................................... 21

*Steiner v. MedQuist, Inc.*,
   Civil No. 04-5487 (JBS), 2006 WL 2827740 (D.N.J. Sept. 29, 2006)......................... 16

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
  127 S. Ct. 2499, 2509 (2008)................................................................................. 18, 19

*TSC Indus., Inc. v. Northway, Inc.,*
  426 U.S. 438 (1976)...................................................................................................... 15

vi

**PRELIMINARY STATEMENT**

Court-appointed Lead Plaintiff Jacques Furher respectfully submits his Memorandum of Law in Opposition to Defendants' Motion to Dismiss ("Defs. Br.") the Consolidated Complaint ("Complaint").  This case involves false and misleading statements concerning Defendant Ericsson LM Telephone Company ("Ericsson" or the "Company") made by Defendants in a conference call on September 11, 2007 (the "September 11 Call").  The September 11 Call was greeted with enthusiasm by the investing public, and Ericsson stock rose 7.6% in two days.  In that call, Defendants made three types of material misstatements and/or omissions.

First, Defendants touted their business with AT&T/Cingular, and stated that business was only a "bit slower," when the truth, as supported by Plaintiff's confidential sources, was that Ericsson's business from AT&T/Cingular was decimated in 2007.

Second, Defendants touted 50 new contracts and large projects.  However, Defendants failed to reveal that these new contracts and projects had produced and would continue to produce very little revenue, either in the short term or the long term.

Third, Defendants stated that Ericsson would have a "seasonal third quarter," and that 2007 would be "back loaded," *i.e.* the second half of 2007 would be better than the first half.  However, the third quarter of 2007 had a 38% drop in net income over the second quarter of 2007, nothing at all like any recent year's third quarters (which had either a slight increase or slight drop in net income from the preceding quarters).  The "seasonal" description and reference to "back-loading" was false and misleading.

The timing of such statements is of key importance here.  The September 11 Call occurred only 13 business days before the end of the Company's third quarter.

1

Therefore, at that late date, Defendants had, or at least should have had, a good idea of Ericsson's third quarter financials. Nonetheless, Ericsson's third quarter results differed sharply from the rosy statements made by Defendants in the September 11 Call. This short time frame between the September 11 Call and the end of the third quarter demonstrates that Defendants knew, or were reckless in not knowing, the falsity of their statements at that time.

Defendants, in their motion to dismiss this Action, have challenged the Section 10(b) allegations in the Complaint on only two grounds. They dispute they made any false statements, and aver that any false statements were not made with the requisite scienter. All other elements of a cause of action under Section 10(b) are implicitly conceded. As shown below, not only were false statements made, they were made with actual knowledge of their falsity, or at least with reckless disregard for the truth.

**FACTS**

**A.** **Background**

Starting in February 2007, Ericsson began issuing glowing revenue projections for the coming year. ¶ 26.[1] While Ericsson was being bullish, its competitors, including Alcatel-Lucent, Nokia, and Nortel, provided reduced outlooks and/or reduced visibility, citing an industry slowdown as the reason. ¶¶ 28-38. Despite these bleak predictions by its competitors, Ericsson continued to reassure its investors by stating it was gaining market share, thus explaining why it was doing so well at the same time the competitors were doing so poorly. Ericsson attempted to distinguish itself from its competitors and still maintained a rosy outlook up through October 2007. ¶ 27.

---

[1] ¶ ___ references paragraphs in the Complaint.

**B.**    **Defendants' September 11, 2007 Call**

On September 11, 2007, only 13 business days before the end of the third quarter of 2007, Ericsson hosted the September 11 Call, open to the public, during which Svanberg and Sundstrom materially misrepresented the Company's prospects.

**1.**    **AT&T/Cingular And T-Mobile Contracts**

Defendant Svanberg misrepresented the strength of Ericsson's contracts with AT&T/Cingular and T-Mobile noting that:

> **when it comes to AT&T first, we've done the initial roll out.  There is still more roll out and capacity build out that is needed.**  They have been a bit slower this year and if you talk to them they will probably even say publicly that they've been so focused on all the mergers and so on, so they haven't been too much into expanding networks.
>
> They see that need that is there and they have fairly recently also stated that they are adding US$1 billion to what they had otherwise planned in 2008 for additional investments.  Remember that is CapEx in total with everything that comes to it, everything doesn't translate to telecom equipment.  And it's in total for AT&T, but a lot of that is focused on the mobile side.  ¶ 45.

However, by the time of the September 11 Call, Defendants knew that business with AT&T and T-Mobile was not just "a bit slower" but was, in fact, decimated. Confidential Source[2] ("CS") No. 1 stated that AT&T/Cingular made up approximately 60% of Ericsson's business in the United States, and AT&T/Cingular had significantly reduced its business with Ericsson in 2007.  ¶ 51.

_____

[2] CS No. 1 is a former Ericsson manager in the Configuration Management department, which is the department tasked with bridging a customer's purchase proposal to the final contract and ordering.  ¶ 22.  CS No. 2 is a former senior director for delivery control at Ericsson, from March 2002 until March 2007.  ¶ 23.  CS No. 3 is a is a former Ericsson Senior Director and Head of Managed Services and reported to the Ericsson North America's Vice President of Operations and the Vice President of Multimedia, who, in turn, reported to CEO of Ericsson North America Angel Ruiz, who reported to the Individual Defendants.  ¶ 24.

