UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
MERRILL STEINBERG, Individually and
On Behalf of All Others Similarly Situated

              Plaintiff,

                                07 CV. 9615 (RPP)

          - against -              **OPINION AND ORDER**

ERICSSON LM TELEPHONE CO.,
CARL-HENRIC SVANBERG and
KARL-HENRIK SUNDSTROM

              Defendants.
--------------------------------------------------------X

**ROBERT P. PATTERSON, JR., U.S.D.J.**

      On the morning of October 16, 2007, Ericsson LLM ("Ericsson" or the "Company"), a Swedish corporation that provides communications networks, related services, and handset technology platforms for mobile and fixed network operators worldwide, issued a press release reporting lower than expected earnings for the third-quarter of 2007.  (Plaintiff's 04/15/2008 Consolidated Complaint ("Compl.") ¶25.)  The disappointing earnings were "due to a shortfall in sales in mobile network upgrades and expansions which resulted in an unfavorable business mix."  (Compl. ¶62; Declaration of Andrew Goldstein, dated September 10, 2008, ("Goldstein Decl.") Ex. C [Ericsson's 2007 Third Quarter Report].)  All other businesses "performed as expected."  (Id.)  After the announcement, the Company's stock declined 24% that day.  (Compl. ¶6.)

      On April 15, 2008, Plaintiff filed this securities class action lawsuit against Ericsson and its C.E.O., Carl-Henric Svanberg, and C.F.O., Henrick Sundstrom, alleging violations of Section § 10(b) of the Securities Exchange Act of 1934 (the "Exchange

Act"), 15 U.S.C. § 78j(b), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, and § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a) (2000) during the September 11, 2007 to October 15, 2007 Class Period ("the Class Period").  (Compl. ¶¶8, 14-15.)  On June 13, 2008, Defendants moved to dismiss Plaintiff's Complaint, and on October 3, 2008, oral argument was held.  For the following reasons, Defendants' motion is granted.

**1. Background**

In 2007, Ericsson operated in over 140 countries around the world and had more than 74,000 employees.  (Declaration of Joshua Kaye, dated June 13, 2008 ("Kaye Decl."), Ex. B at 4, 9 [2007 annual report, filed April 21, 2008.])  The Company operates through three segments, Mobile Networks, Fixed Networks, and Professional Services.  (Compl. ¶¶13, 25.)  The Mobile Networks segment provides mobile systems solutions to network operators, including radio base stations, base station and radio network controllers, mobile switching centers, and application nodes.  (Compl. ¶25.)  The Fixed Networks segment supplies broadband communications equipment and services to fixed network operators in Latin America and Europe.  (Id.)  The fixed network operators are moving from single-service networks toward broadband packet-switched multi-service networks that handle multiple services, such as voice, data, and images.  (Id.)  The Professional Services segment provides consulting, education, systems integration, and managed services, as well as customer support services to the telecommunications industry.  (Id.)

As part of its core operations, Ericsson provides voice and data network solutions. And as part of its current package of services, the Company provides third generation ("3G") or advanced second generation Global System for Mobile Communications ("GSM"). (Compl. ¶25 fn. 1.) Ericsson also provides certain 3G network technology for enhanced data services including Universal Mobile Telecommunications System ("UMTS"), Wideband Code Division Multiple Access ("WCDMA") which uses the UTMS network system to provide high speed data transmission protocol, and High Speed Packet Access ("HSPA") which is used with WCDMA to extend and improve the performance of existing UMTS network technology. (Id.)

The only statements the Complaint alleges as being materially false and misleading during the Class Period were those made by the individual Defendants during a slide show at the outset of a September 11, 2007 Strategy and Technology Summit conference ("the Summit") in London, nineteen days before the end of third-quarter. (Compl. ¶¶39-46.)[1]   A reading of the transcript of that conference provided by Defendants (see Kaye Decl., Ex. C) shows that the objective of the Summit was to explain the business strategy of the Company, which was to achieve long-term growth based on the interrelationships of the various technological products offered by the Company to operators of mobile networks and fixed network communication systems throughout the world. At that Summit, the Complaint alleges that Defendants Svanberg and Sundstrom made statements concerning the Company's projected third-quarter and annual financial prospects which, the Complaint claims, were materially false and

---

[1]      While the substantive allegations of the Complaint begin with thirteen paragraphs of earlier statements and projections by the Company and some competitors during the period from February 2007 to August 2007 (Compl. ¶¶26-38, 58, 60), those statements are not claimed to have been materially false and misleading.

misleading.  (Id. ¶¶3, 65.)  These statements, the Complaint charges, materially misstated the Company's "operating condition and future business prospects."  (Id. ¶20.)

Specifically, the Complaint alleges that even while the Company's competitors were stating that the market was "tightening" and were "retreating from their original forecasts," Defendants Svanberg and Sundstrom falsely assured investors that Ericsson had "sustainable growth" and that the Company was projecting "mid-single digits growth" for 2007.  (Compl. ¶3.)  Indeed, the Complaint charges, Ericsson "falsely claimed to be profiting at its competitors' expense."  (Id.)  These alleged misrepresentations of the Company's "operating condition and future business prospects" were part of an intentional "scheme to deceive the market" in order to "artificially inflate[] the price of Ericsson's securities."  (Id. ¶20.)  Defendants allegedly "concealed their true results from the investing public" until October 16, 2007, when they pre-announced the Company's third-quarter results for 2007.  (Id. ¶¶4, 68.)

Defendants have attached a full transcript of the September 11, 2007 Summit together with the accompanying slides used by Defendants Svanberg and Sundstrom during their presentations.  (Kaye Decl., Ex. C [transcript of Sept. 11, 2007 Ericsson Strategy and Technology Summit], Ex. D [Slides accompanying Defendant Svanberg's presentation], Ex. E [Slides accompany Defendant Sundstrom's presentation].)  Plaintiff does not contest the accuracy of those exhibits.  A review of the transcript and accompanying slides does not support the allegation that Defendants projected either quarterly or annual results (earnings).  Instead, Defendants' statements are almost entirely long-term trends and marketing strategy for each segment of the Company, as well as a regional analysis of the Company's world-wide operations.