According to CS No. 3, since late 2006 AT&T/Cingular had been ordering less and less product from Ericsson in order to "clean their own house" and cut down AT&T/Cingular's costs, because, as CS No. 2 stated, AT&T/Cingular was "wildly over budget."  ¶¶ 52, 74.  Without a commitment concerning the amount of sales, and in light of the declining sales, there was no reasonable basis for Defendants' projections. ¶ 52. CS No. 2 stated that the decline in sales was caused by the fact that Ericsson was selling "in-between technologies" which the customers did not need to buy because they could just wait until the next system came out.  ¶ 53.

CS No. 3, who left the Company in part because of the issues surrounding the revenue projection miss, provided further corroboration on the decline in sales to AT&T/Cingular.  CS No. 3 stated that it was well-known within the Company that the September 11 Call projection "was an astonishing, astronomical figure" and available intra-company results and projections for revenue and margin demonstrated that as of September 11, the targets set by Svanberg and Sundstrom were objectively unobtainable – "They just weren't realistic figures."  ¶ 54.

CS No. 3 stated that Svanberg and Sundstrom's projections for 2007 included the assumption that revenue from AT&T/Cingular would be approximately $2.3 billion, representing an increase from the Company's revenue of $2.2 billion from AT&T/Cingular in 2006 and $2.1 billion in 2005.  AT&T/Cingular's previous purchases and current orders could not in good faith be projected to be $2.3 billion because at the end of 2006, AT&T/Cingular warned Ericsson that it was placing its purchase orders on "hiatus" to review current inventory.  At the end of 2006, AT&T/Cingular's review showed that it had purchased too much from Ericsson in 2005 and 2006 and was carrying

4

excess inventory in 2007. According to CS No. 3, it was "very clear" to Ericsson that AT&T/Cingular would not be placing orders comparable to the magnitude of those made in 2005 and 2006, and revenue from AT&T/Cingular would be closer to $1.5 billion to $1.8 billion. ¶ 55.

### 2.  50 New Contracts/Large Projects

Defendants stated, on the September 11 Call, that they anticipated "50 new operators" and "large growth." These representations were misleading.

Defendant Svanberg discussed specific examples of network growth, and touted 50 new contracts: "A lot of HSPA roll outs in the pipeline. Actually more than 50 operators are now being added to the list, will be added to the list as in the near future. Lots of countries that you see there and this goes beyond just the developing markets, developed markets." ¶ 39. [3]

However, while Defendants touted these 50 new contracts, they failed to reveal the whole truth, which was that these roll outs had a low profit margin and would have a negligible impact on Ericsson's bottom line. In fact, CS No. 1 stated that the 50 new contracts touted by Defendants during the September 11 Call were actually with very

---

[3] Defendant Sundstrom also misrepresented the significance of large projects to Ericsson's growth:

> **Large projects are for the third year in a row our biggest growth engine.** Most of the sales in networks are actually turnkey today. And I will come back to that, coming back to the regional pictures. **Large projects are very good for Ericsson.** We have unique capabilities, we get premium priced, but more importantly, we are getting an installed base where we can leverage expansion and capacity enhancement in the installed base later on. [Emphasis added.] ¶ 42.

As explained herein, the statement is misleading because in reality large projects would have little if no impact on Ericsson's bottom line.

small companies from which the Company could not, even in the most positive circumstances, obtain any immediate profits.  ¶ 50.  For example, one of the new contracts was with U.S.-based Cincinnati Bell, which like the other small companies that made up the 50 new contracts, needed time to do build outs.  Indeed, these smaller companies often delayed payment or paid in small increments over extended periods of time.  *Id.*  Even if these companies signed agreements with Ericsson in the third quarter of 2007, the projections for the third quarter and year end 2007 could not be met because many, if not all, of the companies would have clauses providing that they not initiate payment until the first or second quarters of 2008.  *Id.*

CS No. 3 also confirmed that the 50 new contracts touted by Defendants during the September 11 Call could not make up the lost revenue from the AT&T/Cingular shortfall, noting that the contracts were with "one-off" companies buying services, not equipment, *i.e.* they only provided one-time sales and would not generate the future upgrade purchases which are the cornerstone of economic growth for Ericsson. Moreover, the contracts were for small amounts with "tiny" regional telephone companies in small markets such as Texarkana, Arkansas and Biloxi, Mississippi.  For example, the largest of the new contracts was with Cincinnati Bell, which would provide revenue to Ericsson of less than $5 million.  More typical of the 50 contracts were those with Cellular South ($750,000 in revenue), and Pocket Wireless and Quickit (revenue in the range of $500,000 to $750,000). ¶ 56.

### 3.    Seasonal Third Quarter

During the September 11 Call, Defendant Svanberg misled the market into believing the almost-completed third quarter would be in line with previous third quarters:

**Yes, we are expecting a seasonal third quarter**.  And we also said that, as we did last year, that there is – we have a bigger proportion of larger projects now.  And larger projects tend to sort of be started more in the beginning of the year and finished at the end of the year.  **So like last year we had a little bit of a more back-loaded second half, and I think that's still the comment we make.**  [Emphasis added.]  ¶ 43.