**2. Discussion**

The Complaint states two causes of action.  In the first cause of action, the Complaint asserts that from September 11, 2007 to October 15, 2007, all Defendants violated Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. §78j(b)), and Rule 10b-5 promulgated thereunder (17 C.F.R. 240, 10b-5), by engaging in a scheme of conduct that artificially inflated the price of Ericsson's stock.  (Compl. ¶¶89-92.)  The second cause of action asserts that the individual Defendants, as controlling persons, violated Section 20(a) of the Securities Exchange Act (15 U.S.C. § 78t(a)).  (Compl. ¶¶93-97.)

A. Legal Standards

  i. *Rule 12(b)(6)*

In considering a motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted, a court must accept all of the allegations set forth in the complaint as true, and must draw all reasonable inferences in favor of the plaintiffs.  Rombach v. Chang, 355 F.3d 164, 169 (2d Cir. 2004); Halperin v. eBanker USA.Com, Inc., 295 F.3d 352, 356 (2d Cir. 2002); Garber v. Legg Mason, 537 F. Supp. 2d 597, 609-10 (S.D.N.Y. 2008).

The complaint must provide "plausible grounds" for the allegations with "enough fact to raise a reasonable expectation that discovery will reveal evidence" to support them.  Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1965 (2007); ATSI Communs., Inc. v. Shaar Fund, 493 F.3d 87 (2d Cir. 2007) (applying Twombly to securities fraud

case); Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir. 2007) (Twombly "require[es] a flexible 'plausibility standard,' which obligates a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible.")   A court's function on a motion to dismiss is "not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985).

In reviewing a Rule 12(b)(6) motion to dismiss, the court may consider: the complaint and documents attached to it or incorporated in it by reference, documents 'integral' to the complaint and relied upon it even if not attached or incorporated by reference, documents or information contained in a defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it framing the complaint, documents filed with the SEC, and matters subject to judicial notice.   See Goplen v. 51job, Inc., 453 F. Supp.2d 759, 765 (S.D.N.Y. 2006); Prentice v. Apfel, 11 F. Supp. 2d 420, 424 (S.D.N.Y. 1998); see also Rombach, 355 F.3d at 169; Cortec Industries, Inc. v. Sum Holding L.P., 949 F.2d 42, 47 (2d Cir. 1991); Garber, 537 F. Supp. 2d at 610; Malin v. XL Capital Ltd., 499 F. Supp. 2d 117, 131 (D. Conn. 2007) (court may consider transcript on motion to dismiss where plaintiff has quoted from it in complaint).

ii. *Section 10(b) and Rule 10b-5*

To state a cause of action under Section 10(b) of the Exchange Act of 1934 and Rule 10b-5 promulgated thereunder, a plaintiff must allege that a defendant: 1) in connection with a purchase or sale of securities; 2) with *scienter*; 3) made a material false representation or omitted to disclose material information; 4) upon which plaintiff relied;

5) proximately causing damages to the plaintiff.  Lentell v. Merrill Lynch, 396 F.3d 161, 172 (2d Cir. 2005); Garber, 537 F. Supp. 2d at 614.

      Relatedly, to plead a claim under Section 20(a) of the Exchange Act, plaintiffs must allege 1) a primary violation of the Act by a controlled person, 2) direct or indirect control by the defendant of the primary violator, and 3) "culpable participation."  See In re Adelphia Communications, 2007 U.S. Dist. LEXIS 66911, at *30-31 (S.D.N.Y. 2007); In re Globalstar Sec. Litig., 2003 U.S. Dist. LEXIS 22496, at *12 (S.D.N.Y. 2003) (to withstand motion to dismiss Section 20(a) claim, plaintiffs must "show that the controlling person was in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person").

      iii. *Pleading Requirements for Fraud: Fed. R. Civ. P. Rule 9(b) and the PSLRA*

      Securities fraud allegations under Section 10(b) and Rule 10b-5 are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the PSLRA.[2]  Rule 9(b) requires that, whenever a complaint contains allegations of fraud, the circumstances constituting fraud shall be stated with particularity.  See Fed. R. Civ. P. 9(b); Chill v. Gen. Elec. Co., 101 F.3d 263, 267 (2d Cir. 1996).  Thus, to survive a motion to dismiss, a complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  Rombach, 355 F.3d at 170; Shields v. Citytrust Bancorp. Inc., 25 F.3d 1124, 1128 (2d Cir. 1994) (quoting Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993)).

      The PSLRA of 1995 requires securities fraud plaintiffs to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading,

---

[2] "PSLRA" refers to the Private Securities Litigation Reform Act of 1995.  (15 U.S.C. § 78u-4(b).)

and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. 78u-4(b)(1).  While the PSLRA does not require plaintiffs to plead "every single fact upon which their beliefs concerning false or misleading statements are based," it does require the facts alleged to be "sufficient to support a reasonable belief as to the misleading nature of the statement or omission."  Novak v. Kasaks, 26 F.3d 300, 313-14 fn. 1 (2d Cir. 2000).

In this motion to dismiss, Defendants contend only that the Complaint does not plead sufficient facts to support a reasonable belief that Defendants made material false representations or acted with *scienter*.

B. Defendants' allegedly material misstatements or omissions at the Conference.

i. *Conference Overview*

Defendant Svanberg spoke first at the Conference.  (Kaye Decl., Ex. C at 3-8). He addressed the efforts to increase Ericsson's business, and he discussed market enthusiasm for mobile broadband (HSPA) services and Ericsson's plans to roll out these systems, focusing on Latin America, Russia and India.  (Id. at 4.)  He then spoke of systems upgrades underway in South Africa, Sweden and Malaysia, and how the Company's business models might evolve as demand for data services increased.  (Id. at 5.)  He also discussed Ericsson's progress in increasing its market share and its plans to gain advantages of scale.  (Id. at 5-7.)  Next, Defendant Svanberg spoke of new start-up contracts signed by the Company, while cautioning that new contracts came with "initial costs."  (Id. at 7.)   He then turned briefly to Ericsson's multimedia business, which had

launched at the beginning of the year and which he described as a "little bit bumpy" in its initial phase.  (Id.)