However, when the third quarter ended a few days later it was hardly "seasonal."  It was a disaster.  In fact, as the chart below illustrates, in 2004 and 2005, Ericsson's net income declined from the second quarter to the third quarter by 14% and 9% respectively. However, in 2006, the year Svanberg compared to 2007, net income actually <u>increased</u> 8%, due to a "back-loading" of the second half.  Nonetheless, as shown in the chart below, the third quarter of 2007 net income suffered a 38% <u>drop</u>, which was hardly "seasonal" under any definition of the word.

**Net Income (in billions of SEK)[4]:**

| Year | 2Q | 3Q | Percent Change |
|------|-----|-----|----------------|
| 2004 | 5.0 | 4.3 | -14% |
| 2005 | 5.8 | 5.3 | -9% |
| 2006 | 5.7 | 6.2 | +8% |
| 2007 | 6.4 | 4.0 | -38% |

In fact, it is evident from Svanberg's discussion of "back-loading" in the second half of the year that he expected a "seasonal" increase compared to the first half of the year, rather than a drop. Regardless of whether Svanberg's comment that the third-quarter would be "seasonal" meant that it would be slightly lower than the second quarter (as in 2004 and 2005), or slightly higher in the second quarter (as in 2006), the drop in 2007 net income was hardly "seasonal." It was, in fact, a colossal disaster and was viewed by the

---

[4] These numbers were obtained from Ericsson's Forms 6-K filed with the SEC, dated October 16, 2007, October 19, 2006, October 21, 2005, and July 21, 2005.  The Court can take judicial notice of SEC filings as they are a "source[ ] whose accuracy cannot reasonably be questioned." *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991).

market as such.  Defendants' characterization of a quarter which resulted in a 38% drop

in net income as "seasonal" is false and misleading.

**C.    October 16, 2007 Bombshell**

On October 16, 2007, a mere five weeks after the September 11 Call, Defendants

did an about-face in regards to their financial outlook.  On that date, before the market

opened, Ericsson issued a press release entitled "Lower than expected result for Ericsson

in third quarter 2007."  The press release stated in part:

> Ericsson expects sales of SEK 43.5 b., an operating income of SEK 5.6 b.
> and a cash flow of SEK -1.6 b. for the third quarter 2007.  This is below
> the company's own as well as current market expectations and primarily a
> result of an unexpected shift in the business mix.
>
> "The unexpected development in the quarter is mainly due to a shortfall in
> sales in mobile network upgrades and expansions which resulted in an
> unfavorable business mix that also negatively affected Group margins,"
> said Carl-Henric Svanberg, President and CEO of Ericsson.  "All other
> businesses performed as expected.  The effect of market dynamics is
> always a matter of judgment.  This quarter we have underestimated the
> effects."
>
> Ericsson's networks business continues to develop most rapidly in regions
> where new network rollouts and break-in contracts are predominant.  This
> is where competition is intense as it builds footprint for long-term
> profitable growth.  So far the margin pressures from these business
> activities have been offset by higher margin sales such as network
> expansions and upgrades.  Such expansions and upgrades have a short
> sales cycle and builds during the quarter.  This quarter, sales of these
> higher margin offerings did not materialize as much as in previous
> quarters.  High margin software sales are also lower than normal.
> ***
> The decline in gross margin is mainly due to an unfavorable business mix
> consisting of a high proportion of new network rollouts and lower
> software sales.  In addition to the good growth in network rollout, sales of
> transmission systems, with a lower margin, showed strong growth, also
> negatively affecting Group gross margins.
> ***
> Sales in Networks declined mainly due to lower sales of expansions and
> upgrades of mobile networks with its related high software content.  Sales
> of lower margin network rollouts and break-ins currently represent the
> majority of the networks business.  It is this shift in business mix that is

8

negatively affecting group margins rather than a change in the underlying margins. ¶ 62.[5]

**D.    Material Market Impact**

The material misstatements in the September 11 Call boosted the price of the stock.  On September 10, 2007, Ericsson's ADSs closed at $36.25.  On September 11, 2007, Ericsson's ADSs rose to a closing price of $38.26, an increase of 5.25% from the day before.  The ADS price continued to rise on the following day to a close of $39.23 on September 12, 2007, a total increase of 7.59% from September 10, 2007.[6]  ¶ 47.

Similarly, when the truth was finally revealed on October 16, 2007, Ericsson's ADS price collapsed to close at $31.33 per share, a decline of 24% from the prior day's close of $40.93, on volume of 42.7 million shares compared to average daily volume of 4.15 million shares during the Class Period.  ¶ 64.

## ANALYSIS

### LEGAL STANDARD ON MOTION TO DISMISS

When reviewing a motion to dismiss, the Court must presume that the allegations of the Complaint are true, read the Complaint as a whole, and give Plaintiff the benefit of every favorable inference that can be drawn from the allegations.  *See Caiola v. Citibank, N.A.,* 295 F.3d 312 (2d Cir. 2002).  Furthermore, a complaint "attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations," but rather must simply provide the grounds of entitlement to relief and raise a right to relief above the speculative

---

[5]    In an odd admission of guilt, the Board of Directors of Ericsson voted at its annual meeting on April 9, 2008, to clear the company of any wrongdoing in connection with the projections at issue here, without investigation or any real consideration.  ¶ 71.