Defendant Svanberg then reviewed Ericsson's first-half 2007 results for five regions: Western Europe, Central and Eastern Europe, Middle East and Africa ("CEMA"), Asia-Pacific ("APAC"), Latin America, and North America.  (Kaye Decl., Ex. C at 7.)  He described the U.S. market as a "bit of a rollercoaster," and he used a slide to show that Ericsson's North American operations had declined by 31% during the first-half of 2007.  (Kaye Decl., Ex. C at 8; Kaye Decl., Ex. D at slide 19.)  In concluding, Defendant Svanberg reiterated Ericsson's objectives of operational excellence and improved cash flow.  (Kaye Decl., Ex. C at 8.)

Defendant Sundstrom spoke next, and he reviewed Ericsson's financial results for the first half of 2007, pointing to the substantial growth in the Asia-Pacific, Central and Europe, Middle East and Africa, and the Central and Eastern Europe regions.  (Kaye Decl., Ex. C at 9-10.)  He then turned to the adverse financial impact of irregular payment practices in those regions and the initiation of turnkey projects in those regions as well, mentioning that the turnkey projects would have a consequent immediate adverse impact on working capital and cash flow, but would in the future lead to capacity expansions along with the advantages of scale.  (Id.)  After Defendant Sundstrom concluded his presentation, the audience engaged in a question and answer period with Defendants.  (Id. at 10-48.)

Keeping the entire context of Defendants' presentation at the Conference, as described above, in mind, the Complaint alleges that Defendants made a number of material misstatements during their presentations, which, in essence, promised strong

3Q07 results.  Each of the alleged material misstatements are set forth in Paragraphs 39 to 43 of the Complaint and will be discussed in turn.

ii. *Paragraph 39*.

Paragraph 39 of the Complaint cites as false and misleading CEO Svanberg's statement describing the worldwide growth in HSPA subscribers:

> A lot of HSPA [High-Speed packet access] roll outs in the pipeline. Actually more than 50 operators are now being added to the list, will be added to the list as in the near future.  Lots of countries that you see there and this goes beyond just the developing markets, developed markets. And here we talk about roll outs throughout Latin America and Russia and India as part of, for example, the DS&L contract – although licenses and frequencies are not yet awarded, but it will come rather quickly in India as well.

(Compl. ¶39; Kaye Decl., Ex. C at 4-5.)

The Complaint alleges that as "Ericsson's competitors were announcing grim forecasts for the third-quarter and beyond," the aforementioned statement demonstrates, without evidentiary support, that "Ericsson's top management went to the podium" to "assure investors that Ericsson was not suffering the same fate as its competitors and was profiting at their expense."  (Compl. ¶39.)  Relying upon two of its three confidential sources who claim to have specific knowledge of the fifty contracts cited by Defendant Svanberg,[3] the Complaint asserts that the fifty new contracts would generate only limited third-quarter revenue.  (Compl. ¶¶50, 75, 79.)

But review of the transcript makes clear that Defendant Svanberg was not addressing revenues, let alone third-quarter revenues, but instead was addressing future subscriber growth potential.  In that regard, he stated that "50 operators are now being added to the list, will be added to the list as in the near future," and that "licenses and frequencies are not yet awarded."  Hence, the Complaint's suggestion that Defendant

---

[3] The confidential sources relied upon by the Complaint are referred to as CS1, CS2, and CS3.

Svanberg was promising substantial revenue growth in the third-quarter is unfounded. First, he appears to correct himself to say that the fifty new contracts "will be added" in the near future.  Second, he acknowledges that "licenses and frequencies" had not even "yet [been] awarded."  As the preceding paragraph of the transcript validates, Defendant Svanberg was discussing future high-speed broadband subscriptions.  Defendant Svanberg described how currently in the world there were 150 million subscribers, that 6 million more were being added each month, and that the Company would meet this demand by rolling out HSPA to the network operators.  (Kaye Decl., Ex. C at 4.)

Further, when read in context with the slide accompanying this aspect of Defendant Svanberg's presentation (Kaye Decl., Ex. D at slide 5), the new contracts he was discussing were primarily in emerging market countries such as "Brazil, Kenya, Macau, Mexico, Nigeria, Russia, Thailand, Ukraine and Uruguay."  Slide 5 clearly states that the subject matter under discussion was "HSPA rollouts in pipeline" and "embedded modems early 2008."  The two confidential sources cited by the Complaint -- who address the 50 new contracts statement by claiming that they provide very little immediate revenue -- are described as reporting, albeit indirectly, to the chief of North American operations.  As part of North American operations of a company with headquarters in Europe, it is not plausible that they would have direct knowledge about HSPA rollouts in the pipeline for the regions cited above, rather, it is likely that they would know only about HSPA contracts in the United States.  (Compl. ¶¶22-24, 50-57.) Thus, the confidential sources Plaintiff relies upon here are not shown to have direct knowledge of the non-U.S. contracts that Defendant Svanberg was discussing at the Conference or the fact that the slide makes clear they were in the pipeline and would not

be embedded until 2008.[4]  See In re Intelligroup Sec. Litig., 527 F. Supp. 2d 262, 360-61 (D.N.J. 2007) (rejecting confidential witness allegations lacking an adequate basis for inferring first-hand knowledge).

Indeed, the confidential sources' information is not inconsistent with Defendant Svanberg's statements at the Summit Conference.  Rather, the sources seemed to have misunderstood what Svanberg said at the Conference.  CS1's statement that the 50 new contracts "were with very small companies from which the Company could not, even with the most positive circumstances, obtain any immediate profits," and "needed time to do build outs," was precisely the point of Slides 5 and 6.  (Compl. ¶50.)