[6] There were similar changes in Ericsson's common stock price on the Stockholm exchange throughout the Class Period.

level. *Bell Atl. Corp. v. Twombly,* 127 S. Ct. 1955, 1959 (2007) (citations omitted). As detailed below, the Complaint meets this standard.

Plaintiff must prove the following five elements for a 10(b) cause of action: (1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005). Defendants do not contest the last three elements – they argue only that there was no material misrepresentation or scienter.[7]

## POINT I

### THE COMPLAINT IS PLED WITH THE REQUISITE PARTICULARITY

**A.    The Complaint Properly Sets Forth Defendants'**
**Materially False And Misleading Statements**

Securities fraud claims must meet heightened pleading requirements imposed by Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). As discussed below, the specific facts alleged in the Complaint more than adequately support Plaintiff's claim of fraud under the federal securities laws.

**1.    Falsity**

To plead fraud under Rule 9(b), a complaint must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent. *Novak v.*

---

[7] Defendants also argue that Plaintiff hasn't pled any motive. Defs. Br. at 18. Motive is not an element of a Section 10(b) action and need not be pled. *In re Bristol-Meyers Squibb Sec. Litig.*, No. Civ. A. 00-1990(SRC), 2005 WL 2007004, at *27 (D.N.J. Aug. 17, 2005) ("[m]otive is simply not an element of a 10b-5 claim"); *In re Ashanti Goldfields Sec. Litig.*, CV 00-0717(DGT), 2004 WL 626810, at *4 (E.D.N.Y. Mar. 30, 2004) (no need to allege motive unless relying on motive and opportunity to allege scienter).

*Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000).  Defendants concede that Plaintiff identifies the fraudulent statements, the speaker, and where and when the statements were made. Defendants' sole challenge is that Plaintiff failed to adequately plead <u>why</u> the statements are misleading.  As discussed below, the Complaint more than sufficiently alleges "why" statements made by Svanberg or Sundstrom during the September 11 Call were either 1) false and misleading when made, or 2) contained material omissions that rendered them false.

When a public corporation chooses to make statements highlighting its business prospects, it declares its representations to be material to shareholders and, thus, undertakes an affirmative duty "to disclose all facts necessary to ensure the completeness and accuracy of their public statements." *In re Marsh & McLennan Cos. Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 469 (S.D.N.Y. 2006) (Kram, J.); *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 380 (S.D.N.Y. 2003) (Scheindlin, J.) ("a misstatement that comprises a halftruth or a whole lie (as opposed to an omission), is always misleading because a speaker, having begun to speak, is obliged to do so completely and truthfully"). Accordingly, the Defendants were "obligated to speak truthfully and to make such additional disclosures as are necessary to avoid rendering the statements made misleading." *In re AXIS Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 587 (S.D.N.Y. 2006) (Holwell, J.).  "The touchstone of the inquiry is not whether isolated statements within a document were true, but whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered." *Rombach v. Chang,* 355 F.3d 164, 173 (2d Cir. 2004).

This standard is applied to forward looking statements. "Statements regarding projections of future performance may be actionable . . . if the speaker [did] not genuinely or reasonably believe them" at the time they were made. *In re Int'l Bus. Machines Corp. Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998).

### a.    The 50 Projects Would Never Produce Significant Revenue

Both Svanberg and Sundstrom claimed that they would have growth through "50 [new] operators" and "large projects." While it may be true that these operators and projects in fact existed, Defendants knew or should have known that they would hardly lead to significant growth. While the factual premise was literally true, the extrapolations that Ericsson drew from such facts were false, misleading, and unjustified. For example, while Svanberg touted these contracts and projects, he failed to reveal the whole truth, which was that these roll outs had a low profit margin and would not have an impact on Ericsson's bottom line, as he himself admitted barely a month later. ¶ 62. Many of these contracts would not only fail to produce any profits for the third quarter of 2007, but would fail to produce for many subsequent quarters, and would likely never produce. *Id.*

### b.    Plaintiff's Confidential Sources Are Knowledgeable

Defendants argue that Plaintiff's confidential sources are inadequate, claiming that these sources lacked sufficient knowledge about these "50 contracts" because the sources worked in the United States, whereas some of the contracts discussed in the September 11 Call concerned foreign companies. However, CS No. 3 was a Senior Director and Head of Managed Services and reported to the Ericsson North America's Vice President of Operations and the Vice President of Multimedia, who, in turn, reported to the CEO of Ericsson North America Angel Ruiz, who reported to the

Individual Defendants.  ¶ 24.  For pleading purposes, it may be assumed by CS No. 3's position as a senior director, that while he was located in North America, he had knowledge of the state of business for the rest of the Company as well.  Furthermore, the confidential sources' information was verified after the end of the Class Period, on October 17, 2007, when Merrill Lynch issued an analyst report stating that "the preannouncement, which we described in our report yesterday, was driven by Ericsson's mix being more low-margin new network roll out driven, rather than higher margin 'razor blades' upgrade business. In particular the upgrade markets in China, W. Europe, and the US were weaker."  ¶ 66.  When both the Company and a third party confirm what a confidential source is saying, there is no reason to doubt that source.[8]

Furthermore, Defendants themselves have admitted in their brief that such projects "are less favorable in their early years."  Defs. Br. at 12.  As Svanberg admitted on October 16, 2007, many of these new contracts would never have long-term revenue potential either, because "such expansions and upgrades have a short sales cycle and builds during the quarter."  ¶ 62.  Accordingly, Defendants knew that such projects might never produce significant revenue, and especially not in 2007.