The Complaint's remaining allegations about statements by Defendant Svanberg relate to reduced business in the U.S. from AT&T in 2007.  (Id. ¶¶50-52.)  Svanberg however reported that sales in the United States were down 31% in the first-half of 2007, and he stated that the Company's third-quarter numbers would be seasonable, i.e., lower. (Kaye Decl., Ex. C at 11; Kaye Decl., Ex. D at slide 19.)  CS2's statement is directed to the decline in U.S. sales to AT&T/Cingular and T-Mobile (Compl. ¶¶52-53), and fails to note that Defendant Svanberg made a projection of mid-single digit growth for Ericsson's company-wide third-quarter revenues, and not revenues solely from United States sales which comprised only 7-8% of the Company's business.

CS3 apparently concluded that the 50 contracts cited by Defendant Svanberg were U.S. contracts in small markets such as Texarkana, Arkansas and Biloxi, Mississippi, and with smaller regional companies such as Pocket Wireless, Cincinnati Bell, and Quickit

---

[4] Ericsson's 2007 annual report confirms what Defendant Svanberg was discussing at the Conference concerning the growth in network spending in emerging markets.  The report states that in 2007, "[c]apital spending on mobile networks in emerging markets grew an estimated 17 percent and now represents almost half of the total market."  (Kaye Decl., Ex. B at 24.)  However, "developed markets declined an estimated 8 percent."  (Id.)

(id. ¶¶54, 57), and not the contracts cited in Slide 5, which were located in Brazil, Kenya, Macau, Mexico, Nigeria, Russia, Thailand, Ukraine, and Uruguay.   Based on this misunderstanding that the sales projection was for the United States, CS3 alleged that the September 11 Conference projection of mid-single digit growth "was an astonishing, astronomical figure."   (Id. ¶54.)   However, third-quarter results for the Company were close to Defendant Svanberg's mid-single digit figure (Compl. ¶62; Goldstein Decl., Ex. C [Ericsson's 2007 Third Quarter Report]).   The Complaint does not allege that CS2 or CS3 were present at the Summit or had access to the slides; therefore, the confidential sources erroneously concluded that this projection pertained to the Company's U.S. market results.

The Complaint next quotes the following passage:

> This is a picture that -- what came up there was the added information. The rest was before last time we met.  You can see -- and these are three examples that we follow, two in Western Europe, one in Asia Pacific where we're just seeing what is happening to data traffic in HSPA networks.  And after six months, there was a doubling and now after an additional three months, we're 300% up in these networks.  And it really happens quite quickly.

(Kaye Decl., Ex. C at 4; Compl. ¶39.)  Although this quotation taken in isolation might suggest that it is an estimate of 2007 third-quarter earnings, the slide being explained by Defendant Svanberg demonstrates otherwise.  (Kaye Decl., Ex. D at slide 6).  The slide indicates that Defendant Svanberg was discussing overall data traffic of two Western Europe and one Asian-Pacific operators as evidence of the potential customer use of Ericsson's HSPA once imbedded.  The slide was not a projection of Ericsson's earnings for the third-quarter.  Rather, the slide labeled "data traffic growth, ending June 07" shows quarterly data traffic growth for those operators for the nine months ended June

30, 2007.  (Kaye Decl., Ex. D at slide 6.)  As demonstrated by the slide, the statement was imparting historical information, which the Complaint does not allege is incorrect. Defendant Svanberg's statement was not a projection of either third-quarter 2007 earnings, revenues, or data traffic.  See In re Duane Reade Inc. Sec. Litig., 2003 U.S. Dist. LEXIS 21319, at *22 (S.D.N.Y. 2003) ("Defendants may not be held liable under the securities laws for accurate reports of past successes, even if present circumstances are less rosy"), aff'd sub nom., Nadoff v. Duane Reade Inc., 107 Fed. Appx. 250, 252 (2d Cir. 2004) ("Accurate statements about past performance are self-evidently not actionable under the securities laws…").

   iii. *Paragraph 40.*

   In Paragraph 40, the Complaint cites as materially false and misleading a lengthy quotation of Defendant Svanberg that the Complaint characterizes as a statement concerning "the anticipated growth in mobile networks for the third quarter of 2007." (Compl. ¶40.)   However, the context of the statement (Kaye Decl., Ex. C at 6) demonstrates that Defendant Svanberg's comments were directed at the Company's growth in market share, and not a prediction of revenues or profits.  At the beginning of the quoted passage, Defendant Svanberg explains that an "external report … we're not quoting much of our own estimates" placed the Company's current market share in GSM and HSPA at 45%, which is an increase from "three or four years" earlier when the Company was at 35%.  The Complaint does not contest the accuracy of these market share figures.  In re Sofamor Danek Group, Inc., 123 F.3d 394, 401 n.3 (6th Cir. 1997) ("disclosure of accurate historical data does not become misleading even if less favorable results might be predictable by the company in the future").  In any event, this statement

regarding past growth in market share does not constitute a prediction of earnings growth for the third or fourth quarter, which would depend on profit margins.  Defendant Svanberg also made statements about the profit margins in various sectors for the six quarters leading up through the second quarter of 2007.  (Compl. ¶40, Kaye Decl., Ex. D at slides 15 and 16.)  The slides reflect diminished margins from 2005 and 2006 for the first six months of 2007 in the networks sector as well as for company-wide performance.

The principal statement highlighted in paragraph 40, which the Complaint seeks to portray as falsely promising increased revenue and profits for the third quarter of 2007, was when Defendant Svanberg stated:

> Professional services, I think this is an area that you're familiar with.  Our strategy there is to make sure that we work where we have scale.  How were we on scale?
>
> Which means that focus is always on where we have a fair share of owned products because that's where all our strength starts.  And obviously to make sure that we leverage our capabilities and services there.  If we look at the margins, you can see that what we [found is that they're] around 15% there.  You can also see that in Q3 '06, we actually got a -- quite a lot of start-ups with new contracts that, managed services contracts, that we [wrote in] and there's always initial costs.
>
> We may have a bit of that also in Q3 this year because you know that we took 11 deals only in Q2, and we had deals in Q1 that is also starting up in Q3.  But growth will obviously be strong in Q3 for us here.