### c.    Subscriber Growth Equals Revenue And Earnings

Defendants argue that they were not discussing "revenue" when they made the statements but were rather discussing "future subscriber growth potential."  Defs. Br. at

---

[8]    In attacking Plaintiff's confidential sources, Defendants cite several distinguishable cases.  In *In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 360-61 (D.N.J. 2007); *Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 139 n.17 (D. Conn. 2007); and *In re Career Educ. Group*, No. 03 C. 8884, 2007 WL 1029092, at *4 (N.D. Ill. Mar. 29, 2007), the confidential witness statements were discounted because the witnesses' statements were based on rumor or hearsay and were not supported by other evidence.  However, in this case, Plaintiff's confidential sources had access to specific knowledge that was later corroborated by Defendants' own disclosures.  Defs. Br. at 9 n.8.

8. This smacks of nonsense.   This information was provided in an investor conference call, for the sole purpose of providing information of use to investors.  Investors were not interested in the conference call for esoteric reasons, but would only find the information provided in the call material to the extent that it would eventually produce revenue for the Company.  No investor cares about subscriber growth unless it leads to revenue and earnings.   For that matter, neither does a company.   Subscriber growth without corresponding revenue would simply lead to increased expenses and be a drag on earnings.

### d.        The Third Quarter Of 2007 Was Not "Seasonal"

Ericsson did not experience a "seasonal third quarter" under any definition of the term.   Regardless of whether the modifier "seasonal" meant that a quarter was slightly better or slightly worse than the previous one, the 38% drop over 2Q 2007 net income was much greater than any recent "seasonal" fluctuation.  This gross mischaracterization of the "seasonal" nature of the quarter renders this comment misleading.[9]  In 2006, Ericsson's results were "back-loaded" as Svanberg put it, due to large contracts, and Ericsson's net income rose from the second to the third quarter.  Defendants primed the market to expect the same thing in 2007.

Furthermore, Svanberg's comment regarding business with AT&T being a "bit slower this year" was a material misstatement, because AT&T was reevaluating its business with Ericsson, and Ericsson knew that it could expect only a fraction of the

---

[9] *Rombach v. Chang*, 355 F.3d 164, 173-174 (2d Cir. 2004), and *In re Sierra Wireless, Inc. Sec. Litig*, 482 F. Supp. 2d 365, 373 (S.D.N.Y. 2007) (Stein, J.), cited by Defendants (Defs. Br. at 15-16), are inapposite.  In both cases, the defendants' statements of optimism accompanied otherwise nonactionable or immaterial statements.  Here, by contrast, Defendants' statements, which expressed optimism, also included specific material details that belied Ericsson's true financial condition.

business that it received from AT&T in previous years.  ¶¶ 54-55.  This dramatic business drop was much more than just a "bit" slower, and categorizing it in such a manner was materially false and misleading.  This statement did not provide any realistic guidance to investors, but, rather, lulled them into a false sense of security.  *See In re Prudential Sec. Inc. P'ships Litig*., 930 F. Supp. 68, 72 (S.D.N.Y. 1996) (statements of caution provide "no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.") (Pollack, J.).

    **2.**    <u>**Materiality**</u>

    Misstatements or omissions are actionable under Section 10(b) and Rule 10b-5 if they would be material to the decision-making process of the reasonable investor.  *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988).  As the Second Circuit has explained, "[a] fact is to be considered material if there is a substantial likelihood that a reasonable person would consider it important in deciding whether to buy or sell shares." *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 518 (2d Cir. 1994).  Whether a statement is material is appropriately determined by the trier of fact. *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976). Thus, materiality determinations are only made as a matter of law "if the established omissions are 'so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality.'" *Id.*; *Ganino v. Citizens Utils. Co*., 228 F.3d 154, 162 (2d Cir. 2000).

    Ericsson's statements in the September 11 Call were material.  Statements made in the September 11 Call concerned Ericsson's communications networks and related services, the core of Ericsson's business operations, and are the type of

misrepresentations of material facts that would, and indeed did, affect the market price of the security.   After the September 11 Call the market expected a seasonal quarter, representing a "back-loaded" year.  Instead, net income in fact decreased by 38% over the previous quarter. In response, Defendants argue that Ericsson suffered "only" a $0.5 billion revenue shortfall for AT&T.  Defs. Br. at 20 n.13.   However, this $0.5 billion shortfall alone translates into a 14% earnings shortfall.  These amounts cannot be deemed immaterial, especially at the pleading stage.  *See In re Recoton Corp. Sec. Litig.*, 358 F. Supp. 2d 1130, 1142 (M.D. Fla. 2005) (overstatement of $3 to $4 million from an accounts receivable of approximately $150 million was not deemed immaterial at pleading stage); *In re Home Health Corp. of Am., Inc. Sec. Litig.*, No. Civ. A. 98-834, 1999 WL 79057, at *7 (E.D. Pa. Jan. 29, 1999) (terminations which impacted revenue by 3% could not be deemed immaterial at pleading stage).