(Compl. ¶40; Kaye Decl., Ex. C at 7.)  This statement by Defendant Svanberg referred solely to the "professional services" segment of the Company's business, and the statement did not promise increased revenues or profits for the Company as a whole in the third-quarter of 2007.  (Kaye Decl., Ex. D at slide 17.)  Despite disappointing earnings in the third-quarter of 2007, the third-quarter report of the Company's results highlighted the fact that the professional services segment continued to show "strong

growth and stable margins."  (Compl. ¶62.)  Defendant Svanberg's description of the growth in the professional services segment was an accurate assessment of the results in that segment and was not false and misleading.  (Kaye Decl., Ex. D at slide 14.)

Defendant Svanberg also specifically cautioned that there were "always initial costs" associated with managed services contracts, particularly with those starting in the first and second quarters.  (Kaye Decl., Ex. C at 7.)  Hence, no reasonable investor could conclude from the aforementioned paragraph that Defendant Svanberg was promising revenue or profit gains for the Company in the third quarter.

iii. *Paragraph 41.*

In Paragraph 41, the Complaint claims that Defendant Svanberg "reiterated Ericsson's strong financial positions and his expectations for future growth," when he explained:

> We are in Western Europe so far, 5% up, but it's interesting to see that it's actually 15 compounded over four years, so sometimes we, I think, we have a bit too pessimistic view and it hasn't helped when we were so slow in the second quarter with the standstill in two main markets for us.  But anyway, it's been pretty strong there, of course, a lot driven by services.

(Compl. ¶41; Kaye Decl., Ex. C at 8.) Defendant Svanberg continued on by stating that the Company was in a "good position" and that it expected to "continue to gain share" and "continue to outperform competition."  (Id.)  The Company "expect[ed] to do well in all of the -- key areas."  (Id.)

The Complaint alleges that these were statements of the Company's "expectations for future growth," but there is nothing in those statements that they were anything more than expressions of confidence in the Company's market share vis a vis its competition. Also, as the slides accompanying these statements indicate, Defendant Svanberg was

providing historical market share and historical revenue data for the key segments of Ericsson's business.  (Kaye Decl., Ex. D at slides 15-18.)  Defendant Svanberg did not make a specific promise or prediction of third-quarter results or size of market share.  <u>See In re Worldcom Sec. Litig.</u>, 303 F. Supp. 2d 385, 389-90 (S.D.N.Y. 2004) (dismissing complaint on the basis that a company's "disclosure of accurate historical data" is not actionable under federal securities law).

The statements made by Defendant Svanberg that he expected the Company to continue to do well and gain market share and outperform the competition were, without more, simply expressions of confidence in the viability of Ericsson's future business which do not give rise to a securities violation.  <u>See, e.g.</u>, <u>In re Sierra Wireless Inc.</u>, 482 F. Supp. 2d 365, 373 (S.D.N.Y. 2007) (defendants' "broadly optimistic pronouncements on the future of the [company's] business are considered 'expressions of puffery and corporate optimism,'" which are not securities violations); <u>In re QLT Inc. Fitzer v. Security Dynamics Techs.</u>, 312 F. Supp. 2d 526, 532 (S.D.N.Y. 2004) (same); <u>In re Duane Reade Inc. Sec. Litig.</u>, 2003 U.S. Dist. LEXIS 21319, at *15 ("company's statements of hope, opinion, or belief about its future performance or general market conditions are not actionable under the securities laws"); <u>see also</u> <u>Lasker v. N.Y. State Elec. & Gas Corp.</u>, 85 F.3d 55, 58 (2d Cir. 1996) (predicative statements of opinions and belief are not considered material for purposes of the securities laws).

    iv. *Paragraph 42.*

In Paragraph 42, Defendant Sundstrom explained the importance of large, turnkey projects for Ericsson:

> Large projects are for the third-year in a row our biggest growth engine. Most of the sales in networks are actually turnkey today.  And I will come

back to that, coming back to the regional pictures.  Large projects are very
good for Ericsson.  We have unique capabilities, we get premium priced,
but more importantly, we are getting an installed base where we can
leverage expansion and capacity enhancement in the installed base later
on.

(Comp. ¶42; Kaye Decl., Ex. C at 9.)   While the Complaint contends that the

aforementioned statements were indicative of future growth, in actuality, as the two

paragraphs in the transcript preceding this quotation indicate, Defendant Sundstrom was

discussing historical data concerning turnkey projects from the first half of 2007.  (Kaye

Decl., Ex C at 8.)   Further, Defendant Sundstrom cautioned that these large turnkey

networks projects would reduce "working capital and cash flow" in the short run because

they required early investment of capital.  (Kaye Decl., Ex. C at 9; see also Kaye Decl.,

Ex. B at 24 ("network construction and expansion in emerging markets … are increasing

provided on a turnkey basis which, by its very nature, dilutes short-term margins and cash

conversion because of substantial installation, systems integration, and third-party

content.")   Lastly, during the question and answer period following the presentation,

Defendant Svanberg made clear that margins for turnkey projects were less favorable in

their early years because: "initial roll outs where you have often more tougher

negotiations, which then gives way for many years of expansions, is tougher margins."

(Kaye Decl., Ex. C at 26.)   Contrary to the Complaint's contentions, the statements

concerning the growth in turnkey projects  were focused on long-term strategy and did

not address short-term profitability or project in any way third or fourth-quarter financial

results for the Company.

  v. *Paragraph 43*.

   In Paragraph 43, the Complaint, without citing the question, quotes Defendant

Svanberg as stating that the Company was "expecting a seasonal third quarter," and that

"like last year we had a little bit of a more back-loaded second half, and I think that's still the comment we make."  (Compl. ¶43).  The Complaint interprets this as a "particularly telling" remark, and one that, based on past performance, predicted "strong" third-quarter results.  (Compl. ¶46.)

However, viewed in the context of Defendant Svanberg's response to the question of Matt Hoffman, an analyst with the investment bank Cowen and Company, it is clear that rather than predicting a strong third-quarter, in fact, Defendant Svanberg was indicating that third-quarter results would be weaker.