Furthermore, on September 11, the investing public obviously considered the news important in their investment decision and Ericsson's ADS price rose 5.4%, the greatest one-day rise in over a year in Stockholm trading. ¶ 48.  The stock reaction demonstrates the materiality of Defendants' misstatements in the September 11 Call. *Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir. 2000) ("when a stock is traded in an efficient market, the materiality of disclosed information may be measured post hoc by looking to the movement, in the period immediately following disclosure, of the price of the firm's stock"); *Steiner v. MedQuist, Inc.*, Civil No. 04-5487 (JBS), 2006 WL 2827740, at *11-13 (D.N.J. Sept. 29, 2006) (small but significant stock price declines immediately following company disclosures supported materiality).  The issue of whether this price drop is due to Defendants' misrepresentations, as opposed to other factors, "is a matter of

16

proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss." *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 197 (2d Cir. 2003).

**B.    Defendants' Misstatements Are Not Mere Puffery**

Defendants couch their misleading statements made in the September 11 Call as "general," "optimistic statements," or "puffery" that are not actionable. This contention is unavailing. If a statement is material, as discussed above, it cannot be puffery. Material statements concerning revenue, growth, and contracts are not puffery. "[D]ismissals on this ground are increasingly rare." *Brumbaugh v. Wave Sys. Corp.*, 416 F. Supp. 2d 239, 250 n.11 (D. Mass. 2006). Although "courts continue to 'to find immaterial as a matter of law a certain kind of rosy affirmation commonly heard from corporate managers and numbingly familiar to the marketplace' the recent trend is to consider expressions of corporate optimism carefully." *Id.* at 250. As discussed above, Defendants' statements concern core operations and results, and, for that reason, cannot be considered "puffery." "While mere puffery is insufficient to state a claim of securities fraud, public statements must be 'consistent with reasonably available data' and should not misrepresent existing facts." *City of Sterling Heights Police and Fire Ret. Sys. v. Abbey Nat'l, PLC*, 423 F. Supp. 2d 348, 356-57 (S.D.N.Y. 2006) (Chin, J.).

Here, Defendants' statements pertained to their then-existing beliefs about the Company's pending financial results and existing contracts and, thus, by their nature, were not vague immaterial expressions. *See EED Holdings v. Palmer Johnson Acquisition Corp.*, 387 F. Supp. 2d 265, 276 (S.D.N.Y. 2004) (Sweet, J.) (misrepresentations as to present condition of defendant's finances and operations are not mere puffery, but are actionable as fraud). For example, Defendants knew or must have known, only 13 business days before the end of the third quarter, that Ericsson was

17

suffering a drop in third quarter net income that was hardly "seasonal," and that revenue from AT&T, which was down in the first half, would not rebound as part of a "back-loaded" year. The close proximity in time between the misrepresentation and the end of the third quarter further demonstrates that these statements were not vague future statements, but were statements regarding information that was contemporaneously available to Defendants.[10]  *See* II.F, *infra*.

## POINT II

### SCIENTER HAS BEEN ADEQUATELY PLED

The United States Supreme Court, in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, did not change the standard for pleading scienter, and reaffirmed the existing pleading standards requiring trial courts to "accept all factual allegations in the complaint as true" and "consider the complaint in its entirety" when evaluating whether the plaintiff has pled a strong inference of scienter. 127 S. Ct. 2499, 2509 (2008). When considering all the scienter allegations here in their entirety — Defendants' actual knowledge, the core operations involved, the magnitude of the earnings miss, the confidential sources corroborating each other, and the short time period involved— Plaintiff has pled a strong inference of scienter.

In determining whether the plaintiff's allegations give rise to a strong inference of scienter, the Supreme Court held that a court must grant a motion to dismiss only if "a

---

[10] *In re Duane Reade Inc. Securities Litigation*, No. 02 civ. 6478(NRB), 2003 WL 22801416, at *6 (S.D.N.Y. Nov. 25, 2003) (Buchwald, J.), cited by Defendants (Defs. Br. at 17), can also be distinguished. In that case, the court found that statements about "front-end sales . . . strengthening . . . in a very predictable trend" were mere puffery, because the statements were "ambiguous as to the source of the 'predicable trend' and as to whether the statement includes any future directed implications." Here, Defendants statements, discussed above, were not ambiguous but rather included specifics about the sources of business and future financial projections.

18

reasonable person could not draw [a strong] inference from the alleged facts." *Id*. at 2509-10. The inference of scienter, however, "need not be irrefutable . . . or even the 'most plausible of competing inferences.'" *Id*. at 2510. Rather, a plaintiff need only allege facts demonstrating a "cogent" inference that is "at least as likely as any plausible opposing inference." *Id*. at 2513.

**A.      Defendants Had Knowledge Of The Falsity Of Their Statements**

As discussed below, Plaintiff has alleged specific facts demonstrating Defendants' actual knowledge that intra-company results and projections were significantly below the projections issued by Defendants at the September 11 Call. The divergence between internal reports and external statements on the same subject may demonstrate scienter. *Greebel v. FTP Software, Inc*., 194 F.3d 185, 196 (1st Cir. 1999); *Serabian v. Amoskeag Bank Shares, Inc.*, 24 F.3d 357, 361 (1st Cir. 1994).

As set forth above, Plaintiff has alleged facts demonstrating Defendants' actual knowledge that: (i) by September 11, 2007, the targets set by the Defendants were objectively unattainable (¶ 54); (ii) by September 11, 2007, AT&T had informed the Company that it was suspending purchasing from the Company (¶¶ 51, 52, and 55); and (iii) the "50 new contracts" touted at the September 11 Call were of insignificant value to the Company (¶¶ 50 and 56). These facts are more than plausible and demonstrate a compelling, strong inference of Defendants' scienter.