> *Question*: Seasonally, the third-quarter is a little bit weaker for the networks business, historically, but in -- again, in your comments you commented earlier on the professional services maybe being a little bit better here in the third quarter.  Could the overall corporate top line bump that trend, or are we expecting still a seasonal type of third quarter here?  Thanks.
>
> *Answer*: Yes, we are expecting a seasonal third-quarter.  And we also said that, as we did last year, that there is -- we have a bigger proportion of larger projects now.  And larger projects tend to sort of be started more in the beginning of the year and finished at the end of the year.  So like last year we had a little bit of a more back-loaded second half, and I think that's still the comment we make.

(Kaye Decl., Ex. C at 11.)[5]  Thus, contrary to the Complaint's allegations, the use of the term "seasonal" by Defendant Svanberg was not a prediction of strong third-quarter results, but rather agreement that "seasonally the third-quarter is a little bit weaker."

---

[5]      That the term "seasonal" refers to weaker results in the third-quarter is confirmed by analyst reports.  See Bovee v. Coopers & Lybrand, 272 F.3d 356, 360-61 (6th Cir. 2001) (Court may take judicial notice of analysts' reports).  A September 13, 2007 Lehman Brothers report indicated that "[t]here have been no opportunities to raise revenue estimates, accentuated by management guiding for stronger than normal seasonality in Q3 and Q4 (i.e. stronger than normal declines in Q3 and gains in Q4), while margin levels have eased."  (Goldstein Decl., Ex. A) (emphasis added).  A similar September 12, 2007 report from Natixis Securities stated that "Ericsson confirmed its usual seasonal trends for Q3 for mobile networks (turnover down sequentially around 5%) and low capex in the US, with AT&T currently focusing on the integration of SBC and Bellsouth."  (Id. at Ex. B) (emphasis added).

v. *Paragraph 44.*

In paragraph 44, the Complaint cites what it characterizes as the "Company's projections for 2007":

> Well if you look at the mobile infrastructure as we see it, and that is the figure you're after, mobile infrastructure market we see growing now in mid-single digits in U.S. dollars and all of that.

(Compl. ¶44; Kaye Decl. Ex. C, at 13.)  This statement was simply a reiteration of the Company's early guidance of "mid-single digit growth" in revenues.  (Compl. ¶¶26, 30.)  And while Plaintiff alleges that this is a false statement, and that according to CS3 the predictions of mid-single digit growth were unrealistic (Compl. ¶57), in fact, year-over-year the Company's worldwide revenues grew by 6% during the third-quarter of 2007.  (Compl. ¶62; Goldstein Decl. Ex. C [Ericsson's 2007 Third Quarter Report]; see also Kaye Decl. Ex. B at 22 ("Ericsson increased sales by 4 percent … in 2007.")  Put simply, revenue growth was as predicted by Defendants.

vi. *Statements concerning AT&T (Paragraphs 44*, 51-52.)

Lastly, the Complaint alleges that Defendant Svanberg misled the market by failing to disclose, or to take into account in his statements concerning revenue growth, that Ericsson's largest U.S. customer (AT&T) had reduced its business in 2007.  (Compl. ¶¶45, 51-53.)  In support of this allegation, the Complaint points to Defendant Svanberg's response to an analyst's question regarding the Company's expected revenues from the AT&T/Cingular contract:

> Coming back to your question on AT&T and T-Mobile, when it comes to AT&T first, we've done the initial roll out.  There is still more roll out and capacity build out that is needed.  They have been a bit slower this year and if you talk to them they will probably even say publicly that they've been so focused on all the mergers and so on, so they haven't been too much into expanding networks.

> They see that need that is there and they have fairly recently also stated
> that they are adding US$1 billion to what they had otherwise planned in
> 2008 for additional investments.  Remember that is CapEx in total with
> everything that comes to it, everything doesn't translate to telecom
> equipment.  And it's in total for AT&T, but a lot of that is focused on the
> mobile side.

(Compl. ¶45, Kaye Decl., Ex. C, at 28.)  While the Complaint claims that the Company

failed to disclose that business from AT&T had been reduced, the aforementioned

statement contradicts that claim.  Defendant Svanberg specifically stated business from

AT&T had been a "bit slower this year and if you talk to them they will probably even

say publicly that they've been so focused on all the mergers and so on, so they haven't

been too much into expanding networks."  (Compl. ¶45.)

Nonetheless, the Complaint asserts that the use of the phrase "a bit slower"

constitutes fraud because, according to CS3, Company sales to AT&T were likely to be

between $1.5 billion and $1.8 billion in 2007, down from $2.2 billion in 2006, a drop of

more than $500 million (between 18 and 31%).  (Compl. ¶55.)  However, Defendant

Svanberg's comment, which in the English vernacular can be used as an understatement

of the obvious, cannot be considered in isolation, as Defendant Svanberg then explained

that AT&T was focusing on absorbing its recent mergers and was not as aggressively

expanding its networks upon which the Company's contract with AT&T depended.

Further, this allegation in the Complaint overlooks that earlier in his presentation

Defendant Svanberg had projected a slide demonstrating that North American sales,

which totaled 6.1 billion Swedish Kroner in the first-half of 2007, had declined by 31%

from that same period in 2006.  (Kaye Decl., Ex. D at slide 19.)  At that point, when

addressing the AT&T contract and describing it as a "bit of rollercoaster," Defendant

Svanberg referred to the slide noting a 31% decline in North American sales.  (Kaye Decl., Ex. C at 8.)  This 31% drop projected to investors mirrors the 18.2% to 31.8% decline in revenue from the AT&T contract that CS3 alleged was reflected in "internal Company reports and the Company's internal tracking system."  (Compl. ¶55.)  Thus, the Company's statements concerning the decline in revenue from AT&T were accurate.  See Tuchman v. DSC Communications Corp., 14 F.3d 1061, 1069 (5th Cir. 1994) (defendants are "under no duty to employ the adjectorial characterization that the plaintiffs believe is more accurate").