**B.      The False Statements Concerned Core Operations**

Courts routinely impute knowledge of critical facts concerning a company's core operations to high-level executives. *See Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989) (because certain import restrictions eliminated a significant source of income for the company, knowledge of those import restrictions was imputed to directors of the

19

company); *see also City of Sterling Heights*, 423 F. Supp. 2d at 362 (scienter demonstrated by "the fact that the write-down concerned a core operation, Wholesale Banking, which was responsible for nearly a third of [Defendant's] entire profit and critical to funding of the entire corporation, and about which key officers should have been intimately informed"); *In re Atlas Air Worldwide Hldgs., Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 489-91 (S.D.N.Y. 2004) (Conner, J.) ("Acquiring and hiring out cargo planes pursuant to ACMI contracts are the activities that constitute the core operations of Atlas Air.  Knowledge of market conditions that substantially affect these core operations and the financial reporting of them may be imputed to key officers within the company.").

Here, Defendants' material misrepresentations and omissions concerned the sale of communications networks and related services, the core of Ericsson's business. Moreover, AT&T was the Company's largest U.S. customer, providing over $5 billion in revenue from 2005 through the first half of 2007.  Defendants' projections included revenue from AT&T of approximately $2.3 billion at a time when the Company internally believed that revenue from AT&T would be closer to $1.5 – $1.8 billion, a reduction of between 22 and 34 percent.  Because of the nature of these services and the importance of AT&T to the Company's business, knowledge of this discrepancy can be imputed to the Defendants.

C.    **The Magnitude Of The Earnings Miss**
       **Supports An Inference Of Scienter**

Defendants further make the implausible argument that a shortfall of over $0.5 billion in revenue was not important enough to warrant Defendants' attention.  Def. Br. at 20 n.13. This $0.5 billion revenue shortfall translates into a 14% earnings shortfall which

20

should get the attention of even the most complacent CEO. Defendants' reliance on *380544 Canada, Inc. v. Aspen Tech., Inc.*, 544 F. Supp. 2d 199, 225-26 (S.D.N.Y. 2008) (Defs. Br. at 21), is misplaced. First, the restatement at issue in that case was only 5.8%. Second, the court noted those plaintiffs failed to identify any "meetings, documents, reports, or other red flags" to provide evidence of scienter. *Id.* at 226. Plaintiff here, on the other hand, has alleged a much larger transaction in percentage terms, as well as the existence of intra-company results and projections, ¶ 54, internal Company reports, ¶ 55, and other red flags, ¶¶ 28–29, 32, 34–38, 82, all of which demonstrate that the statements made during the September 11 Call were false and misleading.

**D.      Defendants Did Not Disclose The Expected
          Revenue Decrease In The September 11 Call**

Defendants argue that Svanberg fully disclosed the expected decrease in revenue from AT&T during the September 11 Call. Defs. Br. at 20. What Svanberg actually said, however, was that AT&T was a "bit slower this year." *Id.* (quoting ¶ 45). Defendants' argument that negative news was revealed in the September 11 Call is belied by the fact that the stock <u>rose</u> thereafter and only dropped when the truth was revealed at the end of the Class Period. This argument is further undermined by the fact that Ericsson was priming the market before the September 11 Call with positive news, so the rise in price cannot be attributed to the bad news being better than anticipated.

Defendants provided a slide at the conference with fine print showing that revenue in North America had declined 31% in the first half of 2007, and argue this exculpates them. Defs. Br. at 20. This is precisely what made Defendants' "seasonal" statement, combined with the "back-loaded" comments, misleading. The market was expecting Ericsson to rebound in the second half, because the year was "back-loaded," as

21

evidenced by the immediate increase in the stock price. Even if the few people attending the conference were focusing on the fine print in a background slide, because Defendants assured investors that the year was "back-loaded," investors would have been placated about a fall in revenue in the first half had they even noticed the fine print.

**E.      Corroboration Of Confidential Sources**

The Complaint's confidential source allegations corroborate other allegations in the Complaint. This further supports a strong inference of scienter. *See Atlas Air,* 324 F. Supp. 2d at 493 (information provided by a confidential source that corroborates a complaint's allegations supports a strong inference of scienter).

**F.      The Inference Of Scienter Is Bolstered By The Short Time Involved**

The scienter allegations are amplified by the fact that only 5 weeks elapsed between the September 11 Call and the disclosure of Ericsson's true financial status. A short time period between an alleged misstatement and a later disclosure of inconsistent information further supports a strong inference of scienter. *Mississippi Pub. Employees Ret. Sys. v. Boston Scientific Corp.*, 523 F.3d 75, 91 (1st Cir. 2008) ("[t]he extremely short time period [between the statement and the end of the revelation of the truth] is strong evidence" of scienter); *see Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1225 (1st Cir. 1996) ("temporal proximity" is a "circumstance potentially bolstering the complaint's claims of fraud"). This short time period further demonstrates that Defendants knew or recklessly disregarded the falsity of the statements when they were made.