Accordingly, the Complaint does not allege facts that would support a reasonable belief that Defendants made any false or misleading statements.

C. Scienter

In addition to pleading sufficient facts to establish that Defendants made a false or misleading statement under Rule 10b-5, the Complaint must also allege facts supporting an inference of *scienter*.  A plaintiff can establish *scienter* "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud," or, "(b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  Kalnit v. Eichler, 264 F.3d 131, 138 (2d Cir. 2001); see also ATSI Communs., Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007); Rothman v. Gregor, 220 F.3d 81, 90 (2d Cir. 2000).  Here, the Complaint does not allege that Defendants had a "motive and opportunity to commit fraud."[6]  Rather, the Complaint contends that there

---

[6]     That Defendants "pre-announced" the third-quarter results -- voluntarily disclosed Ericsson's financial results earlier than was required (Compl. ¶62) -- undermines any claim of motive.  See, e.g., Rombach, 355 F.3d at 176-77 ("The allegation that defendants behaved recklessly is weakened by their disclosure of certain financial problems prior to the deadline to file its financial statements"); In re Nokia Corp. Sec. Litig., 1998 U.S. Dist. LEXIS 4100, at *13 (S.D.N.Y. 1998) ("if anything the fact that [defendant] voluntarily chose to issue a press release earlier than its standard year-end reporting … undercuts the allegation that defendants were acting recklessly").

is "strong circumstantial evidence" of Defendants' "conscious misbehavior or recklessness." (Compl. ¶51.)  The PSLRA requires that a plaintiff state with particularity facts giving rise to a strong inference that a defendant acted with intent to deceive. Tellabs, 127 S. Ct. at 2508.

A strong inference of conscious misbehavior or recklessness arises when defendants (1) engage in deliberate illegal behavior, (2) knew or should have known that they were misrepresenting material facts, or (3) failed to check information they had a duty to monitor.  Novak, 216 F.3d at 308-09; see also Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., 531 F.3d 190, 194 (2d Cir. 2008).  In this context, recklessness is not "merely enhanced negligence."  In re JP Morgan Chase Sec. Litig., 363 F. Supp. 2d 595, 624 (S.D.N.Y. 2005).  Rather, at the very least, it is "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."  Id. at 624-25; see also SEC v. McNulty, 137 F.3d 732, 741 (2d Cir. 1998); Chill v. General Electric Co., 101 F.3d 263, 269 (2d Cir. 1996).  An allegation "that a defendant merely 'ought to have known' is not sufficient to allege recklessness."  Hart v. Internet Wire, Inc., 145 F. Supp. 2d 360, 368 (S.D.N.Y. 2001); see also In re Am. Express Co. Sec. Litig., 2008 U.S. Dist. LEXIS 74372, at *15 (S.D.N.Y. 2008).

The initial problem with the Complaint's *scienter* allegation here is that it fails to allege Defendants' knowledge or access to contradictory facts with sufficient particularly. Plaintiffs in Section 10(b) actions must "specifically allege[ ] defendants' knowledge of facts or access to information contradicting their public statements."  Novak, 216 F.3d at

308-09.  "Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information."  Id. (citing San Leandro Emergency Medical Group v. Philip Morris, 75 F.3d 801, 812 (2d Cir. 1996)) ("Plaintiffs' unsupported general claim of the existence of confidential company sales reports that revealed the larger decline in sales is insufficient to survive a motion to dismiss.")

Here, the Complaint fails to identify any reports Defendants Svanberg or Sundstrom saw, or any conversations in which they were provided information, that was inconsistent in any way with their public statements.  Indeed, all three of Plaintiff's confidential sources were mid-level managers in the United States who claim no contacts or communications with Defendants, or even with Ericsson's European corporate headquarters.[7]  See In re Elan Corp. Secs. Litig., 543 F. Supp. 2d 187, 219 (S.D.N.Y. 2008) (allegations based on confidential sources were insufficient to establish *scienter* where there were no facts to establish that the confidential sources would have known what information was communicated to senior executives).  Instead, the Complaint ascribes Defendants with *scienter* based on the generalization that "as key officers of Ericsson," Defendants "knew of facts or had access to information" contradicting their public statements regarding the Company's revenue projections, the 50 new HSPA contracts, and the business dealings with AT&T.  (Compl. ¶¶73-77.)

---

[7]      Confidential Source 1 ("CS1") was a manager of unknown rank in the Company's "Configuration Management" department.  (Compl. ¶22.)  Confidential Source 2 ("CS2") was a senior director for delivery control at Ericsson from March 2002 to March 2007, and he reported to a Vice-President for Infrastructure Delivery.  (Compl. ¶23.)  Not only did CS2 leave the Company six months prior to the allegedly fraudulent comments made by Defendants, but he was at least four hierarchical levels away from Defendants, and he was based in the United States.  (Compl. at ¶23.)  Confidential Source 3 ("CS3") was also a former Ericsson "senior director" who reported to North America's Vice President of Operations, but he too was four hierarchical levels away from Defendants.  (Compl. ¶24.)

Yet the Complaint identifies none of this adverse information other than stating, generically, that it was contained in various "internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof, and via reports" and "internal non-public reports" provided to Defendants.  (Compl. ¶¶16-17, 73, 78.)  These boilerplate allegations are not a sufficient basis for alleging *scienter*.  San Leandro, 75 F.3d at 812-13; Goplen v. 51job, Inc., 453 F. Supp. 2d 759, 773 (S.D.N.Y. 2006) ("bare assertions [that defendants, due to their high-level positions in the Company, had access to adverse undisclosed financial information through internal corporate documents, meetings, and reports], without any further facts or details, do not adequately demonstrate defendants' knowledge of facts or access to information contradicting their public statements"); In re Aegon N.V. Sec. Litig., 2004 U.S. Dist. LEXIS 11466, at *17 (S.D.N.Y. 2004) (allegations that "defendants had access to adverse undisclosed information because of their senior positions with the company" are insufficient).