## POINT III

### THE COURT HAS PERSONAL JURISDICTION OVER DEFENDANTS SVANBERG AND SUNDSTROM

The due process requirements for personal jurisdiction protect a person without meaningful ties to the forum state from being subjected to binding judgment. *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567-68 (2d Cir. 1996). When jurisdiction is based on a statute with nationwide service of process, the plaintiff must show the defendant had minimum contacts with the United States as a whole and the exercise of jurisdiction is "reasonable." *In re Alstom, S.A.*, 406 F. Supp. 2d 346, 399 (S.D.N.Y. 2005) (*quoting In re Daimler Chrysler AG Sec. Litig.*, 247 F. Supp. 2d 579, 582 (D. Del. 2003)). [11]

Defendants Svanberg and Sundstrom certainly had minimum contacts with the United States. For years, they have signed SEC filings, which are not the subject of the lawsuit at hand but are central to Ericsson's efforts to reach this country's capital markets and impart financial information to it. Those continuous and systemic general business contacts are sufficient to confer general jurisdiction over Svanberg and Sundstrom. When asserting general jurisdiction, the business contacts do not have to be related to the lawsuit. *Metro Life Ins.*, 84 F.3d at 568. Certainly, the systemic contact with the United

---

[11] The case of *In re Rhodia S.A. Sec. Litig.*, 531 F. Supp. 2d 527, 542 (S.D.N.Y. 2007), cited by Defendants, is inapposite. In that case, Judge Batts dismissed certain defendants for lack of jurisdiction because they "were 'wholly uninvolved' with the transactions at issue in the Complaint," and "made no allegedly false statements described in the Complaint." *Id*. In fact, the plaintiffs in that case made no allegations that the defendants issued any statements, effectuated any transactions, or authorized any acquisitions at issue in the complaint, instead relying on conclusory allegations that the defendants were "control persons." *Id.* By contrast, Plaintiff has specifically alleged that defendants Svanberg and Sundstrom themselves made the statements which are at the heart of the Complaint in this case.

States regulatory agency overseeing the capital markets is sufficient for general jurisdiction.

The court also has specific personal jurisdiction as to Svanberg and Sundstrom. Specific jurisdiction is exercised when a defendant is in a suit arising out of or related to contacts with the forum.  This inquiry is informed by Section 37 of the Restatement (Second) of Conflict of Laws, which provides that "A state has the power to exercise judicial jurisdiction over an individual who causes effects in the state by an act done elsewhere with respect to any cause of action arising from these effects."  The Second Circuit has noted that "[t]he person sought to be charged must know, or have good reason to know, that his conduct will have effects in the state seeking to assert jurisdiction over him." *Leasco Data Processing Equip. Corp. v. Maxwell*, 468 F.2d 1326, 1341 (2d Cir. 1972).

Defendants knew that the September 11 Call was a public call and would be listened to by investors all over the world.  Thus, Defendants knew that statements made about Ericsson would influence the investment decisions of many investors, including those who purchased ADSs over the NASDAQ.  Accordingly, statements made in the September 11 Call should be treated no differently than statements made in SEC filings.

It would not violate "traditional notions of fair play and justice," *Metro Life Ins.*, 84 F.3d at 568, to exercise jurisdiction over Svanberg and Sundstrom.  They had contact with the United States capital markets for years.  They made statements at issue in this lawsuit, intended to reach the United States capital markets, and which had a direct effect on the United States capital markets.  It is disingenuous to suggest that they are now surprised at being defendants in a United States lawsuit.

**POINT IV**

**CONTROL PERSON LIABILITY IS ADEQUATELY PLED**

To state a claim under Section 20(a), "a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Commc'ns v. Shaar Fund., Ltd*., 493 F.3d 87, 108 (2d Cir. 2007).

For the reasons stated above, Plaintiff has demonstrated a primary violation under Section 10(b). Furthermore, both Svanberg and Sundstrom, as CEO and CFO respectively, controlled Ericsson and, as demonstrated by their own statements during the September 11 Call, were culpable participants in the fraud. Accordingly, control person liability under Section 20(a) has been adequately pled.

**CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss should be denied in its entirety. In the event that the Action is dismissed, Plaintiff requests leave to amend.

Dated:  August 12, 2008         **MURRAY, FRANK & SAILER LLP**

By:  _____/s/_____
       Brian P. Murray (BM 9954)
       (bmurray@murrayfrank.com)
       Gregory B. Linkh (GL 0477)
       (glinkh@murrayfrank.com)
    275 Madison Avenue, 8th Floor
    New York, New York 10016
    Telephone: (212) 682-1818
    Facsimile:  (212) 682-1892

    *Lead Counsel for the Class*

Of Counsel:

Randall Steinmeyer

## CERTIFICATE OF SERVICE

I hereby certify, under penalty of perjury, that on this 12th day of August, 2008, I caused a true and correct copy of the foregoing MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS MOTION TO DISMISS THE CONSOLIDATED COMPLAINT to be served on the person listed below, who is accepting service for defendants, by causing a true copy thereof to be delivered by e-mail to:

**Daniel Jonathan Kramer**
Paul, Weiss, Rifkind, Wharton &
Garrison LLP (NY)
1285 Avenue of the Americas
New York, NY 10019
(212)-373-3020
Fax: (212)-492-0020
Email: dkramer@paulweiss.com
*LEAD ATTORNEY*

_____    */s/*
                Gregory Linkh