Indeed, it is unsurprising that Plaintiff cannot provide specific information contradicting Defendants' public statements at the Technology Summit.  The conference was held on September 11, 2007, three weeks before the close of the third-quarter.  Yet as Ericsson's 2007 annual report confirmed, it was not until "late in the third-quarter" that "sales in certain markets unexpectedly declined sharply."  (Kaye Decl., Ex. B at 13.) "In the third quarter, there was an unexpected shift in the business mix, with a relatively higher proportion of new network sales and a lower proportion of expansions and upgrades sales, resulting in significantly lower markets."  (Id. at 23.)  The "degree and speed of margin compression within Networks was unexpected."  (Id.)  Thus it is highly

likely that at the time of the Technology Summit neither the Company nor the individual Defendants realized that the operating margins related to the network sales would be significantly lower for the third-quarter.

The Complaint's additional bases for *scienter* fare no better.  The Complaint asserts that it "was well-known within the Company that AT&T Cingular, Ericsson's largest U.S. customer, was scaling back its Ericsson purchases for 2007," and that this information "contradicted Defendants' public statements."  (Compl. ¶¶74, 78.)  However, this is not an adequate basis for *scienter* because Defendant Svanberg, in fact, explained at the September 11 Conference that AT&T had been absorbing two mergers "so they haven't been too much into expanding networks" (ordering equipment from Ericsson), and as a result, sales had been a "bit slower this year," referring to 2007.  (Kaye Decl., Ex. C at 28.)  He expected an overall increase of $1 billion in capital expenditures by AT&T in 2008.  (Id.)

Defendant Svanberg also posted a slide showing a 31% decline in North American revenue for the first-half of 2007.  Additionally, Plaintiff cites no evidence that Defendants had knowledge that the slowdown in purchases from AT&T would potentially affect the third-quarter 2007 earnings of the Company or that the downturn in revenue from AT&T was of such a magnitude that Defendants necessarily would or should have known that it would materially affect the Company's third-quarter performance.  After all, the confidential sources cited by Plaintiff alleged that AT&T revenues were expected to drop by $.5 to $.8 billion, only 2 to 3% of the Company's total 2007 revenues of $28.1 billion.  (Compl. ¶55.)  See, e.g., 380544 Canada, Inc. v. Aspen Tech., 544 F. Supp. 2d 199, 225-26 (S.D.N.Y. 2008) (rejecting argument that corporate

officers should have known of transactions that caused a restatement of operating income by 33% in one year and 5.8% in another year).

Next, the Complaint alleges *scienter* in connection with the "50 new HSPA contracts that Defendants touted at the September 11 Conference," claiming that the "agreements and terms were readily available to Defendants" and a review of the contracts would have demonstrated that the revenue provided by these contracts was minimal. (Compl. ¶¶75-76.)  However, as explained, Defendants remarks about the new contracts were cited to show the Company's continued market share growth in the Latin American and Russia and Indian markets, and not for Ericsson's third-quarter 2007 earnings and revenues.  In fact, Defendant Svanberg specifically stated that some of the licenses and frequencies had not yet been "awarded." (Compl. ¶39; Kaye Decl., Ex. C at 4.)  Defendants were clearly addressing future subscriber growth potential in developing markets.  Additionally, as noted, simply claiming that Defendants, due to their senior positions within the Company, should have had insight into the potential revenues received from the contracts, is inadequate.

Lastly, the Complaint alleges *scienter* based on the fact that "Ericsson's chief competitors, Alcatel-Lucent, Nokia, Nortel and Adtran each disclosed to their investors that the market for network systems was 'tightening'" and warned their investors that "earlier revenue projections would be reduced." (Compl. ¶¶81-83.)  These statements, Plaintiff contends, put Defendants on notice prior to the September 11 conference that their revenue projections for the third-quarter would likewise fall short.

However there is little basis to assume that a decline in projected revenue for Ericsson's competitors would necessarily lead to a decline in Ericsson's projected

revenues as well.  This is particularly true in an industry where companies are competing with each other for market share.  (Compl. ¶38 [quoting from an online news article -- one analyst commented that "the message is clear Ericsson (ERIC) is trying to crush its smaller rivals Nokia, Siemens, Nortel and Alcatel-Lucent (ALU) like a trio of June bugs"].)  Moreover, while the Complaint cites to other companies projected declines in revenue as an ominous sign for Ericsson, the simple fact is that Ericsson's guidance with respect to revenues -- that it expected a mid-single-digit increase (Compl. ¶¶26, 33, 44) -- proved accurate.   In the third-quarter of 2007 year-over-year sales increased 6%.  (Compl. ¶62.)  Furthermore, the Company's slides showed that its first and second-quarter 2007 operating margins on net sales had slightly declined from the fourth-quarter of 2006.  (Kaye Decl., Ex. D at slide 15.)

Hence, Plaintiff has failed to allege any facts giving rise to a strong inference of *scienter.*

D.    Section 20(a) Claims

To establish a prima facie case of liability under Section 20(a), a plaintiff must show, *inter alia*, a primary violation" of the Exchange Act.  In re Alstom SA Sec. Litig., 454 F. Supp. 2d 187, 209 (S.D.N.Y. 2006) (quoting Boguslavsky v. Kaplan, 159 F.3d 715, 720 (2d Cir. 1998)); see also 15 U.S.C. 78t(a).  Because the Complaint fails to allege a primary violation by a controlled person, Defendants' motion to dismiss the Section 20(a) claim is granted.

**CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss is granted and the Complaint is dismissed in its entirety.


IT IS SO ORDERED.

Dated: New York, New York
December 10, 2008

Robert P. Patterson, Jr.
U.S.D.J.

**Copies of this Opinion and Order sent to:**

*Attorneys for Plaintiff*
Murray, Frank & Sailer LLP
Attn: Brian Murray
275 Madison Avenue, Suite 801
New York, NY 10016
(212) 682-1818
Fax: (212) 682-1892

*Attorneys for Defendant*
Paul, Weiss, Rifkind, Wharton & Garrison
Attn: Daniel Kramer
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000
Fax: (212) 373-4020